UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| v. ) | Criminal No: 11-CR-10201-NMG |
| ) | |
| ) | |
| ROBERT A. GEORGE ) | |

**Motion to Dismiss and Incorporated Memorandum of Law**
**(Motion For Leave to File Granted on October 20, 2011)**

Now comes the Defendant, Robert A. George, by and through undersigned

counsel, pursuant to the Fifth and Sixth Amendments to the United States Constitution

and Rule 12(b)(3) of the Federal Rules of Criminal Procedure, and hereby moves the

Court for an evidentiary hearing, an order for discovery, and, ultimately, dismissal of the

indictment returned in this case, because the investigation, indictment, and prosecution of

Mr. George violates the Fifth Amendment's Due Process Clause and the Sixth

Amendment's right to effective assistance of counsel.  As grounds and reasons therefore,

the defendant states the following:

1. Should the Court conclude that the government has targeted Mr. George

for prosecution, and in so doing manufactured and/or created the criminal conduct

charged in this case from whole cloth, the government has engaged in outrageous

misconduct, and the instant prosecution is barred by the Due Process Clause, which

forbids government conduct that "shocks the conscience," "interferes with rights 'implicit

in the concept of ordered liberty,'" or constitutes "the arbitrary exercise of the powers of

government."  *See, e.g. County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998);

*United States v. Salerno*, 481 U.S. 739, 746 (1987); *Wolff v. McDonnell*, 418 U.S. 539,

1

558 (1974); *Rochin v. California*, 342 U.S. 165, 172 (1952); *Palko v. Connecticut*, 302 U.S. 319, 325-326 (1937); *Hurtado v. California*, 110 U.S. 516, 527 (1884); *United States v. Santana*, 6 F.3d 1 (1st Cir.1993).

2.  To the extent the Court concludes that the indictment of Mr. George constitutes a vindictive prosecution, because of Mr. George's prior representation of a federal defendant convicted of ███████████████████████████████ and the government's erroneous belief that Mr. George was holding forfeitable assets the charged defendant intended to use to ███████████████, such a conclusion would support a finding of outrageous government misconduct, and would also be a basis to dismiss the indictment pursuant to the Due Process Clause. *See Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038 (1962); *United States v. Batchelder*, 442 U.S. 114, 125 (1979); *United States v. Jarrett*, 447 F.3d 520, 525 (7th Cir.2006).

3.  There are presently critical and relevant facts unknown and unknowable to the defense.  Hence, rather than draw hard conclusions, Mr. George moves herein for an evidentiary hearing, which is appropriate in circumstances, such as here, where "material facts are in doubt or dispute." *See United States v. Colon-Munoz*, 318 F.3d 348, 358 (1st Cir.2003), *citing United States v. Panitz*, 907 F.2d 1267, 1273 (1st Cir.1990).

4.  The Court will reach its own factual determinations, and the defense does not seek to engage in unnecessary hyperbole, but at least three matters appear clear from the facts now known to the defense: (1) the tape-recorded conversations in this case raise serious doubts regarding the evidentiary force, and legitimacy, of the government's case, (2) the government, through its cooperating witness, pursued and targeted Mr. George, continued to pursue him even after he rejected the government's overtures, and ultimately

became "the creative brain behind the illegal scheme" charged in this case, *Russell*, 411

U.S. at 439 (Douglas, J., dissenting), and (3) the U.S. Attorney's Office for the District of

Massachusetts labors under, at the very least, the appearance of serious conflicts of

interest, given that ▇▇▇▇▇▇, the prosecutor who was targeted ▇▇▇▇▇ by Mr.

George's former client, and whom is now ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇ reportedly has been personally involved in the investigation and/or

prosecution of Mr. George.

The defendant further relies upon the memorandum of law submitted in

support of the instant motion.

### REQUEST FOR ORAL ARGUMENT

The defendant respectfully requests oral argument on the within motion.

### LOCAL RULE 7.1 CERTIFICATION

The defendant conferred with the United States in an unsuccessful attempt to

narrow or resolve these issues.

### Memorandum of Law

I.    *Controlling Legal Principles.*

The Due Process Clause and the Court's inherent supervisory powers provide the

Court with the authority to dismiss an indictment when the government has engaged in

outrageous misconduct, *i.e.*, "conduct that 'shocks the conscience,' *Rochin v. California*,

342 U.S. 165, 172 (1952), or interferes with rights 'implicit in the concept of ordered

liberty,' *Palko v. Connecticut*, 302 U.S. 319, 325-326 (1937)." *United States v. Salerno*,

481 U.S. 739, 746 (1987); *see United States v. Santana*, 6 F.3d 1, 4 (1st Cir.1993),

*quoting United States v. Russell*, 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366

(1973) (noting that a prosecution will be barred if the government has engaged in conduct that violates "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment"); *United States v. Nunez*, 146 F.3d 36, 38 (1st Cir.1998) (question of whether the government committed misconduct so outrageous as to warrant the dismissal of charges is a question of law); *United States v. Matiz*, 14 F.3d 79, 82 (1st Cir.1994). Where, as here, the government initiates criminal activity, as opposed to merely infiltrating an on-going criminal enterprise, and becomes the "creative brain behind the illegal scheme," the government has engaged in outrageous misconduct. *See, e.g.*, *Russell*, 411 U.S. at 439 ("Federal agents play a debased role when they become the instigators of the crime, or partners in its commission, or the creative brain behind the illegal scheme") (Douglas, J., dissenting); *Sherman v. United States*, 356 U.S. 369, 383-384, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) ("The power of government is abused and directed to an end for which it was not constituted when employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law.") (Frankfurter, J., concurring); *Sorrells v. United States*, 287 U.S. 435 (1932) ("courts must be closed to the trial of a crime instigated by the government's own agents") (Roberts, J., concurring).

