UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA    )
                                 )
                                 )
v.                              )      Criminal No: 11-CR-10201-NMG
                                 )
                                 )
ROBERT A. GEORGE          )
_____)

### Memorandum In Reply To Government Opposition to Motion to Dismiss
### (Leave to File Granted by Order Dated November 10, 2011)

The government concedes, as it must, that the defenses of outrageous government misconduct and vindictive prosecution remain viable in the First Circuit.  Because the government does not argue that the facts as alleged would not amount to outrageous government misconduct, but instead argues those facts are not accurate, *see, e.g*., Government Opposition at 2 (arguing defendant's allegations are "baseless" and based on "sheer speculation"), an evidentiary hearing is warranted and necessary.  Indeed, as demonstrated below, absent an evidentiary hearing, the Court simply lacks an adequate evidentiary basis to decide that the government has <u>not</u> engaged in outrageous government misconduct.

    **1.**      **There was no "chance" encounter.  Now the issue is who suggested otherwise, and why?**

Dardinski did <u>not</u> have a "<u>chance</u>" encounter with Mr. George at the South Shore Plaza—it was a targeted meeting, as demonstrated by the exhibits submitted by the defendant in support of his motion.  *See* Motion to Dismiss, Exhibits 7 (Affidavit of Susan Jacobson) and 11 (Law Office Logs).  The government does not contend otherwise

in its opposition or in the supporting affidavits.  Indeed, in his most recent affidavit (submitted in opposition to the defendant's motion to dismiss), Agent Tamuleviz does not repeat the assertion made in his original affidavit (submitted in support of the arrest warrant) that it was a "chance" encounter, Tamuleviz *Arrest* Affidavit at ¶6, but instead now asserts that "[i]n or around February 2009" Dardinski "reported that he had recently seen the defendant and the defendant had offered to launder his money."  Tamuleviz Affidavit at ¶2.[1]

The issue now becomes who falsely declared that the meeting was a "chance encounter," and for what reason would they fabricate this matter.  This is no trivial issue—this is the meeting the government claims was the genesis of their entire investigation.  *See* Kaplan Affidavit at ¶¶2-3; Tamuleviz Affidavit at ¶2.  Importantly, the government's opposition does not begin to resolve the factual circumstances surrounding that initial confrontation, such as (1) whether it was random or manufactured by Dardinski, (2) what role, if any, did the government have in manufacturing the encounter if it indeed was not random, as the office logs and Jacobsen affidavit clearly establish, (3) what did the government do or not do to vet Dardinski's allegation that it was a "chance encounter" and/or that Mr. George truly offered to launder funds, (4) whether Agent Tamuleviz had contact with Dardinski prior to the alleged "chance encounter" (he does not swear otherwise in his affidavit), and, ultimately, (5) whether the government had any role in Dardinski targeting Mr. George at that time.

---

[1]  Not only will Agent Tamuleviz no longer swear under oath that the meeting was a "chance encounter," but he has moved the meeting date to February from March 2009 (and still provides no date certain within the month).  One would clearly expect that Agent Tamuleviz knows when he received this information from Dardinski, and knows what precise date Dardinski alleged the encounter occurred, as presumably a report was generated or notes taken.  The imprecision in Agent Tamuleviz's affidavit is striking, particularly in contrast to the detailed facts outlined in the defendant's motion and supporting exhibits.

Notably, the government has not offered an affidavit from Dardinski, who is cooperating and available to the government.  While the government refers to him now as "CW," government counsel has previously filed papers on PACER publicly identifying Dardinski as a cooperating witness, *see* Government Discovery Letter (Dkt. Entry 17-1, at p.5), and has posted on PACER Dardinski's entire criminal record (Dkt. Entry 17-2), as well as all of the reports of the Hansen proffer sessions (Dkt. Entry17-3).  Hence, any claim that the government did not provide an affidavit from Dardinski because it did not want to publicly identify a cooperating witness rings hollow.[2]  Finally, while the defense finds it incredible that the government opened an investigation based upon the uncorroborated allegation of a lifelong criminal, it does not resolve the critical factual issue of whether the government became over-involved in the ensuing investigation and/or created the charged crimes from whole cloth, as detailed below.

> **2.      Whether or not the indictment is the product of vindictiveness, the Court must still determine if the government became the instigators of the charged conduct**.

