1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA          )
4                                 )
                                  )
5    vs.                          )  CR No.  11-10201-NMG
                                  )
6                                 )
     ROBERT A. GEORGE             )
7

8    BEFORE:  THE HONORABLE NATHANIEL M. GORTON

9

                  EXCERPT OF DAY TWO OF JURY TRIAL
10

                  Opening Statement of Attorney Goldstein
11

12   APPEARANCES:

13        OFFICE OF THE UNITED STATES ATTORNEY (By:  Laura Kaplan,
          AUSA, and Zachary Hafer, AUSA), One Courthouse Way,
14        Boston, Massachusetts 02210.  On Behalf of the Government.

15        LAW OFFICE OF ROBERT M. GOLDSTEIN (By:  Robert M.
          Goldstein, Esq.), 20 Park Plaza, Boston, Massachusetts
16        02116.
          - And -
17        LAW OFFICE OF KEVIN J. REDDINGTON (By:  Kevin J.
          Reddington, Esq.), 1342 Belmont Street, Brockton,
18        Massachusetts 02301.  On Behalf of the Defendant.

19

              John Joseph Moakley United States Courthouse
20                        Courtroom No. 4
                          One Courthouse Way
21                        Boston, MA 02210
                       Wednesday, May 30, 2012
22

23                   Cheryl Dahlstrom, RMR, CRR
                        Official Court Reporter
24        John Joseph Moakley United States Courthouse
                     One Courthouse Way, Room 3209
25                        Boston, MA 02210
              Mechanical Steno - Transcript by Computer

1    (EXCERPT AS FOLLOWS:

2          THE COURT:  Mr. Goldstein for the defendant.

3          MR. GOLDSTEIN:  Thank you, your Honor.  May I have a

4    moment, your Honor, just to --

5          THE COURT:  Yes, you may.

6          MR. GOLDSTEIN:  Thank you.

7          THE COURT:  You're going to have to turn that, Mr.

8    Goldstein, so I can see you as well.  Put it up and then

9    we'll --

10:05 10         MR. GOLDSTEIN:  All right.  I just need to

11   apparently --

12         THE COURT:  Just turn it this way -- the other way.

13   That's it.

14         MR. GOLDSTEIN:  How's that?

15         THE COURT:  That's good.

16         MR. GOLDSTEIN:  I have one more, your Honor.

17         Robert George has committed no crime.  That is what

18   the evidence will show.  Let me say that again.  Robert George,

19   a prominent Boston lawyer and zealous advocate, who has spent a

10:06 20  career challenging this government in highly-charged,

21   vigorously-contested proceedings, stands accused of crimes he

22   simply did not commit.  By the end of this case, that narrative

23   told you by Mr. Hafer that Mr. George orchestrated or hatched

24   this conspiracy or that this case began with some random or

25   chance encounter at the South Shore Plaza will be rendered

1    entirely implausible.  And the evidence will show that the

2    government's case is poisoned at its essence, built on a toxic

3    foundation of lies carefully crafted by Ron Dardinski, a

4    person, the evidence will show, cannot be trusted on any level

5    and particularly cannot be trusted when it comes to his former

6    lawyer, Mr. George.

7          Now, it's undisputed that on two occasions, December

8    16, 2009, and April 15, 2010, Ron Dardinski, the government's

9    informant, gave cash to Michael Hansen, each time in return for

10:07  10   a check in the amount of $80,000.  But it's also undisputed

11   that Mr. George was not present and did not physically

12   participate in either one of the two charged transactions.  In

13   fact, on December 7, 2009, as Mr. Hafer calls it, in his own

14   words and in a conversation Mr. Hafer conveniently failed to

15   discuss with you during his opening, this is what Mr. George

16   told Ron Dardinski in his own words.

17   (Audiotape played.)

