UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA        )
                                )
          v.                    )      Criminal No. 11-10201-NMG
                                )
ROBERT A. GEORGE                )


## OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL

Defendant Robert George ("Defendant") has moved for an order pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure for a judgment of acquittal on Counts 1, 2, 3 and 6 or alternatively a new trial on all counts.  Viewing the evidence in the light most favorable to the verdict of guilt, the Court should deny defendant's motion.

The legal standards governing a Rule 29 motion are well-established.  Rule 29 provides that the Court may enter a judgment of acquittal notwithstanding a jury's verdict if the evidence is insufficient to sustain a conviction.  The Court must decide, viewing the evidence in the light most favorable to the verdict of guilt, whether a reasonable or rational fact finder could find the defendant guilty of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Mercado Irizarry*, 404 F.3d 497, 503 (1st Cir. 2005).  This standard of review is "formidable."  *United States v. Loder*, 23 F.3d 586, 589 (1st Cir. 1994).  In conducting this review, the

Court does not weigh the credibility of the witnesses or "assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence." *United States v. Rivera-Ruiz*, 244 F.3d 263, 266 (1st Cir. 2001).  Indeed, the Court must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and, moreover, as among competing inferences, two or more of which are plausible, the Court must choose the inference that best fits the prosecution's theory of guilt.  *See United States v. Taylor*, 54 F.3d 967, 974 (1st Cir. 1995); *United States v. Rothrock*, 806 F.2d 318, 320 (1st Cir. 1986).  As long as the guilty verdict finds support in a "plausible rendition of the record," it must stand.  *United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir. 1992).

## I.  <u>Counts One Through Three Were Supported By The Evidence</u>

The Court must decide, viewing the evidence in the light most favorable to the verdict of guilt, whether a reasonable or rational fact finder could find the defendant guilty of the crimes charged in Counts One through Three beyond a reasonable doubt.  In his arguments for a new trial and judgment of acquittal, the defendant does nothing more than rehash old arguments that; (1) Dardinski was not credible; (2) the tapes do not prove the defendant's guilt; (3) the defendant withdrew from the conspiracy; (4) the unrecorded calls would prove the defendant's innocence, to argue that the government failed to

2

prove that the defendant ever agreed to launder criminally derived funds.  The government submits that the evidence was more than sufficient to establish the defendant's guilt beyond a reasonable doubt and the defendant has failed to raise any new arguments to the contrary.

The Court presided over the trial in this matter and is well aware of the evidence, which included, among other things, (1) defendant's clear understanding of how the two separate $100,000 cash sums would be converted to checks; (2) his explanation of that understanding to Dardinski; (3) his agreement with Hansen to convert the cash to a check made out to a fictitious company; (4) his statement to Dardinski that Hansen had already agreed to "do the rest" referring to the laundering of Dardinski's purported drug money; and (5) defendant's multiple references to money laundering when describing his agreement with Hansen.

Moreover, in conducting its review, the Court should not weigh the credibility of the witnesses or assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence.  *See United States v. Rivera-Ruiz,* 244 F.3d 263, 266 (1st Cir. 2001).  The defendant's view of the evidence should be rejected since all evidentiary conflicts and credibility questions must be resolved in the prosecution's favor.  If there are competing inferences, two or more of which are plausible, the Court must choose the inference

3

that best fits the prosecution's theory of guilt.  *See, United States v. Taylor*, 54 F.3d 967, 974 (1st Cir. 1995).

## II.  <u>The Jury's Verdict As To Counts Four, Five, and Seven Was Proper</u>

The evidence viewed in the light most favorable to the prosecution establishes the propriety of the jury's verdict on Counts Four, Five and Seven.  The defendant posits several possible explanations for structuring the money in the manner in which he did and argues that the government failed to prove an intent to evade.  However, the totality of the evidence introduced before the jury clearly established a pattern wherein it was plain that the defendant's intent was to conceal and evade - from the coded telephone conversations, warnings not to speak on the telephone, meetings in the cars, recorded conversations about how to exchange cash for checks to avoid detection, to making deposits eleven minutes apart at two different branches of the same bank.  The government also provided expert testimony about the structuring of money.  Again, if there are competing inferences, two or more of which are plausible, the Court must choose the inference that best fits the prosecution's theory of guilt.  *See United States v. Taylor*, 54 F.3d 967, 974 (1st Cir. 1995).  Here the inference was that the defendant made these deposits in such a manner as to evade detection.  This was an

4

entirely plausible theory that the jury obviously accepted.
Accordingly, the defendant's motion should be denied.

