1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3
     UNITED STATES OF AMERICA          )
4                                      )
                                       )
5    vs.                               )  CR No. 11-10201-NMG
                                       )
6                                      )
     ROBERT A. GEORGE                  )
7

8    BEFORE:  THE HONORABLE NATHANIEL M. GORTON

9
                      DAY SIX OF JURY TRIAL
10

11   APPEARANCES:

12        OFFICE OF THE UNITED STATES ATTORNEY (By:  Laura Kaplan,
          AUSA, and Zachary Hafer, AUSA), One Courthouse Way,
13        Boston, Massachusetts 02210.  On Behalf of the Government.

14        LAW OFFICE OF ROBERT M. GOLDSTEIN (By:  Robert M.
          Goldstein, Esq.), 20 Park Plaza, Boston, Massachusetts
15        02116.
          - and -
16        LAW OFFICE OF KEVIN J. REDDINGTON (By:  Kevin J.
          Reddington, Esq.), 1342 Belmont Street, Brockton,
17        Massachusetts 02301.  On Behalf of the Defendant.

18
                  John Joseph Moakley United States Courthouse
19                          Courtroom No. 4
                           One Courthouse Way
20                          Boston, MA 02210
                        Wednesday, June 6, 2012
21                           10:23 a.m.

22
                      Cheryl Dahlstrom, RMR, CRR
23                        Official Court Reporter
                  John Joseph Moakley United States Courthouse
24                     One Courthouse Way, Room 3209
                           Boston, MA 02210
25              Mechanical Steno - Transcript by Computer

1                              I N D E X

2     Testimony of:          Direct   Cross   Redirect   Recross

3     JOSEPH TAMULEVIZ (Cont'd)
        by Mr. Kaplan                            82/93
4       by Mr. Reddington              15                    89/94

5     PAUL CROWLEY (Re-called)
        by Mr. Hafer            95               111
6       by Mr. Goldstein               100                  113

7     LORI MOCCALDI
        by Mr. Hafer           115
8       by Mr. Reddington              129

9     PEDRO NIEVES
        by Mr. Hafer           142

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                             E X H I B I T S

2        No.     Description                        For ID/In Evd.

3        116     Highlighted telephone calls between .....    49
                 Dardinski and Tamuleviz and between
4                Dardinski and George

5        117     CD containing Sprint calls...............     49

6        D       Hansen plea agreement.................... 90

7        E       2007 tax return......................... 104

8        F       2008 tax return......................... 104

9        117     IRS account transcript for 2010..........    105

10       20      Stipulation previously read to the jury..    114

11       22A-    Charts prepared by Moccaldi..............    119
         22C
12

13       25E     Bank of America activity from 3/2/11 to .    126
                 3/4/11

14       13E     Stipulation read to the jury.............    128

15       118     Discovery log............................    132

16       11C     Disk of recordings.......................    148

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  I'll see counsel at sidebar.

3      (SIDEBAR CONFERENCE AS FOLLOWS:

4              THE COURT:  We've got some pending motions to deal

5      with.  I'm going to give you my rulings, and then I'll hear you

6      briefly, but I do want to get going obviously.  We're later

7      than we thought we would be starting.

8              The defendant's motion in limine to strike evidence

9      and/or to preclude further evidence, Docket No. 99, is allowed

10:22 10  in part and denied in part.  No evidence with respect to the

11     March 4, 2011, meeting will be stricken from the record.  The

12     government will be permitted to introduce the February 28,

13     2011, meeting but must redact the following portions thereof

14     which the Court deems less probative and/or cumulative of the

15     March 4th transcript, beginning on Page 15 when George says --

16     I actually can show you.

17             MR. HAFER:  Your Honor, can I grab it real quick so I

18     can mark it?

19             THE COURT:  Yes.

10:22 20        MR. GOLDSTEIN:  Can I grab it as well?

21             THE COURT:  In the transcript, on Page 15, about a

22     third of the way down, less than a third, where Mr. George

23     says, "As a client, I agree."  Starting there, I'm going to

24     delete down through the Nieves comment, "'Cause if I need some

25     advice," those 15 or so lines.

1           And then on Page 17, beginning halfway down where

2     George says, "And then you want me to bank it, okay."  Starting

3     there, all the way through Page 19, in the middle, where Nieves

4     says, "Yeah, that's -- that's what I mean.  I mean, you know."

5     That's halfway down the page.  So those two pages go out.

6     Those seem to me to relate to the attorney-client relationship

7     that Mr. George is entitled to talk to a prospective client

8     about, and I don't think there's any probative value.

9           MR. GOLDSTEIN:  Judge, may I interject just for a

10:24 10     second?  I just want -- we may go into those areas only because

11     if the -- and I apologize, and I appreciate the Court going

12     back to the issue.  But if the other parts of 28 are coming in,

13     I may view these as being legitimate areas.  I'm just letting

14     you know.

15           THE COURT:  That's your choice.  If you want to go

16     back into it, that's fine.  I'm just suggesting, as far as I'm

17     concerned, if you don't get into it, they don't need to come

18     in.

19           MR. GOLDSTEIN:  Thank you very much.

10:25 20           THE COURT:  Then with respect to Pages 4 through 12 of

21     that transcript, starting about a third of the way down on the

22     Page 4, where Mr. George says, "All right.  What I've -- I've

23     done this amazing times," all the way through Page 12, eight

24     pages later, at the very top of the page where Nieves says,

25     "Okay."  With respect to that portion, the Court is inclined to

1    delete as unduly prejudicial and cumulative, but I will hear

2    the government with respect to any portion of that colloquy

3    which the government wants to argue bears upon the issue of

4    criminally derived proceeds.  I'm not sure I can decipher any,

5    but if there is, I'll reconsider the deletion of that portion

6    of the transcript.  I'm not going to do it right now.  This is

7    something that I believe will come up with Mr. Nieves this

8    afternoon, right?

9            MS. KAPLAN:  Yes.

10:26 10            THE COURT:  But between now and then, I would hear the

11   government with respect to why any portion of that 4 to 12

12   should not be deleted.

13            MR. HAFER:  We're okay.  I'm looking at my outline,

14   your Honor, and we're happy -- the question with respect to

15   something on Page 3, but in light of the Court's guidance,

16   we're prepared to delete Pages 4 to 12.

17            THE COURT:  That's fine.  Then that does dispense with

18   that.

19            The Court will further consider any limiting jury

10:26 20   instruction submitted by the defendant with respect to the fact

21   that the defendant is not charged with illegal conduct

22   vis-à-vis the undercover officer aside from allegedly

23   structuring the retainer and giving Mr. Dardinski a referral

24   fee and/or that any individual is entitled to legal

25   representation and so forth.  So if you want to prepare

1    something for me either as a limiting instruction at some point

2    during the trial or certainly during the charge, I will

3    consider that.

4        MR. GOLDSTEIN:  We've prepared it and we'll submit it,

5    your Honor.  Thank you.

6        THE COURT:  Then with respect to the defendant's

7    motion in limine to admit jail recordings, that's Docket No.

8    106, which has not been opposed, it is allowed.

9        MS. KAPLAN:  Your Honor, the reason that it wasn't

10:27 10   opposed, first of all, was lack of time.  But it's unclear how

11   much of those recordings they're going to play.  It seems to me

12   they've played a significant amount already.  I think it would

13   be cumulative and a waste of time to play any more unless it

14   goes towards bias or state of mind, if it comes in --

15       THE COURT:  I'm only making a ruling on those which

16   have been played already may be admitted as a -- as a CD or

17   whatever, as an exhibit.  I'm not anticipating that you're

18   going to offer any others.

19       MR. GOLDSTEIN:  There may --

10:28 20       MR. REDDINGTON:  There will be on Dardinski as a

21   witness, your Honor.  The conversation -- I'm sorry,

22   Tamuleviz -- his conversation with Mr. Dardinski while he was

23   in jail down in Martha's Vineyard.  There's maybe one, two

24   tops, and they're very brief.

25       THE COURT:  If there are one or two tops, they will be

1    admitted, but I'm not going to admit 155 conversations.

2             MR. REDDINGTON:  No.

3             MS. KAPLAN:  I would just ask to see a copy of the

4    transcript.

5             THE COURT:  Show Miss Kaplan a copy of the transcript.

6             MR. REDDINGTON:  Okay.

7             THE COURT:  Then, third, the government's -- what was

8    filed yesterday, the defendant's --

9             MR. GOLDSTEIN:  Motion to strike.

10:28 10          THE COURT:  -- motion to strike Exhibit 1C, which is

11   Docket No. 108, obviously, the government has not had a chance

12   to respond.  I just instruct counsel to stay away from that

13   issue until I've had a chance to get the government's response

14   to that.  Are you going to respond in writing?

15            MS. KAPLAN:  I will.  I can respond now.  Our position

16   would be, under Williams vs. United States, a Supreme Court

17   case, that a check is not a factual assertion at all and

18   therefore can't be characterized as true or false.  And,

19   therefore, it's not -- checks don't fall within the exception

10:29 20   to the hearsay rule.  That's a Supreme Court --

21            THE COURT:  I'm not so sure about that.  I'm going to

22   give you a chance to respond in writing, and I will consider

23   this.  This is not something that I have to decide on the spur

24   of the moment.

25            MS. KAPLAN:  I will respond in writing.

1          THE COURT:  This is an important issue, and I will

2     give it careful consideration.  If you can get me something in

3     by the end of the day, I'll rule on it by tomorrow.

4          MS. KAPLAN:  I will do that.

5          MR. GOLDSTEIN:  Thank you, your Honor.

6          THE COURT:  I think that's all.

7          MS. KAPLAN:  I think there were some others.

8          THE COURT:  Some other issues?

9          MS. KAPLAN:  The defense has notified the government

10:29 10    that they want to re-call Ronnie Dardinski and want us to have

11     him available.  They've had three days with him on

12     cross-examination.  I would ask at least for an offer of proof.

13     He's got very significant childcare issues.  It's very

14     difficult to get him here.  I don't think that we should just

15     be bringing him back to go over the same stuff.

16          MR. GOLDSTEIN:  Two things, your Honor.  First of all,

17     I specifically reserved, and your Honor allowed my motion to

18     reserve, in terms of going over the April 27, 2010, transcript

19     with him.  Secondly --

10:30 20    THE COURT:  That's the jail --

21          MR. GOLDSTEIN:  Yes.

22          THE COURT:  -- comments about the $100,000?

23          MR. GOLDSTEIN:  Yes.  Secondly, there was the issue

24     whether we were going to be able to admit Mr. Dardinski's cell

25     phone records.  The government has stipulated that we can admit

1    the Sprint records on the CD, which are Dardinski's cell phone

2    records.  That issues was not resolved until after Mr.

3    Dardinski was taken off the stand.  So I would like to go

4    through his cell phone records and establish certain points.  I

5    promised the jury in my opening they would be examining toll

6    records.  I think it's appropriate that I be able to do that

7    with Mr. Dardinski in this case.

8         THE COURT:  I'll reserve on that.  I think that sounds

9    reasonable.  The length of this testimony would be 15 minutes?

10:31 10       MR. GOLDSTEIN:  I don't think it would be more than 20

11   minutes, Judge.

12        MS. KAPLAN:  Your Honor, with respect to that issue, I

13   know you had said that your ruling was that my name had to be

14   -- and Rachel Hershfang's name had to be redacted.  However,

15   I'm very concerned about this transcript, in reviewing it

16   again, that it still has the gender --

17        THE COURT:  Has this been changed since I last saw it?

18        MS. KAPLAN:  No.  It's not been changed, but I just

19   want to point out --

10:31 20       MR. GOLDSTEIN:  It has been.  I submitted one this

21   morning to your Honor.

22        THE COURT:  I haven't seen it.  That's okay.

23        MS. KAPLAN:  So they still are using the gender as

24   "she."  But this is what concerns me, is a statement by the

25   defendant.  "I knew you and I knew you weren't setting me up,

1   but the fact is she threatened me."  I don't know what

2   relevance that has.  I think the jury is going to speculate

3   that the "she" is me, and I think that's highly prejudicial to

4   the government.  I understand the point that they want to

5   contradict Dardinski's testimony that Bob George told him that

6   he was told that he was a suspect in a labor racketeering case

7   and they want to argue, in fact, Ronnie Dardinski told Bob

8   George that.  But this has no relevance, that a female

9   prosecutor threatened the defendant.  What relevance does that

10:32 10   have?

11              MR. GOLDSTEIN:  Your Honor, it goes to the context.

12   First of all, again, it was the government that walked through

13   this door, opened it up wide and injected itself into this

14   case.  We didn't do this.  Now they've left the jury with the

15   wrongful impression that it was my client who --

16              THE COURT:  Okay.  That has to do with the $100,000

17   and the murder charge.  It has nothing to do with this --

18              MR. GOLDSTEIN:  This is all part and parcel.  See,

19   what happened -- if Mr. George simply made a gratuitous, Oh,

10:32 20   you told me it was a murder, but it's a lengthy conversation

21   about the subject matter.  The more details that Mr. George

22   puts into his explanation of what happened in 2004, the more

23   credible it is.  And so the jury is not going to speculate it's

24   Miss Kaplan.  We've removed her name.

25              THE COURT:  I'm sorry?

1          MR. GOLDSTEIN:  We've removed her name.  We've put in

2     an assistant AUSA.  She's not the only female assistant U.S.

3     attorney on the ninth floor.  It does go to my client's

4     credibility on the --

5          THE COURT:  When is this going to be?

6          MR. GOLDSTEIN:  When Mr. Dardinski testifies.

7          THE COURT:  That's off a ways.  I'm going to think

8     about this one.

9          MS. KAPLAN:  Your Honor, I want to point out is the

10:33 10    reason my name came out is because Dardinski was talking about

11    this, "And I wrote a letter, and I wrote a letter to you."  He

12    spontaneously offered that.  When I came back the next day, I

13    wanted the jury to understand why he would be picking me out.

14    I said, "Why did you write it to me?"  "Because I had worked

15    with you before."  Just to establish why he would be picking me

16    out.  This is far afield from that.  And I think that because

17    they know that he wrote me that letter in 2004, they are going

18    to certainly speculate that I'm the prosecutor that threatened

19    the defendant.

10:34 20    THE COURT:  I will consider it further, but I don't

21    need to do it now.

22         MR. REDDINGTON:  May I -- I want you to know.

23         THE COURT:  Wait a minute --

24         MS. KAPLAN:  One more thing is that I think it's very

25    dangerous territory for the defendant to go into this

1    conversation with Dardinski because Dardinski is going to open

2    it back up to what he told me and there were agents who want to

3    interview him and what the agents talked about.

4         THE COURT:  We'll talk about that before Dardinski

5    testifies again if he testifies again.

6         MS. KAPLAN:  Do you want us to have Dardinski here

7    today because we have to go get him?

8         THE COURT:  When do you expect to rest?  How much into

9    today?

10:34 10      MR. HAFER:  That will lead to -- these aren't legal

11   issues.  It's going to take us some time to fix -- we intended

12   to rest by the end of the day today.  It's going to take us a

13   little time to fix the audio on these transcripts per your

14   rulings.  I expect to be able to do that over the break, so it

15   may be a tad longer and we'll be able to rest by 3:30 today.  I

16   think that's realistic.  I think the amount of time Mr.

17   Reddington's indicated he needs for cross of the case agent and

18   our remaining witnesses that that will probably take the better

19   part of the day.  I just want to --

10:35 20      THE COURT:  Do you have other witnesses that you're

21   going to call other than Mr. Dardinski?

22        MR. GOLDSTEIN:  There was one witness that we're

23   thinking of calling today, but the government has -- is going

24   to re-call their tax guy, so we may not need to call that

25   particular witness.

1          THE COURT:  I'm going to cross this bridge when we get
2     to the next break.
3          MR. HAFER:  I just wanted to tell you, if you care, we
4     are re-calling this tax guy very briefly.  If you'd like me to
5     tell you why I am, I think the issue is --
6          THE COURT:  Is there any objection?
7          MR. GOLDSTEIN:  No.  We asked for him to come back.
8          THE COURT:  Mr. Reddington.
9          MR. REDDINGTON:  I just want to make sure -- I don't
10:35 10   want to run afoul of your ruling.  I would ask permission to be
11    able, on cross, to ask Tamuleviz, in the course of his
12    investigation of this case and Mr. Dardinski, was he aware that
13    back in 2004 the U.S. Attorney wanted to have a consensual
14    wire.  I think that's important on the issue of the bias and --
15         THE COURT:  Mr. Tamuleviz aware?
16         MR. REDDINGTON:  I want to ask him, as the lead agent,
17    is he aware of that.  I'm not going to get into conversation.
18    I'm not going to get into specifics.
19         THE COURT:  I think that's okay.
10:36 20   MR. HAFER:  Thank you, your Honor.
21         MR. REDDINGTON:  Thank you.
22    .  .  .  END OF SIDEBAR CONFERENCE.)
23    (Jury in at 10:40 a.m.)
24         THE COURT:  Good morning, jurors.  Again, we're
25    starting a little later than we otherwise had scheduled.  That

1    had to do with legal matters that we needed to resolve outside

2    of your hearing.  We've not been loafing.  We've been working

3    hard to do that.  In the long run, it does save time for

4    everybody.  Thank you for your patience.  We're ready to

5    resume.

6            Mr. Tamuleviz, you're reminded that you remain under

7    oath.

8            Mr. Reddington, you may continue with

9    cross-examination.

10:40 10       MR. REDDINGTON:  Thank you, your Honor.

11   CONTINUED CROSS-EXAMINATION BY MR. REDDINGTON:

12   Q.   Mr. Tamuleviz, you are a DEA agent and have been for a

13   number of years, true?

14   A.   Yes, sir, 21 years.

15   Q.   In other words, you're not one of these, like, local

16   police officers, Rehoboth or Lakeville, and they task them to

17   the DEA as a special agent?

18   A.   No, I am not.  I'm a special agent with the United States

19   Drug Enforcement Administration.

10:40 20  Q.   In that capacity, one does not just get the job and carry

21   a badge and a gun and deal with criminal matters.  You have to

22   go to an academy, right?

23   A.   Yes.  I went through the academy, yes.

24   Q.   You have to study different manuals, and you have rules

25   and regulations that you have to adhere to, right?

1    A.    Yes.

2    Q.    One of the things that you're instructed in the academy is

3    that it's important to be fair and objective, right?

4    A.    Yes.

5    Q.    And one of the things that you have to be fair and

6    objective about would be the individual that you're working

7    with as a handler?  That's what you refer to, as a "handler,"

8    is that correct?

9    A.    I'm not sure I understand your question.

10:41 10    Q.    Okay.  You have an informant, a guy like Dardinski for

11    example and you sign him up, right?

12    A.    So I sign up a confidential source, is what you're saying?

13    Q.    Yes.

14    A.    Yes.

15    Q.    And you would be referred to as his handler, right?

16    A.    I would be referred to as his controlling agent.

17    Q.    Okay.  So as the controlling agent, especially in your

18    capacity where you would agree with me that you're the lead

19    investigator in this matter involving the United States of

10:41 20    America against Robert George, right?

21    A.    I'm the case agent for DEA, yes.

22    Q.    You're the lead case agent on this investigation?

23    A.    I am the case agent.

24    Q.    Right?

25    A.    Yes.

1   Q.   Is there somebody else that was investigating and involved

2   with witnesses other than you, sir?

3   A.   Yes.  I got assistance from the groups I was assigned to

4   and also from IRS Special Agent Frank Conway and my supervisor.

5   Q.   Frank Conway was the agent that was with you the day that

6   you arrested Bob George, right?

7   A.   Yes, he is, among other agents and officers.

8   Q.   So tell me how it works.  You are working -- is it Group

9   6?

10:42 10   A.   At the time of his arrest, you want to know where I was

11   working?

12   Q.   No, when Dardinski first came to you.

13   A.   At that time, I was working in Group 1.

14   Q.   Group 1.  When was the first time that you met Mr.

15   Dardinski?

16   A.   Oh, I believe I met him maybe in the early 2000s with

17   Special Agent Vincent Kelly.

18   Q.   In the early 2000s, was he working as an informant for

19   you?

10:42 20   A.   Not for me, no.

21   Q.   Another agency, Department of Labor?

22   A.   For another agent at that time.

23   Q.   Okay.  Are you aware, sir, that Mr. Dardinski had been

24   working as an informant for the Department of Labor or the FBI

25   regarding a labor investigation?

1    A.    Yes.

2    Q.    Now, when was it that you first carded -- that's the term

3    you use.  When you open up a file and you bring the person in,

4    you pay them money for their cooperation, you call that

5    carding, right?

6    A.    Yes.

7    Q.    When was he first carded?

8    A.    Mr. Dardinski, I believe -- I didn't card him at first,

9    but I believe in 1997.

10:43 10    Q.    1997.  When did you card him?  You had to reactivate him,

11    right?

12    A.    He was deactivated and reactivated, I believe, at least

13    twice during that time period.  But I was basically asked by

14    Special Agent Vinny Kelly, I believe it was in 2007, if I

15    wanted to use Mr. Dardinski.

16    Q.    So that's the first time you met Dardinski?

17    A.    No.  I stated earlier that I met him in the early 2000s.

18    Q.    The first time you used him as an informant?

19    A.    I believe it was in 2007.

10:44 20    Q.    2007.  Now, you carded him.  You had him sign the

21    cooperation or the agreement that you were talking about the

22    other day, right?

23    A.    I believe he was already carded at that time if I remember

24    correctly.

25    Q.    Didn't you have to reactivate him though?

1    A.    I believe he was already activated at the time, carded.

2    Q.    So at this point when you were dealing with Mr. Dardinski

3    -- and it was on an unrelated investigation, right?

4    A.    When I first met him, he didn't have any information.  If

5    he got something, you know, he was going to call me up.

6    Q.    Let's talk about Bob George, this investigation.

7    A.    Okay.

8    Q.    When was it that you were first contacted by Ronald

9    Dardinski regarding this matter?

10:44 10   A.    I don't remember the exact date.  As I stated earlier, it

11   was either February or early March of 2009.

12   Q.    So he gets out of jail, or prison, as you call it, down in

13   Martha's Vineyard, right?

14   A.    He got out of prison, I believe, on January 9th of --

15   Q.    My question was:  He got out of the prison, yes?

16   A.    I was going to give you the date, sir, if you'd like it.

17   Q.    He got out of prison, is the question, sir.

18   A.    Yes.

19   Q.    Thank you.  When he got out of the prison, it's your

10:45 20   understanding that he then contacted you, right?

21   A.    Yes.  I don't know if it was immediately after.

22   Q.    And he contacted you for the purpose of reactivating and

23   getting some money, right?

24   A.    He was activated at that time for payment purposes only.

25   Q.    Did you know Monica, the mother of his child?

1    A.    As I stated, I met her once or twice.  I don't really know

2    her.

3    Q.    Where did you meet her?

4    A.    I believe it was in Brighton court on a probation hearing

5    for Mr. Dardinski.

6    Q.    While he was down in Martha's Vineyard prison, as you

7    refer to it, would you agree with me, sir, that you spoke to

8    Mr. Dardinski on a number of occasions?

9    A.    He called me several times.

10:45 10   Q.    My question is:  Did you speak to him, sir?

11   A.    He called me several times.

12   Q.    The answer is yes, correct?

13   A.    Yes.  He called me.

14   Q.    Did he ever speak to you in person?  In other words, did

15   you ever go down there to Martha's Vineyard?