An improper motive or ulterior purpose for creating the criminal conduct is not a necessary element of establishing outrageous government misconduct, but it can be a relevant consideration. Moreover, a prosecution premised upon vindictiveness can serve as an independent basis for dismissal. *See Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038 (1962) (government's "broad discretion" to enforce Nation's laws is "subject

to constitutional constraints"); *United States v. Batchelder*, 442 U.S. 114, 125 (1979)

("To punish a person because he has done what the law plainly allows him to do is a due

process violation of the most basic sort . . .."); *United States v. Jarrett*, 447 F.3d 520, 525

(7th Cir.2006) ("The Constitution prohibits the government from undertaking a

prosecution based solely on a vindictive motive").

     Through this memorandum and (if permitted) during an evidentiary hearing, Mr.

George will establish that the government created, from whole cloth, the charged crimes,

that the government became the "instigators of the crime, or partners in its commission,

or the creative brain behind the illegal scheme," and implemented the plan by and

through a long-time government informant, Ronald Dardinski ("Dardinski," herein), and

perhaps did so for the improper purpose of seeking retribution upon Mr. George for his

prior, rightful representation of a defendant subsequently charged with █████████

████ the Assistant U.S. Attorney prosecuting an underlying fraud indictment.  In so

doing, by promoting rather than detecting crime, by seeking the downfall "of those who,

left to themselves, might well have obeyed the law," the government abused its power

and directed it to an end for which it was not constituted. *Sherman*, 356 U.S. at 383

(Frankfurter, J., concurring).

II.    *Evidence Government Manufactured Crime From Whole Cloth.*

    A.    Mr. George rebuffs the government agent's overtures and has no contact
          with alleged co-conspirator (Hansen) during relevant time period.

     The evidence that Mr. George conspired with Michael Hansen ("Hansen," herein)

from February 2009 to June 8, 2010 to launder cash provided by Dardinski (Count One),

and/or that he aided and abetted the two transactions between Dardinski and Hansen

(Counts Two and Three) is virtually non-existent. **First**, and foremost, on December 7,

2009, during a conversation secretly recorded by the government, Mr. George told the government's cooperating witness, Dardinski, in no uncertain terms, <u>no less than fourteen (14) times,</u> that he would not be involved in Dardinski's financial dealings with Michael Hansen, the owner of a well-established mortgage company who, on two different occasions (December 16, 2009 and April 15, 2010), provided Dardinski an $80,000.00 check in return for $100,000 in cash (all statements are Mr. George unless otherwise noted):

- <u>Dardinski</u>: I'm going to make [a check] out to a company and then he's [Hansen]. . . going to make it out to – I guess to you…
  <u>George</u>: **No, no, no, no**---that's –why—**let me ask you something… Why am I involved in this?**

- Tell him [Hansen] to give me a call . . . **because I'm not doing anything . . . I thought this was just him [Hansen] and you**… And **now he's [Hansen] trying to bring me in. He's trying to leverage it to get me involved.**

- I don't know why he [Hansen] wants me involved.

- **I trusted him because I thought that he was strictly going to do business with you straight up . . . I wasn't making anything on the deal.**

- **Ronny, why would I take—why would I get involved**…

- **No, I'm not … listen. You know I'd do anything but I'm not getting involved.**

- Yeah, you can have him call me **but I'm not getting involved unless—** you know, the check should go directly from him to you, … or from him to a company. **But I'm not—I'm not involved in this.**

- **I mean, you're one of my clients, but personally there's nothing but trouble in it for me. I'm not getting involved.**

- I'm not profiting from it . . . he's the one who wants to make the money, let him do the deal. **Like I have anything to do with it.** I referred you to him because I knew that he would help you.

- Tell him what I said . . . but I don't see—**there's no way that I would get myself involved in something where I'm not—you know, where I'm not involved**.

- Meaning I'm not doing a closing, I'm not doing any kind of legal work....

- Because I have nothing to do with this.

- Dardinski: I just figured it would insulate me through you, you know what I mean?
  George: **Yeah, but what it does is it implicates me in something I have nothing to do with**.

- **I'm not saying I don't trust him, Ronny. I'm saying I'm not involved. I can't do this kind of business. I don't run this kind of business**.

- **I mean, I'm a friggin lawyer. Where am I lending money and making money for? I can't—I'm not doing that**.

- Before all I was doing – because you were a friend of mine I was putting you together with a guy that could lend you the money.

- **It had nothing to do with me in the first place...You strictly asked me if you knew anybody—I knew anyone that would lend you the money. Okay. What else is going on?**<u> **I don't want to talk about that anymore.**</u>

December 7, 2009 Transcript, attached hereto as Exhibit 3, at 5-9 (emphasis added).