The government spends the majority of its pleading trying to establish that it did not initiate its investigation of Mr. George because of vindictiveness harbored by Mr. Pirozzolo.[3]  Assuming *arguendo* that is the case, that does not resolve the defendant's motion, nor does it eradicate the need for an evidentiary hearing, because neither government affidavit resolves whether the government became "so over-involved in a

---

[2] Of course, the government could have filed an affidavit from Dardinski under seal to the extent there were issues of privacy or safety.

[3] Mr. George publicly filed a redacted version of his motion to dismiss in an effort to protect the privacy of Mr. Pirozzolo.  For the second time now, the government has publicly filed its papers on this issue, and publicly identified Mr. Pirozzolo and the Bunchan matter.  Tamuleviz Affidavit at ¶3; Kaplan Affidavit at ¶4  As such, given the government's decision, the defendant has not sought leave to file a redacted reply pleading.

felonious venture that they can fairly be said to have created the crime or to have coerced the defendant's participation in it," the standard articulated in *United States v. Santana*, 6 F.3d 1, 4-5 (1st Cir.1993), and quoted by the government, *see* Government Opposition at 2.

One critical factual issue that remains is how or why the government continued to pursue Mr. George after December 7, 2009. Indeed, in its opposition, the government does not dispute many critical factual assertions, including but not limited to: (1) on December 7, 2009, Mr. George told Dardinski no less than 14 times he would not be involved in Dardinski's financial transactions with Hansen, (2) Mr. George had zero— **zero**—communications with either Dardinski or Hansen between December 7, 2009 and April 15, 2010 (the date of Hansen's second transaction with Dardinski), (3) Mr. George had zero communications with Hansen from April 2009 to July 2010—*i.e.*, Mr. George was not on talking terms during the charged conspiratorial period with the one person with whom he is alleged to have conspired.

Given the foregoing, neither the government's opposition nor the sparse affidavits offered in support thereof even begin to resolve: (1) how or why the government continued to investigate Mr. George and/or record his conversations in the wake of the December 7, 2009 conversation, (2) how or why the government continued to instruct Dardinski to pretend to be a client of Mr. George's to seduce Mr. George's continued interaction with Dardinski, (3) how or why the government charged Mr. George with aiding and abetting two transactions (December 16, 2009 and April 15, 2009) when he had no contact with either Hansen or Dardinski during those time frames, and told Dardinski nine days before the December transaction that he would not be involved in

any manner with the financial transaction, (4) how or why the government charged Mr.

George with conspiring with Hansen, when he had no contact with Hansen from April

2009 to July 2010, and Hansen has informed the government that he did not know or

believe Dardinski's funds derived from unlawful activity, and, ultimately, (5) whether the

government in fact became "so over-involved in a felonious venture that they can fairly

be said to have created the crime or to have coerced the defendant's participation in it."

*Santana*, 6 F.3d at 4-5.  As the defendant made clear in his opening pleading, "[a]n

improper motive or ulterior purpose for creating the criminal conduct is not a necessary

element of establishing outrageous government misconduct, but it can be a relevant

consideration." Defendant's Motion to Dismiss at 4.  Moreover, whether the government

engaged in outrageous government misconduct is a factual and legal decision to be

reached by the Court, separate and distinct from any entrapment defense that arguably

could be made at trial.  *Cf.* Government Opposition at 2-3 (erroneously arguing that the

defendant has made a pretrial entrapment argument to the Court).

> **3.      The government's brief relies upon sweeping and conclusory statements, is devoid of factual detail, and relies upon an affidavit the defendant has demonstrated is false and/or misleading**.

The government has simply offered no **<u>facts</u>** to elucidate why it continued to

pursue Mr. George after the December 7, 2009 conversation, nor does the government

even begin to seriously address the fact that their own intercepted conversations

demonstrate that Mr. George ultimately, and unequivocally, rejected Dardinski's

overtures.  Instead, the government offers only conclusory and unsupportable statements,

such as "[t]here is no evidence to establish … that the government became investigators

(sic) of the crime through its CW for an improper purpose or to seek retribution upon the

defendant," Government Opposition at 5, and "there is no evidence that supports the defendant's argument that the government or the CW targeted the defendant," *id.* Of course, Ms. Jacobson's affidavit and the office logs patently demonstrate that Dardinski was in fact targeting Mr. George. Moreover, by the government's own calculations, **Dardinski called Mr. George <u>249 times</u> from February 20, 2009 to March 18, 2011 (and the government recorded only 15 of these initiated calls), which alone demonstrates a factual basis to conclude Dardinski was targeting Mr. George**.[4] Just because the government chooses to ignore the factual evidence does not mean it does not exist.[5]