18         MR. GOLDSTEIN:  These excerpts from a longer

19   conversation on December 7, 2009, only nine days before the

10:08  20   first charged transaction, eloquently capture Mr. George's

21   state of mind on that date.  And the evidence will show his

22   state of mind never changed, not on June 1, 2010, more than a

23   year after the government began its investigation, when Mr.

24   George, yet again, rejected Dardinski's overtures, telling him

25   the only way he could help Mr. George is to refer him clients.

1    (Audiotape played.)

2         MR. GOLDSTEIN:  And his state of mind didn't change in

3    February of 2011, a month before his arrest and almost two

4    years after the government first began secretly tape-recording

5    his conversations when Mr. George, yet again, rejected

6    Dardinski's desperate attempts to manufacture a criminal money

7    laundering conspiracy from whole cloth, telling Dardinski for

8    the umpteenth time that he would not be involved in his cash

9    transactions.

10:10 10    (Audiotape played.)

11         MR. GOLDSTEIN:  Why is Mr. George here?  We may never

12    know the real reason or reasons.  But in the end, whatever Mr.

13    Hansen did or did not do with Ron Dardinski, the evidence will

14    be, as I told you at the outset, Mr. George has committed no

15    crime.

16         May it please the Court, counsel, and ladies and

17    gentlemen of the jury, as you now know, my name is Robert

18    Goldstein, and with Mr. Reddington, I am proud to represent

19    Robert George in this matter.

10:10 20         The evidence will show this case did not begin with

21    any random or chance encounter at the South Shore Plaza in

22    February or March of 2009.  Incredibly, the government, to

23    date, has not even identified the date of this alleged critical

24    meeting.  But the evidence will show that it began well before

25    then.  You will learn that on January 21, 2009, only days after

1    he was released from prison on Martha's Vineyard, Ron Dardinski

2    began telephoning Mr. George's law office, telling his

3    secretary that he just got out of jail and needed to see Mr.

4    George.  The evidence will show that from February 5 to

5    February 17, 2009, Mr. Dardinski called Mr. George's law office

6    at least an additional seven times without making any contact

7    or receiving a return call from Mr. George.  Why was Dardinski

8    so intent on getting in touch with Mr. George immediately upon

9    his release from prison?  Listen carefully to the evidence in

10:11 10    this case, in particular, the cross-examinations of the

11    government's witnesses, and those reasons will be laid bare.

12        By February of 2009, Mr. Dardinski had become a

13    professional informant.  The evidence will show that by that

14    time he had been paid more than $75,000 by government agents in

15    return for his cooperation in other cases.  The evidence will

16    show that he has since been paid more than $20,000 for his role

17    in this investigation and that he stands to be paid still more

18    for his cooperation in this matter.

19        While Ron Dardinski has convinced the government to

10:12 20    buy his lies, ladies and gentlemen of the jury, you will not be

21    required to accept the lies and deception of Ron Dardinski, a

22    man, the evidence will show, has lived a lifetime of deception.

23    You will learn that on repeated occasions Dardinski has been

24    convicted for crimes of deceit.  You will learn that for his

25    entire life Ron Dardinski has honed and perfected his art of

1    deception, manipulating circumstances to make it appear as if a

2    set of facts exist when they do not.  You will learn Mr.

3    Dardinski has deceived dozens of honest citizens of this

4    Commonwealth, robbing them of their hard-earned money by

5    looking them in the eye, as he will do here in this courtroom,

6    and telling a story built on a foundation of lies.

7           Not only has Mr. Dardinski been convicted on dozens of

8    occasions for crimes of deceit, he has committed crimes while

9    ostensibly cooperating with government agents in violation of

10:13 10   his cooperation agreement.  He has been imprisoned and then,

11   yet again, engaged in crimes of deceit.  The evidence will show

12   Mr. Dardinski is simply incapable of changing.  It is who he is

13   down to his molecular DNA.  The evidence will show that there

14   is not a situation in which he will not lie and not a person to

15   whom he will not lie, particularly if it's in his own interest

16   to do so.  And the evidence will show that it was and is

17   entirely in his interest to lie about Mr. George.