## III.  **The Evidence Supported the Jury's Verdict As To Count Six**

Defendant argues that the verdict on Count Six is not
supported by the evidence in that the government failed to prove
that the $2,500 deposited in his bank account to cover the check
to Dardinski constituted the same funds provided to him by the
undercover agent.  There was no such failure on the part of the
government and, even if there were, this argument reflects a
misunderstanding of the law by the defendant.

Contrary to the defendant's argument, the government was not
required to prove that the full amount of the $2,500 check
constituted the same unlawful proceeds provided by the undercover
agent.  Such an interpretation of Section 1956 of Title 18 would
eviscerate the statute permitting one to avoid its reach simply
by commingling proceeds of unlawful activity with legitimate
funds.  *See United States v. McGauley*, 279 F.3d 62 (1st Cir.
2002).

At trial, the evidence clearly proved that the defendant
wrote Dardinski a check in the amount of $2,500 from the very
same bank account where the defendant had recently deposited
$17,000 (of the $25,000) in purported drug money given to him by
the undercover agent.  Moreover, in recorded calls introduced at
trial, defendant made clear to Dardinski that this $2,500 was

Dardinski's 10% cut for bringing the defendant a new client.  As such, the jury could reasonably draw certain inferences to support the theory that the $2,500 check came from what the defendant believed to be unlawful proceeds, as the defendant would not have paid Dardinski the $2,500 if he had not received the $25,000 in cash from the undercover agent.  In addition, the jury could infer that the $2,500 check was from the same unlawful proceeds because the defendant told Dardinski he was going to pay him a fee from the undercover's money.  Indeed, it is hard to imagine better evidence of defendant's intent to launder money than the recorded calls in which the defendant completely made up fake work Dardinski did for him in the memo line of the check.

To the extent the defendant now claims that he might have commingled the funds, a proposition for which there was no evidentiary support at trial, the commingling of funds by the defendant does not absolve him of criminal liability for money laundering.  The jury certainly could have found, and obviously did, that the $2,500 check drawn on that very same Bank of America account included proceeds of purported drug money and that the transaction was designed, in whole or in part, "to conceal or disguise" the nature, location, and source of those proceeds, in violation of 18 U.S.C. Section 1956(a)(1)(B)(i).

IV.  **The Government's Use of the August 17, 2010 Video Recording of the Defendant Was Proper**

Defendant argues that the government's use of the August 17, 2012 videotape was improper and prejudicial.  The videotape, however, was clearly admissible under Fed. R. Evid. 403 and its probative value was not substantially outweighed by danger of unfair prejudice.[1]

As previously explained in the government's opposition to defendant's motion in limine to exclude the August 17, 2010 videotape, this videotape was made at a meeting between the defendant and the cooperating witness.  The meeting took place at the cooperating witness' place of business.  The Drug Enforcement Administration ("DEA") concealed the video recorder in the cooperating witness' office in such a way that it would not be detected or otherwise visible to the defendant.  As in many undercover operations, it was necessary to use a small video recorder to avoid detection by the target.  The object, which contained the video recorder in this case, was placed in an optimal position to record the defendant - who was the target of the investigation.

---

[1]A videotape is considered a photograph, for admissibility purposes; it is admissible in evidence and is subject to the same general rules of admissibility as a photograph.  *Washington v. State*, 406 Md. 642, 961 A.2d 1110 (2008).

Defendant's sole objection to the videotape's admissibility is the fact that the defendant is the only person visible on the videotape.  However, the defendant still fails to cite to a single case where a videotape was excluded on similar grounds.  Defendant analogizes the situation here, where only the defendant is visible on camera, to circumstances involving incomplete or partially inaudible audio recordings.  Such an analogy is inapposite.  The audiotape of the August 17, 2010 conversation is completely audible and there is no issue with the quality of the videotape in question.  The reason the analogy to an incomplete or partially inaudible audio recording fails is that it is quite common for videotaped evidence to be "one-sided" - where the only person visible on camera is the target.  In most drug and gun cases, cooperating witnesses wear small cameras on their person that are focused directly on the target.  Indeed, in any case where a cooperating witness is the videographer, the cooperating witness will not be visible to the camera.