16   A.    No, I did not.

17   Q.    How many times do you believe that he called you while he

18   was incarcerated at the prison on Martha's Vineyard?

19   A.    I believe I stated earlier approximately eight to ten

10:46 20   times.  I don't have an exact number.

21   Q.    Did he call you on your cell phone, or did he call you at

22   your office?

23   A.    At my office.

24   Q.    Did you interact with Monica at all?  Apparently not if

25   she only talked to you once or twice or you met once or twice.

1    A.   She called me when he first went to jail about him being

2    transferred from the jail he was in to Martha's Vineyard.

3    Q.   Sir, the question is:  Did you speak to Monica on the

4    telephone while he was in Martha's Vineyard?

5    A.   Yes.

6    Q.   How often?

7    A.   I believe it was only once or twice.

8    Q.   And the reason that you would speak to Monica, sir, would

9    be what?  Dardinski's well-being, his welfare?

10:46 10   A.   His safety.  She was concerned about his safety.

11   Q.   All right.  She did not know, or did she know, who you

12   were?

13   A.   I can't answer that question.

14   Q.   Well, did you say, Hey, it's Joe T. from the DEA?

15   A.   No, I did not.

16   Q.   Did you have her call you at your office?

17   A.   I believe she had my cell phone number if I remember

18   correctly.

19   Q.   If somebody answers the phone in the DEA office, it's

10:47 20   like, You've reached group whatever it may be from the Drug

21   Enforcement Administration, right?  There's a recording, right?

22   A.   No.  I answer my phone at the office sometimes.  I

23   personally pick the phone up and answer it.

24   Q.   Maybe I'm not being clear.  If someone was to call the

25   DEA, your office, whether it's to recover property or whether

1    it's to arrange to interview an agent and no one is there, for

2    example, there's a recording, right?

3    A.   If I'm not there, there's a recording, yes.

4    Q.   So the answer is yes, there's a recording, right?

5    A.   Yes.

6    Q.   And do you also have staff that answers the phone?

7    A.   My personal phone, no.

8    Q.   I'm asking about the DEA phone, sir.

9    A.   I have my DEA phone, and I'm the only one that answers

10:47 10   that phone.  No one else should be answering that phone.

11   Q.   When you're dealing with Monica, you told this jury that

12   she was concerned about Mr. Dardinski's safety, right?

13   A.   Yes.

14   Q.   So the concern was because of his informant status on

15   organized crime cases, right?

16   A.   Her concern was that his cooperation with DEA was known by

17   certain people that he had given information to and that were

18   arrested.  And he was afraid for his safety.

19   Q.   And that was publicized also in the newspaper a little

10:48 20   bit, right, those arrests?

21   A.   I can't answer that question.  I don't know.

22   Q.   All right.  So she's concerned that her boyfriend, Ronald

23   Dardinski, is in fear for his safety because of his informant

24   status for the DEA, right?

25   A.   Because of his cooperation with the DEA.

1    Q.   Sir, his informant status is what was the concern, isn't

2    that right?

3    A.   Because of his cooperation with DEA.

4    Q.   So she knew that he was cooperating with DEA, didn't she?

5    A.   She knew that he had cooperated with the law enforcement

6    agency.  I can't really answer that question.

7    Q.   So out of the FBI, the Brockton Police Department, the

8    Massachusetts State Police --

9    A.   I don't believe he cooperated with the Brockton Police

10:49 10   Department.

11   Q.   What's that?

12   A.   I don't believe he cooperated with the Brockton Police

13   Department.

14   Q.   No kidding?  So --

15           MS. KAPLAN:  Objection.

16           THE COURT:  Sustained.

17   Q.   It's obvious --

18           THE COURT:  Sustained.

19   Q.   -- that she knew he was cooperating as an informant

10:49 20   working with the DEA, right?

21   A.   I do not know what Monica knew.  I cannot read her mind.

22   Q.   You knew that she was concerned about his safety, right?

23   A.   Yes.

24   Q.   You knew that he was in prison.  Where was he, in Concord?

25   A.   I believe -- I'm not positive -- at the time, he was in

1    South Bay.

2    Q.    South Bay Correctional.  That's not a very nice place, is

3    it, sir?

4    A.    I've never been there.  I don't know.

5    Q.    Okay.  Well, they have jail cells in there, don't they?

6    A.    I would assume so.  It's a prison.

7    Q.    You're on a 23-hour-a-day lockdown when you're in South

8    Bay, right?

9    A.    I cannot answer that question.  I don't know.

10:49 10   Q.    Did you ever meet with Dardinski while he was in South

11    Bay?

12    A.    No, sir, I did not.

13    Q.    Did you ever talk to Dardinski on the phone or the cell

14    phone while he was in South Bay?

15    A.    I may have.  I don't recall specifically.  I may not have

16    either.

17    Q.    Do you remember talking to Dardinski while he was wringing

18    his hands and worried that he's in fear as an informant, and

19    he's going to be in trouble and someone is going to whack him

10:50 20   or hurt him or punch him or whatever?

21    A.    Like I stated, I don't recall if he talked to me when he

22    was in South Bay.

23    Q.    So the answer would be no?

24    A.    I don't recall.  I don't know.  I may have.

25    Q.    But it was Monica who reached out to you, apparently,

1    because of the fear of retaliation; it was Monica, right?

2    A.   Yes.  I don't know if Dardinski had access to a phone.

3         MS. KAPLAN:  Objection.

4         THE COURT:  Let him answer the question, Mr.

5    Reddington.  Don't interrupt his answer.

6    A.   I do not know if Mr. Dardinski had access to a telephone

7    when he was at South Bay.

8    Q.   My question, though, sir, was:  It was Monica that reached

9    out to you first and talked about the concerns for his safety,

10:50 10   yes?

11   A.   Yes.

12   Q.   All right.  And Monica reaches out to you knowing,

13   obviously, that you are the DEA agent that Ronald Dardinski is

14   working with, right?

15   A.   That is not absolutely correct.  She called me because she

16   knew I was involved in law enforcement.  I was a law

17   enforcement officer.  I don't know if she knew who I worked for

18   at that time.

19   Q.   Okay.  So -- and her concerns were that you -- as far as

10:51 20   you know, she just thought you could have been just a regular

21   cop, no big deal?

22   A.   As I stated, I don't know what she knew.

23   Q.   Okay.  But, nevertheless, she reaches out to you to ask

24   you to intercede with the Department of Corrections and have

25   him moved to Martha's Vineyard, true?

1    A.    Yes.

2    Q.    And in that regard, sir, would you agree with me that when

3    a person is convicted in the state system they are placed in

4    the care and custody of the Department of Corrections, right?

5    A.    Yes, the Massachusetts Department of Corrections.

6    Q.    And the person would then be told to go -- whether it's

7    Walpole State Prison, whether it's Norfolk, Concord, wherever

8    it may be, right?

9    A.    He would not be told to go there.  He would be sent there.

10:51 10   Q.    Sent there, in custody, right?

11   A.    In custody, yes.

12   Q.    Now, you've been to the Martha's Vineyard prison, have you

13   not?

14   A.    No, I have not.

15   Q.    Are you aware, sir, that it isn't even a prison?  It's

16   little white house next to the Mobil station?

17   A.    I do not know what it is.  I have never been there.

18   Q.    Have you ever seen the movie Goodfellas?

19   A.    Yes, I've seen that movie.

10:52 20   Q.    Remember when the guys would leave and go down to the

21   store and buy the wine or buy the food and them come back?  You

22   know, they go shopping at the A&P right down the street?

23             MS. KAPLAN:  Objection.

24             THE COURT:  Sustained.

25   Q.    It's a pretty good place to be, isn't it?

1    A.   I guess so.  Like I said, I've never been there.

2    Q.   Okay.  Well, it's a place where people go when they're

3    informants, right?

4    A.   I've been told that.  I don't have personal knowledge of

5    that.

6    Q.   All right.  So who is it that you called to get him into

7    Martha's Vineyard?

8    A.   I called somebody in the Department of Corrections.  It

9    could have been Joe Pepe.  I don't recall at that time who I

10:52 10   called.

11   Q.   Who's Joe Pepe?

12   A.   He used to work -- he was in the DEA task force, and he

13   was a Department of Correctional officer.  I'm not a hundred

14   percent positive.

15   Q.   You have a conversation with Mr. Pepe or someone?

16   A.   Or somebody, yes.

17   Q.   As a result of which, Mr. Dardinski is moved down to the

18   House of Correction -- or the house, if you will, on Martha's

19   Vineyard?

10:53 20   A.   Yes.  For his safety, he was moved to Martha's Vineyard.

21   Q.   For his safety, sir.  But you moved him to that location,

22   right?

23   A.   I did not move him.  I made a request to move him.

24   Q.   He was moved to the location?

25   A.   Department of Corrections moved him.

1    Q.   Yes?

2    A.   Yes.

3    Q.   And it was at that time that you were then being contacted

4    on a regular basis by Mr. Dardinski regarding issues that he

5    had, right?

6    A.   I wouldn't call it on a regular basis, but he contacted me

7    from jail, yes.

8    Q.   When he contacted you from jail, one of the things you

9    told the jury is that at no time would you be working with or

10:53 10   getting information from Mr. Dardinski while he's an inmate and

11   certainly not working for DEA.  Do you remember making that

12   statement yesterday?

13   A.   I'm not sure I understand that question.

14   Q.   Well, you were asked by the prosecutor whether or not you

15   received or obtained any information from Mr. Dardinski while

16   he was down in Martha's Vineyard, and you responded no, because

17   he's an inmate, and he wasn't actively engaged with the DEA?

18              MS. KAPLAN:  Objection.

19              THE COURT:  Sustained.

10:54 20   Q.   Well, did you ask Mr. Dardinski, while he was down at the

21   Martha's Vineyard place, for information regarding cases?

22   A.   No, I did not.

23   Q.   How about the Heider matter, H-e-i-d-e-r?  You're familiar

24   with that case, are you not, sir?

25   A.   Yes.  I'm the case agent on that matter also.

1   Q.   Do you recall asking Mr. Dardinski if he had any

2   information on the Heider brothers or this marijuana issue at

3   all?  Do you remember that?

4   A.   The brothers were Robert and James McCann.  There was also

5   a Brian McCann.

6   Q.   Do you recall talking to Mr. Dardinski and asking him for

7   information on that case?

8   A.   I may have asked him if he had background information on

9   the individuals arrested in that case because they were from

10:54 10   the same area where Mr. Dardinski grew up.

11   Q.   Who was Mr. Rodriguez?  Do you recall Mr. Rodriguez?

12   A.   No, I do not recall Mr. Rodriguez.

13   Q.   Do you recall Mr. Federico dealing with a Harley-Davidson

14   motorcycle in the town of Bridgewater?

15   A.   Mr. Federico?

16   Q.   Do you recall being contacted by --

17        MS. KAPLAN:  Objection.  I don't believe there was an

18   answer.

19        THE COURT:  Yeah.  Had you finished your answer?

10:55 20   A.   I barely remember Mr. Federico, slightly remember that

21   incident.

22   Q.   Do you recall one of the conversations that you had with

23   Mr. Dardinski, while he was down at the Martha's Vineyard

24   house, that he had a problem?  Do you recall that conversation?

25   A.   Mr. Dardinski always has problems.

1   Q.   Yeah.  Do you recall indicating that to him in the same

2   way, Oh, buddy you've always got problems?  You've always got

3   issues?

4   A.   I may have.  I don't remember what I said to him in 2008

5   specifically.

6            MR. REDDINGTON:  Number 27.

7   (Audiotape played.)

8   Q.   That's you talking?

9   A.   Yes, that is me.

10:57 10  Q.   You're talking to Dardinski?

11  A.   Yes.

12  Q.   And he's telling you that Monica is going to call you the

13  next day?

14  A.   That's what he said.

15  Q.   You also had information that he had some potential

16  criminal issues involving the town of East Bridgewater, right?

17  A.   He stated that he did, yes.

18  Q.   Right.  You said you could take care of that, didn't you?

19  A.   Well, I said that because -- if he had a warrant --

10:57 20  Q.   No, no.  You said "because."  Was that not what you just

21  said as we heard on the tape:  "I can take care of that"?

22  A.   Can I explain my answer?

23  Q.   Do you agree that's what you just said on the tape, sir?

24  A.   Can I explain my answer?

25            MR. REDDINGTON:  Continue with the tape, please.

1    (Audiotape played.)

2    Q.   Did you ever reach out to East Bridgewater regarding

3    Dardinski's issues, sir?

4    A.   No.  I believe I ran him for his record, but I was pretty

5    sure he didn't have a warrant because if he had a warrant he

6    was locked up at the time, and the warrant simply would have

7    been lodged at the jail.  I was basically just trying to get

8    rid of him because he'd talk all day long.

9    Q.   So now you're trying to get rid of the guy because he's

10:58 10   garrulous and he likes to chat, right?

11   A.   Because I have to work.

12   Q.   Okay.  In the course of your investigation, sir, dealing

13   with Mr. Dardinski --

14   A.   But I do know people at the East Bridgewater P.D.  I do

15   know detectives.

16   Q.   In the course of investigating this case, sir, you deal

17   with Mr. Dardinski, right?

18   A.   The instant case, Mr. George, this case.

19   Q.   This guy right here, who's on trial in front of this jury,

10:59 20   is your case.

21   A.   Yes.  I've dealt with Mr. Dardinski.

22   Q.   You investigate the background of the individual, don't

23   you?

24   A.   The background of Mr. George?

25   Q.   Mr. Dardinski.  Focus.

1    A.    I am focused.

2          MS. KAPLAN:  Objection.

3          THE COURT:  Sustained.  No instructions, Mr.

4    Reddington.

5          MR. REDDINGTON:  I apologize.  Yes, your Honor.

6    Q.    We're talking about Mr. Dardinski, right?

7    A.    Okay.

8    Q.    In reference to Mr. Dardinski, you would investigate his

9    background, right?

10:59  10   A.    I'd run a criminal history on him.

11   Q.    You'd run a criminal history, okay.

12          And you have other agents that worked with the guy

13   before you, so I'm sure you guys talk.

14   A.    And those agents highly recommended that I use him.

15   Q.    Well, that was good.  But my question, sir, is that you

16   talked to these other agents, right?

17   A.    In the office, yes, I just stated that, and they

18   recommended that I use him.

19   Q.    You knew that Mr. Dardinski was an arm-breaker, if you

10:59  20   will, for the mob, right?

21   A.    Yes, I believe I knew that.

22   Q.    You knew that he also was involved in many, many larcenies

23   and convictions and had about a 30-page record, correct?

24   A.    Yes.  He has an extensive criminal record.

25   Q.    In the course of your investigation on Mr. Dardinski's

1   background, you also were concerned about whether or not he was

2   going to be committing other crimes or would stop committing

3   crimes, correct?

4   A.   I always have to be aware if informants commit other

5   crimes.  Therefore, I constantly run them for warrants and

6   criminal history for new charges.  I cannot rely on the

7   informant telling me if he has been arrested.  I have to do

8   that on the criminal justice system.

9   Q.   That would violate your rules and regulations if you were

11:00 10  to interfere or impede or get involved with any investigation

11  involving one of the people that you are dealing with, correct?

12  A.   That's correct.  If my informants commit --

13  Q.   The answer is, yes, that's correct, sir?

14  A.   If my informants commit a violation of the law, they will

15  be --

16       MS. KAPLAN:  Objection.

17  A.   -- arrested and go to jail.

18       THE COURT:  Let him finish his answer.

19       MR. REDDINGTON:  If I may just make a note, your

11:00 20  Honor?  I appreciate this, but I'm trying to contain --

21       THE COURT:  I understand.  Ask the next question, Mr.

22  Reddington.

23       MR. REDDINGTON:  Okay.  Thank you.

24  Q.   Who's Mr. Goodnow?

25  A.   He's an individual that we arrested for the distribution

1    of cocaine.

2    Q.   And when you say "we," you're referring to your office,

3    right?

4    A.   I'm referring to DEA.

5    Q.   And you had an informant working on that case, right?

6    A.   Mr. Dardinski worked on that case.

7    Q.   Mr. Dardinski.  Now, this is the case that -- the U.S.

8    Attorney asked you yesterday about the Goodnow investigation,

9    and you indicated that there were convictions of people that

11:01 10   came out of that investigation, right?

11   A.   Yes.  Four people -- four individuals were convicted in

12   federal court for trafficking in both cocaine and heroin.

13   Q.   Were they convicted by a jury, or were they convicted by a

14   change of plea?

15   A.   They pled guilty to the charges.

16   Q.   All right.  So there's four guys.  We put them over here

17   because they come into court and said I'm guilty, right?

18   A.   Yes.

19   Q.   Okay.  But Mr. Goodnow, Steven Goodnow, ended up going on

11:02 20   trial in the Brockton Superior Court, didn't he?

21   A.   That is correct.  He --

22   Q.   The answer is yes.  And that would be on November 16 of

23   2010, was the date of that trial, sir?

24   A.   It could be.  I don't remember the exact date.

25   Q.   And that is the only time Ronald Dardinski, the informant,

1    testified in front of a jury, like this, correct, on that case?

2    A.    Yes.

3    Q.    And he was acquitted?  Mr. Goodnow was acquitted, wasn't

4    he?

5              MS. KAPLAN:  Objection.

6              THE COURT:  Sustained.

7    Q.    Did Mr. Dardinski testify sitting there, looking at the

8    jury, and giving a description of what his involvement was with

9    Mr. Goodnow, do you recall?

11:02 10    A.    I was not allowed to listen to his testimony because I was

11    also a witness in that case.

12    Q.    So was Mr. Dardinski contacting you and saying that he

13    wanted to be reactivated, wanted to come in and get some money,

14    and this is when he told you, in one of the initial

15    conversations, that he told you that he had a chance encounter

16    with Attorney Bob George, right?

17    A.    It was not one of the initials.  He told me that, he's

18    probably been out of jail for several weeks at that time.

19    Q.    So he's out of jail for several weeks.  Comes to you,

11:03 20    tells you that he had a chance encounter with Bob George, his

21    attorney, right?

22    A.    That's what he told me, yes.

23    Q.    I guess they got along pretty good, right?

24    A.    He told me that he used to -- Mr. George used to represent

25    Mr. Dardinski and that's how he knew him.

1    Q.   Okay.  Told you it was an affable meeting that they had,

2    the chance encounter at the Braintree mall, friendly?

3    A.   Yes.  They talked to each other is what he told me.

4    Q.   In your investigation, sir, were you aware that Mr.

5    Dardinski had indeed called Robert George at his home, on his

6    cell phone, at his office, repeatedly, and relentless to try to

7    get money from him, sir, while he was in Martha's Vineyard

8    house?

9    A.   I have not seen -- I do not know who he called while he

11:04 10    was in jail at Martha's Vineyard.  Only since he's come out do

11    I have tolls.

12    Q.   My focused question, sir:  Are you aware, as the lead

13    investigator in that case, that Ronald Dardinski, your previous

14    informant, the guy that testified in the Goodnow case prior to

15    that, that he had called Attorney George a number of times

16    while he was incarcerated?  Did you know that?

17    A.   No, I did not know that.

18    Q.   Did you know that he had conversations with Monica

19    expressing his anger, his -- that he was going to shove his

11:04 20    foot up his ass?  He was going to stove in his head?  Did you

21    know that?

22    A.   No.  Defense counsel asked me to leave the courtroom for

23    those conversations.

24    Q.   That would be me, right?

25    A.   That would be you and Mr. Goldstein, yes.

1    Q.    And you were sequestered, right?

2    A.    Yes.

3    Q.    So you're not aware of having any conversation whatsoever

4    with Ron Dardinski about his anger or dislike for Bob George,

5    right?

6    A.    The only thing I knew is what I saw on the news.

7    Q.    Now, you have your conversation with Mr. Dardinski.  He

8    tells you about this chance meeting when he sees Bob George,

9    and Bob George says, Hey, can I help you launder your money?

11:05 10   In the Braintree mall, right?

11   A.    The way --

12   Q.    That's the conversation, right?

13   A.    The way it was relayed to me --

14   Q.    No, no.  My question, sir:  The conversation, by chance,

15   in the Braintree mall, when it is alleged that Bob George says,

16   Hey, how are you?  Can I launder your money?, that was the

17   first time that Dardinski told you about that, right?

18   A.    I was not present for that conversation.

19   Q.    Obviously, sir.

11:05 20        MS. KAPLAN:  Objection.

21        THE COURT:  Let him answer the question.

22   A.    I'm not sure I understand your question.

23   Q.    Okay.  You know about the conversation that Dardinski

24   alleges occurred in the Braintree mall, right?

25   A.    He told me he met Mr. George at the Braintree mall, yes.

1   Q.   We're both on the same page with that.  That's the first

2   time that he told you about Mr. George, right?

3   A.   I believe so, yes.

4   Q.   Okay.  Now -- and you told this jury you don't know Bob

5   George.  Maybe read about him in the newspaper, know he's a

6   criminal defense lawyer.  But you don't know the guy, right?

7   A.   He was present at one trial that I had.  I don't believe

8   he cross-examined me.  It was the trial of Nam The Tham and

9   Siny Van Tran in Suffolk Superior Court.

11:06 10   Q.   Right.  You know, sir, that, indeed, Mr. George did

11   cross-examine you, and he cross-examined you in front of the

12   judge and the jury for over two hours, accusing you of being a

13   liar, isn't that right?

14         MS. KAPLAN:  Objection.

15         THE COURT:  Sustained.

16   Q.   Did he cross-examine you, sir?  Do you remember?

17   A.   Not that I recall, no.

18   Q.   Well --

19   A.   I testified to statements that Nam The Tam made.  Mr.

11:06 20   George was representing Siny Van Tran.  To the best of my

21   knowledge, he did not cross-examine me in that case.

22   Q.   You do remember that case, sir, right?

23   A.   Yes, I do remember that case.

24   Q.   When Mr. Dardinski comes to you and relates the Braintree

25   conversation that he alleges occurred, you then open up an

1    investigation on Bob George, right?

2    A.    No.

3    Q.    Okay.  At some point, you open up an investigation on Bob

4    George?

5    A.    Yes.  I believe it was a couple weeks later.  I had to do

6    some background investigation first and corroborate some

7    information.

8    Q.    Did you open up --

9    A.    At some point later, yes.  The exact date --

11:07 10          MS. KAPLAN:  Objection.

11          THE COURT:  Let him answer your question, Mr.

12    Reddington.

13          MR. REDDINGTON:  I'm trying to focus on a yes or no,

14    your Honor.

15          THE COURT:  He'll answer the question.

16    A.    The exact date that the case was opened on Mr. George is

17    March 17, 2009.

18    Q.    Now, in the course of your background investigation on

19    this case, sir, I'm sure you were well aware of the fact that

11:07 20    in 2004, indeed, Mr. Dardinski met Mr. George up in the Concord

21    prison, right?

22    A.    I became aware of that fact during the investigation.

23    Q.    And you knew, sir, that, indeed, back in 2004, this

24    attorney prosecutor's -- Assistant U.S. Attorney's Office

25    sought permission from Concord to have Dardinski wear a wire in

1    his conversations with Attorney George; did you know that?