**Second**, according to records now in the possession of the defense, Mr. George did not

speak to Dardinski again until April 26, 2010, eleven days **after** the second charged

transaction (April 15, 2010) and four months **after** the first charged transaction

(December 16, 2000), *see* Indictment, Dkt. Entry 8, Counts II and III.   **Third**, Mr. George

stopped speaking to Hansen, the only co-conspirator in this case,[1] in early April 2009,

more than eight (8) months before the first charged transaction (December 16, 2009), and

---

[1] In a discovery letter dated May 5, 2011, the government identified Hansen as the only known, unindicted co-conspirator.  Discovery Letter, dated May 5, 2011, attached hereto as Exhibit 4.  Dardinski was at all times a government agent and therefore by law could not be a co-conspirator. *See, e.g., United States v. Giry*, 818 F.2d 120, 126 (1st Cir.1987) ("[I]n situations where the conspiracy involves only [one] defendant and a government [agent,] ... there can be no conspiracy because it takes two to conspire and the government [agent] is not a true conspirator.").

they did not speak again until July 2010, well after the second charged transaction, and only after the government persuaded Hansen to become a cooperating witness against Mr. George. **Fourth**, Mr. George was not present and did not participate in either of the two charged transactions, and subsequent (tape-recorded) conversations demonstrate he was not even aware that they occurred. **Fifth**, Hansen has repeatedly told the government in proffer sessions, before and after Mr. George's arrest, that he did not know or believe the funds derived from unlawful activity, but instead believed the money derived from Dardinski selling repossessed vehicles. *See* Exhibit 5 (compendium of DEA-6 Reports). **Sixth**, and finally, as late as June 1, 2010, Mr. George was telling Dardinski he would not get involved in his dealings. *See* June 1, 2010 Transcript at 12-13 ("**Not getting involved in it . . .The only way you take care of me, Ronny, is you refer me business. That's it. And you haven't referred me a [ ] case ever**") (emphasis added).

Given all of the foregoing, particularly Mr. George's unwavering and unequivocal rejection of Dardinski's overtures, crystalized in the December 7, 2009 conversation (recorded unbeknownst to Mr. George), the government's decision to charge Mr. George with conspiring with Mr. Hansen, and/or aiding and abetting Hansen's transactions with Dardinski, is simply without an adequate evidentiary basis. *See United States v. Gomez-Rosario*, 418 F.3d. 90, 105 (1st Cir.2005) (government must prove that "an agreement existed to commit the underlying substantive offense, and that the defendant elected to join the agreement, intending that the underlying offense be committed") (*quoting United States v. Medina-Martinez*, 396 F.3d. 1, 5 (1st Cir. 2005). As a matter of law, "mere association" with others, "mere presence" at the scene and/or "mere knowledge" of illegal activity cannot alone establish knowing participation. *See United States v.*

*Dellosantos*, --- F.3d ---, 2011 WL 2011 WL 3569334, *5 (1ˢᵗ Cir. Aug. 16, 2011)

(reversing convictions) ("agreement is the *sine qua non* of a conspiracy, and this 'element

is not supplied by mere knowledge of an illegal activity . . ., let alone by mere association

with other conspirators or mere presence at the scene of the conspiratorial deeds'");

*United States v. Pérez-González*, 445 F.3d 39, 49 (1st Cir. 2006) (same)); *United States v.*

*Nelson-Rodriguez*, 319 F.3d 12, 28 (1ˢᵗ Cir.2003).[2]

B.    Evidence that government agent targeted Mr. George.

The defense has accumulated significant evidence that Dardinski targeted Mr.

George, a fact that utterly undermines the government's contention that Dardinski

*fortuitously* had a "chance encounter" with Mr. George at the South Shore Plaza in March

2009. **First**, in January 2009, a month or two before the alleged "chance encounter" and

almost immediately upon his release from prison, Dardinski began telephoning Mr.

George's law office seeking a meeting.  Exhibit 7 (Affidavit of Susan Jacobson); Logs

From George Law Office, attached hereto as Exhibit 11 (demonstrating calls on 1/21/09,

2/3/09, 2/9/09, 2/10/09 and 2/13/09).  Each time, Dardinski left a message for Mr.

George, and on at least one occasion (February 13ᵗʰ) referenced a purported court date in

the Norfolk Superior Court of April 17, 2009. *See, e.g.*, Exhibit 7 (Jacobson Affidavit);

Exhibit 11 (Office Logs).

---

[2] For all of the foregoing reasons, Counts Two and Three fail as well. The government cannot prove that Mr. George aided or abetted the December 16, 2009 or April 15, 2010 transactions, as charged in Counts Two and Three, because, *inter alia*, the evidence demonstrates Mr. George did not possess an intent that the crime be committed, nor did he commit some affirmative act of assistance in the commission of the substantive crime. *See, e.g., United States v. de la Cruz-Paulino*, 61 F.3d 986, 998 (1ˢᵗ Cir.1995) (after quoting "classic definition of aiding and abetting, first enunciated by Learned Hand," court holds that for defendant "to have been convicted under an aiding-and-abetting theory, the government had to prove (1) that Díaz–Pérez committed the underlying substantive crime and (2) that de la Cruz–Paulino shared Díaz–Pérez's criminal intent"); *Id.* ("[m]ere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt; nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting").