Likewise, while the defendant has offered the Court transcripts of every recorded conversation, and analyzed those conversations in his papers to the Court, the government ignores the recordings and instead argues that Agent Tamuleviz's arrest warrant affidavit shows that Mr. George was "ready and willing to participate" in the charged scheme. Government Opposition at 4. This argument is fatally flawed, as Mr. George provided the Court with a detailed analysis of the false and/or misleading nature of Agent Tamuleviz affidavit, on a paragraph-by-paragraph basis. *See* Motion to Dismiss

---

[4] The government asserts there were 317 calls between Dardinski and George from February 20, 2009 to March 18, 2011, and "at least 68 were placed by" Mr. George. Government Opposition at 4; 16, n.7. The government fails to inform the Court that 34 of the 68 calls occurred in 2011—long after the December 2009 and April 2010 transactions that supposedly informed the government's continued investigation (and after Dardinski told Mr. George he had a client referral for him). Prior to April 15, 2010 (the date of the second charged transaction), Mr. George called Dardinski 22 times, but 20 of the 22 calls are clearly examples of Mr. George returning incessant calls from Dardinski. For example, from May 2009 to April 15, 2010, Mr. George called Dardinski 12 times in response to Dardinski's calling George a total of 92 times during this same time period. Finally, there were more than 800 unrecorded calls in this investigation and the defendant has not double counted. *Cf.* Government Opposition at 16, n.7.

[5] Another example is the government assertion that "there is quite simply no proof of" the allegation that Dardinski defrauded Hansen of $10,000.00. Government Opposition at 16, n.6. The proof comes from the government's own cooperating witness—Hansen—who has told the government in his proffer sessions that Dardinski scammed him of the money. As noted, reports of these proffer sessions have been publicly filed by the government with the Court.

at 16-19.  The government has not addressed a single one of those paragraphs in its

opposition, but instead offers a blanket, unsworn assertion "[t]here is nothing false or

misleading about the allegations contained in the affidavit," which does not begin to

seriously address the issue.  Agent Tamuleviz does not affirm the veracity of the arrest

warrant affidavit in his present affidavit to the Court.

Likewise, the government's assurance that evidence exists, *e.g.*, Government

Opposition at 5 ("there is strong evidence to prove lack of inducement and there is

certainly an adequate evidentiary basis to have charged George"), without detailing that

evidence, is not sufficient to defeat the need for an evidentiary hearing. Again, blanket

assertions, devoid of factual detail, are not enough to trump the necessity of a hearing,

particularly considering the detailed factual basis outlined in the defendant's pleading.

> **4.      The Government's affidavits do not resolve the animus or
> vindictiveness issue**.

The affidavits offered by the government, in an attempt to convince the Court that

the Bunchan matter did not inform or motivate the investigation of Mr. George in this

matter, do not resolve critical factual issues.  For example, taking the affidavits at face

value, they do not resolve or address whether AUSA Kaplan was aware of the Bunchan

matter in March or April 2009, when she reportedly learned of Dardinski's allegations

and formally opened an investigation.  *See* Kaplan Affidavit at ¶3.  While Agent

Tamuleviz asserts that he "had no role or knowledge of the case involving James

Bunchan or Seng Tan," Tamuleviz Affidavit at ¶3, AUSA Kaplan does not asseverate

that she was unaware of the Bunchan matter in March or April 2009 (when she learned of

Dardinski's allegations).  AUSA Kaplan does not swear that the Bunchan case provided

no motive to investigate Mr. George, and/or provided no animus towards Mr. George,

either by her in particular or the office hierarchy in general, as it existed in March or

April 2009.  AUSA Kaplan's affidavit does not swear that Mr. George's prior

representation of others in this District, and/or his prior representation of Dardinski in

particular, did not generate motive or animus, either for her in particular or the office in

general.  AUSA Pirozzolo provided his victim-impact statement in the Bunchan matter in

August 2009, which presumably was a well-known event within the U.S. Attorney's

office, as it was a matter reported in the Boston Globe.[6]  AUSA Kaplan does not swear

that she was unaware of that event and/or that it did not generate motive or animus, either

for her in particular or the office in general.  In short, while the affidavits address Mr.