18          Incredibly, you will hear the agents ostensibly

19   responsible for Mr. Dardinski's cooperation knew all about his

10:14 20   history of deception, yet they continued to use him as a

21   cooperator.  At least the FBI has demonstrated the wisdom to

22   cut Dardinski off as a cooperator, not the DEA, not DEA Agent

23   Joseph Tamuleviz.  Rather than cut ties with Mr. Dardinski, the

24   evidence will show that Agent Tamuleviz and his team have

25   continued to handsomely reward him for his cooperation.  I

1    expect the evidence to show that Dardinski's marriage to Agent

2    Tamuleviz has proven to be not only very lucrative but,

3    ultimately, a powerfully corrupting incentive for Mr. Dardinski

4    to create the appearance of crime where none exists.

5          In the end, I expect Ron Dardinski to tell you in his

6    own words that he has absolutely no place, no place, as a

7    witness in a criminal proceeding.  I expect he will admit that

8    not because he wants to but because he has to.  So I ask you to

9    keep an open mind during Mr. Dardinski's direct examination

10:15 10   testimony.  In the end, his motives and intentions will be

11   crystal clear, and the evidence will show he not only has the

12   ability to create the appearance of crime where none exists,

13   but that is precisely what he has done here.

14         Now, Mr. Hafer and I agree on at least one thing:  The

15   recordings in this case will be of paramount importance,

16   perhaps even more important than the government now realizes.

17   But to discern the true, real course of events requires a

18   careful, almost forensic, examination of the recordings, not

19   some superficial playing of the tapes but almost a forensic

10:16 20   examination of the recordings.  So together, throughout the

21   course of this trial, we will navigate and deconstruct the

22   pertinent recordings and meetings.

23         And I expect that examination will reveal several

24   immutable facts.  First, Mr. George repeatedly rejected

25   Dardinski's efforts to get him to launder criminal funds

1     beginning with the very first recorded conversation on March

2     18, 2009, when Mr. George told Dardinski that he obviously

3     would not be involved in any transaction involving drug

4     proceeds.  As you heard, nine months later, on December 7,

5     2009, Mr. George told Dardinski, no less than 14 times, he

6     would not be involved in Dardinski's transactions with Hansen.

7     And you will learn Mr. George continued to reject those

8     overtures all the way through to February 2011.

9           Second, the recordings will demonstrate Mr. George had

10:17 10     no actual knowledge that Dardinski and Hansen were even

11     engaging in financial transactions, much less knowledge

12     regarding the purpose, structure or details of those

13     transactions.  In fact, the recordings after April 15, 2010,

14     the date of the charged transaction, I expect will show Mr.

15     George repeatedly questioning Dardinski and Hansen whether they

16     actually engaged in any transactions.  For example, on April

17     27, 2010, 12 days after the second of two charged transactions,

18     you will hear Mr. George actually ask Dardinski to swear on his

19     kids' lives that he was even doing deals with Mr. Hansen.

10:18 20     (Audiotape played.)

21           MR. GOLDSTEIN:  Mr. George's absence of knowledge that

22     Hansen and Dardinski were even engaging in financial

23     transactions, I expect, will be a recurring theme throughout

24     these recordings.

25           Third, after Mr. George told Dardinski in the very

1    first conversation in March of 2009 that he would not be

2    involved in any transaction involving drug proceeds, you will

3    learn Ron Dardinski never again mentioned drugs or drug

4    proceeds in any conversation with Mr. George that predates

5    April 15, 2010, the date of the second charged transaction.

6    Did Dardinski later, after April 15th, mention drugs or drug

7    proceeds in conversations with Mr. George?  Yes.  But never

8    again between April 15, 2010, and March 18 of 2009.  And the

9    recordings will demonstrate Mr. George simply had no intent to

10:19 10   launder criminal proceeds.