The defendant argues that the jury cannot know whether the cooperating witness made a gesture or nuance during the conversation that provoked the defendant's physical reactions or gestures during the pertinent meeting.  It is sheer speculation to suggest that the cooperating witness did something not visible to the camera that somehow provoked the defendant's physical reactions or gestures.

8

Fed.R.Evid 403 provides in pertinent part:

> Although relevant, evidence may be excluded
> if its probative value is substantially
> outweighed by the danger of unfair prejudice,
> confusion of the issues, or misleading the
> jury, or by considerations of undue delay, waste
> of time, or needless presentation of cumulative
> evidence.

Moreover, most courts have held, as the defendant concedes, that a generally audible tape should be admitted, leaving its evidentiary weight to the jury. *See United States v. Howard*, 80 F.3d 1194, 1198-99 (7th Cir. 1996).

While the August 17, 2010 videotape was strong evidence of defendant's guilt (and the fact that he was not entrapped), it was not unfairly prejudicial, confusing of the issues, or misleading to the jury. Moreover, playing of the videotape while the jury listened to the audio did not cause undue delay, waste of time, or needless presentation of cumulative evidence. *See United Stats v. DiSanto*, 86 F.3d 1238, 1253 (1st Cir. 1996); *United States v.Carbone*, 798 F.2d 21, 24 (1st Cir. 1986).

## V.  The Government's Use of the February 28, 2011 and March 4, 2011 Recordings Did Not Unfairly Prejudice the Defendant

Defendant has argued twice before, both before and during trial, to exclude portions of the February 28, 2011 and March 4, 2011 conversations. Now, defendant argues that admission of these conversations unfairly prejudiced him at trial. Again, the defendant offers no support for his core contention that the

government should have been precluded from offering incriminating evidence in more than one form and, for this reason, his motion should be denied.

The conversations contained in the February 28, 2011 and March 4, 2011 transcripts were relevant to, among other things: (1) the full nature and context of the relationship between the defendant and the undercover agent, including the repeated references to the undercover agent's purported drug trafficking business; (2) the full nature and context of the business relationship between the defendant and Dardinski, a point very much in dispute in this case, including the fact that the defendant used Dardinski as the go-between for him and the "drug dealer," and repeatedly asked Dardinski how much the defendant should charge the "drug dealer" for his legal services; and (3) it established the fact that the defendant was surveillance-conscious and aware of the importance of not talking about criminal activity on the telephone.[2]

In further support of his motion, defendant claims that because some of the evidence had already come in through Dardinski, the government did not need to go over it again with the undercover

---

[2]   In both his opening and cross-examination of Dardinski, defendant repeatedly attempted to portray his statements about talking on the telephone as innocuous.  In the February 28 and March 4, 2011 conversations, however, defendant tells the DEA undercover agent, among other things, that he should never talk to him on the phone, that the Dedham Hilton is a great place to meet because "no one's ever [t]here" and "they got the TVs going."

agent.  He is wrong.  First, it is clear that the lynchpin of the defense was to try to make this case about Dardinski, not the defendant, and the suggestion that the government was not allowed to corroborate Dardinski is ludicrous.  Second, it would have greatly prejudiced the government if it could not have called the undercover agent to testify, among other things, about: (1) what he meant by certain of his statements in the transcripts on both February 28 and March 4, and what his understanding of the conversations was; (2) the defendant's giving him his business cards; and (3) the handover of the $25,000 in cash to the defendant, the same cash that the defendant laundered later that afternoon.

In sum, the audio/video of the February 28 and March 4 meetings, and the accompanying transcripts, were critical in explaining to the jury the full nature and context of the undercover agent's relationship with the defendant, the defendant's relationship with Dardinski, and the circumstances of the March 4 transaction in which defendant took $25,000 in cash.  Moreover, and significantly, to the extent portions of these conversations were highly prejudicial, irrelevant, or inflammatory (such as references to "Dominicans"), the jury never heard those references as the Court excluded them.