2    A.   I was not involved in that investigation.  At some point

3    --

4    Q.   Were you aware of that, sir?

5    A.   I may have been.  I don't recall.

6    Q.   Okay.

7    A.   It was not my investigation.

8    Q.   Well, it's involving Mr. George, Mr. Dardinski, U.S.

9    Attorney's Office, looking for permission to have Dardinski

11:08 10   wear a wire.  Do you think -- does that jog your memory?

11   A.   I wasn't involved in that investigation.  If I heard

12   something like that, I would have heard it secondhand.

13   Q.   Now, one of the things that you mentioned in this case,

14   sir, is that -- by the way, when I asked you about the

15   Federico, Harley-Davidson, and Mr. Rodriguez, were you aware,

16   sir, that, indeed, Mr. Dardinski was committing crimes while he

17   was working for you on the DEA investigation of Mr. Goodnow?

18   A.   Yes.  That's why he went to jail.

19   Q.   So while he's working for you as an informant -- and you

11:09 20   believed, as an agent, that he was credible, right?

21   A.   No.  That's why we corroborate everything he does.

22   Q.   Exactly.  Would you buy a used car from the guy?

23        MS. KAPLAN:  Objection.

24        THE COURT:  Sustained.

25   Q.   Well, let me ask you this, sir:  It's important that we

1    corroborate everything that is done.  That's why you go to

2    court and get Title IIIs, right?

3    A.    In a general sense, yes.

4    Q.    Yeah, because a Title III requires that the agent fill out

5    an affidavit, sign it under oath, and present it to a judge,

6    just like his Honor, Judge Gorton, right?

7    A.    I never saw the Title III against Mr. George because it

8    would have involved attorney-client privilege.

9    Q.    Try to focus.

11:09 10         MS. KAPLAN:  Objection to the statement, could he

11   focus.

12         THE COURT:  Let him answer the question.

13   Q.    You know what I mean by a Title III, right?

14   A.    I know exactly what you mean.  I've done them before, sir.

15   Q.    Unlike the reverse sting operation on Mr. George, this is

16   your first, right?

17   A.    Yes.  This is my first reverse undercover money laundering

18   investigation.

19   Q.    So when you have information and you sign an affidavit

11:10 20   before a judge, you're swearing under oath to certain things

21   that are being represented in that affidavit, correct?

22   A.    I'm swearing under oath to every fact in that affidavit.

23   Q.    And when you sign the affidavit, sir, it's under oath, and

24   you are seeking permission from a federal judge to conduct

25   wiretaps or video surveillance of citizens, right?

1   A.   To conduct wiretaps, not video surveillance.

2   Q.   When you're dealing with the individual that is going to

3   be the subject of a wiretap, the citizen, you would agree it's

4   quite invasive to have somebody wiretap you, right, or record

5   your conversation?

6   A.   Yes.

7   Q.   And it's important to corroborate what your person, who's

8   your informant, is doing with the target of the investigation,

9   and that's why many times you would have a wiretap, right?

11:11 10   A.   I'm not sure I understand your question.

11   Q.   Okay.  Dardinski had how many phones, sir?

12   A.   During the course of the investigation, I believe he had

13   two phones:  a 774 number and a 508 number.

14   Q.   Okay.  Which one --

15   A.   I'm sorry, excuse me.  And he was also bought a phone for

16   DEA, so he had three phones.

17   Q.   Now, which one of those phones, sir, came with all of the

18   power and the authority of the federal court to be utilized in

19   conversations with the target?  Which one?

11:11 20   A.   None of them.

21   Q.   Okay.  Did Dardinski have a phone that was given to him

22   that would automatically record, through Nextel or Verizon or

23   whoever it was, under a Title III?

24   A.   Yes.  It was a consensual, so we did not need the

25   permission of the court to do it.  He consensually let us

1    monitor his conversations.

2    Q.   Those conversations would be automatically recorded,

3    right?

4    A.   Yes.

5    Q.   By the phone company.  And then you'd get the disk, right?

6    A.   Not by the phone company, sir, no.

7    Q.   Well, you don't have to walk around and have some kind of

8    a device in your hand and have wires hanging off your ear.  You

9    just pick up the phone and make a phone call, right?

11:12 10   A.   As I stated, it was a consensual interception done on Mr.

11   Dardinski's phone, that's correct.

12   Q.   The consensual interception with Mr. Dardinski, he could

13   have used that phone on every conversation that he had, isn't

14   that true?

15   A.   Mr. George was not returning his calls during that time.

16   Q.   Can you understand my question, sir?  He could have

17   utilized that phone at any time --

18   A.   No.  It was --

19   Q.   -- during this investigation, right?

11:12 20   A.   The consensual intercept was only good for 90 days.  I

21   believe it was April 13 of 2009 to July 13, approximately those

22   dates, of 2009.

23   Q.   All set?

24   A.   Yes.  Those are the dates it was in effect.

25   Q.   And what the court then does many times is we'll have a

1   reapplication, in other words, an extension for an additional

2   90 days?

3   A.   As I stated before, the court had nothing to do with this.

4   It was consensual.  There was no order from a judge to get this

5   --

6   Q.   What's the 90 days you're talking about?

7   A.   Mr. Dardinski signed a form, and the telephone company

8   allowed us to consensually record those conversations for 90

9   days.

11:13 10   Q.   Exactly.  Mr. Dardinski could very well, through the DEA,

11   have extended that for another 90 days, isn't that right?

12   A.   Mr. Dardinski could not extend it.  We'd have to go back

13   to the phone company and have him sign another form.  DEA could

14   get an extension.

15   Q.   He could sign the form giving consent, and it would go for

16   another 90 days, right?

17   A.   That's correct.

18   Q.   Now, do you -- in your capacity as an agent dealing with

19   an informant, do you tell the person when to contact a target,

11:13 20   what to say to the target, or do you basically give then carte

21   blanche to do whatever they want?

22   A.   We have control over him.  We had to tell him when to

23   call.  He was given a recorder.

24   Q.   That's the thing in the hand and he had the wire, and it

25   was embarrassing Monica because she didn't know he was

1    cooperating in any investigations, correct?

2    A.    It's really obvious, yes.

3    Q.    How about the other phone you just pick up and it

4    automatically records through the phone company?

5    A.    The consensual phone.

6    Q.    The consensual phone?

7    A.    Yes.

8    Q.    So, in any event, sir, Mr. Dardinski signs this form.  He

9    agrees that he's going to be receiving money from the United

11:14 10    States Government, correct?

11    A.    I don't know what form you're talking about, sir.

12    Q.    Well, do you pay him by the hour?

13    A.    No.

14    Q.    How much money did Dardinski make on this investigation,

15    sir?

16    A.    As I stated earlier, I believe it was $28,600.

17    Q.    Was he paid in cash or was he given checks?

18    A.    He was paid in cash.

19    Q.    Do you guys make him sign a receipt or anything?

11:14 20    A.    Absolutely.

21    Q.    Did you know, as his handler or the person that was the

22    controlling case agent, that Mr. Dardinski, indeed, hadn't paid

23    income taxes for about 15 or 17 years?

24    A.    He did pay -- when he was working, the taxes were taken

25    out of his paycheck.

1    Q.   The money that he's getting from you, the 28 grand in

2    cash, is certainly not something that is tax-free, right?  He's

3    got to pay taxes on that, right?

4    A.   He's instructed to pay taxes on that.  He's supposed to

5    pay taxes, but I cannot force him to pay taxes.

6    Q.   It's pretty apparent that he didn't, right?

7    A.   The best of my knowledge, he did not pay taxes.

8    Q.   So at some point, sir, it was determined how many times

9    Mr. Dardinski reached out to you and spoke during the course of

11:15 10   this investigation, right?

11   A.   No, I wouldn't -- I don't have that number.  He's called

12   me probably on a daily basis during the course of the

13   investigation, but I don't know exactly how many times.

14   Q.   I'm going to put something on the --

15        MR. REDDINGTON:  Excuse me, your Honor.  With the

16   Court's permission, your Honor, I'd like to --

17   Q.   Now, take a look right up on there.  You see where it

18   says, "Dardinski, 774," ending with "9273"?

19   A.   I see that number.

11:16 20   Q.   Okay.  Whose number is that?

21   A.   I believe it's Ronald Dardinski's.

22   Q.   And then you'll see the purple that's highlighted, January

23   23, for example, ████████6271 -- yeah, 6271.  Whose number is

24   that?

25   A.   That's my number.  I mean --

 1    Q.    Okay.

 2    A.    -- I would not want my cell phone number being in federal

 3    court, but I guess it's too late.

 4    Q.    Bob George wouldn't want his social security number being

 5    in federal court?

 6               MS. KAPLAN:  Objection.

 7               THE COURT:  Sustained.

 8    Q.    How about these telephone calls, sir?  All the purple

 9    calls are Dardinski reaching out and talking to you, correct?

11:16 10   A.    Yes.

11    Q.    And the yellow, you see where the yellow is, and it's

12    Dardinski calling 617-262-6900.  Do you know whose number that

13    is?

14    A.    I believe that's the law office of Mr. George.

15    Q.    Okay.  And continuing on, sir, you would agree with me

16    that Mr. Dardinski contacted ███████5669 on February 20 of

17    2009?  Whose number is that?

18    A.    That's Mr. George's cell phone number.

19    Q.    Now, when did Mr. Dardinski have access to the consensual

11:17 20   recorded phone -- telephone?  When did he get access to that?

21    A.    I believe the dates it was activated were April 13, 2009,

22    through July 13, 2009, approximately those dates.

23    Q.    Would you agree with me that Mr. Dardinski contacted you

24    and Mr. George on a number of occasions through the month of

25    March 2009, right?  Through the month of March, calls purple to

1    you, yellow to Mr. George, right?

2    A.    Yes.

3    Q.    Up to the end of March.  And then in April, he has access

4    to that consensual telephone from the phone company, right?

5    A.    On April 13th, I believe it was activated.

6    Q.    Okay.  And you told us that you supervise or monitor what

7    these people do when they're working with you, right, as far as

8    utilizing telephones, correct?

9    A.    The only reason I subpoenaed Mr. Dardinski's tolls in this

11:18 10   case was because we couldn't subpoena Mr. George's.

11   Q.    I didn't ask you why you subpoenaed Dardinski's tolls,

12   sir.  I'm asking you about supervising the person and

13   controlling them.

14   A.    Well, it was telephone calls.  I didn't look at all his

15   telephone calls.

16        MR. REDDINGTON:  I'm going to offer this, your Honor.

17   I think there's no objection.

18        MS. KAPLAN:  That's fine, your Honor.

19        THE COURT:  Describe it for the record, Mr.

11:19 20   Reddington.

21        MR. REDDINGTON:  Yes, your Honor, certainly.  This

22   would be a compilation of telephone calls that are highlighted

23   in purple involving Mr. Dardinski contacting the agent,

24   highlighted in yellow being Mr. Dardinski contacting Attorney

25   George.

1          THE COURT:  All right.  The next available number is?

2    Do we know?

3          MR. REDDINGTON:  Is it 116?

4          THE COURT:  116.  It will be admitted as 116.

5    (Exhibit No. 116 received into evidence.)

6          MR. REDDINGTON:  Your Honor, I also have the disk of

7    Sprint telephone calls in their entirety that we move as well,

8    and I don't believe there's any objection.

9          MS. KAPLAN:  No objection.

11:19 10         THE COURT:  The next number will be 117?  They will be

11   the Sprint CD, is that right?

12         MR. REDDINGTON:  Yes, your Honor.

13   (Exhibit No. 117 received into evidence.)

14   Q.   Now, sir, one of the things you indicated to this jury is

15   that it took some time for the DEA to acquire and obtain funds

16   for this investigation, true?

17   A.   Yes.

18   Q.   So Mr. Dardinski contacts you.  He's got access to the

19   phone in April of 2009.  We've all heard -- you were here, I

11:20 20  believe, on direct examination -- of the number of phone calls

21   that Mr. Dardinski had between himself and Mr. George.  You

22   were here for that testimony, right?

23   A.   For --

24   Q.   The number of phone calls, when they first called, and the

25   investigation continued.

```
 1   A.   For whose testimony?  Could you give me a name, please?

 2   Q.   Were you here for Mr. Dardinski's direct?

 3   A.   Yes, I was here for his direct testimony.

 4   Q.   You were here for his direct testimony.  You remember that

 5   conversation, sir.  You recall Mr. Goldstein -- strike that.

 6   You didn't see cross.

 7        Is it your understanding, as the lead agent, sir, is

 8   that it was that first conversation that Dardinski has with Bob

 9   George saying that, hey -- something to do with drugs and

11:20 10   money?  First conversation that was recorded, right?

11   A.   Are you referring to the conversation on March 18 of 2009?

12   That was the first --

13   Q.   I'm referring to the conversation when he makes --

14   Dardinski makes reference to this guy here about money and

15   drugs, and Bob George says, I can't get involved with that.

16   That's illegal.  That's the conversation, sir.

17   A.   He said -- I believe his exact words were, I don't want to

18   know about that.  That's illegal.  If it's the conversation on

19   March 18th -- March 18th is the first recorded conversation.

11:21 20   Q.   You would --

21   A.   On March 18, 2008.

22   Q.   And you would agree with me that in all of the relentless

23   telephone calls from Dardinski, calling and meeting and talking

24   to Bob George, that was the last time there was any mention of

25   drugs and money, true?
```

1   A.   No.

2   Q.   Okay.  In the course of this investigation, sir, it's your

3   understanding that you now have a lawyer, who you may have

4   known, and you know nothing about any prior attempts to record

5   conversations with Dardinski and the government.  And now

6   you're dealing with a guy who's apparently throwing himself at

7   Dardinski in the mall.  Please, give me money to launder,

8   right?

9   A.   No, that is not correct.  And there's also calls going

11:22 10   back and forth.  There's incoming and outgoing calls between

11   Dardinski and Mr. George.

12   Q.   Were they all recorded, sir?

13   A.   No, they were not all recorded.

14   Q.   Because you were monitoring Mr. Dardinski so well that Mr.

15   Dardinski did, indeed, have the ability to make a number of

16   telephone calls, isn't that right, not being recorded?

17   A.   He did not record all the telephone calls to Mr. George.

18   Q.   Okay.  Do you know how many times you spoke -- Mr.

19   Dardinski called you from the beginning of this investigation

11:22 20   up until 2010?  Do you know how many times he called you, sir?

21   A.   He calls me pretty much on a daily basis, so it would be

22   --

23   Q.   879 times?

24   A.   I'd like to see how many of those calls are of zero

25   duration.

1    Q.    Now, in the investigation as it goes on, you have a

2    situation where Mr. Dardinski is wearing a wire; can record,

3    even videotape, his interaction with the lawyer who wants to

4    launder his drug money, as is your theory, correct?

5    A.    What was the question?

6    Q.    Mr. Dardinski is in a position where he's wearing a wire,

7    and he's able to record conversations with a guy who doesn't

8    even know he's being bugged, right?

9    A.    Yes.  When we do undercover negotiations, nobody knows

11:23 10  they're being bugged.  They wouldn't say anything.

11   Q.    Sir, when he's in the car in front of Dunkin' Donuts or

12   when he's sitting -- whether it's at a restaurant or in a hotel

13   or whatever, Bob George doesn't know he's being wired --

14   doesn't know he's being recorded?

15   A.    Of course, he doesn't know.

16   Q.    Okay.  So would you agree with me, sir, that there is not

17   one conversation in April pertinent to, Hey, Bob, I've got the

18   money from the drug dealer, or Bob saying, Hey, where's that

19   money so I can launder it?  There's no such conversation in

11:24 20  April, true?

21            MS. KAPLAN:  April of what year, your Honor?

22            THE COURT:  April of what year?

23            MR. REDDINGTON:  I'm sorry, your Honor.  2009.

24   A.    In April of 2009, no, there is no conversation between Mr.

25   Dardinski --

1     Q.    May, none, right?

2     A.    No, there was no contact in May.

3     Q.    June.  All the way through the investigation, there's no

4     conversation where Bob George sits down with Dardinski and

5     Dardinski says to him, Hey, remember that money we were talking

6     about?  I'm going to have it.  We can launder it.  True?  You

7     listened to the tapes, right?

8     A.    I listened to the tapes, yes.

9     Q.    You hear Bob George on a number of occasions talking about

11:24 10   he wanted Dardinski to get him hooked back up with his friend

11    Hansen, right?  Isn't that right?

12    A.    Yes.  Did you have a previous question before that?

13    Q.    Sir, deal with the conversations that you listened to.

14    A.    Excuse me, sir.  You had a previous question before that

15    that I didn't understand.

16    Q.    Never mind the question before that.  I'm asking you about

17    the conversations you had with Dardinski pertinent to the

18    conversations Dardinski had with Hansen that were recorded.

19    You listened to them, right?

11:25 20   A.    The conversations between Mr. Dardinski and Mr. Hansen?

21    Q.    Yeah.

22    A.    Yes.

23    Q.    And Mr. Dardinski and Bob George?

24    A.    That were recorded, yes.

25    Q.    Okay.  And when you listened to those conversations, would

1    you agree with me, sir, that out of the number of times that

2    Mr. Dardinski, hundreds of times Mr. Dardinski talked to Bob

3    George, that there were only -- what did you say yesterday, 15

4    recorded?

5    A.    No, sir.  What I stated yesterday was that of all the

6    calls between Mr. Dardinski and Mr. George, there were 317

7    total calls.  There were 30 longer than two minutes, which is a

8    substantial conversation.  Out of those 30, 15 were recorded

9    and 15 were not recorded.  As I stated yesterday, there were

11:25 10   numerous calls of zero durations and numerous calls that had

11   durations under 10, 20 seconds, also.

12   Q.    All set?

13   A.    Yes, I am.

14   Q.    Okay.  Mr. George repeatedly -- and I would leave it with

15   you -- I think you were here -- that we have heard the tapes --

16   repeatedly talked about he wanted Dardinski to get him back in

17   good graces with his friend Hansen, right?

18   A.    Yes.  He wanted him to threaten Hansen.

19   Q.    The answer is, yes, sir.  On a number of occasions, he

11:26 20   would state that how upset he was that Mr. Hansen was mad at

21   him or Mr. Hansen -- as Rob said the other day, they're like

22   two school kids fighting, right?  They're not talking to each

23   other?

24   A.    They were not talking to each other.  I don't know if

25   they're like two school kids fighting, but they were not

1    talking to each other.

2    Q.   But it was a significant period of time?  It was, like, a

3    year that they weren't talking, right?

4    A.   That's what they claim.  I have no direct knowledge of

5    that.

6    Q.   Did you know, sir, that Bob George and Mr. Hansen knew

7    each other from the ages of, like, 12 or 13 years old?

8    A.   Mr. Hansen told me that.

9    Q.   The answer is, yes, you knew that they have a longstanding

11:26 10   relationship, right?

11   A.   According to Mr. Hansen, yes.

12   Q.   Okay.  And in the course of that longstanding

13   relationship, Mr. Hansen at some point became a person that

14   dealt with mortgages, right?

15   A.   Yes.  He was the owner of East Coast Mortgage Company.

16   Q.   You knew from your investigation that Mr. George would on

17   many occasions see Mr. Hansen to negotiate or rewrite, for

18   example, of his own house or his house down the Cape or borrow

19   money to buy a car?  He would do that on a number of occasions,

11:27 20   right?

21   A.   I can only tell you what Mr. Hansen told me about those

22   situations.

23   Q.   You're the investigator on this case, sir.  Do you know

24   that Mr. George had a longstanding relationship with Mr. Hansen

25   dealing with getting money to buy houses and pay his taxes and

         1    pay bills, buy cars, right?

         2    A.   According to Mr. Hansen he did, yes.

         3    Q.   Okay.  And were you able to get access to records and

         4    determine that yeah, indeed, Bob George did constantly go to

         5    Mr. Hansen, right, for money?

         6    A.   Mr. George refinanced his house several times.  I saw some

         7    financial records, but --

         8    Q.   They were all with Mr. Hansen, weren't they?

         9    A.   According to Mr. Hansen they were, yes.

11:28   10    Q.   Okay.  So if we -- any one us wants to go get a mortgage,

        11    you've got to fill out all sorts of papers.  You've got to

        12    sweat it out as to whether you're going to get approved and the

        13    credit and all the rest of it, right?  He didn't have to do

        14    that with Mr. Hansen, did he?

        15    A.   I believe Mr. Hansen took care of him, is what he told us.

        16    Q.   Also, Mr. Hansen would actually rewrite mortgages on

        17    clients, that Bob would bring clients.  If somebody wanted to

        18    retain him on a case and he wanted 10, 20, 50, a hundred grand,

        19    whatever the case may be, and they didn't have the money, he

11:28   20    could refer them to Mr. Hansen, and Mr. Hansen would rewrite

        21    the client's mortgage so Bob would get paid, right?

        22    A.   Yes.

        23    Q.   Okay.  And that relationship continued for many, many

        24    years, didn't it?  Yes?

        25    A.   According to Mr. Hansen, yes.

1    Q.   Okay.  Now, one of the things that you do when you're

2    dealing with the secretive nature of narcotics and money

3    laundering and all these things you were involved in, sir, you

4    have code words, right?  Sometimes somebody will say, I'm going

5    to drop off ten soccer balls at your house tomorrow.  You guys

6    would say, That's referring to ten kilos of cocaine or

7    something, code words?

8    A.   Most people do use code words on phones, yes.

9    Q.   There was not one code word used in this case, was there,

11:29 10   sir?

11   A.   I don't believe so, no.

12   Q.   No.  Because when Mr. Dardinski is talking about

13   mortgages, he never told you that mortgages was a code word for

14   laundering money, did he?

15   A.   No.

16   Q.   Okay.  And there's not one report that Dardinski ever

17   referred to mortgages -- every time a mortgage was referred to

18   by Mr. Hansen or Mr. George, it was a legitimate mortgage on

19   real estate property, correct?

11:29 20   A.   No, that is not correct.

21   Q.   Well, how about the property in Lakeville?  Did you hear

22   the conversation on the tapes where Hansen was talking to

23   Dardinski about buying property in Lakeville and putting a

24   mortgage on that property?

25   A.   Mr. Hansen wanted to sell Mr. Dardinski property in

1    Lakeville, Mass., and get him a mortgage on that property.

2    Q.   Do you recall a conversation about putting a mortgage on

3    it?

4    A.   Yes.  He wanted him to buy the property in Lakeville,

5    Mass.

6    Q.   In your investigation, sir, of Mr. George -- you mentioned

7    to the jury that you've seen -- he rewrote his house mortgage

8    seven times?

9    A.   I did not say seven times.

11:30 10   Q.   I'm sorry.  I misheard you.  How many times?

11   A.   I don't know how many times it was, two or three maybe.

12   Q.   You knew he had the house in Dedham, right?  You knew he

13   lived in Westwood?

14   A.   Westwood.  Mr. George lived in Westwood, yes.

15   Q.   Okay.  Bob George lived in Westwood, right?

16   A.   Yes.

17   Q.   Had a house that you described in the past in a tony,

18   rich-type neighborhood, right?

19   A.   Yes.  I believe it was assessed for $1.5 million.

11:30 20   Q.   He's living in that house.  How much equity did he have,

21   at the time you were investigating him, in that house, sir?

22   A.   Special Agent Conway did most of the financials, but I

23   believe he had a mortgage for $1.1 million on that house, and I

24   believe at that time it was assessed for 1.5, if I remember

25   correctly.