**Second**, after the South Shore Plaza meeting, Dardinski began to hunt Mr. George, but engaged in selective recording of conversations. In the fourteen (14) months between February 20, 2009 (the approximate date of the South Shore Plaza meeting) and April 26, 2010, (eleven days after the second charged transaction), Dardinski recorded only seven (7) conversations with Mr. George: (1) March 18, 2009, (2) March 31, 2009, (3) April 6, 2009, (4) August 11, 2009, (5) August 14, 2009, (6) December 7, 2009, and (7) April 26, 2010.[3] Yet, while Dardinski's tape recordings are sporadic and inconsistent, with literally months passing between recorded conversations, he is at times incessantly telephoning Mr. George. For example, from August 17th to August 18th, 2009, Dardinski telephones Mr. George twenty-two (22) times. From August 14, 2009 to December 7, 2009 (when Mr. George tells Dardinski he will not be involved), Dardinski calls Mr. George fifty-five (55) times (and Mr. George apparently returns only three (3) of the calls). The following facts bear emphasis:

- Between December 7, 2009 and April 15, 2010 (the date of the second charged transaction), Mr. George does not speak to Dardinski at all.

- After December 7, 2009, the next recorded conversation between Dardinski and Mr. George (the seventh) occurred on April 26, 2010—eleven days after the second charged transaction.

- Between December 7, 2009 and April 15, 2010, Dardinski called Mr. George a total of ten (10) times, leaving two voicemail messages (December 21, 2009 and January 11, 2010). **Mr. George does not return any of these calls, at all**.

- Mr. George and Hansen stopped talking on or about April 10, 2009, and did not speak again until July 2010.

**Third**, and finally, rather than criminally charge Hansen, whose contacts and actions with Dardinski were far more robust than Mr. George's, the government

---

[3] Dardinski records Mr. George on four additional occasions during the balance of the charged conspiratorial period: (1) April 27, 2010, (2) May 11, 2010, (3) May 12, 2010, and (4) June 1, 2010.

immediately tried to use Hansen to further ensnare Mr. George.  For example, on June 8, 2010, after agents confronted Hansen and informed him they possessed probable cause to arrest him, agents immediately told him they "were interested in his cooperation." Exhibit 5 (compendium of proffer reports), DEA-6, dated June 8, 2010, at 1.  Hansen agreed to cooperate two days later, on June 10, 2010, and he called George, at the direction of the DEA, on July 29, 2010.  On August 17, 2010, Hansen provided Mr. George a check in the amount of $20,000.00, ostensibly to pay George a commission for the transactions charged in Counts II and III, despite the fact that Mr. George had previously told Hansen—during numerous recorded conversations—that he did not want or expect any money from Hansen.  *See, e.g.*, August 17, 2010 Transcript at 4 ("…if you want to give me nothing, it doesn't matter to me.  If you want to give me something, you can give me something.  That's not what this is about"); August 17, 2010 Transcript at 5; August 17, 2010 Transcript at 6 ("There's no debt"); September 23, 2010 Transcript at 9; N-47 (no date provided by government), Track 1;[4] N-47, Track 2.; N-47, Track 3.  Mr. George had previously told Dardinski, in tape-recorded conversations, he did not want or expect any money as a result of putting him in contact with Hansen.  *See, e.g.*, April 6, 2009 Transcript at 2 ("I mean, I get nothing …"); April 6, 2009 Transcript at 5; April 26, 2010 Transcript at 3 ("I never—I never wanted anything anyway"); April 27, 2010 Transcript at 4; April 27, 2010 Transcript at 6 ("I mean, I don't want anything …"); April 27, 2010 Transcript at 24 ("I don't want anything … I just want the guy to call me"); June 1, 2010 Transcript at 8; June 1, 2010 Transcript at 11; June 1, 2010 Transcript at 12.

---

[4] For the Court's convenience, the defense has prepared a notebook containing transcripts of referenced conversations. Unless otherwise noted, the transcripts have been prepared by the government (the defense has not received transcripts for certain conversations from the government). The transcript for N-47 has been prepared by the defense.

Mr. George never cashed the check.  Hence, on September 23, 2010, at the direction and under the command of his law enforcement handlers, Hansen convinced George to accept $20,000 in cash.  Hansen has not been charged with any crimes, and, as noted *supra*, has since denied to the government that he knew any money provided to him by Dardinski derived from drug transactions or from another specified unlawful activity. *See* Exhibit 5 (compendium of Hansen proffer reports).

C.     The government continues to pursue Mr. George.

Undoubtedly discontent with the strength of the charged Hansen money-laundering conspiracy, the government had Dardinski introduce Mr. George to an undercover law enforcement agent posing as a drug dealer in need of legal representation. In particular, on January 20, 2011 (four months after the September 23, 2010 cash transfer from Hansen and more than a year after the first charged transaction), Dardinski, at the direction of the government, told Mr. George he had a potential client to refer to Mr. George. *See* January 20, 2011 Transcript at 2.  Thereafter, on March 4, 2011, at a meeting video and audio taped by the government, the undercover officer provided Mr. George with $25,000 in cash, ostensibly as payment of a legal engagement fee, after Mr. George presented the undercover agent with a representation agreement. *See* March 4, 2011 Transcript at 16-18.[5]  On that same date, March 4, 2011, at approximately 2:20 p.m., Mr. George deposited $9,000.00 into his personal checking account at the Bank of America branch located at 1455 Highland Avenue in Needham, Massachusetts. Approximately eleven (11) minutes later, Mr. George deposited $8,000.00 into the same checking account, but at a bank branch located at 355 Chestnut Street in Needham,

---

[5] The transcript for March 4, 2011, has been prepared by the defense.