Pirozzolo's involvement, they do not resolve whether the office in general, or AUSA

Kaplan in particular, harbored any overt or even latent animus towards Mr. George.

    **5**.       **The government ignores the USAM Guidelines**.

    It is precisely for these reasons that the Department of Justice has formulated

guidelines dealing with the potential for conflicts of interests in the prosecution of

practicing attorneys.  While the government was apparently concerned regarding whether

*the defendant* had any potential conflicts of interest, *see* Kaplan Affidavit at ¶4, it

seemingly wholly ignored the fact that *the government* had potential or actual conflicts of

interest.  In its responsive materials, the government completely ignores the issue of

whether it complied with the obligations imposed upon the USAO by the United States'

Attorney Manual and/or the Code of Federal Regulations.  *See, e.g.*, Defendant's

Memorandum at 13-16 (discussing USAM §§9-2.032(D), 3-2.170; 5 C.F.R. §§ 2635.501,

---

[6] Given the government argues that Mr. George should have known that Dardinski defrauded victims of hundreds of thousands of dollars, in part, because it was detailed in the Boston Globe, Government Opposition at 4, n.1, it is fair to infer AUSA Kaplan and the entire USAO hierarchy was aware of Mr. Pirozzolo's victim-impact statement through, at the very least, the Globe's reporting of same.

2635.502; 28 C.F.R.§ 45.2).  The government's apparent failure to comply with its own applicable internal guidelines raises yet another issue of fact warranting an evidentiary hearing, such that the Court can determine from a factual record if the failure to vet the case with the Department of Justice is related to any animus towards Mr. George.[7]

 **6.**      **The government ignores the Dilday Affidavits**.

Additionally, the government's affidavits do not address much less dispute the factual assertions in Mr. Dilday's affidavits.  While the government asserts the affidavits are "replete with misstatements of the facts," *see* Government Opposition at 12, government counsel did not contest them in her affidavit to the Court.  Of course, statements of counsel in a memorandum are not evidence, nor a lawful basis to reject the sworn affidavit of another attorney.

 **7.**      **An evidentiary hearing is necessary to resolve the legal issues presented in the defendant's motion**.

As the foregoing demonstrates, the government is simply incorrect in arguing that there are no "material facts" in doubt or dispute. There are numerous factual disputes that must be resolved in order to decide the motion to dismiss with an adequate evidentiary record.  *Cf. United States v. Turner*, 99-Cr-10098-RGS (Judge Stearns convened an evidentiary hearing to determine if the government improperly manufactured a crime to create leverage over certain defendants the government believed had access to or could facilitate the return of paintings stolen from the Gardner Museum).

---

[7] AUSA Kaplan reveals in her affidavit that AUSA Pirozzolo became Acting First Assistant in November 2009.  It was not until December 16, 2009, that authorization was provided by some unknown person or agency to provide Hansen $100,000.00, a factual issue raised in the defendant's pleadings.  Moreover, it was not "sixteen months" following commencement of the instant investigation before Mr. Pirozzolo had any involvement in this case.  Kaplan Affidavit at ¶4.  The government opened its investigation in April 2009, and by April 2010 Mr. Pirozzolo was apparently participating in internal discussions related to the defendant's potential conflict of interest in the continued representation of other defendants in the courthouse.  Kaplan Affidavit at ¶4.

Respectfully Submitted,                     Respectfully Submitted,
**ROBERT A. GEORGE**,                        **ROBERT A. GEORGE**,
By His Attorney,                             By His Attorney,


**/s/ Kevin J. Reddington**                  **/s/ Robert M. Goldstein**
Law Offices of Kevin J. Reddington          Robert M. Goldstein, Esq.
Mass. Bar. No. 414160                        Mass. Bar No. 630584
1342 Belmont Street, Suite 203               20 Park Plaza, Suite 1000
Brockton, MA 02301                           Boston, MA 02116
(508) 583-4280                               (617) 742-9015
kevinreddington@msn.com                      rmg@goldstein-lawfirm.com


Dated: November 15, 2011


## Certificate of Service

I, Robert M. Goldstein, hereby certify that on this date, November 15, 2011, a copy of the foregoing document has been served, via electronic filing, upon Assistant U.S. Attorney Laura Kaplan.

**/s/ Robert M. Goldstein**
Robert M. Goldstein