11             In fact, the evidence will show Mr. George had ample

12   reason to believe Ron Dardinski would have legitimate earnings

13   that he would want converted into a check.  The evidence will

14   show -- you'll hear many recordings regarding the fact Ron

15   Dardinski at one point in time owned and operated a very large

16   automobile repossession business which had approximately 300

17   different banks as customers.  And the evidence will show Mr.

18   George had every reason to believe Mr. Dardinski would not want

19   to publicly expose his legitimately earned money, including the

10:20 20   fact that when Mr. Dardinski was released from prison in

21   January of 2009, there was an outstanding order from a court

22   for back-owed child support obligations exceeding $50,000 and

23   court-ordered restitution obligations of tens of thousands of

24   dollars.

25             Now, while we agree the recordings will be important

1    in this case, that's not where the story ends.  In addition to

2    the content of the recordings, it's not just the content but

3    the timing of the recordings that will be critically important

4    in this case.  For example, as you will learn, after two

5    recordings of substance in the spring of 2009 -- March 18 and

6    April 6, 2009 -- there are only two recorded calls with Mr.

7    George for the entire following year, between April 6, 2009,

8    and April 25 of 2010.

9         I expect you'll hear evidence of a conversation on

10:21 10   August 14, 2009, when Mr. Dardinski simply reports back to Mr.

11   George regarding the results of a meeting he had with Mr.

12   Hansen on that date, and the conversation on December 7, 2009,

13   when Mr. George told Dardinski, no less than 14 times, he would

14   not be involved in his transactions.

15        Importantly, the government will not offer a single

16   recorded call of Mr. George between December 7, 2009, and April

17   15, 2010, the date of the second transaction, meaning you will

18   not hear a single recording wherein Mr. George alters the

19   message he delivered so unequivocally to Mr. Dardinski during

10:21 20   the December 7th telephone conversation.

21        Additionally, you will learn it's not just the content

22   of the recordings or the timing of the recordings but the

23   absence of calls and the absence of communications that will be

24   critically important to understanding the true, real course of

25   events in this case.  For example, I expect the evidence to be

1    overwhelming that Mr. George stopped talking to Michael Hansen

2    in April of 2009 and that they did not begin speaking again

3    until July of 2010, more than a year later and only after Mr.

4    Hansen had agreed to cooperate with the government.  Some

5    conspiracy, ladies and gentlemen.  The government has charged

6    that Mr. George conspired with Michael Hansen from February of

7    2009 to June of 2010, and the evidence will demonstrate Mr.

8    George was not even on speaking terms with the only other

9    person charged as a coconspirator for almost that entire period

10:22  10    of time.

11           Now, the Honorable Judge Gorton is the only authority

12    on the law in this case.  But I expect he will instruct you

13    that, as a matter of law, a conspiracy in this case cannot

14    include Mr. Dardinski because he was, at all pertinent times,

15    acting as a government agent.

16           The evidence will also show there were large swarths

17    of time when Mr. Dardinski simply fell off the grid and stopped

18    calling Mr. George.  For example, the evidence will show that

19    between September 4, 2009, and December 6, 2009, Mr. Dardinski

10:23  20    calls Mr. George zero times, a period of slightly more than

21    three months, 92 days, not a single call from Dardinski to

22    George.  Likewise, from January 11, 2010, to April 26, 2010,

23    the evidence will show Dardinski called Mr. George zero times.

24           What does Mr. George, this money-hungry,

25    money-laundering, lawyer do to further his alleged intent to

1    engage in criminal money laundering?  To further his alleged

2    conspiracy when Dardinski stops calling him?  The evidence will

3    show:  nothing, not a single thing.  The evidence will show Mr.

4    George did not contact or call Mr. Dardinski even a single time

5    when Dardinski stopped calling him between September 4th and

6    December 6th and did not call him a single time between January

7    11 and April 26, 2010, and only then in response to calls from

8    Dardinski to Mr. George.  How do we know?  You will examine

9    with us certain toll records of their respective telephones.