## VI.  __The Government's Closing Argument Was Proper__

The defendant argues that the government's closing statement was improper in that the government misstated the facts, misstated the law, and vouched for its witnesses.  Nothing that the government said in its closing statement, however, "so poisoned the well" as to have likely affected the trial's outcome.  *See United States v. Mooney*, 315 F.3d 54, 60 (1st Cir. 2002). Moreover, the Court gave clear instructions, both before and after the closing arguments, that the lawyers' arguments were just argument and nothing more.

Defendant's claim that the government improperly vouched for Dardinski is unfounded.  "Improper vouching occurs when the government places the prestige of the United States behind a witness by making personal assurances about the credibility of a witness or implies that the jury should credit the government's evidence simply because the government can be trusted."  *United States v. Robinson*, 473 F.3d 387, 396 (1st Cir. 2007)(internal quotations and citations omitted).  There was no vouching here.  In asking its questions, the government neither commented on nor made personal assurances about Dardinski's credibility nor did the government ever use the term "I" or "we" to express an argument as claimed by the defendant.  Indeed, the government spent a substantial portion of its direct examination eliciting Dardinski's lengthy criminal history.

The defendant also argues that by stating that the government could have proved its case without even calling Dardinski, the government somehow improperly vouched for Dardinski.  This argument is difficult to follow.  Indeed, the government told the jury that they need not believe Dardinski about anything because there was plenty of other evidence to rely upon.  This can hardly be considered vouching for a witness.  The defendant's motion should be denied.

## VII.   The Court's Exclusion Of Portions Of An April 27, 2010 Conversation  Was Proper

The defendant again argues that the tape-recorded inflammatory remarks made by the defendant about the prosecutor in this case should have been admissible.  This cannot be true.  Such inflammatory remarks about the prosecutor, including defendant's comment about what he believed to be the prosecutor's religion and the prosecutor's alleged threats to the defendant, would have been highly prejudicial to the government and would have resulted in the prosecutor, and others, having to testify to the untruthfulness of the allegations.  These remarks were irrelevant to the facts at issue in this case and would have distracted the jury from the core issues at trial.

## VIII.   This Court Already Found Defendant's Claim of Outrageous Government Misconduct To Be Baseless

Any claim based on outrageous government misconduct has already been ruled on pre-trial and is not the proper subject of a

Rule 29 or Rule 33 motion.  Such a claim has no basis in fact and no place at trial but rather should have been made at the appropriate time in a motion alleging a defect in the indictment. Federal Rule of Criminal Procedure 12(b)(3)(B) requires all vindictive prosecution claims to be raised prior to trial.  Those not raised before trial are waived, absent "good cause." Fed. R. Crim. P. 12(e).  *See Espinal-Genao v. United States,* 2010 WL 3809997 (D. Puerto Rico 2010).

Moreover, the First Circuit has yet to see a case in which it has found the government's conduct outrageous within the meaning of the doctrine.  *See, e.g., Luisi*, 482 F.3d at 59 (holding that even if the government's efforts gave the defendant a viable entrapment claim, based on derivative entrapment, they "fell well short of shocking the 'universal sense of justice'"; and collecting cases); *United States v. Teague*, 469 F.3d 205, 210-11 (1st Cir. 2006) (finding no evidence that the police conduct in searching an RV was "so outrageous as to violate the 'canons of decency and fairness' to implicate the Due Process Clause.") (quoting *United States v. Payner*, 447 U.S. 727, 737 n.9 (1980) (citations omitted)); *United States v. Gifford*, 17 F.3d 462, 470-71 (1st Cir. 1994) (stating that "the Executive Branch is free, within broad limits, to set [undercover] snares for unwary criminals."); *Santana*, 6 F.3d at 4, 6 (even assuming that the government had supplied 13.3 grams of 92% pure heroin to gain confidence of drug traffickers, and that the

14

quantity was introduced into the market and not recovered, such an operation was not outrageous in light of extensiveness of the criminal enterprise; collecting cases); *Panitz*, 907 F.2d 1267 (government's conduct of "sting" operation after large quantity of marijuana was intercepted was not so outrageous as to violate due process; although government agents brought marijuana into country after it was intercepted and delivered it to smuggler, smuggler had already formulated plan for distributing marijuana and was alone responsible for lining up customers, with agents merely affording smuggler and customers opportunity to carry out preplanned crime; district court did not abuse its discretion in denying evidentiary hearing on the motion; noting the "unbroken string" of First Circuit cases repulsing outrageous governmental conduct claims); *United States v. Penagaricano-Soler*, 911 F.2d 833, 839 n.1 (1st Cir. 1990).