1    Q.   He's got about 400 grand, give or take, in that property.

2    He also owned property down the Cape, didn't he, Falmouth?

3    A.   I believe it was in Dennis, sir.

4    Q.   Dennis.  Pretty nice location.  You were down there.  You

5    surveilled it before, right?

6    A.   No.  I never went to his house in Dennis.

7    Q.   You followed him or you surveilled him on a number of

8    occasions during the course of this investigation of his home

9    in Dedham -- Westwood, right?

11:31 10    A.   No, sir.

11    Q.   Do you recall indicating, sir, that Mr. George had been

12    the subject of surveillance, but surveillance was not

13    appropriate because of the neighborhood that he lived in and

14    the neighbors would see the surveilling officers, et cetera?

15    Do you recall anything --

16    A.   I do recall that, sir.  I drove by his office on a few

17    occasions just to see what it looked like and to get plates out

18    of the driveway to see whether there were cars there.  But I

19    never followed him to his house.

11:31 20    Q.   You knew that he was living there with his wife of

21    30-something years, right?

22    A.   I knew he was living there with his wife.  I have no idea

23    how long they were married.

24    Q.   You knew he had children?

25    A.   I believe I knew he had children, yes.

1    Q.   You knew that -- in the course of your investigation, that

2    he educated all of his children, sent them to school, paid

3    every bill --

4              MS. KAPLAN:  Objection.

5              THE COURT:  Sustained.

6    Q.   One daughter went to Pepperdine Law School, didn't she?

7              MS. KAPLAN:  Objection.

8              THE COURT:  Sustained.

9    Q.   Now, he also had access to financial accounts, checking

11:32 10   accounts, things of that nature, right?

11   A.   Mr. George?

12   Q.   Yeah.

13   A.   Yes.

14   Q.   Okay.  He had access to lines of credit, isn't that right?

15              MS. KAPLAN:  Objection.

16              THE COURT:  Overruled.  If he knows.

17   A.   I don't know if he had access to lines of credit.  I can't

18   answer that.

19   Q.   Well, you recall testifying in the grand jury that it was

11:32 20   your opinion that Mr. George was living hand to mouth at the

21   time of this investigation?

22   A.   That was based on information told to me by Special Agent

23   Frank Conway.

24   Q.   Bouncing checks all over the place, isn't that what you

25   testified to in the grand jury?

1    A.    Excuse me?  I didn't hear that, sir.

2    Q.    Bouncing checks all over the place?

3    A.    I don't know if he was bouncing checks all the over the

4    place.  He may have bounced one or two, I believe I said.

5    Q.    One or two was what your investigation revealed.  Page 25

6    of your testimony before the grand jury on this case, sir, do

7    you recall testifying that "bank records show he was living

8    hand to mouth.  A review of his bank records show he bounces

9    checks all over the place."  Do you remember testifying to

11:33 10    that?

11   A.    Can I see that, sir?

12   Q.    You want to see it?

13   A.    Yes, please.

14         MR. REDDINGTON:  May I approach, your Honor?

15         THE COURT:  Yes.

16   Q.    Reference Page 27, Line 18.

17   A.    (Reading.)

18   Q.    Does that refresh your memory, sir, of your testimony?

19   A.    I'll read Line 18.  "The bank records basically show that

11:34 20    he was living hand to mouth.  He owned two houses, one in

21   Westwood that was valued, I believe, at about 1.2 or 1.5

22   million.  He also had a house on the Cape, I believe in Dennis,

23   Mass., that he had another $300,000 loan for."  I don't see the

24   reference to bouncing checks.

25   Q.    We could read the entire transcript, sir, but my question

1    is:  Does this refresh your memory as it relates to Agent

2    Tamuleviz' statement, "The bank records basically show he was

3    living hand to mouth"?  Did I read that right?

4         MS. KAPLAN:  Objection, your Honor.  The question was

5    whether the agent --

6         THE COURT:  Yeah.  The original question was about

7    bouncing checks.  Show him that part, Mr. Reddington.

8         MR. REDDINGTON:  Page 28, Line 20.

9    A.   (Reading).  That was the question asked by the prosecutor.

11:34 10   Q.   What was the question?

11   A.   "Does a review of his bank records show that he bounces

12   checks all over the place?"  I responded:  "Yes."

13   Q.   You were under oath, right?

14   A.   Yes, I was under oath.

15   Q.   And you know, sir, that your investigation, indeed,

16   revealed that he was not bouncing checks all the place?  If

17   anything, he was like any one of us, maybe one or two, right?

18   A.   I've never bounced a check in my life.

19   Q.   When you were testifying in the grand jury, sir, and you

11:35 20   said, "Yes," leaving the impression with those grand jurors

21   that Bob George, bum that he is, financially, bouncing checks

22   all over the place, that was not true, was it?

23   A.   He bounced checks before.

24   Q.   One of the things that you indicated, sir, is that you've

25   had to apply for and seek funds for this investigation,

         1    correct?  Had a tough time getting it?

         2    A.    Yes.

         3    Q.    Now, I imagine, dealing with the United States Government,

         4    that one of the things you have to do is pretty much paper

         5    every move you make on stuff like that, right?

         6    A.    You have to put in requests to DEA headquarters in

         7    Washington, D.C.

         8    Q.    When was it, sir, that you first put in a request on this

         9    investigation going back April, May, June of 2009?  When was

11:36 10    the first request put in for a hundred grand?

        11    A.    I believe it was either October or November of 2009.

        12    Q.    So this entire period of time, sir, that transpired,

        13    April, May, June, July, August, September, October, certainly

        14    had nothing to do with the inability to obtain the funds

        15    because you didn't even ask for it until October 29 of 2009,

        16    right?

        17    A.    I checked around about it, and they said the percentage

        18    that he wanted to charge Mr. Dardinski, 20 percent --

        19    Q.    Focus, please.

11:36 20    A.    I am focusing.

        21    Q.    No, you're not.

        22    A.    I can explain it.  Yes, I am.

        23          MS. KAPLAN:  Objection.

        24          THE COURT:  Let him answer the question.

        25          MR. REDDINGTON:  I'm not going -- respectfully, your

1   Honor, he's volunteering stuff.  He knows what my question is.

2          THE COURT:  Ask another question, Mr. Reddington.

3          MR. REDDINGTON:  Thank you.

4   Q.   Isn't it true, sir, that the first time you all sought

5   money for this investigation was October 29 of 2009, right?

6   A.   I believe that's the date of the first request I made.

7   Q.   Thank you.  And this would be New England Field Division,

8   "Group 1 is requesting Operation High Wire funding in the

9   amount of $100,000," correct?

11:37 10   A.   We requested $100,000 from DEA headquarters.

11   Q.   You noted that George is a prominent and well-known

12   defense attorney, correct?

13   A.   Yes.

14   Q.   And then you reference the unexpected meeting that Mr.

15   Dardinski had in March of 2009, correct?

16   A.   Yes.

17   Q.   And that Mr. Dardinski indicated to you that Mr. George

18   inquired as to whether or not Dardinski had any money that he

19   needed cleaned, correct?

11:37 20   A.   Yes.

21   Q.   And on March 18 of 2009, that would be the consensually

22   recorded telephone conversation that -- he indicated that the

23   money that he was giving Mr. George came from the sale of

24   cocaine.  That's what you put in your document, didn't you?

25   A.   Yes.  He said that in the very first conversation with Mr.

George.

Q.   When he's talking about -- remember Mr. Goldstein --

strike that.  Maybe you weren't here for that.

But in that tape he says, "I have other money,"

doesn't he?

A.   From cocaine.

Q.   Okay.  "I have other money," is what he said, right?

A.   Yes, from cocaine.

Q.   So they're talking about investing money that he got from

his repos and from his business and his trucks and all the rest

of it, right?

A.   I believe they were talking about money from the repo

business where he ripped the people off.

Q.   And then the problem that Dardinski repeatedly commented

on to Bob George is the fact that he had problems with his

women chasing him for back child support.  He owed over

$100,000, right?

A.   He didn't say he had problems with his women, no.

Q.   No?

A.   He told me --

Q.   He had restraining orders that were taken out against him

by these women, right?

MS. KAPLAN:  Objection.

THE COURT:  Sustained.

Q.   He told you that he owed over a hundred grand to these

1     people for his child support, didn't he?

2     A.    Yes.

3     Q.    He told you that he owed money to the Department of

4     Revenue, back taxes, right?

5     A.    I don't believe Mr. Dardinski --

6     Q.    Told you that he was on probation and he had bills, that

7     he had to pay -- restitution, he had to pay through Probation,

8     right?

9     A.    He had restitution through Probation, yes.

11:39 10    Q.    And he told Mr. George on a number of occasions that he

11    wanted to hide that money from these people because if he took

12    20 grand into a courthouse he's going to have a problem, right?

13    A.    He told him that during an undercover meeting, yes.

14    Q.    So in that first conversation, sir, is what I'm asking you

15    about, talks about he's got to hide the money because he's got

16    these bills and he's got Department of Revenue, talks about his

17    child support issues and that he wants to hide the money.  He's

18    giving money that he obtained from a legitimate source to have

19    Mr. Hansen give him a check so he can show that he's working;

11:39 20    he's got some employment, right?

21    A.    In the beginning you stated -- you talked about --

22    Q.    That's the first conversation.  I'm asking you that, sir.

23    A.    That is not the first conversation.

24    Q.    We have the tape on the first conversation.  Do you recall

25    that that was when he said, No, I can't get involved with that?

1    That's illegal.  That's the first conversation, right?

2    A.   I believe his exact words were, I don't want to know about

3    that.  That's illegal.

4    Q.   You indicate, sir, on March 18th, during a consensually

5    recorded telephone conversation with George, the source told

6    George the money he needed cleaned was from the sale of

7    cocaine.  That's what you put, isn't that right, sir?

8    A.   Can I see --

9    Q.   Yes or no?

11:40 10    A.   Can I see that report, please?

11          MR. REDDINGTON:  May I?

12          THE COURT:  Yes.

13    Q.   Read Paragraph 4, please.

14    A.   (Reading.)

15          Yes.

16    Q.   Okay.  So you indicated, sir, that -- in any event, sir,

17    that's not true, is it, what you said?  That's not true in

18    Paragraph 4 about that conversation, is it?

19    A.   It is true.

11:41 20    Q.   Okay.  As previously mentioned, George is a prominent

21    defense attorney in Massachusetts, has legitimate sources of

22    income, right?

23    A.   He's an attorney.  He makes money from being a defense

24    attorney, yes.

25    Q.   And preliminary financial investigation showed he had bank

          1    accounts with Citizens Bank and Bank of America, right?

          2            MS. KAPLAN:  Objection to the reading of this report,

          3    your Honor.

          4            THE COURT:  Yes, sustained.

          5    Q.   In reference to the March 18th telephone conversation,

          6    sir, what I would like to do is -- this is the transcript of

          7    that conversation.  With the Court's permission, let me just go

          8    along.  It's very brief.  It's, like, two pages.  This is a

          9    telephone call between Mr. Dardinski and Mr. George, is that

11:41  10    correct?

         11    A.   Yes.

         12    Q.   Is this the first conversation that they were -- that they

         13    had?

         14    A.   No.  It is not the first conversation.

         15    Q.   First recorded conversation?

         16    A.   It's the first recorded conversation.

         17    Q.   All right.  So Dardinski says, "Hello."  George says, "Did

         18    you call me?  I called you twice."

         19    A.   I really can't see the report, sir.

11:42  20    Q.   Let me do it this way.  Dardinski talks about being in the

         21    middle of painting the car, and he's got to run to Needham,

         22    right?

         23    A.   Yes.

         24    Q.   Then George says, "What time do you want me to meet you?

         25    I can meet you at 7," right?

1   A.   Yes.

2   Q.   Dardinski says, "I'll call you back once I get done with

3   the car.  You sure this guy is all right," right?

4   A.   Yes.

5   Q.   That's when Bob George goes, "Oh, my good God, he's great.

6   If there's a problem, you just -- if this guy isn't all right,

7   you hold me a hundred percent responsible."  You remember

8   hearing that on the tape, right?

9   A.   "If this guy isn't all right, you can hold me" -- yes.

11:42 10   Q.   Then he says, you know, "It's a hundred grand"?

11   A.   Yes.

12   Q.   George says, "Well, I need to tell you.  You don't have to

13   worry.  You don't have a worry in the world with this guy"?

14   A.   Yes.

15   Q.   Then he says, "All right.  And I'm not going to have to

16   pay no taxes.  It's not going to come back to me," right?

17   A.   Mr. Dardinski says that, yes.

18   Q.   George says, "No, that's his responsibility.  What he's

19   going to do is give you the check that you need.  Now you've

11:43 20   got to give me -- you know, I can't do it.  I have to have --

21   I'll call him up.  I'll tell him we're all set to go," is what

22   George said, correct?

23   A.   Yes.

24   Q.   And then Dardinski says, "Okay."  George says, "I'll get

25   ahold of him tonight.  He lives in Dover.  Give me a couple of

           days.  That's all.  I'm on a murder trial.  I'll get it done.

           I'll have the check.  I'll deliver it to you myself," right?

  3    A.    Yes.

  4    Q.    Then he says, "All right.  What's it going to be, like, a

  5    mortgage or something?"  He says, "No, you know, according to

  6    the way he explained it, you don't even have to sign anything,"

  7    right?

  8    A.    Yes.

  9    Q.    And he says, "All you have to do is get the check.  I

11:43 10    mean, I thought that was the best thing when he said that to

 11    me," right?

 12    A.    "When he said that to me," yes.

 13    Q.    That's what I said.

 14          Then he says, "Yeah."  Then Mr. George says, "Hey, you

 15    know something?  That's better.  That's better for Ronnie than

 16    the way I was thinking of doing."  That's dealing with the

 17    money that he was going to get from Dardinski to give to

 18    Hansen, correct?

 19    A.    Yes.  He wanted that money.

11:43 20    Q.    So the next statement that is made by Mr. Dardinski is:

 21    "Yeah, 'cause I got some other money from -- I sold some coke

 22    to a guy, and I got to hide that money, too."  And what does

 23    Mr. George say, sir?

 24    A.    "Well, the fact is I don't want to know that stuff because

 25    it's illegal."

1    Q.   What does Dardinski say?  "Ah, whatever"?

2    A.   "Ah, whatever."

3    Q.   Then George says, "When you see me, obviously I can't help

4    you with something like that.  When you see me, I'm not going

5    to call him until I see you though.  And I think" -- then they

6    go on to talk about pretty much innocuous stuff, end of

7    conversation, right?

8    A.   Yes.

9    Q.   That's the conversation that you put in your form and

11:44 10   indicated that Mr. George was told by Mr. Dardinski that it was

11   drug money that he was taking and was going to launder.  That's

12   a lie, isn't it?

13   A.   No, it's not.

14   Q.   And then you continue on, sir, again making reference to

15   Mr. George being a prominent defense attorney, what his

16   practice pertains to.  And then your goal of the investigation

17   was to charge Mr. George with money laundering and begin

18   proceedings against him for disbarment.  You put that in that

19   report, didn't you?

11:45 20   A.   I don't know if I authored that report.  I may have.  But

21   that is in that report, yes.

22   Q.   When was the next hundred grand that you sought

23   authorization for, sir?

24   A.   In April of 2010.

25   Q.   In April of 2010, you got another $100,000, correct?

1    A.    Yes.

2    Q.    That would be the meetings, again with Dardinski, no Bob

3    George.  Dardinski sits with Mr. Hansen.  One time it's Merry

4    Christmas, another time talking about, you know, the gym bag

5    that he had, that type of thing.  Bob George wasn't even there,

6    was he?

7    A.    Bob George was not present for either of those

8    transactions on December 16, 2009, or April 15 of 2010.

9    Q.    And those would be High Wire funds again, right?

11:46 10    A.    Those would be DEA funds.

11    Q.    What's High Wire?

12    A.    It's --

13          MS. KAPLAN:  Objection.

14          MR. REDDINGTON:  I'll withdraw that.

15          THE COURT:  Wait a minute.  Is there an objection?

16          MS. KAPLAN:  Yes, your Honor.

17          THE COURT:  What grounds?

18          MS. KAPLAN:  I believe that this is information that's

19    not relevant, and it's sensitive information to the DEA.

11:46 20          THE COURT:  All right.  Sustained.

21    Q.    You then put in a request in February for an additional

22    chunk of money, correct, 25,000, right?

23    A.    February of 2011?

24    Q.    Yup.

25    A.    Yes.

1    Q.   Again referring to Mr. George as a prominent, well-known

2    defense attorney in Massachusetts and basically detailing an

3    update, if you will, of your investigation, correct?

4    A.   Yes.

5    Q.   And you would agree, sir, that you indicate that the plan

6    was to have the CS meet with George.  Now, this is a meeting

7    that hasn't even taken place because Mr. George has been

8    relentlessly contacted by your informant, as we've already

9    established, for quite some time, almost two years, right?

11:47 10   A.   The calls are both incoming and outgoing.

11   Q.   On a number of occasions, Mr. George was asked or thrust

12   or given money that he never took, isn't that right, sir?  Two

13   years.

14   A.   Excuse me?

15   Q.   For two years you were investigating Bob George, the guy

16   that's a money-hungry, grubby guy that wants to launder a

17   hundred grand, 200 grand.  Give me your money.  Meets him at

18   the mall.  Two years, right?

19   A.   I didn't describe -- the investigation lasted two years.

11:47 20   I never described Mr. George in that manner.

21   Q.   You had an occasion in February of 2007 when you

22   requested -- now, that would be the $300,000?

23   A.   I never requested anything in February of 2007 for this

24   case.  It did not start until 2009.

25   Q.   Okay, my bad.

1   A.   April of what year?

2   Q.   November of 2010, sir.  Did you request an additional

3   amount of money?

4   A.   Yes, I did.

5   Q.   All right.  And the New England Field Division requested

6   and was granted, in November of 2010, another hundred grand,

7   right?

8   A.   I believe it was granted in December, but, yes.

9   Q.   Okay.  And the operational plan is to have the CS -- that

11:48 10   would be Dardinski -- meet with George for the purpose of

11   allowing George to launder the proceeds himself.  By personally

12   laundering the money George would have negated any defense of

13   his involvement in this scheme.  You wrote that, didn't you?

14   A.   I don't know if I wrote that.  I don't know.

15   Q.   Would you agree, sir, that it was in the report?

16   A.   It was in the report, yes.

17   Q.   Indeed, there were a number of occasions that your guy

18   Dardinski reached out to Mr. George to meet with him, isn't

19   that right?

11:48 20   A.   He reached out to him several times.  He tried to set up

21   three meetings which did not happen.

22   Q.   Was he recorded when he would call Bob George?  Now, he's

23   got a hundred grand in the bag.  He's got the grubby lawyer

24   over here that wants that cash, wants to launder it.

25   A.   I never described Mr. George as a grubby lawyer.

```
 1   Q.   You indict him for money laundering?
 2            MS. KAPLAN:  Objection.
 3            THE COURT:  Sustained.
 4   Q.   Sir, you have $100,000 that's now been authorized,
 5   correct?
 6   A.   In December of 2010?
 7   Q.   Yes.
 8   A.   Yes.
 9   Q.   And you put it in a bag, right?
11:49 10   A.   In a gym bag, yes.
11   Q.   And you give it to Dardinski, right?
12   A.   He's got it in January of 2011, yes.
13   Q.   And the idea of the scheme is that Mr. Dardinski's going
14   to meet with Bob George, and he's going to give him $100,000 in
15   dead presidents, right?
16   A.   He's got to see if he would accept the money, yes.
17   Q.   So I imagine that Mr. Dardinski must have had close,
18   personal contact with Bob George on a number of occasions to
19   set up those meetings?
11:49 20   A.   He called him on the telephone.  Mr. George said he would
21   show up, but he never did.
22   Q.   He never did.  Was there an occasion, sir, where Dardinski
23   actually was riding around and had a hundred grand in a bag in
24   a car and Mr. George, again, never showed up for it?
25   A.   He wasn't riding around.  He was stationary.
```

1    Q.   Okay.  So you would agree with me, if you knock out the

2    riding around, that he was stationary in a vehicle, yes?

3    A.   I said on three occasions, yes, in January of 2011.

4    Q.   Just work with me on this.  He was in a vehicle, yes?

5    A.   Mr. Dardinski was in his vehicle, yes.

6    Q.   Yes.  And the bag of cash was in the vehicle with Mr.

7    Dardinski, right?

8    A.   Yes.

9    Q.   Okay.  And do you recall, sir, that Mr. Dardinski then

11:50 10   contacted you and made statements to the effect, This guy won't

11   ever show up?  This guy never responds.  This guy, this guy,

12   this guy, expressing frustration about Attorney George, right?

13   A.   There were recorded conversations.  I don't know the exact

14   context of them, but he was frustrated because Mr. George kept

15   saying he would show up and never showed.

16   Q.   There must have been recorded conversations, because you

17   monitored this guy -- must have been conversations where he

18   said, Bobby, I've got a hundred grand in drug money.  Meet me.

19   Do you have one tape like that?

11:51 20   A.   I don't believe so, no.

21   Q.   No.  But we do have a conversation, sir, where -- who's

22   Calice Couchman?

23   A.   She was my supervisor at the time.

24   Q.   Is that the one you're referring to that you would have to

25   hold off until after she leaves before you could get the money

         1    for this investigation?

         2    A.   I don't know what you're talking about.

         3    Q.   Did you ever hear your voice, sir, indicating -- oh, wait

         4    a minute.  Did you ever have a conversation with Monica or Mr.

         5    Dardinski, while he was incarcerated, regarding your supervisor

         6    and waiting for the supervisor to leave?

         7    A.   Waiting for the supervisor to leave?  I may have, but I

         8    don't recall that.

         9    Q.   In any event, sir, do you recall that Mr. Dardinski now

11:51   10    has this bag of money, and Mr. Dardinski then indicates that --

        11    something to the effect of:  What money?  He's kidding with

        12    you, right?  Your guys are all giggling and laughing.  Do you

        13    remember that, sir?  You heard that tape, right?

        14    A.   I believe he was joking, yeah.

        15    Q.   And Dardinski says, Is that bag more important?  And then

        16    there's a conversation.  What bag?  You're not giving the money

        17    back.  Here you go.  Can we shoot him now, Calice?  That was

        18    you, right?

        19    A.   I believe that was me.

11:52   20    Q.   All a big gut fest.  Everybody was having a good time,

        21    right?

        22    A.   Mr. Dardinski was --

        23    Q.   Mr. Dardinski had a hundred grand in his car, did he?

        24    A.   Excuse me?

        25    Q.   Dardinski didn't have a hundred grand in his car?

         1    A.   At that time, I probably took it out of his vehicle.

         2    Q.   Now, continuing on with the investigation, sir, you would

         3    agree that one of the things that you did is you were

         4    instrumental in getting another local police officer who was

         5    attached to the DEA to meet with Mr. George and pretend that he

         6    was some kind of drug dealer, correct?

         7    A.   Are you referring to Task Force Officer Pedro Nieves.

         8    Q.   Task Force Officer Pedro Nieves, yes, sir.

         9    A.   Yes.

11:52   10    Q.   And at some point -- that meeting was surveilled as well,

        11    wasn't it?

        12    A.   Mr. Nieves had two meetings with Mr. George.  They were

        13    both audio and video recorded.  They were on --

        14    Q.   The answer is yes?

        15    A.   -- February 28 of 2011 and March 4 of 2011.

        16    Q.   And Mike Hansen, is he still in the banking business or

        17    the mortgage business?