Massachusetts, less than a half mile away from the original branch. Here, it is not as if the transactions were consummated on different days or even hours apart—they were made within approximately eleven (11) minutes of each other. Moreover, they were made at the same banking institution, albeit at two different branches in close proximity to each other. These two obviously related transactions would so predictably generate a currency transaction report by the bank that the government will not be able to prove an intent to avoid such a filing. Indeed, the transactions did in fact cause a currency transaction report, as required by the Bank Secrecy Act. *See* Currency Transaction Report, attached hereto as Exhibit 13.

III.   *Evidence of Improper Motive and/or Vindictiveness*.

A.   Affidavits of James Dilday▮▮▮▮▮▮▮▮▮▮ Possible Involvement.



In 2006, while his Federal fraud prosecution was pending, ▮▮▮▮▮▮▮▮▮ was heard on prison telephones, as well as in consensual tape-recorded conversations with an FBI informant, plotting the murder of ▮▮▮▮▮▮▮▮▮▮▮▮ and claiming that Mr. George (who was representing ▮▮▮▮▮ in the underlying fraud prosecution, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was holding diamonds, jewelry and/or cash that would be used to pay the "hit man" upon proof that the killings had occurred. In October 2006, while the fraud prosecution was pending, ▮▮▮▮▮▮ was charged in a murder-for-hire case; he was eventually convicted and sentenced for the murder plot. On August 13, 2009, at ▮▮▮▮▮ sentencing hearing in the murder-for-hire case, ▮▮▮ ▮▮▮▮ said the following as part of his victim-impact statement:

> . . . Now, every prosecutor knows this is a rough business, and we deal with rough people, we deal with people who are capable of horrific acts of violence, not only to witnesses but also to prosecutors. And we all, every one of us, has in the back of our minds some sense that this could happen

to us, that there could be violence against us…for many of us, it's an abstraction. It stopped becoming an abstraction for me in 2006… The reality is that a threat like this does not just affect me; it affects my family as well. Now, I, as a prosecutor, signed up for this. I went into this job with my eyes open. My wife and kids did not, though…**this was an extraordinarily distressing and upsetting episode in our lives, in [my wife's] life…my wife now has to spend her time worrying about whether some guy she never met, who is, by all accounts, a sociopath, will someday arrange to have some harm befall me or, God forbid, her kids…So, until about 2006 I made an effort to wall off everything I did here from my home life, and now I cannot do that anymore; that is over. And in certain respects, in not a disastrous way, but in a very real way, this type of episode has infected -- affected every aspect of our lives. The best way that I can describe it is that there is this pervasive feeling of vulnerability that we didn't have before, and it has at all events a corrosive effect on how we live our lives** ….

Exhibit 6 (Transcript of ▮▮▮▮▮ Sentencing Hearing) at 10-12 (emphasis added).

A review of pleadings filed in connection with the ▮▮▮▮ murder-for-hire case indicates that ▮▮▮▮▮ suspected or believed Mr. George had some complicity in ▮▮▮▮ scheme. In particular, in approximately November 2006, after indicting ▮▮▮▮ in the murder-for-hire plot, the government served a subpoena on Mr. George, seeking to learn whether or not Mr. George had received or was holding ▮▮▮▮ jewelry and/or cash. Litigation regarding the propriety of the subpoena ensued, though the government eventually withdrew their subpoena. In opposing Mr. George's motion to quash, ▮▮▮▮, writing for the government in a sealed pleading, accused Mr. George of hiding funds subject to forfeiture, asserting that ▮▮▮▮ told the CW in secretly recorded conversations ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



██████████████████████████████████

██████████████████████████████

████████████████████████████ and that the

██████████████████████████████████████

███████████

       In the wake of the foregoing, ████████ has reportedly played some role in the

investigation and/or prosecution of Mr. George, though the exact contours of that

participation is not yet known or knowable to the defendant.  According to Mr. Dilday,

who represented ████████ co-defendant and ████████ in the Federal fraud

prosecution, on or about April 12, 2011, he spoke to Assistant U.S. Attorney Laura

Kaplan, who advised that the government was willing to offer his client a Rule 35 in

return for confirmation that Mr. George was holding cash, jewelry or diamonds for ██

████████  In the course of conversations on this subject matter, Ms. Kaplan stated, *inter*

*alia*, that it was '████'s idea" to approach Mr. Dilday's client because he thought "there

was probably something there," Exhibit 1 at ¶¶6-14, that "she was 'taking her orders

from the front office,'" Exhibit 2 at ¶18, and that "the 'front office'" was a reference to

██████████████████████████████████████

████" Exhibit 2 at ¶19.  Finally, Mr. Dilday asseverates that he received a telephone call

on June 21, 2011 from Attorney Joshua Gordon, who represented ████████ in her appeal

before the First Circuit, and that Attorney Gordon told Mr. Dilday that he had received a

telephone call directly from ████████ who advised that he had received a letter from

████████ that was "inconsistent" with what Dilday had told Ms. Kaplan in their

conversations and he wanted to visit ▇▇▇▇▇ immediately, with or without Gordon.

Exhibit 2 at ¶¶7-10, 12-13.