10:24 10   In the end, it's not just the content of the recordings, but

11   we'll also examine relevant toll records, and they, too, will

12   help demonstrate the poisoned foundation of the government's

13   case.

14          Finally, in addition to the content of the calls, the

15   timing of the calls, and the absence of calls, we will examine

16   certain call patterns in this case, and they will demonstrate,

17   contrary to what Mr. Hafer tried to tell you a few minutes ago,

18   that it was Ron Dardinski that was the engine pushing this

19   entire orchestration, that if not for Dardinski, the

10:25 20   professional informant, pushing his agenda, there would have

21   been no transactions in this case, none at all.

22          You will learn that Mr. Dardinski engaged in numerous

23   predatory calling campaigns, that he would essentially force

24   his way into conversations and meetings, including his first

25   meeting with Mr. Hansen on August 14, 2009, when, the evidence

1    will show, Dardinski simply threatened to show up unannounced

2    at Hansen's place of business if Michael Hansen would not

3    return his calls.

4         Now, as Mr. Hafer tried to explain, we will not hear

5    the overwhelming majority of calls made to Mr. George or Mr.

6    Hansen in this case by Ronald Dardinski because Mr. Dardinski

7    selectively recorded very few of the conversations that he had

8    in this case even though I expect the evidence to show

9    government agents had the ability to tape-record and preserve

10:26 10   every single call made during their two-plus-year investigation

11   if they so desired.  But we do have the toll records, and an

12   examination of those toll records will also help expose the

13   toxic foundation of the government's case.

14        Now, this is just the tip of the proverbial iceberg as

15   to the evidence we expect to elicit from the recordings and

16   toll records in this case.  Does Mr. George sound less

17   professional than he would want to?  Does he say some dumb

18   things during the course of the recordings?  Of course, he

19   does, as would most anyone if you were secretly tape-recorded

10:26 20   for more than two years of your life.  The evidence will show

21   that Mr. George was simply trying to appease what he thought to

22   be an existing client, Ron Dardinski, and to connect with what

23   he believed to be a potential new client, an undercover

24   officer.

25        But in the end, the recordings and toll records will

1    demonstrate overwhelmingly that Michael Hansen and Ron

2    Dardinski formed their own independent relationship, completely

3    divorced from Mr. George, and the government cannot and will

4    not prove that Mr. George conspired with Michael Hansen in

5    February of 2009, June of 2010, or any time in between.

6            In fact, as I noted, government agents eventually

7    decided to confront Michael Hansen.  I expect the evidence to

8    show that on June 8, 2010, government agents appeared

9    unannounced at Mr. Hansen's home.  I expect the evidence to

10:27 10    show that by June 10 of 2010 -- I expect the evidence to show

11   that by June 10 of 2010, Michael Hansen had entered into a

12   cooperation agreement with the government.  Over the course of

13   the next month to six weeks, the government agents debriefed

14   Michael Hansen, getting his view of events from February of

15   2009 to June of 2010, his view of Dardinski, and his view of

16   his interactions with Dardinski.

17           Now, you may have noticed Mr. Hafer did not list

18   Michael Hansen as one of the people he expected you might hear

19   from in this case.  It's not yet known whether or not the

10:28 20   government will call Michael Hansen as a witness.  They've

21   informed the Court that they do not presently intend to call

22   him.  But we expect that, if called, Michael Hansen will

23   testify that he never entered into a conspiracy to launder

24   criminally derived funds with Mr. George and that Mr. George

25   never told him that Dardinski's money came from drug proceeds.

1    That's right, ladies and gentlemen.  The one person charged in

2    this case as a coconspirator, who at this very moment in time

3    is subject to a cooperation agreement with the U.S. attorneys,

4    I expect will testify, if called, that he never entered into an

5    agreement with Robert George to launder criminally derived

6    funds.