For all of these reasons, and those previously articulated in its pre-trial motion in opposition to the defendant's motion to dismiss, the defendant's motion should be denied.

## IX. Dardinski Did Not Improperly Testify at Trial

Defendant argues that Dardinski should have been precluded from testifying because he had a "clearly-defined, vested interest in a guilty verdict." To support this claim, the defendant points to *United States v. Cresta*, this Circuit's hallmark contingency fee case in which a cooperating witness was paid for his services as an

15

informant and also expected to recover a percentage of the assets seized. 825 F.2d 538 (1st Cir. 1987). The defendant misrepresents the facts and misapplies the holding in *Cresta* to our case. Dardinski's testimony was entirely proper.

First, Dardinski had no vested interest in a guilty verdict. He was not promised by DEA that he would receive an award. He was informed by DEA that he was eligible for an award should assets be seized. In fact, assets in the amount of approximately $180,000 were seized by DEA from co-conspirator Michael Hansen ("Hansen") prior to the defendant's trial. Dardinski received a percentage of that money prior to the defendant's trial and may receive a second payment from additional money seized from Hansen. This award money would have been paid to Dardinski regardless of whether the defendant was found guilty because the money was seized from the defendant's co-conspirator, Hansen, who pled guilty and agreed to forfeit assets.

Second, an award of this nature is entirely permissible. "Rewards for assistance are essential to the business of detecting and punishing crime." *United States v. Innamorati*, 966 F.2d 456, 482 n.11 (1st Cir. 1993)(internal citations omitted); *See United States v. Davis*, 261 F.3d 1, 38 (1st Cir. 2001)("We have been reluctant to exclude testimony based only on the fact that a witness was paid.").

The Department of Justice Assets Forfeiture Fund provides a statutorily permissible means of awarding individuals for

information in 28 U.S.C. § 524(c)(1)(B).  Section 524(c)(1) states that the Department of Justice's Assets Forfeiture Fund is available to award individuals for "information or assistance directly relating to" money laundering activities and structuring payments (in relevant part).  Therefore, Dardinski's receipt of an award pursuant to this statute should be viewed with an assumption of validity. *See United States v. Wilson*, 904 F.2d 656, 660 (11th Cir. 1990).

The First Circuit in *Cresta* set forth a number of safeguards to promote transparency and to bring to light any conflicts that may have colored the witness's testimony. Those safeguards include: (1) informing the jury of the nature of the agreement; (2) permitting defense-counsel to cross-examine the witness about the agreement; and (3) instructing the jury to weigh the witness's testimony accordingly. *Id.* at 546; *See also*, *United States v. Gonzalez-Vazquez*, 219 F.3d 37, 46 (1st Cir. 2000).

The government thoroughly complied with these safeguards in this case. First, the jury was informed that Dardinski had received money from DEA during the direct examination of Dardinski.  Second, defendant's counsel ably cross-examined Dardinski about the possibility of his receiving an award.  Third, the Court gave cautionary instruction to the jury about how to evaluate the testimony of witnesses who receive payment in exchange for their testimony.

Though a high payment to a cooperating witness may be "subject to scrutiny" by the court, many very high payments have been upheld as proper. *See Cresta*, 825 F.2d at 549 (finding over $65,000 in payments proper); *Innamorati*, 996 F.2d at 482 (finding a $250,000 payment (twenty percent of seized assets) proper); *Wilson*, 904 F.2d at 660 (holding that size of $11 million award did not violate the defendant's due process rights). The defendant makes only a conclusory statement that Dardinski's payment was "excessive," and fails to allege any facts to support his assertion. Because the government followed the procedural safeguards in place as required by *Cresta*, the size of the award was not "excessive" and should not be considered in determining the testimony's permissibility. *See Cresta*, 825 F.2d at 549; *accord Wilson*, 904 F.2d at 660.