        18    A.   I don't know what he's into right now.

        19    Q.   Where does he live?

11:53   20         MS. KAPLAN:  Objection.

        21         THE COURT:  Sustained.

        22    Q.   Well, you did speak to Mr. Hansen regarding this case,

        23    didn't you?  You told us on direct that you debriefed him?

        24    A.   Yes, on several occasions.

        25    Q.   Is it fair to say, sir, that one of the requests for

```
 1    production would be the notes that were taken of the meeting

 2    that you would have with Mr. Hansen, correct?

 3              MS. KAPLAN:  Objection.

 4              THE COURT:  Sustained.

 5    Q.   Would you agree with me, sir, that Mr. Hansen repeatedly

 6    denied that Robert George ever told him that the source of the

 7    money was drugs?  Would you agree with that, sir?

 8    A.   That's what Mr. Hansen told us, yes.

 9    Q.   All right.  You're aware, sir, that the identity of the

11:54 10   office manager for Mr. Hansen has been identified?  That would

11    be Carolyn, C-a-r-o-l-y-n, Motta.  You're aware of that, sir,

12    are you not?

13    A.   Yes.  I got you that DEA 6 that you requested from

14    yesterday.

15    Q.   Good job, because, indeed, Carolyn Motta didn't know who

16    the heck Bob George was and had no knowledge of any $80,000

17    check, true?

18    A.   She did not know Bob George, and she did not have any

19    recollection about that check.

11:54 20   Q.   By the way, did you ever talk to Drass, the detective from

21    Whitman, regarding the Whitman investigation?

22    A.   Regarding -- I've talked to him.  I know who you're

23    referring to, but I don't know what investigation you're

24    referring to.

25              MR. REDDINGTON:  Excuse me one minute, your Honor,
```

1    please.

2    Q.   Now, when you started to arrest Mr. George, sir, you

3    sought another one of your Tamuleviz affidavits, correct, to

4    get a complaint to issue from this court charging; that's the

5    process you go through, right?

6    A.   To arrest Mr. George?

7    Q.   Right.

8    A.   Yes.

9    Q.   What you had to do is sign an affidavit.  It would be

11:55 10   reviewed by Miss Kaplan or whoever is working with you on the

11   case, right?

12   A.   Yes.

13   Q.   And then it's submitted to a court, right?

14   A.   To a magistrate.

15   Q.   You sign the affidavit under oath swearing to be as

16   accurate and as truthful as you can be, correct?

17   A.   Yes.

18   Q.   And on the date of March 22, 2011, you did, indeed, sign

19   the affidavit, correct?  That's your signature, right?

11:56 20   A.   Yes, it is.

21   Q.   All right.  And in the course of your submissions to the

22   magistrate, do you recall detailing to the court your

23   understanding of Mr. George's involvement with this

24   investigation, correct?

25   A.   Yes.

1    Q.   And do you recall indicating, sir -- for example, on March

2    18, 2009, that was the conversation that I stood next to you

3    and read pretty much verbatim from the little book out there,

4    right?

5    A.   Yes.

6    Q.   That's the first conversation, right?

7    A.   The first recorded conversation.

8    Q.   All right.  In your affidavit, sir -- you have in mind

9    what we heard the conversation really involved -- you indicated

11:57 10   on your affidavit that CSI -- that would be Dardinski -- placed

11   a consensually recorded call to George.  During the telephone

12   conversation, CSI told George that he had some cash from

13   selling cocaine.  You put that in the affidavit, didn't you?

14   A.   I would have to see the affidavit, but I believe it's CS1.

15   I don't know what you're referring to as CSI.

16   Q.   CS1, Dardinski, that's the guy we're talking about

17   correct?  Yes?

18   A.   Yes.  He had a consensually recorded telephone with Mr.

19   George on March 18 of 2009.

11:57 20   Q.   By the way, in your dealings in your investigation, in

21   addition with Mr. Hansen, it was pretty clear and apparent that

22   Mr. Dardinski wanted checks to avoid the DOR, Probation, what

23   we've already been through, correct, even with Hansen?

24   A.   That was his undercover role --

25   Q.   So --

1    A.    -- to do that.

2    Q.    Was it your understanding, sir, that Mr. Hansen, before he

3    started to work with Group 1, whatever you are, DEA, that,

4    indeed, he thought the money to Dardinski was so that Dardinski

5    would be able to pay his bills, DOR and things like that,

6    right, initially?

7    A.    Mr. Hansen thought that.

8    Q.    Yes.

9    A.    That he had to clean the money so he could pay his bills.

11:58 10    He had to launder the money.

11              MR. REDDINGTON:  One moment, your Honor, please.

12              That's all I have, your Honor.  Thank you.

13              THE COURT:  Redirect?

14              MS. KAPLAN:  Yes, your Honor.  If I could just have a

15    moment, your Honor?

16              THE COURT:  Yes.

17    REDIRECT EXAMINATION BY MS. KAPLAN:

18    Q.    Good afternoon, Agent.

19    A.    Good afternoon.

11:59 20    Q.    You were asked questions, both on direct and

21    cross-examination today, about when Mr. Dardinski was in

22    Martha's Vineyard you had some conversations about this matter

23    in East Bridgewater, correct?

24    A.    Yes.

25    Q.    And you were asked specifically today about when you said

1    "I can take care of that."  Can you tell us what you meant when

2    you said, "I can take care of that"?

3    A.   I was going to check on the warrants, but I also was just

4    basically -- he would talk to me all day.  I was just trying to

5    get rid of him.  I didn't want to talk to him for too long

6    because if there was a warrant issued, they would simply have

7    lodged a warrant at the jail because he was in custody.  I was

8    pretty sure there was no warrant at that time.

9    Q.   Was there?

12:00 10   A.   No.

11   Q.   Did you take care of anything for him in connection with

12   that East Bridgewater matter?

13   A.   No, I did not.

14   Q.   Was he ever charged with any crime?

15   A.   No, he was not.

16   Q.   Was that as a result of any action that you took or anyone

17   in law enforcement?

18   A.   No.

19   Q.   Did you need federal authorization from the court to make

12:00 20   consensual recordings with Ronnie Dardinski?

21   A.   No, I do not.

22   Q.   Have you done that in other cases?

23   A.   Yes.

24   Q.   How many other cases have you had investigations where

25   you've had a confidential source make consensual recordings

1    without authorization from the court?

2    A.   Every investigation we do, pretty much, is consensual

3    recordings.

4          MS. KAPLAN:  Your Honor, if I may get the toll

5    records, please?

6          THE COURT:  Yes.

7    Q.   You were shown Exhibit 116 by Mr. Reddington.  Do you

8    remember?

9    A.   Yes.

12:01 10   Q.   What is this?

11   A.   This is Mr. Dardinski's calls.  This is toll information

12   on Dardinski's telephone, Mr. Dardinski's telephone, I believe.

13   Q.   Are these toll records that came from the phone company?

14   A.   That's what they appear to be, yes.

15   Q.   This isn't something that you put together?

16   A.   No.  It is not something that I put together, no.

17   Q.   And do you see on these records where it says, "In," "in,"

18   "in"?  I'm sorry, at the bottom.

19   A.   Yes, I do see that.

12:01 20   Q.   What does that mean?

21   A.   That means it's an incoming telephone call, a person is

22   calling Mr. Dardinski.

23   Q.   So during the course of this investigation, were there

24   incoming calls from the defendant to Mr. Dardinski?

25   A.   Yes.  During the course of the investigation, there were

1   72 incoming calls from Mr. George to Mr. Dardinski, and they

2   continued right through the end of the investigation.

3   Q.   And as a result of your subpoenaing the telephone records

4   of Mr. Dardinski, were you able to determine, during the course

5   of this investigation, how many telephone calls Mr. Dardinski

6   placed or received during the course of this investigation?

7   A.   During the course of the investigation, from January 2009

8   to March 18 of 2011, he placed approximately 55,000 calls.

9   Q.   Back to Exhibit 116, in the column where my finger is,

12:02 10   going down, is that the duration of the calls?

11   A.   Yes, it is the duration, yes.

12   Q.   You see some calls that look like they're 16 seconds, 42

13   seconds, 30 seconds?

14   A.   Yes.

15   Q.   On the next page, again, you see, 19 seconds, 98 seconds,

16   18 seconds?

17   A.   Yes.

18   Q.   You said earlier that there were some calls that were of

19   -- between yourself and Mr. Dardinski, for instance -- that

12:03 20   there were some calls that were of zero duration, correct?

21   A.   Yes.   There were some calls of zero duration between Mr.

22   Dardinski and Mr. George.   I never reviewed my own telephone

23   tolls, so I can't speak for my calls to me.

24   Q.   What does "zero duration" mean?

25   A.   They did not talk.   They did not have a conversation.

1    Q.    So there were calls between Dardinski and the defendant

2    where there was no conversation?

3    A.    Yes, that's correct.

4    Q.    But the toll records reflect the call?

5    A.    Yes.

6    Q.    And going back to the very first recorded conversation in

7    this case between the defendant and Dardinski -- you just went

8    through this with Mr. Reddington again.  And you were asked

9    whether, other than in this first recorded call where Dardinski

12:04 10   says, "Yeah, 'cause I got some other money from -- I sold some

11   coke to a guy, and I got to hide that money too."  The

12   defendant says, "Well, the fact is I don't want to know that

13   stuff because it's illegal."  You said there were no other

14   conversations where there was a reference to the money being

15   from drugs?

16   A.    There are references to the money being from drugs, yes,

17   in numerous conversations.

18   Q.    Do you recall that behind Tab 3 there is a meeting between

19   Dardinski and the defendant, on April 6 of 2009, which has been

12:05 20   played for the jury, where the defendant says, "I'm doing a

21   huge favor -- I'm doing a favor -- I don't -- I don't even know

22   the guy.  And by the way, he's already agreed to do the rest."

23   Do you recall that conversation?

24   A.    Yes.

25   Q.    And that was in April of 2009, correct?

1    A.   Yes.

2    Q.   And "the rest" would be what, Agent?

3             MR. REDDINGTON:   Objection.

4             THE COURT:   He can state what his understanding is of

5    that.   Overruled.

6    A.   To launder the money for Mr. Dardinski.

7    Q.   From what?   What would the rest of the money be in your

8    understanding?

9             MR. REDDINGTON:   Objection.

12:06 10            THE COURT:   Overruled.

11   A.   The rest of the money at that time would be from the money

12   Mr. Dardinski made from the repossession and also from the

13   cocaine.

14   Q.   Because he had previously told the defendant that he had

15   money from cocaine, too, correct?

16            MR. REDDINGTON:   Objection.

17            THE COURT:   Overruled.

18   A.   Yes.

19   Q.   Now, is there any -- were you able to come up with any

12:06 20   evidence during the course of this investigation that Mr.

21   Dardinski had the money to purchase a home?

22   A.   No.   He does not have any money to purchase a home.

23   Q.   Did you come up with any information that Mr. Dardinski

24   was looking at a piece of property to buy in Lakeville,

25   Massachusetts?

1    A.   No.  Mr. Hansen wanted to sell him that property, and he

2    may have looked at it just as part of the investigation, but he

3    was not interested in purchasing that property, and he couldn't

4    purchase it financially.  He had no credit.

5    Q.   And you've heard throughout the course of these tapes that

6    there's reference to mortgage and loan?

7    A.   Yes.

8    Q.   Was it your understanding that these transactions were

9    about obtaining a mortgage for Mr. Dardinski?

12:07 10   A.   No.  They were going to use the mortgage to launder the

11   money.

12   Q.   Now, you conducted -- a financial investigation of the

13   defendant was conducted?

14   A.   Yes.

15   Q.   And who did that investigation?

16   A.   Special Agent Frank Conway did most of that investigation.

17   Q.   Was there also someone at the U.S. Attorney's Office who

18   did that investigation?

19   A.   Yes, Lori Moccaldi.

12:07 20   Q.   Some of the information that you received from the

21   defendant's finances, did that come from Agent Conway and the

22   financial analyst, Lori Moccaldi?

23   A.   Yes.

24   Q.   In that first conversation that you just went over again

25   with Mr. Reddington, on March 18, 2009, between Dardinski and

1    the defendant, is there any mention in that conversation about

2    money that Dardinski is trying to keep from the Department of

3    Revenue?

4    A.   No, there is not.

5    Q.   Is there any conversation during that call about women

6    that Dardinski is trying to hide his money from?

7    A.   No, there is not.

8    Q.   Is there any discussion in that first recorded phone call

9    that the money that Dardinski says he's got, the $100,000, that

12:08 10   that comes from a legitimate source?

11   A.   No, there is not.

12            MS. KAPLAN:  If I may just have a moment, your Honor?

13            THE COURT:  Yes.

14            MS. KAPLAN:  I have no further questions.

15            THE COURT:  Recross, Mr. Reddington?

16            MR. REDDINGTON:  Yes, your Honor, very briefly, if I

17   may.

18   RECROSS-EXAMINATION BY MR. REDDINGTON:

19   Q.   You mentioned on redirect again Mr. Michael Hansen.

12:09 20   You're aware, sir, that Mr. Hansen entered into an agreement

21   with the United States Attorney's Office, is that correct?

22            MS. KAPLAN:  Objection.

23            THE COURT:  He can state whether he knows that he

24   entered into the agreement.  Overruled.

25   A.   A cooperation agreement.

1    Q.   You also know that he signed what's called a plea

2    agreement where he agreed --

3              MS. KAPLAN:  Objection.  Beyond the scope, your Honor.

4              THE COURT:  Overruled.

5    Q.   You know that, right?

6    A.   Excuse me?  What's the question again?

7    Q.   You know, sir, that Mr. Michael Hansen executed a plea

8    agreement with the U.S. Attorney's Office where he basically

9    agreed to plead guilty and cooperate, isn't that right?

12:09 10   A.   There were two separate agreements.  It was a cooperation

11   agreement.

12   Q.   You have the cooperation agreement.  Just put that aside.

13   I'm asking about the plea agreement.

14   A.   You stated both.  Yes, there's a plea agreement.

15             MR. REDDINGTON:  I would offer the plea agreement,

16   your Honor.

17             MS. KAPLAN:  Objection, your Honor.

18             THE COURT:  Sustained.

19             MR. REDDINGTON:  Could I offer it for ID, your Honor?

12:10 20           THE COURT:  It may be marked as Exhibit D for

21   identification.

22             MR. REDDINGTON:  Thank you.

23   (Exhibit D marked for identification.)

24   Q.   You agree, sir, that Mr. Hansen, even as we stand here

25   today, is still under a cooperation agreement with the U.S.

1    Attorney's Office, right?

2    A.    I don't believe so, no.

3    Q.    You don't know that?

4    A.    I don't know that.

5    Q.    Has Mr. Hansen been sentenced on his case yet?

6    A.    No, he has not.

7    Q.    Okay.  Finally, sir, last question:  In reference to the

8    affidavit that you submitted and the complaint, I neglected to

9    point out that:  Do you recall, sir, that in the December --

12:11 10    Paragraph 11, you indicated, sir -- and this would be the

11    December conversation.  You remember the one where he would be

12    saying, "Why would I get involved in that," repeatedly, right?

13    You know that conversation, right?

14    A.    I believe I know the one.

15    Q.    "I'm a lawyer.  Why would I get involved with that?"

16    George talking on the tape, George repeatedly saying he didn't

17    want to get involved with that?

18    A.    My recollection is he said he couldn't do that, and he

19    didn't want to be involved.  He also stated, I couldn't do

12:11 20    that.

21    Q.    He repeated that on a number of occasions, didn't he?

22    A.    No, not on a number of occasions, no.

23    Q.    All right.  In any event, sir, you filed -- there's only

24    one recorded call that you're referring to in December of 2009,

25    right, only one?

```
 1    A.    There's more than one --

 2              MS. KAPLAN:  Objection.

 3    Q.   Do you recall, sir --

 4              MR. REDDINGTON:  I'll withdraw the question, your

 5    Honor.

 6    Q.   Paragraph 11, in December of 2009, in a consensually

 7    recorded conversation, George asked Dardinski whether Hansen,

 8    George's associate, was ready to engage in the transaction.

 9    You signed that under oath, didn't you?

10    A.   I signed the affidavit under oath.  I don't know if that's

11    what it says.  I don't recall the exact wording of it.

12              MR. REDDINGTON:  May I, your Honor?

13              THE COURT:  Yes.

14              MR. REDDINGTON:  Thank you.

15    Q.   This is pertinent to the December 2009 conversation that

16    -- read that paragraph -- from your affidavit.  It's one

17    sentence.  Read it out loud.

18    A.   "In December 2009, at the direction of law enforcement, in

19    a consensually recorded conversation, George asked CS1 whether

20    George's associate was ready to engage in the transaction."

21    Q.   That's not true, is it?

22    A.   I believe that's true, yes.

23              MR. REDDINGTON:  Thank you, your Honor.  Nothing

24    further.

25              MS. KAPLAN:  Just briefly, your Honor.
```

1         THE COURT:  Re-redirect.

2         MS. KAPLAN:  Yes.

3    FURTHER REDIRECT EXAMINATION BY MS. KAPLAN:

4    Q.   With respect to that affidavit that was attached to the

5    original complaint, Agent, you were asked about -- where you

6    discussed the March 18, 2009, conversation between the

7    defendant and Dardinski.  And you said in that affidavit that

8    Dardinski told George that he had some cash from selling

9    cocaine.  Do you recall that --

12:13 10        MS. KAPLAN:  If I may just have a moment, your Honor?

11        I'll withdraw that, your Honor.

12   Q.   Do you recall in this affidavit that in addition to

13   talking about some of the conversations between the defendant

14   and Dardinski that there was a place where you said, At

15   different times, particularly when George, meaning the

16   defendant, talked on the telephone, he made other similar type

17   comments expressing his unwillingness to engage in illegal

18   activity?

19   A.   Yes.

12:14 20   Q.   Do you recall that you did notify the court that there

21   were conversations where the defendant had said he was not

22   willing to launder that money?

23   A.   Yes, I did.

24   Q.   And you were just asked about the plea agreement with

25   Michael Hansen.

1    A.    Yes.

2    Q.    Is that a cooperating plea agreement?

3    A.    No, it is not, not to my knowledge.

4          MS. KAPLAN:  No further questions.

5    A.    He did cooperate with the government, so he got a -- he

6    got a deal.

7    Q.    But did he agree in his plea agreement to cooperate with

8    the government?

9    A.    No, he did not.

12:15 10         MS. KAPLAN:  No further questions.

11         THE COURT:  Recross?

12         MR. REDDINGTON:  Thank you, Judge.  Limited to that.

13   FURTHER RECROSS-EXAMINATION BY MR. REDDINGTON:

14   Q.    He did sign a cooperation agreement, true?

15   A.    Yes.

16   Q.    And he did indicate in his representations to the court in

17   the change of plea that his plea was for a structuring count?

18         MS. KAPLAN:  Objection.

19   Q.    Nothing to do with money laundering?

12:15 20         MS. KAPLAN:  Objection.

21         THE COURT:  Grounds?

22         MS. KAPLAN:  It's beyond the scope and it's completely

23   irrelevant.

24         THE COURT:  Sustained.

25   Q.    So the plea would be to a count charging what's known as

```
 1    an 8300, correct?  Failure to report --

 2              MS. KAPLAN:  Objection.

 3              THE COURT:  Sustained.

 4              MR. REDDINGTON:  That's all.

 5              THE COURT:  Thank you, Mr. Tamuleviz.  You may step

 6    down.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  Yes, Mr. Hafer.

 9              MR. HAFER:  Your Honor, the government briefly

12:16 10   re-calls Paul Crowley.

11              MS. KAPLAN:  Your Honor, I assume it's all right for

12    the agent to remain in the courtroom?

13              THE COURT:  Yes.

14              PAUL CROWLEY, Sworn

15              THE CLERK:  Thank you.  You may be seated.

16    DIRECT EXAMINATION BY MR. HAFER:

17    Q.   Please state your name and spell your last name for the

18    record.

19    A.   Paul Crowley, C-r-o-w-l-e-y.

12:16 20   Q.   Good afternoon, Mr. Crowley.

21    A.   Good afternoon.

22    Q.   Welcome back.

23              You recall testifying a couple days ago with respect

24    to some tax records related to Robert George?

25    A.   Yes.
```

```
 1    Q.   And one of those records you testified to was an account

 2    transcript for the year 2007?

 3    A.   Yes.

 4         MR. HAFER:  Your Honor, the exhibits that I'm going to

 5    show the witness are already in evidence.  I just request

 6    permission to publish them.

 7         THE COURT:  Yes.  They may be published.

 8    Q.   I'm showing you first Exhibit 26A, Mr. Crowley.  Actually,

 9    let me just back you up to orient the testimony.  I'm going to

10    show you 26D.  This is the certification of lack of record that

11    you testified to?

12    A.   That's correct.

13    Q.   And your general testimony with respect to this document

14    was what again?  What is it reflecting?

15    A.   This reflects that the taxpayer did not file a Form 1040

16    for tax periods 2007 and 2008.

17    Q.   And directing you now back to the transcript, 26A, from

18    2007, taking you to the bottom of that document under

19    "Transactions," the first entry, Code 150, could you read that

20    and then describe what that is?

21    A.   The explanation is:  "Substitute tax return prepared by

22    the IRS."

23    Q.   What does that mean?

24    A.   The Internal Revenue Service prepared a return.  Actually,

25    all they did is put the entity information, the name of the
```

1    taxpayer and their social security number, into the computer

2    system to start a process to secure funds that the Internal

3    Revenue Service thought -- believes are due and owing by the

4    taxpayer.

5    Q.    That's why the IRS does that, is --

6    A.    That's correct.  It starts the process to collect taxes.

7    Q.    Directing you now to the second page of Exhibit 26A, the

8    second and -- let's start with the third entry there.  The code

9    is 599, indicates "tax return filed"?

12:19 10   A.    That's correct.

11   Q.    What is that?

12   A.    That actually indicates that the Internal Revenue Service

13   has made an assessment for the taxes for the taxpayer for that

14   particular year, and that's our entry indicating that we have

15   done so and sent a letter to the taxpayer.

16   Q.    Right above it there's an entry.  It says, "Duplicate

17   return filed."  What is that, Mr. Crowley?

18   A.    That is a notification from the taxpayer that they accept

19   the adjustments for the -- what the IRS had made -- listed here

12:19 20   that are just below.

21   Q.    Did either of these indications reflect that the taxpayer

22   has filed a return?

23   A.    No.

24   Q.    Directing your attention now to Exhibit 26B in evidence

25   and the bottom of that page, again, the first entry under the

1    "Transaction," the Code 150.  Again, briefly, what is that?

2    A.    That is the substitute tax return prepared by IRS, and

3    that's to start collecting taxes for this tax period.

4    Q.    Just going up to the top, this is for tax year 2008 now,

5    is that correct?

6    A.    That's correct.

7    Q.    Again, this reflects, this first entry, that on March 28

8    of 2011, having not received a tax return from the taxpayer,

9    the IRS filed a substitute return?

12:20 10    A.    That's correct.

11    Q.    On the second page here, Mr. Crowley, about halfway down,

12    there's an entry, "599."  It says, "Tax return filed."  Would

13    you explain that, please?

14    A.    That means that the Internal Revenue Service input the

15    adjustments and sent a notice to the taxpayer that these

16    adjustments were going to take place for the assessment of

17    taxes and penalties.