     B.    <u>Indicia of Vindictiveness</u>.

    There are serious reasons to question whether the government created the charged

crimes from whole cloth to exact retribution upon Mr. George for his past representation

of ▇▇▇▇▇. **First**, there is, at the very least, the appearance of serious conflicts of

interests and/or loss of impartiality, as it appears beyond question that a reasonable

person with knowledge of relevant facts would question a loss of impartiality by ▇▇

▇▇▇▇▇ in particular, if not the USAO in general. ▇▇▇▇▇ participation in any

aspect of the investigation and/or decision-making that led to Mr. George's indictment,

and/or the government's failure to follow internal guidelines, would support the

proposition that the present indictment is the product of a vindictive prosecution. *See,*

*e.g.*, USAM §9-2.032(D); §3-2.170; USAM §3-2.170; USAM §9-2.032(D)(3); 5 C.F.R.

§ 2635.501; 5 C.F.R. § 2635.502; 28 C.F.R.§ 45.2; USAM, Section 9-2.032.

    **Second**, on March 22, 2011, the government knowingly and/or recklessly

submitted an affidavit in support of an application for an arrest warrant that contained

numerous false and/or misleading statements, and/or that omitted material facts. *See*

Exhibit 10 (Affidavit). Here, Agent Tamuleviz clearly knew that he could not submit an

affidavit containing false and/or misleading statements, and/or omit from his affidavit

facts material to the issue of probable cause. *Franks v. Delaware*, 438 U.S. 154, 165

(1978);[6] *Salmon v. Schwarz*, 948 F.2d 1132, 1139 (10th Cir.1991) (finding that "law was

---

[6] The holding of *Franks* applies with equal force to omissions of material facts, *see, e.g., United States v. Salameh*, 152 F.3d 88, 113 (2d Cir.1998), *cert. denied sub nom. Abouhalima v. United States*, 525 U.S. 1112 (1999), as well as to "technically accurate statements that have been rendered misleading by material omissions." *United States v. Grant*, 218 F.3d 72, 77 (1st Cir. 2000).

clearly established at the time of Salmon's arrest that the omission of material

information from an arrest affidavit violated the Fourth Amendment"). His decision to

do so, therefore, raises additional questions regarding the propriety of the instant

investigation and indictment. The following paragraphs illustrate the false and/or

misleading nature of the affidavit:

> Paragraph 7: First, on March 18, 2009, Dardinski did <u>not</u> say he had "some cash"
> from selling cocaine. He said he had "some **other** money" from cocaine sales and
> he had to hide that money "**too**." As such, what Dardinski actually told George
> was he had **other** money—*i.e.*, money different than and in addition to the money
> they were actually discussing. Hence, presented in its accurate context, the
> conversation established that, as far as Mr. George understood, the money that
> Dardinski planned to give to Hansen was **not** drug proceeds, yet Agent
> Tamuleviz's misleading description suggests that Mr. George was not bothered by
> the fact that the money to be involved in the Hansen transaction would derive
> from cocaine sales. Second, Agent Tamuleviz provides the misleading impression
> that Mr. George tried to engage in willful blindness, by asserting that Mr. George
> "did not want to know that because it is illegal, but he continued the conversation
> nonetheless." In fact, Mr. George said "**I obviously can't help you with
> something like that.**" March 18, 2009 Transcript at 2 (emphasis added).
> Critically, Dardinski never raised the subject of his money being derived from
> drug sales again with Mr. George in any of the conversations that follow the
> March 18th conversation and that predate either of the two charged transactions
> (December 16, 2009 and April 15, 2010). What the March 18th conversation
> actually established, then, was that (1) if the money Dardinski intended to provide
> Hansen derived from any crime, it would have been his State fraud offense, not
> cocaine sales, and (2) Mr. George's unequivocal assertion that he would not be
> involved in laundering any drug money for Dardinski.

> Paragraph 11 and footnote 4: Agent Tamuleviz's use of his footnote 4 ("at
> different times, particularly when George talked on the telephone, he made other
> similar type comments expressing his unwillingness to engage in illegal
> activity"), and his description of the December 7, 2009 conversation, *see*
> Tamuleviz Affidavit at ¶11, were incredibly misleading, and constitute an
> egregious omission of material facts. Agent Tamuleviz describes the December
> 7th conversation as follows: "In December 2009, at the direction of law
> enforcement, in a consensually recorded conversation, George asked CS1 whether
> George's associate was ready to engage in the transaction." The juxtaposition
> between Agent Tamuleviz's description of the December 7, 2009 conversation
> and the actual conversation could not be any greater. *See, supra*, (Mr. George
> telling Dardinski, no less than fourteen (14) different times, that he would not be
> involved in his dealings with Hansen); Exhibit 3 (December 7, 2009 Transcript) at

5-9.  The omission of the actual details of the December 7th conversation renders the entire affidavit fatally misleading.  Finally, even the one piece of this December 7th conversation cited by Agent Tamuleviz is entirely misleading. Rather than simply ask if Hanson "was ready to engage in the transaction," Mr. George referred to Hanson in derogatory terms and actually said **"Then what are you talking to me for?"** Exhibit 3 (December 7, 2009 Transcript) at 4-5 (emphasis added).  Agent Tamuleviz's description of the conversation creates the false impression that George—in the shadows of the charged transaction—was making sure that his "associate" was still on-board and ready to consummate the transaction at the center of the conspiracy, when in fact George was asking why he was talking to George about the transaction at all.