7          Now, after debriefing Mr. Hansen for a month or so,

8    government agents had him reinitiate contact with Mr. George.

9    As you'll recall, the evidence will establish Mr. George had

10:29 10   not spoken to Michael Hansen since April of 2009.  And Mr.

11   Hansen eventually records a series of conversations and

12   meetings in the fall of 2010.  Yes, Michael Hansen eventually

13   gives Mr. George a check in the amount of $20,000 and later

14   replaces that check with $20,000 in cash.  But the evidence

15   will show that that occurred in August of 2010 and September of

16   2010, four and five months after the second charged transaction

17   and well after Mr. Hansen agreed to cooperate with the

18   government.

19         I expect the recordings to demonstrate Mr. George

10:30 20   never asked for, expected or wanted even a penny of the money

21   that Hansen may have taken from Dardinski.  And Mr. Hafer's

22   descriptions of those conversations in April and May of 2010,

23   for the government to suggest that Mr. George was trying to

24   physically scare Michael Hansen to reinitiate contact with him

25   so that he could get paid will once again be rendered entirely

1    implausible.  I also expect the recordings to show how strange

2    Mr. George found it that Michael Hansen was chasing him to give

3    him money.

4         In the end, a thorough examination of the recordings

5    between Mr. George and Michael Hansen will demonstrate that

6    there was no preexisting agreement between Mr. George and

7    Michael Hansen to split any proceeds that Hansen may have taken

8    from Dardinski.  And any suggestion to the contrary by the

9    government will be exposed for precisely what it is:  yet

10:31 10   another allegation manufactured from whole cloth.

11        Now, in January of 2011, after almost two years of

12   Dardinski chasing Mr. George and after turning an old friend

13   into a cooperating witness, government agents implemented a new

14   effort to ensnare Mr. George.  Picking up on his comment on

15   June 1, 2010, as you heard, Mr. George telling Dardinski the

16   only way he could help him was by referring him clients,

17   government agents had Dardinski tell Mr. George he had a

18   potential new, big-money client for him.  There are two

19   meetings with an undercover officer in 2011 -- well, we've got

10:32 20   a technical glitch.  There are two meetings with an undercover

21   officer, February 28, 2011, and March 4, 2011, who Mr. George

22   believes is a potential new client.  And the undercover agent

23   does eventually give Mr. George $25,000 in cash as a legal

24   retainer.

25        The evidence will show Mr. George was open and

1    transparent in his representation and dealings with the

2    undercover officer.  If the hallmark of criminal conduct is

3    secrecy, clandestine meetings, and hidden evidence, the

4    evidence will show Mr. George meeting in public places with the

5    undercover officer, in a restaurant, in a lobby of a hotel in

6    Dedham, having public conversations and asking the undercover

7    officer to sign an engagement agreement.

8            Now, an important point, ladies and gentlemen, the

9    government does not charge Mr. George has done anything

10:33 10   unlawful by accepting the $25,000 as a legal fee in this case.

11   It is perhaps distasteful to some, but the fact of the matter

12   is that every citizen is entitled to legal representation, even

13   a person engaged in despicable conduct such as drug

14   distribution.  The Sixth Amendment of the United States

15   Constitution demands no less.  And so the government has not

16   charged that Mr. George has done anything unlawful by accepting

17   the undercover officer as a client or accepting his $25,000 as

18   a legal fee.

19           Instead, as you heard, the government charges that Mr.

10:34 20   George illegally structured the deposit of that money, making

21   two deposits in amounts less than $10,000, one -- both deposits

22   into the same Bank of America account but at different branches

23   located approximately a mile or so away from each other and

24   making those deposits within minutes of each other.  Counts 4,

25   5, and 7 charge that Mr. George illegally structured those

1    transactions to avoid certain reporting requirements imposed

2    upon our financial banking institutions.  In the end, the

3    evidence will be clear:  Mr. George did not have any intent to

4    evade any reporting requirements.  In fact, as Mr. Hafer told

5    you, Bank of America actually issued the Currency Transaction

6    Report the government alleges Mr. George had an intent to

7    evade.