Finally, even if there were a legitimate challenge to Dardinski, "the challenge should ordinarily be directed to the jury, not the appellate court." *See United States v. Gonzalez-Vazquez*, 219 F.3d 37, 46 (1st Cir. 2000). In *Gonzalez-Vazquez*, the First Circuit stated that courts have relied on cross-examination to right any possible wrongs in the informant's testimony and leave to the jury the question of credibility. *Cresta*, 825 F.2d at 546 (summarizing *United States v. Dailey*, 759 F.2d 192, 196 (1st Cir. 1985)). The veracity of the informant's testimony should not be *per se* excluded based on his payment agreement with the government. It is within the jury's province to weigh the testimony and the witness's character

18

within the context of the facts and the law, as they did in this case, to find the defendant guilty.

## X.  __There Was No *Brady* Violation__

Defendant argues that there was a *Brady* violation in that he learned for the first time during trial: (1) of the existence of a previous investigation involving himself and (2) that DEA had requested an additional $100,000 in cash to provide to the defendant.  It is difficult to imagine, however, how prior criminal investigations of one defendant could be considered exculpatory, rather than inculpatory.  Nevertheless, the defendant did obtain the information during the trial and was able to use this evidence to cross examine the witnesses at trial.  Thus, he was not prejudiced in any way.

In addressing the contours and contents of *Brady* claims, the First Circuit has held that "the rule of *Brady* . . . applies to the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Soto-Alvarez*, 958 F.2d 473, 477 (1st Cir. 1992) (citations omitted) (no *Brady* violation where the material in question was introduced into evidence as a trial exhibit by the government); *see also Hernandez*, 490 F.3d at 85 (no *Brady* violation due to government's introduction of previously undisclosed phone records into evidence because, while the defendant was "certainly . . . surprised by the government's new evidence," he "has not alleged that the government was aware of the

19

significance of the codes at an earlier time, or that it deliberately withheld the evidence until it would cause maximum harm to the defense"; "[i]n addition, the evidence [defendant] complains of was within his ability to discover, just as it was within the government's, as both parties had access to the cell phone records").

To establish prejudice sufficient to prove a *Brady* violation in the delayed disclosure context, a defendant must show that the delay in production prevented him from using the evidence effectively in preparing and presenting his case; he must make at least a *prima facie* showing of a "'plausible strategic option which the delay foreclosed.'" *United States v. Lemmerer*, 277 F.3d 579, 588 (1st Cir. 2002) (quoting *Devin*, 918 F.2d at 290). *See, e.g., United States v. Laurent*, 607 F.3d 895, 901 (1st Cir. 2010) (no prejudice from government's delayed disclosure because, at most, defense counsel might have tweaked his opening argument to account for the information and, in any event, "no tweaking of defense counsel's argument could have made any difference" in light of the trial evidence); *United States v. Rivera-Hernandez*, 497 F.3d 71, 79 (1st Cir. 2007) (no *Brady* violation because defendant failed to show how government's delayed disclosure impaired his ability to effectively cross-examine witness or present his defense); *United States v. Misla-Aldarondo*, 478 F.3d 52, 64 (1st Cir. 2007) (where defense counsel was aware of allegations contained in report prior

to trial, no prejudice resulted from government's delayed disclosure of the report).

A defendant's argument that he has been prejudiced by delayed disclosure will be seriously undermined by his failure to request a continuance when the evidence does come to light. *See Mathur*, 624 F.3d at 506 ("The customary remedy for a *Brady* violation that surfaces mid-trial is a continuance and a concomitant opportunity to analyze the new information and, if necessary, recall witnesses." Thus, no *Brady* violation occurred where district court offered such remediation but defendant rejected it); *United States v. Mangual-Garcia*, 505 F.3d 1, 5 (1st Cir. 2007) ("As a general rule, a defendant who does not request a continuance will not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery"); *United States v. Smith*, 292 F.3d 90, 102-103 and n.10 (1st Cir. 2002) (noting that "defense counsel must typically request a continuance to preserve a claim of prejudice by delayed disclosure of evidence"). *See also Aviles-Colon*, 536 F.3d at 26 (no *Brady* violation because defendant neither argued that a particular strategic option was foreclosed nor provided an explanation for why he did not request a continuance after government's delayed disclosure of evidence); *United States v. Perez-Ruiz*, 353 F.3d 1, 8-9 (1st Cir. 2003) (where continuance was requested but not granted, no prejudice given that defense counsel had already had the records for hours, the records were not

voluminous, and the trial court offered to allow the defendant to recall the witness.)