18    Q.    As we go a little bit further down, again, there's another

19    entry, "599," "tax return filed."  Your understanding of that

12:21 20    entry?

21    A.    That would be just the same, indicating that the Internal

22    Revenue Service has assessed additional penalties for filing

23    tax return after the due date.  These are the numbers that come

24    after:  interest charge for late payment as well as a penalty

25    for late payment of taxes.

1    Q.    These entries do not reflect -- based on your training,

2    experience and understanding of these documents, they do not

3    reflect that the taxpayer has filed a return, is that correct?

4    A.    That is correct.

5    Q.    Finally, Exhibit 26C, Mr. Crowley, tax year 2009, is that

6    correct?

7    A.    Yes.

8    Q.    And at the bottom of this one, under "Transactions,"

9    there's an entry, "Tax return filed."  There's a code of 150

12:21 10   and some numbers under the tax return.  Could you just describe

11   what that reflects?

12   A.    That indicates that the taxpayer filed a return with the

13   Internal Revenue Service.  That series of numbers is a document

14   locator number.  That's the number that would be stamped in the

15   top right-hand corner of the actual document.  And if we go all

16   the way to the right, it indicates an amount of $114,225 of

17   taxes that were self-assessed by the taxpayer for that period.

18              MR. HAFER:  Could I have just one moment, your Honor?

19              THE COURT:  Yes.

12:22 20              MR. HAFER:  Thank you very much, your Honor.  I don't

21   have any further questions.

22              THE COURT:  Cross-examination, Mr. Goldstein.

23              MR. GOLDSTEIN:  Thank you, your Honor.

24   CROSS-EXAMINATION BY MR. GOLDSTEIN:

25   Q.    Mr. Crowley, you've been called back to testify for the

1   government, is that correct?

2   A.   That's correct.

3   Q.   And you understand that's because we provided certain

4   documents to Mr. Hafer since you've testified?

5   A.   That's correct.

6   Q.   And they came -- they asked you to come back to explain

7   some of those things, is that correct?

8   A.   They asked me to come back and explain the information for

9   2007, eight and nine.

12:23 10   Q.   You went through a series of these documents with Mr.

11   Hafer.  And beginning with tax year 2007, Exhibit 27A -- you

12   see that, right?

13   A.   It's Exhibit 26A.

14   Q.   26A, I'm sorry.  Do you see that?  And that's for tax year

15   December 31, 2007, right?

16   A.   That's correct.

17   Q.   And your testimony is that the IRS filed its own return,

18   is that correct?

19   A.   The IRS processed the assessments.

12:24 20   Q.   Well, strike that.

21       Let me go back to the first page.  Code 150 is a

22   substitute tax return prepared by the IRS, right?

23   A.   That's correct.

24   Q.   Okay.  And then on the second page of this particular

25   document, it specifically says that a tax return was filed,

```
 1   correct?

 2   A.   That's correct.

 3   Q.   And the date of that is August 26 of 2010, right?

 4   A.   That's correct.

 5   Q.   Now, are you absolutely sure that Mr. George did not file

 6   a 2007 return on or about August 26, 2010?

 7   A.   That's what this reflects, yes.

 8   Q.   And you're positive about that?

 9   A.   Yes.

10   Q.   Okay.  And have you gone back since you spoke to Mr. Hafer

11   yesterday and examined the records at the IRS regarding what

12   returns Mr. George has filed and what returns he has not filed?

13   A.   No.  I can't do that.  I can only speak to these

14   documents.

15   Q.   So you don't have authority to go back and look and make

16   sure that your interpretation of this document is accurate?

17   A.   I have checked this document.  This is correct.  This is

18   true and accurate as of the date it was printed.

19   Q.   I understand that.  But your interpretation of this

20   document is that no tax return has been filed, right?

21   A.   That's correct.

22   Q.   And Code 599, where do I find what Code 599 means?  Is

23   that located somewhere?

24   A.   There's an Internal Revenue manual that would have that

25   information.
```

1    Q.    And you're sure that it means that Mr. George didn't

2    actually file his return on or about that date?

3    A.    Yes.

4    Q.    And the 95,000 -- or the 94,000 -- strike that.

5          This number here, sir, is that not the actual tax that

6    was assessed as a result of Mr. George filing a 2007 tax return

7    declaring approximately $430,000 in revenue income?

8    A.    This indicates that the Internal Revenue Service made an

9    adjustment to the tax of that amount of money.

12:26  10   Q.    But it doesn't say "prepared by the IRS," does it,

11   meaning, on the first page, when it says that the IRS has

12   prepared a tax return -- excuse me -- right here, it says,

13   "Prepared by the IRS"; do you see that?

14   A.    Yes, I do.

15   Q.    But on the second page, there's no indication that the tax

16   return filed on or about August 26, 2010 -- there's nothing

17   indicating that that was prepared by the IRS, right?

18   A.    It does not indicate that it's prepared by anybody in

19   particular.

12:26  20   Q.    Right.  Meaning, if we go through to 2009 -- you agree

21   that Mr. George filed a tax return in 2009, right, Exhibit 26C?

22   There it is.  You see that?

23   A.    I do see that.  When looking at this document, when a tax

24   return is filed and it has a tax amount here that's indicated

25   by the return, that's the information off of the return when it

1    was filed.

2    Q.   Okay.  And when it says here -- back on Exhibit 26A, it

3    says, "Additional tax assessed."  Do you see that?

4    A.   I do see that.

5    Q.   That's based on the return that was filed by Mr. George,

6    right?

7    A.   That is based on the assessment from the Internal Revenue

8    Service.

9    Q.   Okay.  On 26C, what does it say right here?

12:27 10   A.   "Tax return filed."

11   Q.   "Tax return filed."  The same language that's used back in

12   26A on or about August 26th, right?

13   A.   That's correct.

14   Q.   Doesn't say "substitute tax return," right?

15   A.   That's correct.

16   Q.   It says, "Tax return filed," right?

17   A.   That's correct.  And the tax return on -- the one that's

18   circled in red here has a figure of zero here.

19   Q.   But right underneath it, it shows additional tax assessed,

12:28 20   right?

21   A.   Yes, it does.

22   Q.   Okay.  But your testimony is that's not based -- you're

23   saying that he didn't file a return in 2008 -- in 2007, on or

24   about that date, right?

25   A.   Yes.

1    Q.   But you can't go back and actually examine the IRS

2    records, right?

3    A.   That's correct.

4         MR. GOLDSTEIN:  Your Honor, may I have two documents

5    marked for identification, please?

6         THE COURT:  Yes.  The next in succession, they would

7    be, I believe -- Exhibit E is going to be which one for

8    identification?

9         MR. GOLDSTEIN:  2007, your Honor.

12:28 10        MR. HAFER:  I would just ask to see them.

11        THE COURT:  Show them to counsel.

12        MR. GOLDSTEIN:  Of course.

13        THE COURT:  Then we'll differentiate between which is

14   E and which is F, right, Mr. Goldstein?

15        MR. GOLDSTEIN:  Yes, your Honor.

16   (Exhibit E marked for identification.)

17   (Exhibit F marked for identification.)

18        MR. GOLDSTEIN:  And while I'm doing that, there's an

19   agreement with the government that we can admit Exhibit 117,

12:29 20   which is the tax transcript for fiscal year 2010.

21        THE COURT:  Tax transcript?

22        MR. GOLDSTEIN:  It's an account transcript by the IRS

23   for 2010.

24        THE COURT:  For 2010.  It will be admitted as Exhibit

25   117.

 1    (Exhibit No. 117 received into evidence.)

 2    Q.   Mr. Crowley, have you seen the account transcript?  You

 3    recognize this, right?

 4    A.   This appears to be a copy of an account transcript, yes.

 5    Q.   At the top here, where it says tax period of 2010, you

 6    recognize that to be a tax transcript of the year 2010, right?

 7    A.   That's correct.

 8    Q.   And this is the same as the transcripts you went through

 9    with Mr. Hafer today and the other day in terms of prior tax

12:30 10   years, right?

11    A.   That's correct.

12    Q.   According to this particular transcript, Mr. George, once

13    again, it says, "Tax return filed."  Do you see that, sir?

14    A.   Yes, I do.

15    Q.   And looks like there's an assessment of 190,000-plus,

16    right?

17    A.   That's correct.

18    Q.   That would be Mr. George's tax obligation for the year

19    2010, correct?

12:30 20   A.   That would be what he reported as his tax obligation.

21    Q.   And then here it shows that April 15, 2011, Mr. George

22    made a $100,000 payment towards that tax obligation, right?

23    A.   That's correct.

24    Q.   That's for 2010.  Now, if I may --

25         MR. GOLDSTEIN:  May I approach the witness, your

1    Honor?

2         THE COURT:  Yes.

3    Q.   Mr. Crowley, I show you a document that's 2007.  Been

4    marked for identification as --

5         THE COURT:  E, Exhibit E.  That's the 2007 return?

6         MR. GOLDSTEIN:  And the 2008 return will be marked as

7    Exhibit F for identification.

8    Q.   Now, you recognize -- not this particular document perhaps

9    but the form -- as a return filed with the Internal Revenue

12:31 10   Service due to be filed on April 15th of each year, reporting

11   one's income, correct?

12   A.   This is a Form 1040, U.S. individual income tax return for

13   tax year 2007.  This has not been filed with the Internal

14   Revenue Service.

15   Q.   How do you know that, sir?

16   A.   For one, it doesn't have the document locator number

17   across the top of the page, and there's no Internal Revenue

18   Service received stamp date.

19   Q.   When someone files their tax returns, the original goes to

12:32 20   the IRS, right?

21   A.   That's correct.

22   Q.   And as a taxpayer, I keep a copy of that, correct?

23   A.   Yes.

24   Q.   Okay.  So my copy wouldn't have the IRS stamp on it,

25   correct?

1  A.   That's correct.

2  Q.   You don't know whether or not the original of that form

3  was filed with the IRS because you haven't conducted a search

4  of the IRS files to look for Mr. George's 2007 return?

5  A.   A search was conducted, and the lack of record indicated

6  that there was no return filed for tax year 2007.

7  Q.   Did you conduct the search?

8  A.   No, I did not.

9  Q.   When was the search conducted?

12:32 10  A.   I would -- I believe it was in April of this year.

11  Q.   By whom?

12  A.   I would need to look at the lack of record --

13  Q.   Miss Cooper?

14  A.   Yes.

15  Q.   Does Miss Cooper ever make a mistake?

16       MR. HAFER:  Objection, your Honor.

17       THE COURT:  Sustained.

18  Q.   Is it possible that Miss Cooper made a mistake?

19       MR. HAFER:  Objection, your Honor.

12:32 20       THE COURT:  He can answer that question.

21  A.   It's possible.

22  Q.   It's possible, right?

23  A.   Yes.

24  Q.   Okay.  So I'm showing you a 2007 return, correct?

25  A.   Correct.  You're showing me a document that's filled out

1    for 2007.

2    Q.   Right.  And the date of that document on the second page,

3    sir?

4    A.   Is 8/23/10.

5    Q.   What was the date -- hold on one second.  What was that

6    date on the document?

7    A.   8/23/10.

8    Q.   If I take you back to Exhibit 26A -- which is for tax year

9    2007, right?

12:33 10   A.   Yes.

11   Q.   You see that?  Tax period 2007 on the screen?

12   A.   I see that.

13   Q.   And you look at "tax return filed," what's the date that's

14   indicated on your transcript?

15   A.   8/26/10.

16   Q.   That would be three days after the date on the copy of

17   that particular return, correct?

18   A.   That's correct.

19   Q.   So it is possible that Miss Cooper made a mistake, right?

12:33 20        MR. HAFER:  Objection.  Asked and answered, your

21   Honor.

22        THE COURT:  Overruled.

23   A.   It is possible for Miss Cooper to make a mistake, yes.

24   Q.   Okay.  So when you testified originally a few days ago and

25   again today that Mr. George didn't file his 2007 return, you

1  concede, rightfully so, there could be a mistake on the IRS's

2  part, right?

3  A.   I can't answer that, no.

4  Q.   Now, the second document --

5       MR. GOLDSTEIN:  May I approach, your Honor?

6       THE COURT:  Yes.

7  Q.   The second document I've shown you is another 1040 return,

8  correct?  Do you have that or do I have that?

9  A.   No.  You took it with you.

12:34 10  Q.   One second, sir.

11       Showing you what's been marked for identification as

12  Exhibit F, this is a return prepared for Mr. George dated 2008,

13  correct?

14  A.   It's a tax year 2008 return, and it was --

15  Q.   Not stamped with the IRS's but looks to be a copy of a

16  return, correct?

17  A.   It does appear to be.

18  Q.   And it's signed on the second page by a tax preparer,

19  correct?

12:35 20  A.   It appears to be, yes.

21  Q.   What's the date of the signature on the 2008 return?

22  A.   It looks like October 5, 2011.

23  Q.   October 5 of 2011.

24       Now, let me direct your attention to Government

25  Exhibit 26B.  This is a transcript that you went over

1    originally a couple days ago and again today, and this is for

2    the tax period of 2008, correct?

3    A.    That's correct.

4    Q.    And on the second page, it says, "Tax return filed October

5    19, 2011."  Do you see that?

6    A.    Yes, I do.

7    Q.    What's the date on the 2008 return in front of you?

8    A.    October 5th or October 7th, depending on -- it appears

9    that the tax preparer either signed it on the 6th or the 7th,

12:36 10   but the preparer appears to sign it on the 5th.

11   Q.    Your official transcript shows a return being filed ten or

12   so days after the date that appears on the copy of the return

13   in front of you, right?

14   A.    That's correct.

15   Q.    Again, it's possible Miss Cooper made a mistake regarding

16   2008, right?

17   A.    It is possible.

18            MR. GOLDSTEIN:  Your Honor, may I have one moment?

19            THE COURT:  Yes.

12:36 20            MR. GOLDSTEIN:  Your Honor, I would move to admit

21   Exhibits E and F.

22            MR. HAFER:  Objection, your Honor.  There's been no

23   foundation.  He doesn't recognize the documents.

24            THE COURT:  Yeah.  The objection is sustained.

25            MR. GOLDSTEIN:  One moment, your Honor.

1          No further questions.

2          THE COURT:  Any redirect?

3          MR. HAFER:  Yeah.  It's brief, your Honor.

4    REDIRECT EXAMINATION BY MR. HAFER:

5    Q.   Mr. Crowley, Mr. Goldstein just showed you a document

6    that's now in evidence.  It's Exhibit 117.  This document isn't

7    stamped with the official IRS certification, correct?

8    A.   That's correct.

9    Q.   But you generally recognize that it is what it purports to

12:37 10   be, a 2010 account transcript?

11   A.   That's correct.

12   Q.   Directing your attention to the middle of the document,

13   this is for tax year 2010, at the top?

14   A.   That's correct.

15   Q.   And according to the middle document, the middle of the

16   document where I'm pointing, what is the current account

17   balance on this document -- reflected on this document for this

18   tax year?

19   A.   $114,668.26.

12:38 20   Q.   According to this document, that information is current as

21   of June 18, 2012?

22   A.   That's correct.

23   Q.   So when we add the amount from 2007, 2008, 2009, 2010, is

24   it fair to say that Mr. George currently owes the IRS over

25   $500,000?

1    A.    That's about right.

2    Q.    Going to the second page of this document Mr. Goldstein

3    showed you, at the top, "Tax return filed," and underneath that

4    you testified that's a document locator number that matches up

5    with an actual tax return that's been filed?

6    A.    That's correct.

7    Q.    What is the date that this tax return was filed according

8    to this document?

9    A.    It's indicated as January 9, 2012.

12:39 10   Q.    January 9, 2012.  And this is for a 2010 return?

11   A.    That's correct.

12   Q.    And it was filed about five months ago?

13   A.    Yes.

14   Q.    Mr. Crowley, is there any evidence, based on the documents

15   that you have reviewed in preparation for your testimony today,

16   that Mr. George filed a tax return in 2007 or 2008?

17   A.    No.

18         MR. HAFER:  Nothing further, your Honor.

19         THE COURT:  Any recross?

12:39 20        MR. GOLDSTEIN:  Very briefly, your Honor.

21         THE COURT:  Yes.

22   RECROSS-EXAMINATION BY MR. GOLDSTEIN:

23   Q.    Mr. Crowley, are you aware that since 2007 Mr. George has

24   paid $512,000 in taxes to the IRS and the Department of

25   Revenue?

A.   No, I am not.

MR. GOLDSTEIN:  Nothing further, your Honor.

THE COURT:  Thank you, Mr. Crowley.  You may step down.

We're going to take the lunch recess now, jurors, a little early.  I'm going to ask you to come back a little early to help make up for the time we've lost.  We'll come back in exactly an hour, 20 minutes before 2.  We'll have one hour for lunch, and I'll see you at that point.

(The jury left the room at 12:40 p.m.)

THE COURT:  Be seated, counsel.  The government's plans now?

MR. HAFER:  Yes, your Honor.  The next witness the government plans to call is Lori Moccaldi.

THE COURT:  Who was it?

MR. HAFER:  Lori Moccaldi, M-o-c-c-a-l-d-i.  She's an auditor.  She was just referred to in Agent Tamuleviz' testimony.  It's probably approximately a 20-minute direct related to some financial records she reviewed.

The next witness after her would be the individual referred to as the undercover agent.  And in light of your Honor's ruling, that we will move as fast as we can, but we want to try -- we need to redact both audio and transcripts.  So I would just ask the Court's indulgence.  We'll do this as quickly as we can.  It may take us a little while just to get

1    that right.  In our view, there's no point in starting his

2    testimony until we have that thing teed up.  We'll go and start

3    working on it right now.  I just wanted to alert the Court.

4              THE COURT:  All right.  Anything else that needs to

5    come to my attention from the defendants?

6              MR. GOLDSTEIN:  No, your Honor.

7              THE COURT:  We're in recess then for one hour.

8    (Luncheon recess taken at 12:42 p.m.)

9    (Court and jury in at 2:12 p.m.)

02:11 10          THE COURT:  Good afternoon, jurors.  Once again, we

11   needed some extra time to get prepared for the next session,

12   but we are now ready.  And the government will call its next

13   witness.

14             MR. HAFER:  Yes, your Honor.  The government calls

15   Lori Moccaldi.  Your Honor, at this time, while we're waiting

16   for her to take the stand, I would just also offer into

17   evidence a stipulation that the government previously read.

18   It's Exhibit 20.  It's the stipulation that the government read

19   at the close of Mark Smith's testimony prior to Ronnie

02:11 20   Dardinski's testimony.  Just formally -- it's marked, and I

21   just wanted to offer it.

22             THE COURT:  All right.  Exhibit 20 will be admitted.

23   (Exhibit No. 20 received into evidence.)

24             LORI MOCCALDI, Sworn

25             THE CLERK:  Thank you.  You may be seated.  Would you

1    please state your name for the record, spelling your last.

2         THE WITNESS:  Lori Moccaldi, M-o-c-c-a-l-d-i.

3    DIRECT EXAMINATION BY MR. HAFER:

4    Q.   Good afternoon.

5    A.   Good afternoon.

6    Q.   What is your current title?

7    A.   Auditor.

8    Q.   Where are you employed?

9    A.   The U.S. Attorney's Office.

02:12 10   Q.   How long have you been employed as an auditor at the U.S.

11   Attorney's Office?

12   A.   Just a little bit more than seven years.

13   Q.   Prior to being an auditor in the U.S. Attorney's Office,

14   where were you employed?

15   A.   At Fidelity Investments here in Boston.

16   Q.   What was your job at Fidelity?

17   A.   I was a senior investigator.

18   Q.   Approximately how long were you employed at Fidelity?

19   A.   Just shy of two years.

02:13 20   Q.   Miss Moccaldi, would you briefly describe your educational

21   background beginning with college?

22   A.   Yes.  I have a bachelor of science from Merrimack College,

23   with a major in accounting.  I have a master's in taxation from

24   Bentley University, and I also have a law degree from New

25   England School of Law.

1    Q.    Do you have any other degrees or certification?

2    A.    Yes.  I am a certified public accountant here in the

3    Commonwealth of Mass.  I've been licensed since 1988.  And I'm

4    also a licensed attorney.

5    Q.    Could you describe your day-to-day responsibilities, in

6    general terms, as an auditor at the U.S. Attorney's Office?

7    A.    I basically review and analyze all various types of

8    financial information.

9    Q.    To include what types of financial information?

02:13 10    A.    Bank records, mortgage records, anything related to any

11    type of financial transactions or activity.

12    Q.    In connection with the case we're here for today, did you

13    participate in some way in this case?

14    A.    I did.

15    Q.    What did you do generally?

16    A.    I reviewed some voluminous records, financial records, to

17    include bank records, mortgage records, credit card records,

18    and some tax records.

19    Q.    Whose records did you review?

02:14 20    A.    Robert George.

21    Q.    If you had to approximate, Miss Moccaldi, approximately

22    how many pages of Mr. George's records did you review in this

23    case?

24    A.    I would estimate somewhere in excess of 5,000 pages.

25    Q.    If you had to, again, just estimate how much time you

1    spent reviewing those records, how much time would you

2    estimate?

3    A.   I don't know exactly because I don't keep track of it, but

4    I would say in excess of a few hundred hours.

5    Q.   After your review of the thousands of pages of documents,

6    over the hundreds of hours, were you able to determine what you

7    believe to be the primary bank accounts of Mr. George?

8    A.   Yes.  It appeared that there were four accounts, four

9    primary bank accounts that were used by Robert George:  two

02:15 10   business bank accounts that were at the Bank of America; one

11   business account -- excuse me, one personal account that was at

12   Citizens Bank, that was joint with his wife; and one personal

13   account that was at Needham Bank, that was also joint with his

14   wife.

15   Q.   Not in a ton of detail, but could you just briefly explain

16   how you identified those four accounts?

17   A.   Looking at the activity, there were common expenses, both

18   business and personal, that were paid from the bank accounts,

19   what you would normally see:  mortgage payments, credit card

02:15 20   payments, personal living expenses.

21   Q.   After specifically identifying and reviewing records

22   related to those four accounts, did you do anything?  Did you

23   create any work product?

24   A.   Yes.  Those were the four primary accounts that I

25   discovered.  I didn't discover any other bank accounts in his

1    name that had any significant activity.  But based on the four

2    accounts, I prepared charts.  I analyzed the activity and

3    prepared some financial charts.

4    Q.   The charts that you prepared, Miss Moccaldi, do they

5    reflect a certain time period?

6    A.   Yes.  It was from January 1 of 2008 until March 3 of 2011,

7    and one of the charts includes a footnote that relates to a

8    mortgage taken in December of 2007.

9         MR. HAFER:  Your Honor, could I have permission to

02:16 10   approach the witness?

11        THE COURT:  Yes.

12   Q.   Miss Moccaldi, I've placed in front of you three exhibits

13   marked for identification at this point.  Could you take a look

14   at those and tell me if you recognize them?

15   A.   I do.

16   Q.   In general terms, starting with the first, could you just

17   describe what they are?

18   A.   These three charts represent the financial activity in the

19   four bank accounts that I indicated earlier, and it's basically

02:17 20   the activity showing the funds that have come in and out of his

21   account in total and individually by each year, 2008, nine,

22   ten, and the shorter period in 2011, up until March 3 of 2011.