Identifying Hansen as "George's associate" throughout affidavit: Agent Tamuleviz's reference to Hansen as "George's associate" throughout the affidavit was itself entirely false and/or misleading.  They had not spoken at all since April 2009.

Failure to inform Magistrate Judge that George and Hansen severed Communications:  Agent Tamuleviz clearly should have informed the Magistrate Judge that Hansen and George stopped communicating in April 2009 if he was interested in presenting the Magistrate Judge with a fair and accurate presentation. Indeed, by omitting this information, yet continually referencing Dardinski's statements about cocaine or drug sales *in conversations with Hansen*, *see* Tamuleviz Affidavit at ¶12 (December 16, 2009 Hansen conversation); Tamuleviz Affidavit at ¶14 (April 15, 2010 conversation), and continually referring to Hansen as "George's associate," Agent Tamuleviz creates the false impression that Mr. George would have been on notice of these statements through his "associate," Hansen.

Paragraphs 15 and 16:  Agent Tamuleviz's description of the April 26, 2010 conversation is likewise misleading and/or false.  *See* April 26, 2010 Transcript at 2-4.  Viewing the conversation in its entirety, it is clear that what Mr. George actually says to Dardinski is that he wants Dardinski to "scare" Hansen into believing he has done something illegal with Dardinski, so he comes running to Mr. George for legal help.  *See* April 26, 2010 Transcript at 3 ("If he thinks there's some kind of exposure for him as a result of what he's done with you, and only Bob George can solve it for him").  Mr. George makes it clear that he does not expect or want any money from Hansen, telling Dardinski "I never wanted anything [money] . . . that isn't the issue," and making it clear he was "not shaking him down," but just wanted Hansen "to come to me begging me to help. All right. That's all I need, and then we're all patched up. **I get nothing out of him**. You go on your merry way doing what you're doing anyway."  (Emphasis added).  Agent Tamuleviz continued the misimpression of this aspect of the conversation in the ensuing paragraph (Paragraph 16).  Agent Tamuleviz knew that Mr. George was not referring to himself or his own conduct when he said "I don't want this to unravel as to what we're doing," but was instead telling Dardinski what to tell

Hansen ***about Dardinski's and Hansen's dealings.***  This was yet another glaring example of the misleading and/or false nature of Agent Tamuleviz's affidavit.

Paragraph 20:  In paragraph 20, Agent Tamuleviz creates the false impression that Mr. George sought money from Hansen as a result of Hansen's transactions with Dardinski. Tamuleviz Affidavit at ¶20 ("CI2 asked George whether he wanted cash instead [rather than a check that Hansen previously provided], and George stated he would"). Mr. George never once asked for money from Hansen at any time, a fact that should have been communicated to the Magistrate Judge. It was Hansen, only after he became a cooperating witness working at the direction of the government, who pressed the issue of payment to Mr. George, who repeatedly told Hansen that he did not expect any money from Hansen and it was not necessary. *See, e.g.*, April 26, 2010 Transcript at 3; April 27, 2010 Transcript at 4-24; June 1, 2010 Transcript at 8-12.

The foregoing are illustrative (not exhaustive) examples regarding the false and/or misleading nature of Agent Tamuleviz's affidavit.  There are other objectionable representations within his affidavit, including but not limited to Paragraph 6 ("chance encounter" with George at the South Shore Plaza) and the assertion that the information provided by Dardinski has "always proved to be reliable and accurate" (Tamuleviz Affidavit at p.1, n.1). [7]

**Third**, the circumstances surrounding Mr. George's arrest, the ensuing press conference, and a false and/or misleading press release, further support the proposition that the present indictment is vindictive.  Rather than simply serve Mr. George with a summons, or have an agent or two arrest him, the government sent a small army of armed federal agents to Mr. George's home in the early morning hours, surrounded his home, and arrested him.  While Mr. George remained in custody, the government condemned him at the ensuing press conference as a launderer of drug proceeds, despite the

---

[7] Dardinski is a long time government informant who has been opened and closed as an informant by several law enforcement agencies, *see* Exhibit 4 (Discovery Letter, dated May 5, 2011), with a track record of committing unsanctioned crimes during his cooperation, and possesses an extensive criminal record, Dardinski Criminal Record, attached hereto as Exhibit 8. It also bears noting that, **while Dardinski has a lengthy criminal record, he has never been *charged* with any drug offenses, much less convicted.**

government's knowledge that Mr. George told Dardinski at the outset of the

government's investigation that he would not be involved in any transaction involving

drug proceeds, and that Hansen told the government he did not believe the proceeds

derived from drug distribution. *See* Statement of United States Attorney Carmen Ortiz,

dated March 23, 2011. Finally, not only did the government disseminate Agent

Tamuleviz's false and misleading affidavit to the public, but it issued a press release that

was misleading at best, given it overtly asserted that Mr. George agreed to launder drug

proceeds from Dardinski, when in fact he refused to do so. March 23, 2011 Press

Release, attached hereto as Exhibit 15.[8] Whether or not the press release constitutes a

violation of the Local Rules, *see* Local Rule 83.2A (detailing what information may be

disclosed from "time of arrest" to "commencement of trial"), the government clearly is

not permitted to publish or utter misleading and/or inaccurate statements regarding their

cases, and it did just that by, at the very least, publishing Agent Tamuleviz' affidavit and

asserting that Mr. George conspired to conceal $225,000 in drug proceeds.