8        Count 6, which we've not yet discussed, concerns a

9    check in the amount of $2,500 that Mr. George gave to Mr.

10:35 10   Dardinski after receiving the $25,000 from the undercover

11   officer, representing a 10 percent referral fee for what Mr.

12   George believed to be a new client.  In the end, for reasons

13   that will become clear during trial, the government cannot and

14   will not prove that count either.

15       Now, faced with a factual void regarding Mr. George's

16   actual conduct, the evidence will show the government has

17   engaged in an invasive examination of his finances, going so

18   far as to subpoena his wife's credit card statements, her car

19   payment history, and even his children's college and

10:35 20   postgraduate academic and loan records, all in an effort to try

21   to show Mr. George was laboring under some financial pressure,

22   all in an attempt to explain how or why Mr. George in life

23   would ever offer to launder funds for Mr. Dardinski.

24       In the end, the evidence will show Mr. George was, by

25   all accounts, a well-accomplished, well-paid lawyer, with

1    substantial assets and significant earning power when

2    government agents, approximately ten of them, surrounded and

3    stormed his home in the early morning hours of March 23, 2011.

4    Mr. George, a devoted family man, at home with his wife and

5    daughter, getting ready for the day ahead, was so stunned, you

6    will hear, that he actually fainted when he realized government

7    agents were in his home accusing him of criminal conduct.

8         Now, this is a criminal case.  As the Court has

9    instructed you, in a criminal case, a defendant bears

10:36 10   absolutely no burden of proof.  The Constitution upon which

11   this country was built unequivocally provides Mr. George the

12   right to sit here silent.  It is the government that bears the

13   burden of proving beyond a reasonable doubt each and every

14   element of each charged crime.  It is a gravely solemn burden

15   of proof that requires not speculation, assumption or guesswork

16   or even the possibility or probability that a crime occurred

17   but only proof beyond a reasonable doubt, evidence so

18   convincing and compelling that you would rely on it in making

19   gravely serious decisions upon which your fate or your family's

10:37 20   fate would depend.

21        Ladies and gentlemen, there is no greater horror in a

22   democracy than to be wrongfully charged by your government.

23   Our criminal justice system has you as its foundation, the

24   framers of the Constitution.  The Founding Fathers feared the

25   centralization of excessive power in its government.  That is

1   why an accusation is not the same as a conviction.  That is why

2   a prosecutor does not decide whether to extinguish a citizen's

3   liberty or instead to liberate that person from false charges.

4   That is a power so compelling that in our system of justice

5   it's reserved for 12 people, not one or two, a jury of a

6   citizen's ultimate protection against the excesses of his

7   government.

8            In the end, I respectfully submit to you the

9   government will fail to sustain its gravely solemn burden of

10:38 10   proof.  Mr. George surely permitted Ron Dardinski to remain in

11   his life for too long, but there simply will be no sustainable

12   foundation to the government's case.  When we stand before you

13   for closing arguments, we will, therefore, respectfully ask

14   that you return a verdict of not guilty on each and every

15   count, not out of sympathy or passion but because it will be

16   right, just and proper, because Mr. George is innocent of these

17   wholly unjust and unfounded accusations.  Thank you.

18   .  .  .   END OF EXCERPT.)

19

20

21

22

23

24

25

1  C E R T I F I C A T E

2

3

4        I certify that the foregoing is a correct transcript

5  of the record of proceedings in the above-entitled matter to

6  the best of my skill and ability.

7

8

9

10

11

12  /s/Cheryl Dahlstrom              06/05/2012

13  Cheryl Dahlstrom, RMR, CRR       Dated

14  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25