Because the defendant has failed to show that he has been prejudiced in any way, his *Brady* claim should be denied.

## XI. Wire Fraud As An Alternative Specified Unlawful Activity Was Proper.

The defendant argues that the jury was improperly instructed with respect to wire fraud as an alternative specified unlawful activity as to Counts One through Three. He argues that the use of the wires was not in furtherance of the scheme. The case law requires that the use of the wires must be "incident to an essential part of the scheme," *Pereira v. United States*, 347 U.S. 1 (1954); *United States v. Lopez*, 71 F.3d 954 (1st Cir. 1995). There is no reason why the jury could not have found that the use of faxes in this case was in furtherance of Dardinski's scheme.

The evidence clearly established that the defendant knew that Dardinski was involved in unlawful activity involving repossessed cars. As the Court may recall, Dardinski testified that his arrest in 2002 generated a good deal of publicity and specifics of his crimes and the proceeds he earned from those crimes were detailed in the Boston Globe, Boston Herald, Fox 25 and Needham Times. In addition, when Dardinski was arrested, he contacted the defendant for legal help. According to Dardinski, he and the defendant discussed the details of his criminal activity. Dardinski did not retain the defendant because the defendant wanted too much money as

a fee.   Dardinski also testified that the defendant frequently visited Dardinski at his auto body and vehicle repossession business and knew the nature of his business.  Dardinski's previous crimes, of which the defendant was aware, constitute the specified unlawful activity of wire fraud.  Although Dardinski was charged in multiple state courts with larceny, his scheme involving the repossessed cars could have been charged as a federal wire fraud.

The evidence showed that at the time of his arrest, Dardinski owned his own auto body shop, Independent Auto Recovery, and he had a franchise from American Lenders, a vehicle repossession company located in Odessa, Texas.  Dardinski testified that he received faxes from American Lenders identifying vehicles to be repossessed. Dardinski would repossess these and other vehicles and store them on his lot in Norwood.  Individuals would come to his shop and offer to purchase the repossessed vehicles.  Dardinski took money from several individuals for vehicles (both repossessed ones and fictional ones).  Of course, Dardinski never gave these individuals the vehicles they had paid for.  The evidence also proved that the defendant had knowledge of this scheme.  Prior to Dardinski's arrest on these charges, the defendant had visited Dardinski at his place of business.  Dardinski had thirteen trucks some of which had the name American Lenders written on them.  The two discussed Dardinski's business and, in fact, the defendant discussed the purchase of a vehicle from Dardinski.  Even if Dardinski did not

specifically tell the defendant that he used wire communications to conduct this scam, based on all of the above, it should have been reasonably foreseeable to the defendant that this type of business involved use of wire communications.

Clearly, the use of the wires was incident to an essential part of Dardinski's scheme.  Since it is not necessary that the scheme contemplate the use of the wires as an essential element, it was entirely proper to charge wire fraud as an alternative specified unlawful activity.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motions for a new trial and judgment of acquittal ss the evidence was more than sufficient to sustain a conviction on all counts.

                        Respectfully submitted,

                        CARMEN M. ORTIZ
                        UNITED STATES ATTORNEY

            By:
                        */s/ Laura J. Kaplan*
                        LAURA J. KAPLAN
                        ZACHARY R. HAFER
                        Assistant U.S. Attorneys

Date: August 17, 2012

## CERTIFICATE OF SERVICE

24

I hereby certify that this document filed through the ECF
system will be sent electronically to the registered participants
as identified on the Notice of Electronic Filing (NEF).

/s/ Laura J. Kaplan
LAURA J. KAPLAN
Assistant U.S. Attorney

Date: August 17, 2012