23   Q.   Specifically, the one that's marked 22A, is that the chart

24   that you created related to what you've identified as deficit

25   and surplus?

1   A.   Deficit and surplus is marked as Exhibit 22B.

2   Q.   I'm sorry.  The charts that you've created marked "Funds

3   in/Funds Out," what number does that have?

4   A.   22A.

5   Q.   Then, finally, you've created a chart entitled,

6   "Payments/Withdrawals."  Is that labeled 22C?

7   A.   Yes, it is.

8   Q.   Do these three charts, Miss Moccaldi, reflected in

9   Exhibits 22A through 22C, fairly and accurately summarize the

02:18 10   voluminous records that you've just testified that you

11   reviewed?

12   A.   Yes, they do.

13        MR. HAFER:  Your Honor, at this time, the government

14   offers 22A, 22B and 22C.

15        MR. REDDINGTON:  No objection.

16        THE COURT:  They will be admitted as 22A, 22B, and

17   22C.

18   (Exhibit Nos. 22A-22C received into evidence.)

19        MR. HAFER:  Permission to retrieve and publish, your

02:18 20   Honor?

21        THE COURT:  Yes, they may be published.

22   Q.   Start with what's now in evidence, Miss Moccaldi, as 22B.

23   Could you just -- let's start with, I guess, the top.  These

24   columns in this chart reflect the years of financial activity

25   that it relates to?

1   A.   Yes, for the -- the combined total of all four accounts

2   for each individual year.

3   Q.   2011, just so it's clear, that's only for a period from

4   January 1 until March 3 of 2011?

5   A.   Yes, as indicated in the column heading on the chart.

6   Q.   Could you explain?  You have this entry on the left on the

7   top line, "Deposits."  Could you explain what that is or what

8   that refers to?

9   A.   It's the combined total of all of the deposits that went

02:19 10   into the four accounts:  the two business accounts at Bank of

11   America, the one at Citizens, and the one at Needham Bank.

12   Q.   And the line below "Deposits" that's labeled

13   "Payments/Withdrawals," could you describe that, please?

14   A.   And that is the total of all the payments and withdrawals

15   made out of those four accounts.

16   Q.   So focusing your attention for the moment just on 2008,

17   you have a third row at the bottom labeled "Deficit/Surplus."

18   What is that column?

19   A.   It's depicting that for 2008 there was 186,000 more that

02:20 20   came out of the accounts than went into the accounts.

21   Q.   And correspondingly for each year, so, for example, 2009

22   reflects a deficit of 39,000, is that correct?

23   A.   Yes.

24   Q.   The deficits are in parentheses?

25   A.   Yes.

1    Q.    2010 has a surplus of 46,000 and change?

2    A.    Correct.

3    Q.    And the two -- little over two-month period of 2011 has a

4    deficit of 51,895?

5    A.    Yes, also indicated in parentheses.

6    Q.    Finally, this final column that's labeled "Total," what's

7    that, Miss Moccaldi?

8    A.    It's the combination of the three years plus the shorter

9    period in 2011.  It's the total of all four accounts, all

02:21 10    deposits going into all four accounts for that time period,

11    indicating just slightly over $2 million in payments and

12    withdrawals coming out of all of those four accounts, again,

13    for the total time period, totalling approximately 2.2 million,

14    and indicating deficit for the combined time period for all

15    four accounts of approximately 230,000.

16    Q.    I show you now what's in evidence as 22A.  We'll start at

17    the top.  First, Miss Moccaldi, what are the columns in this

18    account?

19    A.    This is --

02:21 20    Q.    This document.  Pardon me.

21    A.    This indicates the individual bank accounts.  Each column

22    heading has an abbreviation of the bank account, so the first

23    column on the left, that's a Bank of America account.  The

24    four-digit number, 8923, is just the four digits -- the last

25    four digits of the account number just to make an abbreviation.

1    The second column being almost the same, Bank of America

2    account, ending in 2478; the Citizens account ending in 3969;

3    and the Needham Bank account ending in 4573.

4    Q.   Starting with the first row, account balances as of

5    January 1, 2008, starting with the Bank of America 8923

6    account, could you explain what that row reflects?

7    A.   It reflects that in the Bank of America account ending in

8    8923 that there was a balance of $981.27 on January 1 of 2008.

9    In Account --

02:22 10  Q.   I'm sorry?

11   A.   Account 2478 had a balance at January 1, 2008, of

12   $1,463.91, and the same for the other two bank accounts as

13   depicted on the chart.  So for --

14   Q.   Can I stop you there?  You have what appears to be a "(1)"

15   above the entry under the Needham account.  Do you see actually

16   where I'm pointing on the screen here?

17   A.   Yes, I do.

18   Q.   That refers to that footnote down at the bottom of the

19   document?

02:23 20  A.   Yes, it does.  It's indicating that the balance of

21   $230,000 in the Needham Bank account on January 1 of 2008 came

22   from a mortgage, a cash-out mortgage, from the second home of

23   Robert George, located in Dennis, Massachusetts.  The mortgage

24   was taken in December of 2007.

25   Q.   What's a cash-out mortgage?

1    A.   It's a mortgage where there's not an existing mortgage on

2    a piece of property so that all of the funds that are borrowed

3    as part of that mortgage, less closing costs, are paid to the

4    borrower as opposed to using those funds to pay off an existing

5    mortgage on the property.

6    Q.   And you reviewed the mortgage records in connection with

7    your review of all the records in this case for the property in

8    Dennis, Massachusetts?

9    A.   I did.

02:24 10    Q.   And prior to December 12 of 2007, there was not a mortgage

11    on that property?

12    A.   That's correct.

13    Q.   Going back to the top of the chart where I'm pointing

14    here, this row entitled, "Account Balances at March 3 of 2011,"

15    I assume that that row reflects the balances in these four

16    accounts on March 3 of 2011?

17    A.   Yes, the same as the top row reflected just a different

18    date.

19    Q.   And it shows, in total for the four accounts that you've

02:24 20    identified you believe to be the primary accounts, a total

21    account balance on March 3 of 2011 of $3,976?

22    A.   Yes.  And this chart relates to the previous chart in

23    terms of total deposits and total payments and withdrawals come

24    directly from the first chart that we reviewed.

25    Q.   So this notation here, is this essentially the same that's

1    back on 22B, showing the money in and then the money out and

2    the deficit, the difference between those two?

3    A.    Yes.

4    Q.    I show you now what's in evidence as 22C.  This is a chart

5    titled, "Payments/Withdrawals."  In general terms, Miss

6    Moccaldi, what is this chart?

7    A.    It's basically the totals from the previous chart, the

8    first chart that we reviewed, broken down by category, by

9    individual category, for the funds coming out of the four

02:25 10   accounts.

11   Q.    So this chart aggregates -- it's a total of all four

12   accounts?

13   A.    Correct.

14   Q.    And it's the total amount of either withdrawals or

15   payments out of the accounts?

16   A.    Yes.

17   Q.    And this number where I'm pointing at the bottom right,

18   2,296,000, that's the same number that's on the 22A, right

19   here, correct?

02:26 20   A.    Yes, and also 22B.

21   Q.    We're not going to go through each column here, but, for

22   example, the second entry here where it says, "Mortgages,

23   Westwood and Dennis," what does that first column reflect in

24   2008 for mortgages, Westwood and Dennis?

25   A.    That out of the accounts of Robert George, that a total of

1    121,000 in 2008 was paid for a mortgage but -- a combination of

2    both mortgages for the primary residence in Westwood, Mass.,

3    and the second home in Dennis, Mass.

4    Q.   Have you had an opportunity to review mortgage records

5    related to the Westwood property that the defendant owns?

6    A.   I did.

7    Q.   Do you know the amount of the mortgage that exists on that

8    property?

9    A.   The original mortgage was $1,100,000.

02:27 10   Q.   You say "the original."  Why do you use the word

11   "original"?

12   A.   I'm sorry.  The original mortgage -- the mortgage that he

13   took in June of 2006.

14        MR. HAFER:  Your Honor, may I approach again?

15        THE COURT:  Yes.

16   Q.   I've placed in front of you an exhibit marked 25E, Miss

17   Moccaldi.  Do you recognize that?

18   A.   I do.

19   Q.   What is it?

02:28 20   A.   It is an illustration of the account balances in one

21   account, in the Bank of America account, ending in 8923.  It's

22   depicting the balances and the activity from March 2 of 2011 to

23   March 4 of 2011.

24   Q.   And the Bank of America account ending 8923, that's one of

25   the accounts that you've testified you reviewed records for?

1    A.   Yes, it is.

2    Q.   Did you create that chart yourself?

3    A.   No, I did not.

4    Q.   Have you compared the information in that chart to your

5    review of the underlying records?

6    A.   Yes, I have.

7    Q.   To the best of your knowledge, does that chart fairly and

8    accurately depict --

9             MR. REDDINGTON:  No objection to the chart.

02:28 10             MR. HAFER:  We'd offer the chart, your Honor.

11             THE COURT:  It will be admitted as Exhibit 25E.

12    (Exhibit No. 25E received into evidence.)

13             MR. HAFER:  Permission to approach and publish?

14             THE COURT:  It may be published.

15    Q.   25E, Miss Moccaldi --

16             MR. HAFER:  Just one moment.  I'm sorry, your Honor.

17    Q.   Probably self-explanatory, but could you explain the

18    entries on the chart just briefly, Miss Moccaldi?

19    A.   Yes.  So on March 2, 2011, there was a balance in the 8923

02:29 20    of $40.42.  On March 3, 2011, there was a deposit; and based on

21    my review of the records, it was a cash deposit in the amount

22    of $1,000.  Also, on March 3 of 2011, there was a withdrawal of

23    $917.60.  That withdrawal related to a payment to an insurance

24    company, an electronic payment related to an insurance company,

25    resulting in a balance on March 3 of 2011 of $122.82.  And then

1   after March 3rd, there were two deposits on March 4 of 2011.

2   And based on my review of the records, they were both cash

3   deposits, one in the amount of $9,000, one in the amount of

4   $8,000.  And then a check also cleared on that day, on March 4

5   of 2011, in the amount of $16,557.41.

6   Q.   When you say a check cleared, was that the check that's

7   reflected in this exhibit for $16,557?

8   A.   Yes, a check that was made payable to the Department of

9   Revenue.

02:30 10   Q.   That was a check drawn on a Bank of America account?

11   A.   Yes.

12   Q.   This Bank of America 8923 account, is that correct?

13   A.   Yes, it was.

14        MR. HAFER:  Your Honor, we have a stipulation that I'd

15   like to quickly read to the jury if that's okay.

16        THE COURT:  Yes.

17        MR. HAFER:  The United States of America and Defendant

18   Robert A. George hereby stipulate and agree that a

19   representative of Bank of America would testify, if called,

02:31 20   that the following information is true and accurate:  Bank of

21   America is a federally insured bank and a member of the Federal

22   Reserve Board and, as such, is engaged in interstate commerce.

23        Your Honor, that is marked Exhibit 13E, a stipulation

24   of the parties.  I would offer it at this time into evidence.

25        MR. REDDINGTON:  No objection.

1              THE COURT:  Exhibit 13E will be admitted.

2    (Exhibit No. 13E received into evidence.)

3    Q.   Miss Moccaldi, you testified that you reviewed thousands

4    of pages of bank records related to the defendant, is that

5    correct?

6    A.   Yes.

7    Q.   And that included checking account records?

8    A.   Yes.

9    Q.   And that was for this period in time, roughly from January

02:32 10   of 2008 until February or March of 2011?

11   A.   Yes.

12   Q.   During that time, did you have occasion to determine

13   whether in that period the defendant bounced any checks?

14   A.   Yes, I did.

15   Q.   Approximately how many checks did the defendant bounce,

16   based on your review of the records, in the period January of

17   2008 and February of 2011?

18   A.   Checks and/or electronic payments that were rejected or

19   bounced, there were approximately 35 transactions.  In total

02:32 20   dollar amount, it was approximately $120,000.  And they were

21   rejected due to insufficient funds on those particular dates in

22   each one of the accounts.

23              MR. HAFER:  Could I have just a moment, your Honor?

24              THE COURT:  Yes.

25              MR. HAFER:  Nothing further, your Honor.

| | |
|---|---|
| 1 | THE COURT:  Cross-examination, Mr. Reddington? |
| 2 | MR. REDDINGTON:  Yes. |
| 3 | CROSS-EXAMINATION BY MR. REDDINGTON: |
| 4 | Q.   Is it Miss Moccaldi?  Is that how you pronounce it? |
| 5 | A.   Yes. |
| 6 | Q.   And you work for the United States Attorney's Office that |
| 7 | is prosecuting Mr. George, right? |
| 8 | A.   I do. |
| 9 | Q.   You work upstairs on the ninth floor? |
| 02:33 10 | A.   Yes, I do. |
| 11 | Q.   You've been there for about seven years or so? |
| 12 | A.   Just in excess of seven years. |
| 13 | Q.   The purpose of your testimony here would be for this jury |
| 14 | to evaluate Mr. George's finances, hopefully, from the |
| 15 | government's perspective, to show that he's in dire straits, |
| 16 | living hand to mouth, something like that, right? |
| 17 | MR. HAFER:  Objection, your Honor. |
| 18 | THE COURT:  Sustained. |
| 19 | Q.   You certainly have labored over obtaining records, |
| 02:33 20 | reviewing records, and certainly working with the prosecutors. |
| 21 | You guys must sit down and talk about the case? |
| 22 | A.   Yes, of course. |
| 23 | Q.   How long have you been procuring Attorney George's |
| 24 | records? |
| 25 | A.   My first involvement in the case was July or August of |

1    2010.

2    Q.   All right.  You put in a number of hours examining

3    records, speaking to counsel, preparing for your testimony

4    before this jury, correct?

5    A.   Yes.

6    Q.   And the idea of your position here in this trial is you

7    are kind of like the financial evaluator?  Fair?  You're

8    providing evidence as to what your opinion is as to the assets

9    that Mr. George had and his financial condition during the time

02:34 10   in question?

11           MR. HAFER:  I would just object to the opinion part of

12   the question, your Honor.  I don't think we've offered a --

13           THE COURT:  I think he took that out of the remaining

14   question.  She can answer it.

15           MR. REDDINGTON:   Thank you.

16   A.   I am here to summarize the activity in the accounts of Mr.

17   George.

18   Q.   All right.  And it's important, is it not, for a person

19   like yourself, kind of a forensic examination, in other words,

02:35 20   you're dealing with the hard numbers.  You don't really have

21   any dog in the fight, as they say.  You have no opinion about

22   his financial condition.  You just want to be fair in

23   representing what his condition was in these years?

24   A.   Yes.

25   Q.   And it's important to be objective, obviously?

1   A.   Yes.

2   Q.   And it's important to be as diligent as you can be to

3   obtain access to the records?

4   A.   Yes.

5   Q.   Now, records that were obtained that you reviewed, you've

6   seen what is referred to as a discovery log, financial records?

7   You've seen that document, prepared by the U.S. Attorney, with

8   all the records that were obtained?

9   A.   I'm not sure of what you're looking at is what I've seen

02:35 10  before.

11              MR. REDDINGTON:  May I approach, your Honor?

12              THE COURT:  Yes.

13  Q.   Have you seen that before?

14  A.   Yes, I have.

15  Q.   All right.  So it's fair to say that this is a compilation

16  of records that your office obtained in the course of

17  investigating this case, right?

18  A.   Yes.

19              MR. REDDINGTON:  May I publish this, your Honor?

02:36 20             THE COURT:  Any objection?

21              MR. HAFER:  Is it being offered, your Honor?

22              THE COURT:  Are you offering it as an exhibit?

23              MR. REDDINGTON:  Sure, I'll offer it.

24              THE COURT:  It would be 118, I believe.

25              MR. HAFER:  We don't have any objection.

 1          THE COURT:  It will be marked as Exhibit 118.

 2     (Exhibit No. 118 received into evidence.)

 3     Q.   Now, for example, the discovery log sets forth a number of

 4     items that were obtained obviously through subpoena power; in

 5     other words, your office would issue a summons to a particular

 6     keeper of the records, and the documents would then be

 7     certified and brought into your office for your examination,

 8     right?

 9     A.   Yes.

02:36 10     Q.   Now, as you can see here, we've got American Express;

11     you've got payment history; you've got a number of American

12     Expresses dealing with statement, payment history, correct?

13     A.   Yes.

14     Q.   Ameriprise Financial; personal portfolio statements;

15     annuities surrendered.  What is Ameriprise Financial?

16     A.   It's a financial institution.

17     Q.   Well, dealing with Mr. George, what was it?  Was it an

18     annuity?  Was it retirement?  Was it a cash account?  What was

19     it?

02:37 20     A.   It was a personal -- actually, there was not just one type

21     of investment.  It was a fixed and, I believe, also a variable

22     annuity.

23     Q.   In 2008, that account had $53,915.99 in it, didn't it?

24     A.   I'm not sure of the exact date, but by the end of the

25     period that I analyzed, March 3, 2011, it was less than a

1    $1,000 balance in those annuities.

2    Q.    Okay.  You obtained the records from Ameriprise, did you

3    not?

4    A.    Yes.

5    Q.    Do you recall them indicating the closing balance for 2008

6    being 53,915.99?

7    A.    Again, I don't recall specifically.

8    Q.    Okay.  The next one that you have down here would be Bank

9    of America, signature card, deposits, withdrawals.  You can see

02:38 10  from No. 10 down to about 18 are all Bank of America, correct?

11   A.    Yes.

12   Q.    And then Bank of America investment services, right?

13   A.    Yes.

14   Q.    Boston College, academic, financial, and related records

15   for Megan George.  Who's Megan George?

16   A.    I believe it's the daughter of Robert George.

17   Q.    And she had been at Boston College, right?

18   A.    The records indicated that there was a Megan George that

19   attended Boston College.

02:38 20  Q.    Not just that.  You guys asked the school to provide her

21   academic records along with financial records, right?

22   A.    Yes.

23   Q.    Why?  What do you care what her grades were?

24   A.    It was to determine whether the amounts that were coming

25   out of the accounts related to, to cross-reference the payments

1    for tuition in relation to the amounts coming out of the

2    accounts of Robert George.

3    Q.    So -- and they did not cross-reference, did they?  You

4    didn't discover any cash deposits or payments to Boston

5    College, did you?

6    A.    I'm not sure I understand.

7    Q.    Cash.  You know what cash is?

8    A.    Cash deposits to Boston College?

9    Q.    To the school, paying tuition.  You didn't find any

02:39 10   records to show that Bob George would go to Boston College with

11   a bag of cash to pay for his daughter's tuition, did you?

12   A.    No, I did not.

13   Q.    They were all checks, were they not?

14   A.    They were checks or electronic withdrawals.

15   Q.    And you knew that when he was indicted that, obviously,

16   this was a case where he received an intensive amount of

17   publicity, isn't that right?  You knew that?

18            MR. HAFER:  Objection.

19            THE COURT:  Sustained.

02:39 20   Q.    You still have to serve a summons on his daughter's school

21   to get her academic records?  That's what I'm asking you about:

22   academic records.

23            MR. HAFER:  Objection, your Honor.

24            THE COURT:  Sustained.

25   Q.    And you served a summons on Emerson College to get his

1    son's academic records as well, didn't you?

2            MR. HAFER:  Same objection.

3            THE COURT:  Sustained.

4    Q.   Now, continuing on, Citizens Bank; David Cleary, CPA,

5    you've got a bunch of documents from him; East Coast Mortgage

6    Company; Mortgage Vow; Emerson College; Internal Revenue

7    Service, tax transcripts and tax returns, correct?

8    A.   Yes.

9    Q.   Moving on down farther, No. 50, Northwestern Mutual Life

02:40 10   Insurance Company, what was that?

11   A.   There were various insurance policies in the name of

12   Robert George.

13   Q.   Okay.  Were they worth anything, or is it just someone has

14   a hope that he dies, and then they get the insurance money?

15   A.   No, no.  They had cash value that was liquidated, that

16   loans were taken against, after March 3 of 2011.

17   Q.   Exactly.  There was $288,000 available to this guy in

18   2008, nine and ten, isn't that right?

19   A.   No, that isn't right.

02:41 20   Q.   Okay.  Well, when you prepared your charts and your

21   documents for his payments to, for example, the Internal

22   Revenue Service, you indicated that, according to your expert

23   opinion, he had paid, from August of 2008 up to November 12 of

24   2010, $311,315.54 in taxes; fair?

25   A.   The records indicated that from the four accounts there

1    were payments related to either the Department of Revenue or

2    the Internal Revenue Service that totaled the amount that you

3    just stated.

4    Q.    So the answer is yes?  The answer is yes, he paid?

5    According to your analysis, he paid 311,315.54 in taxes in that

6    three-year period, right?

7    A.    That's what the records reflected.

8    Q.    Sorry, two-year period, August of 2008 to November of

9    2010.

02:42 10          You did not include, did you -- and here we are in

11   June of 2012 testifying before a federal jury.  You did not

12   include a payment on April 7, 2011, in the amount of $100,000

13   drawn on the Northwestern Mutual Insurance Company.  You didn't

14   include that, did you?

15   A.    Mr. Reddington, my charts reflect the activity up until

16   March 3 of 2011, and it was not included on my charts, no.

17   Q.    Okay.  So my question now would be:  You have seen the

18   check that was drawn on Northwestern Mutual, payable to the

19   order of Robert George, in the amount of $100,000, that was

02:42 20   paid over to the Internal Revenue Service.  You've seen that,

21   correct?

22   A.    What date are you asking about?

23   Q.    April 7 of 2011.  You've seen this check?

24   A.    Yes, I have.

25   Q.    And there's still a balance of about 100-some-odd thousand

1    dollars that he could just make a phone call and pick up a line

2    of credit on that insurance policy, right?

3    A.    I do not believe that the balance is that.

4    Q.    What do you think the balance is?  Do you know?

5    A.    I think it's closer to no cash surrender value.

6    Q.    Well, as of 2011, were you aware that the Northwestern

7    Mutual cash value life insurance, before withdrawing the

8    $100,000, was $288,616.99?  Are you aware of that?

9    A.    That balance is not what I recall it being.

02:43 10    Q.    You didn't even know about that balance, did you?

11    A.    I did know about the balance.

12    Q.    Is that included in your charts?

13    A.    It is not.

14    Q.    Okay.  Have you ever heard of the concept of examiner

15    bias?  You're an attorney, right?

16    A.    Examiner?  I'm not sure what you mean by "examiner."

17    Q.    Okay.  For example, if I'm a police officer and I find a

18    cartridge casing at the scene of a homicide and I'm going to

19    have my ballistics guy take a look at that to see if that could

02:44 20    be matched up to a pistol.  And I say to the guy, I really hope

21    that you're able to help me out and hook that cartridge casing

22    up to the pistol.  And then the ballistics guy says, I'll do my

23    best.  You would agree that the ballistics guy would be a

24    little biased, wouldn't you?

25    A.    I'm not sure how that relates to the activity in the

1    accounts?

2    Q.   Okay.  Would you suggest that working in the U.S.

3    Attorney's Office, laboring over these documents and records

4    all this time, putting this case together, preparing yourself

5    for testimony in front of this jury and Mr. Robert George's

6    case, that you have a hope that you can help the government

7    out, your boss?

8    A.   I examined records and what I feel is objectively and

9    accurately depicted the summary of those records in my charts.