**Fourth**, the government failed to properly supervise Dardinski. For example,

while cooperating, Dardinski defrauded Hansen out of at least $10,000.00, apparently

using a different telephone to consummate the fraud than the one he was using to tape-

record the so-called money-laundering conversations. Moreover, on May 12, 2010,

Dardinski signed a document claiming that he was given a recording device "on or about

Jan 2010" to record telephone calls with Mr. George and Hansen, but "due to technical

difficulties or operator error these calls were not recorded." Exhibit 12. While it is not

certain from the face of the document, it appears that the agents were just learning about

---

[8] The same misrepresentations were repeated in the press release announcing Mr. George's indictment. *See* April 7, 2011 Press Release, attached hereto as Exhibit 16.

this "operator error" in May 2010, five months after the recorder had been provided to

Dardinski.  There appears to be at least eight-hundred plus calls that were not recorded or

taped by Dardinski in this case: 140 calls to a Boch car salesman (Rizzitano) whom

Hansen told the government was involved in the second charged transaction, which

Hansen said he believed to be a lawful purchase of a repossessed car; 560 calls between

Hansen and Dardinski; and 150 calls with Mr. George.  To the extent the government did

not properly supervise Dardinski, and/or simply permitted Dardinski to effectively run

the investigation, such a lack of oversight would be an abrogation of the agents'

supervisory responsibilities over a cooperating witness.  *See* Seven Steps to Successful

Informant Management, DEA Informant Interaction, U.S. Drug Enforcement

Administration, Office of Training, Quantico, Virginia (July 1992); Integrity Assurance

Notes, Drug Enforcement Administration, Planning and Inspection Division, Vol. 1, No.

1 (August 1991) (Failure in the management of cooperating individuals constitutes,

perhaps, the most obvious single cause of serious integrity problems in the DEA and

other law enforcement agencies).  To effectively control Mr. Dardinski, the government

simply could have tape-recorded all of his conversations over his government issued

telephone through the use of a consensual Title III order, as it apparently did at the outset

of this investigation.  *See* Exhibit 4 (Discovery Letter, dated May 5, 2011) at 2.[9]

---

[9] The government has provided a copy of a disc, marked N-4, which contains 1227 individual audio files, which were obtained pursuant to its so-called consensual Title III, but the overwhelming majority of those files have no audible sound. The government has advised that the disc is not corrupted, that "cell phones are constantly receiving and sending signals to the cell phone company" and is also "hitting on different cell sites," and later advised that the N-4 contains four calls from Dardinski's cell phone to Mr. George's phone.  It is not clear whether the Title III interception captured other calls—not provided to the defense—involving Dardinski and persons unrelated to the instant investigation.  In any event, the defense has identified 45 calls on the disc provided by the government, each of which contain the voice of Dardinski, either calling his own voicemail, Mr. George's office or Mr. George's cell phone.  The defense does not presently know why more calls between Mr. George and Dardinski were not captured pursuant to this consensual Title III.

IV.   *Evidentiary Hearing is Warranted and Necessary*.

To receive an evidentiary hearing, a defendant must make a sufficient threshold showing that material facts are in doubt or dispute. *United States v. Colon-Munoz*, 318 F.3d 348 (1st Cir.2003), *citing United States v. Panitz*, 907 F.2d 1267, 1273 (1st Cir.1990).  There are many material facts in doubt or dispute, which if resolved in the defendant's favor would warrant judicial relief, including but not limited to the following: (1) who authorized the investigation and/or prosecution of Mr. George, and who participated in the decisions regarding the course of the investigation; (2) did Mr. George's role in the ▮▮▮▮▮ matter influence the government's investigation and/or pursuit of Mr. George; (3) was Dardinski instructed to target or ensnare Mr. George and, if so, when were those instructions communicated and from whom did they derive; (4) what instructions were provided Dardinski, if any, prior to his recording conversations with Mr. George and/or Hansen; (5) when did Dardinski begin cooperating in this matter, before or after the South Shore Plaza encounter, (6) did the government comply with various internal guidelines in pursuing the indictment of Mr. George; and (7) what steps did the government take to supervise Dardinski's activities, including but not limited to his recording of telephone conversations.  In these circumstances, where critical facts remain in doubt or dispute, and the existence of those facts would warrant judicial relief, an evidentiary hearing is warranted and necessary.

V.   *Conclusion*.

For all of the reasons discussed herein, the Court should convene an evidentiary hearing and, ultimately, dismiss the indictment returned in this case.

Respectfully Submitted,
ROBERT A. GEORGE,
By His Attorneys,

**/s/ Kevin J. Reddington**
Law Offices of Kevin J. Reddington
Mass. Bar. No. 414160
1342 Belmont Street
Suite 203
Brockton, MA 02301
(508) 583-4280
kevinreddington@msn.com

**/s/ Robert M. Goldstein**
Robert M. Goldstein, Esq.
Mass. Bar No. 630584
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated:  October 24, 2011

## Certificate of Service

I, Robert M. Goldstein, hereby certify that on this date, October 24, 2011, a copy of the foregoing document has been served via hand delivery, upon Assistant U.S. Attorney Laura Kaplan.

**/s/ Robert M. Goldstein**
Robert M. Goldstein