02:44 10   Q.   When you were examining Mr. George's background and

11   records in that period of time that you mentioned about the 30

12   or 35 checks or the electronic transfers that were noted to be

13   insufficient funds, they were covered, weren't they?

14   A.   They were bounced because there was an insufficient

15   balance in the account at the time.

16   Q.   They were covered, were they not?

17   A.   They may have been.  There was one that bounced twice.

18   Q.   You're telling me that you don't know that those checks

19   and those transfers were covered by money from Mr. George in

02:45 20   paying his bills?

21   A.   They were bounced, and then there potentially may have

22   been a deposit into the account after they bounced to cover the

23   payment.

24   Q.   Any lawsuits that you found against this guy, any

25   judgments outstanding for being a person who's a financial

1    stiff?  He's not paying his bills?  One at all?

2    A.    Not that I became aware of.

3    Q.    Okay.  How about collections, did you notice any

4    collections from -- you know, sometimes people get behind in

5    their bills, and you get that little letter saying that we're a

6    debt collection agency.  Any of those with Mr. George at all?

7    A.    Yes.  In the mortgage records, there were various tax

8    liens that were --

9    Q.    Tax liens?

02:46 10    A.    Tax liens that were indicated in the mortgage records

11    other than --

12    Q.    The tax liens were paid off, were they not?

13    A.    I'm aware of one tax lien being paid off by the refinanced

14    mortgage on the primary residence in June of 2006.

15    Q.    How about the tuition bills that you analyzed, you were

16    able to determine that Mr. George paid over $170,000 in

17    tuitions to educate his kids, right?

18    A.    It wasn't direct tuition to these schools.

19    Q.    Did he pay 170,000 so his kids could go to school and

02:46 20    graduate?

21    A.    In some instances, it was a tuition payment plan that was

22    paid to third parties that handle those type of financial

23    arrangements.

24    Q.    Did he pay them, though?  That's all I'm asking.

25    A.    They were withdrawn from the accounts, yes.

1    Q.    When you say "they were withdrawn from the accounts," that

2    means that the third parties that would receive from Mr. George

3    money they would then pay the tuition bill as they would become

4    due, right?

5    A.    I assume that that's what they did with the funds.

6    Q.    And his kids graduated, did they not?  One is a nurse; one

7    is a lawyer; and the other one works in California, right?

8         MR. HAFER:  Objection.

9         THE COURT:  Sustained.

02:47 10   Q.    Did you determine that they graduated in your examination

11   of their academic record?

12        MR. HAFER:  Same objection.

13        THE COURT:  Sustained.

14   Q.    How about any levies?  You know what a levy is, right?

15   A.    I do.

16   Q.    Did you notice any levies on Mr. George's property?

17   A.    On his property?

18   Q.    Uh-huh.

19   A.    I don't think it turned into a levy, but there were some

02:47 20   real estate taxes that were overdue that were also paid from

21   the refinance of --

22   Q.    Real estate taxes?

23   A.    -- of the mortgage back in 2006.

24   Q.    How about examining his accounts, did you find any

25   accounts in fictitious names that Mr. George had access to?

1    A.   The accounts that I examined were in his name or --

2    Q.   They're in his name, right?  They're all in his name?

3    A.   Right.

4    Q.   In the course of your examination, you summonsed records

5    dealing with his wife's accounts, his daughters' accounts,

6    didn't you?

7    A.   There were accounts that he had joint with all three of

8    his children.

9    Q.   Did you find any massive cash deposits or anything that

02:48 10   was placed in these accounts during the course of your

11   examination?

12   A.   As I indicated earlier, there was no significant activity

13   in the accounts that were joint held with his children.

14          MR. REDDINGTON:  I have nothing further, your Honor.

15   Thank you.

16          THE COURT:  Mr. Hafer, any redirect?

17          MR. HAFER:  No, your Honor.

18          THE COURT:  Thank you, Miss Moccaldi.  You may step

19   down.

02:48 20          THE WITNESS:  Thank you.

21          MR. HAFER:  Your Honor, may we just have a minute for

22   the logistics-related issue?

23          THE COURT:  Yes, you may.

24          MR. HAFER:  Your Honor, at this time the government --

25   would you like me to wait until they're distributed or call the

1    witness?

2           THE COURT:  No.  Call the witness.

3           MR. HAFER:  The government calls Pedro Nieves, your

4    Honor.

5           PEDRO NIEVES, Sworn

6           THE CLERK:  Thank you.  You may be seated.  Would you

7    please state your name for the record, spelling your last.

8           THE WITNESS:  First name is Pedro; last name, Nieves,

9    N-i-e-v-e-s.

02:51 10   DIRECT EXAMINATION BY MR. HAFER:

11   Q.   Good afternoon.  What is your title?

12   A.   My title, I'm a detective with the Billerica Police

13   Department.

14   Q.   How long have you been a detective with the Billerica

15   Police Department?

16   A.   About four years.

17   Q.   Prior to being a detective with the Billerica Police

18   Department, how were you employed?

19   A.   I was a patrolman with the Billerica Police Department.

02:51 20   Q.   How long were you a patrolman?

21   A.   About four years.

22   Q.   Detective Nieves, where are you currently assigned?

23   A.   I'm assigned to the Drug Enforcement Administration, DEA,

24   New England Field Division.

25   Q.   What's your title?

1    A.    I'm a task force officer.

2    Q.    How long have you been assigned to the DEA New England

3    Field Division as a task force officer?

4    A.    About four years.

5    Q.    Could you describe just in general what your day-to-day

6    responsibilities as a task force officer at DEA consists of?

7    A.    We do surveillance.  We talk to informants.  We

8    investigate narcotics cases, and I do undercover work.

9    Q.    In connection with the case we're here for today, were you

02:52 10   involved in the case that we're here for today?

11   A.    Yes.

12   Q.    What was your role in this case?

13   A.    I did the surveillance at one point, and I was the

14   undercover.

15   Q.    Directing your attention, first, Detective, to September

16   23 of 2010, were you working on that day?

17   A.    Yes, I was.

18   Q.    Were you working in an undercover capacity or as a

19   surveillance officer?

02:52 20   A.    Surveillance capacity.

21   Q.    Did there come a time on September 23 of 2010 when you

22   went somewhere in connection with your work?

23   A.    Yes.

24   Q.    Where did you go?

25   A.    We went to 736 High Street in Westwood, Massachusetts.

1    Q.   About what time did you go there?

2    A.   We went there around -- I would say sometime after 6:00 in

3    the afternoon.

4    Q.   What was the significance -- or what is 736 High Street?

5    A.   That was -- I don't recall his first name but Hansen's

6    place of work.

7    Q.   What did you do when you went there?

8    A.   We installed some surveillance equipment in the office.

9    Q.   You say "we."  Who installed the surveillance equipment?

02:53 10   A.   Myself, Special Agent Joe Tamuleviz, and Special Agent

11   Frank Conway.

12   Q.   After installing that equipment, what did you do next?

13   A.   I set up on the surveillance unit outside of the business.

14   Q.   Directing your attention now to approximately 6:47 p.m.,

15   what, if anything, did you observe at that time?

16   A.   I observed the defendant's black Lexus exit the parking

17   lot, take an immediate right, drive to a gas station, where the

18   attendant provided the defendant with gas.  Minutes later, he

19   went across the street to a small plaza.  He sat there for

02:54 20   several minutes, and then after several minutes, he returned to

21   -- returned back to the 736 High Street.

22   Q.   You saw him reenter 736 High Street at some point --

23   A.   Yes.

24   Q.   -- on September 23rd?

25        Directing your attention now to February 28 of 2011,

         1    were you working on that day?

         2    A.   Yes, I was.

         3    Q.   In what capacity?

         4    A.   I was the undercover.

         5    Q.   You refer to being an undercover agent.  What does that

         6    mean in laymen's term?

         7    A.   I was posing as a Dominican drug dealer out of the Boston

         8    area.

         9    Q.   Did there come a time when -- or how did you learn that

02:55   10    you were going to be posing as a Dominican drug dealer?

        11    A.   Yes.

        12    Q.   When was that?

        13    A.   When I talked to Special Agent Joe Tamuleviz prior to that

        14    meeting.

        15    Q.   And at that meeting, it was determined that that was the

        16    role that you were going to play that day?

        17    A.   Yes.

        18    Q.   Did there come a time on February 28, 2011, when you went

        19    somewhere?

02:55   20    A.   Yes.

        21    Q.   Where did you go?

        22    A.   I went to the Dedham Hilton Hotel in Dedham,

        23    Massachusetts.

        24    Q.   Approximately what time did you go to the Dedham Hilton

        25    Hotel?

1    A.    About 9:35 in the morning.

2    Q.    Prior to you going to the Dedham hotel, what was your

3    general understanding of why you were going?

4    A.    I was going there to hire the defendant as the attorney

5    for my drug trafficking organization.  It was a fictitious drug

6    trafficking organization.

7    Q.    Prior to February 28, 2011, had you met the defendant?

8    A.    No.

9    Q.    Was there a plan for someone to introduce you to the

02:56 10    defendant on February 28, 2011?

11   A.    Yes.  I was going to get introduced by the confidential

12   informant.

13   Q.    Was that confidential informant Ron Dardinski?

14   A.    Yes.

15   Q.    Did you eventually go to the Dedham Hilton on February

16   28th?

17   A.    Yes.

18   Q.    Where did you go when you got there?

19   A.    When we got there, we went to the diner.

02:56 20   Q.    What happened when you went to the diner?

21   A.    Myself and the confidential informant, we sat at the

22   diner.  Minutes later, the defendant arrived.

23   Q.    Were you wearing a recording device that day?

24   A.    Yes.

25   Q.    Was Dardinski, to your knowledge, wearing a recording

1   device?

2   A.   Yes.

3   Q.   Generally, what happened at the meeting?

4   A.   We discussed retainer fees for the drug trafficking

5   organization, and we discussed about several individuals that

6   had been arrested from the organization.

7          MR. HAFER:  Your Honor, permission to approach the

8   witness?

9          THE COURT:  Yes.

02:57 10   Q.   Detective Nieves, you mentioned you were wearing a

11   recording device on February 28, 2011?

12   A.   Yes.

13   Q.   And you recorded that meeting?  And you testified

14   Dardinski was recording that meeting also?

15   A.   Yes.

16   Q.   Since that day, have you listened to excerpts of that

17   recording?

18   A.   Yes.

19   Q.   And to the best of your knowledge, are the excerpts that

02:57 20   you listened to of that meeting fair and accurate depictions of

21   what occurred at the meeting?

22   A.   Yes.

23   Q.   To the best of your knowledge, is the excerpt from

24   February 28, 2011, that you listened to contained on the disk

25   in front of you marked Exhibit 11C?

1    A.    Yes.

2          MR. HAFER:  At this time, your Honor, the government

3    offers Exhibit 11C.

4          MR. GOLDSTEIN:  Just reserving objections, your Honor.

5          THE COURT:  It will be admitted over reserved

6    objections.

7    (Exhibit No. 11C received into evidence.)

8          MR. HAFER:  Permission to approach again?

9          THE COURT:  Yes.

02:58 10   Q.    Detective Nieves, in addition to listening to the

11   excerpted recordings on this disk, have you read the transcript

12   created reflecting this conversation?

13   A.    Yes.

14   Q.    Does the transcript that you've read as you listened to

15   this disk, in your view, fairly and accurately depict what was

16   said at the meeting?

17   A.    Yes.

18   Q.    Before we play the tape of the meeting, did you use an

19   undercover name that day, on February 28th?

02:58 20   A.    Yes, I did.  I used Angel Ramos.

21   Q.    Angel Ramos?

22   A.    Yes.

23         MR. HAFER:  Your Honor, at this time, I request

24   permission to play Exhibit 11C.

25         THE COURT:  Are you going to distribute the

1    transcripts?

2              MR. HAFER:  I'm sorry, your Honor.  Yes.  We would

3    request also that the revised transcripts, which should replace

4    the transcripts behind --

5              THE COURT:  We understand.  Jurors, you're not to look

6    at your notebooks.

7              MR. HAFER:  We would request that the revised

8    transcripts be distributed at this time.

9              THE COURT:  These are revisions of what is in the

02:59 10   notebooks, which will be replaced this evening after you leave,

11   with this new revised transcript that's now going to be

12   distributed to you.

13             MR. HAFER:  Your Honor, at this time, I'd request

14   permission to play.

15             THE COURT:  Yes, it may be played.

16   (Audiotape played.)

17             MR. HAFER:  Your Honor, I'm sorry.  I paused this.

18   There appears to be a technical issue with the redactions that

19   your Honor ordered.  I don't know how your Honor would like to

03:03 20   address it at this time.  We need to have somebody fix the

21   disk, is the short answer.

22             THE COURT:  Let me see counsel at sidebar.

23   (SIDEBAR CONFERENCE AS FOLLOWS:

24             MR. HAFER:  Judge, we were clear on that section

25   should have been redacted.

1          THE COURT:  What section?

2          MR. HAFER:  The Page 4 to 12 that you ordered.  I was

3     listening as best I could.

4          THE COURT:  The next eight pages should be out.

5          MR. HAFER:  Well, it was the 4 to 12 in the old one

6     which was at -- the transcript is correct.  The transcript is

7     correct.  The disk is not.

8          THE COURT:  This transcript is now correct?

9          MR. HAFER:  What's playing on the audio is not

03:04 10    appropriate.  We didn't -- I apologize for this.

11         THE COURT:  Can you wind through it, through -- pick

12    it up at the end of Page 12?

13         MS. KAPLAN:  It's computed.

14         MR. HAFER:  I mean, the way it -- it sort of controls

15    it.  It's going to take some fudging.  I would guess it's a

16    seven- or eight-minute section because it was seven or eight

17    pages.  But it might not be the most -- it might be a little

18    awkward.  I guess, your Honor, at this point, with the Court's

19    -- our view, subject to what your Honor rules, maybe it makes

03:05 20    sense to break now.  We can fix this.  We can get this done

21    very quickly tomorrow morning and then rest.  And that would

22    be, I think, the cleanest way to do it at this point.  If you

23    want me to try to do something now, I know you don't want to

24    waste 25 minutes.  I don't, think even if we fix it now, we'll

25    finish it.

 1          THE COURT:  I'm not worrying about your finishing.

 2     I'm worrying about the case moving along.

 3          MR. REDDINGTON:  We're right on target to finish the

 4     case tomorrow.

 5          THE COURT:  How long do you expect it to take the

 6     defendants on their case right now?

 7          MR. GEORGE:  We will be done tomorrow, Judge.  We're

 8     going to call between one to three witnesses.  One is

 9     Dardinski; one may be Mr. George's tax attorney; and maybe an

03:06 10     office custodian to put in some records for Mr. George.  If

 11     there are any others, it will be short.

 12          THE COURT:  I'm going to let the jury go now, tell

 13     them that we're going to complete the evidence tomorrow.  In

 14     other words, both the government and the defendant will rest

 15     tomorrow.  And then we'll have closings first thing Friday

 16     morning, and the case will be submitted to the jury sometime

 17     late Friday morning.  All right?

 18          MR. HAFER:  Yes.

 19          MR. REDDINGTON:  Excellent.

03:06 20          MR. HAFER:  Just a reminder that we were going to

 21     start at 10 tomorrow because I have --

 22          THE COURT:  Yes, that's right.  We'll be beginning at

 23     10:00.

 24     .   .   .  END OF SIDEBAR CONFERENCE.)

 25          THE COURT:  Mr. Nieves, you may step down for the time

1    being.

2           Jurors, sometimes this happens.  There are such things

3    as glitches.  But the good news is this is not going to prevent

4    us from moving forward in the case.

5           Because of a glitch with the tape itself, I'm going to

6    excuse you now for the rest of the day.  We're 25 minutes ahead

7    of time, but that gives you a little bit of a break.  What I

8    want you to do is to leave the transcripts that you have and

9    your notebooks here in the courtroom because, as I said before,

03:07 10    these transcripts are going to replace something that's already

11    in your notebook that you don't need to worry about.  But we'll

12    do that over the evening.

13           I am assured now by counsel that we are going to

14    complete the evidence in this case tomorrow.  We don't know

15    exactly when.  You can never predict exactly that sort of

16    thing.  Remember, we're going to start an hour late tomorrow.

17    We're going to start again at 10:00.  But before the end of the

18    day tomorrow, the evidence is going to be completed, and you're

19    going to be excused.  We're going to have some work to do after

03:07 20    that because we have to prepare for closing arguments and my

21    charge to you on the law, which is going to occur Friday

22    morning.

23           Now, Friday we will be back to our regular schedule.

24    We'll start at 9 a.m.  On Friday, sometime right early in the

25    morning, you will hear closing arguments by both sides and then

 1   my charge to you on the law.  All of them are rather extensive,

 2   so the case is likely not to be submitted to you until sometime

 3   late on Friday morning.  At that stage, the case will then be

 4   in your hands.

 5        Now, it is especially important, as we get closer to

 6   the end of the case, that you honor my instructions about not

 7   talking about this case with anybody else or trying to do any

 8   independent research, electronically or otherwise.

 9        We are getting close to the end.  You've heard almost

03:08 10   all of the evidence, but you haven't heard all of it.  You

11   haven't heard closing arguments, and you haven't heard my

12   charge on the law, all of which are extremely important before

13   you collectively decide this case.  And that's when, and only

14   when, you are to sit and consult with one another and hear what

15   everybody else has to say and deliberate about this case.

16        Don't talk to any members of your family.  Use me

17   again for the foil.  Tell them you'd love to talk to them, but

18   you cannot; you are prevented from doing that.  You can do it

19   later.  After the end of the case, you can talk to anyone you

03:09 20   want.  But now is not the time to do that.

21        I'm going to see you tomorrow morning at 10 a.m., one

22   hour late.  We're going to hear the rest of the evidence in the

23   case.  You're going to be excused tomorrow, and then Friday

24   you're going to hear closing arguments and charge on the law.

25   Have a pleasant rest of the day, and I'll see you tomorrow

1    morning at 10 a.m.  And leave your own notebooks in the jury

2    room.

3    (The jury was excused at 3:10 p.m.)

4            THE COURT:  Be seated, counsel.  Mr. Hafer, this is a

5    matter -- the electronic matter will be corrected overnight.

6    And we'll go forward then first thing starting at this point in

7    the transcript, Page 4?

8            MR. HAFER:  Correct, your Honor, other than maybe 15

9    seconds back.

03:10 10         THE COURT:  We can go back a few lines.  That will be

11   fine.

12           MR. HAFER:  I think when the correct version comes

13   through, your Honor -- this file indicates it's 25 minutes.  I

14   think it will be closer to 17 minutes once the redactions go

15   through.  That's the only one I'm playing with this witness.

16   There will be some follow-up questions on this particular one

17   and some questions on the other meeting, which is already in

18   evidence, that I'm not going to replay.  I'm just going to

19   direct him to the transcript.

03:10 20         THE COURT:  You're not going to direct him to the

21   March 4th?

22           MR. HAFER:  No.

23           THE COURT:  And the cross-examination of Mr. Nieves

24   will be done by Mr. Goldstein?

25           MR. GOLDSTEIN:  Yes, your Honor.

1          THE COURT:  And the government expects to rest?

2          MR. HAFER:  Yes, your Honor.

3          THE COURT:  The defendant will offer some evidence,

4    but whatever it offers, it will be completed tomorrow?

5          MR. GOLDSTEIN:  That's my understanding, yes.

6          THE COURT:  We will then plan, at least tentatively,

7    to have a charge conference tomorrow at approximately 3:00.  If

8    we get done sooner than I anticipate, we may move that forward,

9    so counsel should remain flexible.  But, otherwise, we'll have

03:11 10    the charge conference at 3:00.  If there's anything else that

11    counsel wants me to consider with respect to requests for

12    instructions to the jury, I should have it tonight by 5:00.

13          I also had one other matter.  With respect to the

14    requested redaction, I am going to allow the government's

15    request to redact the reference at the end -- not at the end.

16    But as was requested at sidebar by Miss Kaplan, I am going to

17    redact the portion of the line that was referred to at that

18    time.  I have the redaction as I will allow it, that I will

19    submit to counsel, and one additional matter because of the

03:12 20    fact that the defendants intend to re-call Mr. Dardinski.  The

21    government will be permitted to speak to him only in respect to

22    not referring directly to the identity of Miss Kaplan but to

23    refer only to an "assistant United States attorney."  They will

24    not be permitted to have any further conversation with Mr.

25    Dardinski in anticipation of his being re-called.

1      Finally, there is the issue of forfeiture, which I

2  have been told up to now the government expects me to submit to

3  the jury.  I am disinclined to do that.  Why is it that the

4  government thinks that I should?

5      MS. KAPLAN:  I thought the procedure was that the

6  defendant would make that request, and we had talked about it

7  and the -- I was told by Mr. Goldstein that they would prefer

8  it go to the jury.  If you'd rather that wait for you to hear

9  that, that's fine, your Honor.

03:13 10      MR. GOLDSTEIN:  I think the process, your Honor, is

11  that if, and only if, the jury comes back with a guilty finding

12  on one -- I don't know.  Do all the counts have a forfeiture

13  attached to it?

14      MS. KAPLAN:  I believe so.

15      MR. GOLDSTEIN:  If, and only if, they come back with a

16  guilty verdict, they will then go on to consider --

17      THE COURT:  I'm not going to make a jury come back

18  with either a not guilty or a guilty verdict and then say, Now

19  you've got more work to do.  You've got to go back and

03:13 20  deliberate again.  I'm not going to do it.  I haven't done it

21  up to this point.  I don't think it's necessary.

22      If you feel and insist that I submit that question to

23  the jury, then I'll have an instruction in the verdict form

24  that says, at the end of the seventh count, If you have found

25  the defendant guilty as to any count, then proceed to Question

1    No. 8, which will refer to forfeiture.  If you find the

2    defendant not guilty as to all seven counts, then your

3    deliberations are complete.  So they will know going in, and I

4    will instruct them going in, that they have another matter to

5    refer to.

6         I've never done that before because I have never

7    submitted the question of forfeiture to a jury.  But if the

8    defendant wishes me to do that, then that's the format I will

9    follow.

03:14 10        MR. GOLDSTEIN:  Well, let me consult with my client

11   overnight, your Honor.  We'll let you know in terms of that in

12   the morning.

13        One final request.  Some of the documents that the

14   government has admitted, particularly tax forms, I think, and

15   some of the financial material, have personal identifiers,

16   social security numbers on them.  They should be --

17        THE COURT:  They should very definitely be deleted,

18   Mr. Goldstein.  Thank you for calling that to the Court's

19   attention.

03:15 20        Miss Patch will pass this to counsel so they can see

21   what I've done.

22        Anything else that needs to come to my attention

23   before we adjourn for the day?

24        MS. KAPLAN:  No, your Honor.

25        MR. GOLDSTEIN:  No, your Honor.

1          THE COURT:  Then we're in recess until 10:00 tomorrow

2     morning.

3     (Whereupon, at 3:15 p.m. the trial recessed.)

4

5                         *  *  *  *  *  *

6

7                    C E R T I F I C A T E

8

9

10         I certify that the foregoing is a correct transcript

11    of the record of proceedings in the above-entitled matter to

12    the best of my skill and ability.

13

14

15

16

17

18    /s/Cheryl Dahlstrom              02/11/2013

19    Cheryl Dahlstrom, RMR, CRR       Dated

20    Official Court Reporter

21

22

23

24

25