1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

    UNITED STATES OF AMERICA          )
4                                      )
                                       )
5    vs.                               )  CR No.  11-10201-NMG
                                       )
6                                      )
    ROBERT A. GEORGE                   )
7

8    BEFORE:  THE HONORABLE NATHANIEL M. GORTON

9
                         DAY EIGHT OF JURY TRIAL
10

11   APPEARANCES:

12       OFFICE OF THE UNITED STATES ATTORNEY (By:  Laura Kaplan,
         AUSA, and Zachary Hafer, AUSA), One Courthouse Way,
13       Boston, Massachusetts 02210.  On Behalf of the Government.

14       LAW OFFICE OF ROBERT M. GOLDSTEIN (By:  Robert M.
         Goldstein, Esq.), 20 Park Plaza, Boston, Massachusetts
15       02116.
         - And -
16       LAW OFFICE OF KEVIN J. REDDINGTON (By:  Kevin J.
         Reddington, Esq.), 1342 Belmont Street, Brockton,
17       Massachusetts 02301.  On Behalf of the Defendant.

18
                 John Joseph Moakley United States Courthouse
19                            Courtroom No. 4
                             One Courthouse Way
20                            Boston, MA 02210
                            Friday, June 8, 2012
21                              9:17 a.m.

22
                      Cheryl Dahlstrom, RMR, CRR
23                       Official Court Reporter
                 John Joseph Moakley United States Courthouse
24                     One Courthouse Way, Room 3209
                             Boston, MA 02210
25               Mechanical Steno - Transcript by Computer

1                        I N D E X

2  Closing Argument:                                    Page

3    by Mr. Kaplan                                     7

4    by Mr. Reddington                                 40

5  Rebuttal
     by Mr. Hafer                                      62
6
7  Charge to the Jury                                  66

8
                          * * * * * *
9

10
                       E X H I B I T S
11
   No.      Description                            In Evd.
12
   124      Binder of transcripts offered by ........ 7
13          Government

14 125      Binder of transcripts offered by ........ 7
           Defendant
15
   1C       $80,000 check (struck from the record)... 7
16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2      THE COURT:  Good morning, counsel.  I wanted to see

3  you before we call the jury for some last-minute items that we

4  need to clarify.  First of all, I have received overnight the

5  defendant's motion for an instruction regarding Count 2.  I

6  take it the government has also received a copy?

7      MS. KAPLAN:  Yes, your Honor.

8      THE COURT:  I'm going to deny that motion.  The Court

9  does, in fact, use the Sand standard instruction that does

09:17 10  refer to the term "involved," which is the key word that the

11  criminal -- that the defendants brought up to me.  And,

12  therefore, I am not going to change my standard charge, but I

13  note your objection for the record.

14      MR. GOLDSTEIN:  Thank you, your Honor.

15      THE COURT:  Then with respect to the admission of the

16  binder with the transcripts, have counsel reached an agreement?

17      MR. HAFER:  Yes, your Honor.

18      THE COURT:  All right.  Then it will be marked, and I

19  will inform the jury before closings that it will be marked as

09:17 20  Exhibit 124 and therefor be allowed to go into the jury room.

21  I believe there's no other 124, is that right?

22      MR. GOLDSTEIN:  I don't think so, your Honor.

23      MR. HAFER:  I think it probably will actually be two

24  things.  It will be the binder that they've had throughout

25  trial and then the additional transcripts from Mr. Goldstein.

1    I don't know whether you want to give our binder a lower number

2    and then his the -- whatever number --

3          THE COURT:  124, 125 -- what is the -- I'm going to

4    let counsel do this then.  When the jury comes in, I will turn

5    it over to you to clarify what these exhibits are.  124, I

6    would take it, would be the binder that we've been using.  125

7    would be a binder with how many transcripts in it?

8          MR. GOLDSTEIN:  I'll get the exact number, your Honor.

9          THE COURT:  About 15?

09:18  10          MR. GOLDSTEIN:  About 15, plus the April 27th that we

11   played as well.  Remember, we brought Mr. Dardinski back.  That

12   should also go to them.  There will be about 16 or 17

13   transcripts.

14          THE COURT:  It will be marked as 125?

15          MR. GOLDSTEIN:  125.

16          THE COURT:  I'll let the government offer 124.  Mr.

17   Goldstein will offer 125.  And then I will inform the jury that

18   Exhibit 1C, that is, the $80,000 check given to Special Agent

19   Tamuleviz by Mr. Hansen, which was previously admitted into

09:18  20   evidence by the government, is stricken from the record.  Any

21   problem with that?

22          MR. GOLDSTEIN:  Just also related testimony regarding

23   -- because Agent Tamuleviz did testify regarding the check,

24   your Honor.

25          MR. HAFER:  I understand the basis of the Court's

1   order to be as stated yesterday:  the hearsay, the <u>Crawford</u>

2   issues.  I don't think that the testimony from a witness on the

3   stand raises the same issues.  The issue was the hearsay of the

4   check, and I don't think the direct --

5        THE COURT:  I agree.  I'm not going to strike related

6   testimony.  I'm going to strike the document.

7        MR. GOLDSTEIN:  Just for the record, your Honor, as

8   the Court ruled, I believe, Agent Tamuleviz' entire basis of

9   knowledge regarding the check comes from Mr. Hansen's

09:19 10   post-cooperation statements.  It was given to Agent Tamuleviz

11   after Mr. Hansen became a cooperator, and his only basis of

12   knowledge regarding the check comes from those post-conspiracy,

13   post-cooperating statements.  And I respectfully suggest that,

14   for all the reasons I put in the motion, to have them consider

15   Agent Tamuleviz' testimony violates Mr. George's Sixth

16   Amendment and <u>Crawford</u>.

17        THE COURT:  I'm going to strike the document and not

18   refer to the testimony, Mr. Goldstein.  Your objection is

19   noted.

09:20 20        MR. GOLDSTEIN:  Thank you.

21        THE COURT:  And I believe those are the only items

22   that need to be called to the attention before we go to

23   closings.

24        Oh, one other matter.  The verdict form -- have you

25   passed out the verdict form, Christine?  I've slightly amended

1    it so that Counts 2 and 3 refer to aiding and abetting, which

2    they didn't mention yesterday.  Any problem with that?

3            MS. KAPLAN:  No, your Honor.

4            MR. GOLDSTEIN:  No, your Honor.

5            THE COURT:  Okay.  I'll give copies of the revised

6    verdict form now.

7            With that, we're ready to call the jury.

8    (The jury entered the room at 9:22 a.m.)

9            THE COURT:  Good morning, jurors.  We are just about

09:23 10   ready to have closing arguments.  There are a few minor matters

11   that we need to take care of before we start with respect to

12   some exhibits.  I'm going to turn it over to the government and

13   to defense counsel with respect to two exhibits that are going

14   to be offered and admitted into evidence.

15           MR. HAFER:  Thank you, your Honor.  At this time, the

16   government would offer Exhibit 124, the transcript binder that

17   the jurors have used throughout the trial, into evidence.

18           MR. GOLDSTEIN:  And the defense would offer Exhibit

19   125, which will be transcripts of the jail recorded calls that

09:23 20   were played during the case as well as a transcript from April

21   27, 2010, the defense played during Mr. Dardinski's

22   reexamination.

23           THE COURT:  So the first will be admitted, the black

24   binder that you've had, as 124, and the group of transcripts

25   that Mr. Goldstein just mentioned will be 125.  They will both

1    be admitted.

2    (Exhibit No. 124 received into evidence.)

3    (Exhibit No. 125 received into evidence.)

4         THE COURT:  Now, also, jurors, with respect to Exhibit

5    1C, that was that $80,000 check given by Special Agent

6    Tamuleviz -- to Special Agent Tamuleviz by Mr. Hansen, which

7    was previously admitted into evidence by the government.  That

8    exhibit is stricken from the record, and evidence that the

9    Court orders stricken is no longer evidence in the case and

09:24 10    must not be considered by you once you commence your

11    deliberations.

12    (Exhibit No. 1C struck from the record.)

13        THE COURT:  Now, before we get to closings, by

14   tradition, I will just inform you the government goes first and

15   has a right to a short rebuttal.  So you will hear first from

16   the government, have their closing arguments.  Then you'll hear

17   from defendant's counsel, his closing argument, and then you

18   will hear a brief rebuttal from the government.  At that point,

19   we will take a recess before I give you my charge on the law.

09:25 20   So that's the order of events today.

21        And with that, Miss Kaplan may make closing argument

22   for the government.

23        MS. KAPLAN:  Thank you, your Honor.

24        THE COURT:  Miss Kaplan, I want you to turn so -- put

25   it down and then turn the whole easel so that I cannot be

1    sighted from you.  Yes, that's okay.

2         MS. KAPLAN:  May it please the Court, counsel, members

3    of the jury, good morning.  This is a case about a 30-year

4    member of the bar, an attorney, an attorney who strayed far,

5    far afield from the law.  And he strayed far afield from the

6    law by entering into a corrupt agreement with another

7    individual, Michael Hansen, to launder his former client's

8    money.  This is all well before the government ever entered

9    into this case.

09:26 10         On March 18 of 2009, you heard, in the first recorded

11   conversation, that the defendant, this 30-year member of the

12   bar, was captured on tape talking to a criminal who was working

13   for the DEA and working at the direction of the DEA.  During

14   that conversation, the defendant and the former criminal -- or

15   the criminal, the former client, Ronnie Dardinski, discussed

16   that Dardinski had a hundred grand.  And he revealed -- the

17   defendant revealed that he had spoken to a third party, Michael

18   Hansen, about laundering this money.

19        You heard the defendant's own words in that

09:27 20   conversation.  You heard the defendant as he assured Dardinski

21   that if this guy, Hansen, was not all right, Dardinski, the

22   criminal, could hold the defendant 100 percent responsible.

23   You heard the defendant say, "We are all set," "we," meaning

24   the defendant, Michael Hansen, and Dardinski.  You heard the

25   defendant say that he would deliver the check himself to

1  Dardinski.  You heard the defendant say that Dardinski would

2  not have to sign anything and that Hansen had explained it all

3  to the defendant and that the defendant thought that was the

4  better way to do it, a better way than the defendant himself

5  had thought.  This is all before -- all before, the

6  conversation with Hansen, the government gets involved.

7       From that very first recorded call, you have evidence

8  of a conspiracy, an agreement between two people, the defendant

9  and Michael Hansen, to do something with the criminal's money.

09:28 10  You heard Dardinski tell the defendant in that conversation,

11  and you're going to hear a lot about this, that Dardinski had

12  that other money from cocaine to hide, too.  That's in the

13  first conversation.  That is your unlawful agreement, members

14  of the jury:  hiding Dardinski's drug money.  So right then and

15  there in that very first conversation, it is clear that the

16  defendant has entered into a conspiracy to launder Dardinski's

17  money.

18       And he has already drilled down with Michael Hansen,

19  before this first recorded call, as to what the details of this

09:28 20  transaction will entail because the defendant himself is the

21  one who set this transaction up.  Right in that call and the

22  next few calls into April, the government has proven that the

23  defendant agreed to engage in a financial transaction, several

24  transactions, with knowledge that these transactions were

25  designed to conceal or to disguise the source of the money, the

1    money that Dardinski had represented was from drugs.

2         This, members of the jury, is the evidence in this

3    case.  These are the words from the defendant's mouth, that

4    contrary to what you were told in the defendant's opening

5    statement, prove the defendant's guilt beyond a reasonable

6    doubt.  This is evidence that is not susceptible to lying, to

7    bias, to motivation.  The tape can't lie.  And this is the

8    evidence that the government is asking you to rely on, the

9    defendant's own words, which prove his guilt beyond a

09:30 10   reasonable doubt.

11         And that's what I want to talk to you about in this

12   summation:  the evidence.  This is really not a complicated

13   case.  It's a very simple series of transactions that

14   constitute a conspiracy to launder money, money laundering, and

15   structuring.  Whatever the defendant's motivation was, whether

16   it was his poor finances or whether it was his desperately

17   wanting to stay in business with Michael Hansen so that he

18   could send his clients to Michael Hansen to get these

19   mortgages, these loans, because these individuals couldn't

09:30 20   otherwise get them, whatever it was, the government need not

21   prove his motivation in doing what he did.

22         The defendant chose to get into bed with Ronnie

23   Dardinski, an individual that he had represented in criminal

24   cases over the years, an individual that he knew had defrauded

25   numerous individuals of over $700,000, an individual that he

1    knew had worked for organized crime, an individual he now tries

2    to distance himself from and suggests to you that he feared

3    that he was entrapped by.  He chose to get into bed with

4    Dardinski, and he chose to make him his business partner in

5    these transactions.  He chose to do business with Ronnie

6    Dardinski who he now wants you to believe is completely

7    unworthy of your belief.  The gaps in time between the calls,

8    the prison calls, Dardinski's criminal history, these are all

9    meant as distractions, as ways to turn your attention away from

09:31 10  the evidence in this case.

11        On behalf of the government, I want to thank you for

12   the attention that you've paid to this case.  For all of these

13   charges, the issue boils down to what the defendant's knowledge

14   was as to the source of the money and what his intent was,

15   whether it was to conceal the source of the money or whether it

16   was to evade the reporting requirements.  Knowledge and intent,

17   that's the issue for you to decide as to each one of the

18   counts.  And I submit to you that the evidence is clear that at

19   all times this defendant knew that the money came from either

09:32 20  drugs or a fraud in which the interstate wires were used.  And

21   his intent was either to conceal the source of that money or to

22   evade reporting requirements.

23        Let's talk about the tapes and the evidence.  Now, Mr.

24   Goldstein, in his opening statement, told you that they were

25   going to do a forensic examination of the conversations, but

1    they didn't do that.  What they did was they took a little bit

2    from Column A and a little bit from Column B, and they only

3    focused on those times that the defendant said he was not

4    involved.  They want you to believe that all the times that the

5    defendant, this 30-year criminal attorney, denied the obvious

6    and claimed that he wasn't involved in this laundering of

7    Dardinski's money, something he actually set up, that those

8    false claims were the truth.  And all the times that he did say

9    incriminating things, really, really incriminating things,

09:33 10    like, "He's already agreed to do the rest," that those are

11    false.  They don't mean what the government says they mean.

12           But your common sense should tell you.  There's no

13    reason in the world why this 30-year member of the bar would

14    make incriminating statements if they weren't true.  And

15    there's every reason, in case he ever got caught, that he would

16    make statements that gave him some type of deniability, however

17    absurd that might be, because, remember, the most important

18    thing to the defendant was to protect his incorruptibility.

19    Those were his words:  to protect his incorruptibility.

09:34 20           Now, another promise made to you by the defendant in

21    their opening statement was that they would show that the

22    defendant had no knowledge of the nature, the structure or the

23    details of the transactions.  But that, members of the jury,

24    has been totally belied by the evidence.  First, it's clear

25    that the defendant and his coconspirator, Hansen, had met in

1    connection with this money laundering scheme before this first

2    recorded call on March 18 of 2009, and you know that from the

3    March 18, 2009, call.  The defendant is explaining to Dardinski

4    how he's spoken to Hansen and how they've agreed to set it up.

5    So when the call is made on 3/18/09, the conspiracy is already

6    in place.  The defendant and Hansen have agreed to launder

7    Dardinski's money.

8         The evidence has also shown that the defendant and

9    Hansen did not believe that Dardinski's money was from a

09:35 10   legitimate source.  They believed it was money from unlawful

11   activity.  How do you know that?  First, you know that back in

12   the early 2000s, Ronnie Dardinski was convicted of having

13   defrauded people of some $700,000 in a scheme that involved use

14   of the wires.

15        Let me digress on that for a moment.  What makes this

16   wire fraud, members of the jury, is that the wires were used in

17   connection with his scheme to defraud, the wires here being the

18   fax machines and the telephone calls between Massachusetts,

19   where Dardinski was, and American Lenders in Odessa, Texas.

09:35 20   The faxes were sent by American Lenders in Texas to Dardinski

21   in Massachusetts telling him which vehicles to repossess.  And

22   then Dardinski told the victims of his fraud that he had those

23   vehicles.  The vehicles were on the lot.  He took their money,

24   and he never gave them the vehicles.  That's wire fraud.

25   Regardless of whether he was charged with state larceny, that's

1    wire fraud.

2         And the next two conversations, in March -- on March

3    31st and April 6th, the defendant and Dardinski continued to

4    discuss the conspiracy to launder Dardinski's dirty money.  And

5    in those conversations, you hear the defendant, not

6    Dardinski -- you hear the defendant pressuring Dardinski for

7    the money.  The defendant tells Dardinski that his

8    coconspirator, Hansen, is sitting in his office waiting for the

9    money.  The defendant tells Dardinski that his coconspirator,

09:36 10   Hansen, wants nothing to do with him, with Dardinski.  He

11   doesn't even want to meet Dardinski.  The defendant tells

12   Dardinski that he, the defendant, is going to take that cash

13   from Dardinski, and he's going to give it to Hansen.  And then

14   he's going to get the check from Hansen and give it to

15   Dardinski.  He tells him he's going to be smack in the middle

16   of this transaction.

17        He tells the defendant exactly how this transaction is

18   going to work.  The defendant was going to take that bag of

19   money on those -- in those first few conversations and give it

09:37 20   to Hansen, his coconspirator.  The defendant tells Dardinski in

21   those first conversations that Hansen is making 2,900, he says,

22   which, by the way, is worth it when you think about what he's

23   doing, which, of course, means he's laundering money.  The

24   defendant says, He's going to cut you a check from his company,

25   East Coast Mortgage for $80,000.  The defendant says, You're

1    paying a guy two points on a hundred to cut you a check for 80.

2          So here it is.  Here are the details of how the money

3    laundering transaction is going to occur, from the defendant's

4    own mouth, on this disk.  Even at this early stage in the

5    conspiracy, in March and April of 2009, it's clear.  It's the

6    defendant who is setting up this transaction.  He's setting it

7    into motion with full knowledge that it was designed to conceal

8    the source of Ronnie Dardinski's unlawful proceeds.

9          It's the defendant who tells Dardinski, on April -- on

09:38 10   March 31st, Meet me today so I can get the thing done.  It's

11   the defendant who tells Dardinski on April 6th, I'm not fucking

12   around with this thing anymore.  It's the defendant who tells

13   Dardinski, We don't do this, we're done.  He tells Dardinski,

14   He's sitting in his office right now, meaning Hansen.  I blow

15   him off today, we're all done.

16         So who is rushing who, members of the jury?  Is it the

17   defendant or is it Dardinski?  Is Ronnie Dardinski pushing a

18   bag of cash on the defendant?  No, he's not.  But the defendant

19   is waiting for that bag of cash.

09:39 20         The defendant tells Ronnie Dardinski, The only way he,

21   meaning Hansen, will do this is if I, the defendant, give it to

22   him.  So had Ronnie Dardinski had the money right then and

23   there, I submit to you the defendant was prepared to launder

24   his money.  He was prepared to take that $100,000 in cash from

25   this long-time criminal, cash that we well knew was from some

1    form of unlawful activity.  He was prepared to give it to

2    Hansen, his coconspirator, to clean for Dardinski, and he was

3    then prepared to deliver a check to Dardinski from a mortgage

4    company for $80,000, taking $20,000 as a fee.

5         What else does the defendant say in that April 6th

6    conversation?  Remember, on March 18th, Dardinski has told the

7    defendant that he has that other money from coke?  Well, after

8    he's told him that, that he's got that money to hide, he tells

9    Dardinski, on April 6th, in that whispered tone, And by the

09:40 10   way, he's already agreed to do the rest, meaning Hansen.  The

11   defendant tells Dardinski that the defendant's coconspirator,

12   Hansen, the man that Dardinski has never met and he's never

13   spoken to, that he has agreed with the defendant to launder

14   Dardinski's drug money.  It cannot be any clearer than that,

15   members of the jury, that an agreement has been reached between

16   the defendant and Hansen to launder Dardinski's money.

17        Now, that's your conspiracy to launder Dardinski's

18   money right there on the disk, all without having heard a

19   single word from Ronnie Dardinski on the witness stand.  That

09:41 20   is evidence that is not susceptible to lying.  It has no

21   baggage and no agenda.

22        Now, we don't hear anything more until August of 2009,

23   and you heard one of the reasons for that was that DEA hadn't

24   yet gotten the money because they wanted Ronnie Dardinski to

25   try and get the commission down because $20,000 was an awful

1     lot of money to go walking.

2          The first meeting between Dardinski and the

3     defendant's coconspirator, Michael Hansen, takes place on

4     August 14 of 2009.  In that recorded call, you hear Hansen

5     slapping Ronnie Dardinski on the back, congratulating him for

6     having all of this cash, and asking him whether his four years

7     in jail was worth it.  Does that sound like Hansen thought

8     Dardinski's money was from a legitimate source?

9          The very same day that Dardinski and Hansen met, on

09:42 10   August 14, 2009, there we have the defendant speaking to Ronnie

11    Dardinski and saying, How did it go?  Does this sound like

12    someone who's no longer interested in being involved in this

13    conspiracy, or does it sound like someone who's facilitating

14    the scheme to launder Dardinski's money?  Are you going to

15    definitely do it?, the defendant says.  The defendant wants to

16    know the details.  80,000 for a hundred thousand?, he asks

17    Dardinski.

18         The next recorded conversations don't take place until

19    December of 2009, again, because the DEA is still trying to get

09:42 20   the commission down, to get Ronnie to get the commission down.

21    Again, on that same day that Dardinski talks to Hansen, the

22    defendant's coconspirator, there's the defendant on the phone

23    with Dardinski.  And here's the conversation that the defendant

24    wants you to believe proves that he was not involved in this

25    conspiracy.

1          But even after the defendant asks Ronnie Dardinski in

2     that call, Why am I involved?, the defendant goes on to tell

3     Dardinski that he should tell Hansen to give Dardinski a

4     mortgage in Lakeville, to tell Hansen that that's the way the

5     business is done.  Then he wants to know how much his

6     coconspirator is charging Dardinski.  Does that sound like

7     someone who doesn't want to be involved, or is it someone who

8     is facilitating and assisting with the scheme, even directing

9     it?  The defendant is telling Dardinski to tell Hansen how to

09:43 10     launder his money.

11          Members of the jury, when the defendant says in this

12     conversation that he isn't involved, in context, what that

13     really means is that he can't get his fingerprints on this

14     transaction, on any of these transactions, because, as he says,

15     there's nothing but trouble in it for him.  Remember later he

16     tells Dardinski he can't do it because he can't paper it?  But

17     his coconspirator, Michael Hansen, can?  He can make it look

18     like a mortgage.  A mortgage?  Really?  Do you believe that the

19     defendant meant mortgage in the true sense of the word?  Do you

09:44 20     think for a minute that the defendant believed that his former

21     client, this criminal, this bad person, this leg breaker, this

22     mob enforcer, who he had represented before, that he owned any

23     property and he could get a mortgage?  The defendant knew he

24     didn't.  He knew he didn't own any property.  And either he was

25     just using the word "mortgage" as code, or he thought that his

1    coconspirator, Hansen, could dummy something up to look like a

2    mortgage.  But he couldn't.

3           And then in that same conversation, where he says he's

4    not involved, he admits that he put Dardinski together with a

5    guy that could lend him the money.  That's Hansen, because he

6    had the mortgage company.  Really?  Lend him the money?  A

7    loan?  Was this a loan?  Did Dardinski need the money?  Or did

8    Dardinski need his money laundered?  Again, is "loan" another

9    code word or does the defendant think that Hansen can dummy up

09:45 10   some paperwork to make it look like a loan?

11           And when the defendant tells Dardinski, I don't want

12   to talk about that anymore, isn't he really saying, I don't

13   want to talk on the phone because it may be recorded?  Don't

14   you later hear him telling his coconspirator, Hansen, that

15   Dardinski was talking too much on the phone?  Don't you later

16   hear him tell Hansen that he himself, the defendant, had said

17   too much on the phone as well?  Doesn't the defendant -- don't

18   you hear him on the tape say to Dardinski, When you start

19   saying bad things on the phone, I say bye, Ronnie?  Remember

09:45 20   when the defendant says to Dardinski, That better not be the

21   cops on the phone?  If what they're talking about is

22   legitimate, why is there a problem talking on the phone?

23           Until March 23 of 2011, when the defendant is

24   arrested, does the defendant ever again say he doesn't want to

25   be involved with Dardinski?  I submit to you he does not.  He

1    is at all times a ready and willing participate throughout the

2    life of this conspiracy.

3              Now, we're at the first transaction on December 16 of

4    2009, the first laundering of the $100,000 for an 80,000 check.

5    Again, the defendant is clear with Hansen, I got all --

6    Dardinski is clear with Hansen.  I got all that money from the

7    cocaine, too.  And Hansen says, All right.  Dardinski tells him

8    that it's small shit because some of this money is from the

9    blow, the cocaine.  Hansen, without batting an eye, he takes

09:47 10   that gym bag filled with $100,000 in money from unlawful

11   activity, both drugs and wire fraud money, and off he goes with

12   a ho, ho, ho.

13             And now we're into April 15th, the second transaction,

14   where Hansen takes $100,000 and again gives Dardinski $80,000

15   all after Dardinski again tells Hansen the money is from

16   cocaine.  Could not be clearer.

17             And ten days later, after that April 15, 2010, deal,

18   here we have the defendant once again speaking with Dardinski,

19   all after that August 2009 conversation where he said he's not

09:47 20   involved.  But now the defendant has a new scheme.  He's going

21   to enlist Dardinski, this criminal, this mob enforcer and leg

22   breaker, to scare Hansen.  The defendant is angry because he

23   thinks that Hansen has cut him out of this deal with Dardinski.

24   He thinks that Hansen has taken the money, and he wasn't gotten

25   his cut, and he's not happy about that.  So now we begin a

series of ridiculous conversations between the defendant and
Ronnie Dardinski where the defendant wants Dardinski to scare
Hansen into calling the defendant and then Dardinski trying to
get Hansen to call the defendant.

So, first, the defendant has used Hansen to launder
Dardinski's money because, of course, he can't have his
fingerprints on it.  And then he's going to use Dardinski, his
former client, who Mr. Goldstein referred to ten times in his
cross-examination as a leg breaker, who the defendant refers to
as the most devious guy he knows, he's going to use him to
scare Michael Hansen.  He's now using both Dardinski and
Hansen, two men who are only involved because the defendant, by
his own admission, put them together, to further his agenda.
But he wants you to believe that he's not involved.  Nope, not
him.

And what he wants is for the defendant to scare the
ever loving hell out of Hansen.  He wants Dardinski to play it
rough.  He doesn't want Dardinski to threaten him, but he tells
him, If you're shaking him down for money, I don't want to
know.  There it is again.  No, don't do it, or do it, but just
don't tell me about it.  And, interestingly, the defendant
suggests, as one way that Dardinski can scare Hansen is by
telling him the deals that he just did with Dardinski were
money laundering.  How is that for his knowledge of what he was
doing?

1          Again, the issue for you to decide is did the

2     defendant know Dardinski's money was from some sort of unlawful

3     activity.  The government submits that both the direct and the

4     circumstantial evidence we have presented to you show that he

5     did.  But because we can't climb into the defendant's head and

6     see what he was thinking, the government is allowed to prove

7     the defendant's knowledge by circumstantial evidence as well as

8     by asking you to use your common sense.  And that evidence

9     comes from several things.  It comes from the understanding by

09:50 10     the defendant of who Dardinski is and the fact that he knows

11     that all of Dardinski's money comes from criminal activity.  He

12     knew that Dardinski made all of his money from the repo scheme.

13     There was publicity about it.  He discussed it with Dardinski

14     when Dardinski wanted to hire him but the defendant wanted too

15     much money.  Even on the tapes, you heard the conversations

16     between Dardinski and the defendant about the repo scam.

17          The defendant wants you to believe that Dardinski is

18     this conniving criminal, but he also wants you to believe that

19     Dardinski's money was legitimate?  He cannot have it both ways.

09:51 20     The evidence of his knowledge comes from the defendant's

21     understanding of this massive 20 percent commission that he and

22     Hansen were going to receive.  The evidence comes from the

23     complete absence of any paperwork.  A mortgage, a loan, with no

24     paperwork?  Use your common sense.  The evidence of this

25     knowledge comes from the fact that he knows Ronnie Dardinski

1    doesn't own any property in Lakeville or anywhere else.  So

2    what was he getting a mortgage on?

3         The evidence comes from the meetings that the

4    defendant held in his car and in Dardinski's car, the caution

5    not to speak on the phone, the lowered voice on the phone, the

6    false exculpatory statements saying he was not involved.  These

7    are all circumstantial evidence of his knowledge and his guilt.

8         Now, the defendant has suggested there's not a single

9    recording where the defendant says that he agreed to launder

09:52 10    drug money, but there are many conversations where it can

11    clearly be inferred by you.  And the judge will instruct you on

12    the law of conspiracy, and I believe that you will hear that a

13    conspiracy is nothing more than an agreement or a kind of

14    partnership in criminal purpose in which each member becomes

15    the agent or the partner of every other member.  The government

16    need not prove there was a formal agreement.  And a person who

17    becomes a member of a conspiracy need not know all the details

18    of the unlawful scheme.  Here, the defendant had a general

19    understanding of the unlawful purpose of the plan, and he

09:52 20    knowingly joined in the plan even if it was just on one

21    occasion.  That's sufficient to convict him of the conspiracy

22    even if he had played a lesser role than Michael Hansen.

23         Now, you're going to hear the judge also tell you

24    about another way the government can prove knowledge of what

25    the defendant knew, and that's known as willful blindness.  The

1     judge will tell you, I believe, that you can infer knowledge on

2     the part of the defendant if the defendant was aware of the

3     high probability of the fact that the money was from unlawful

4     activity and the defendant consciously and deliberately avoided

5     learning of that fact; that is, he willfully made himself blind

6     to the fact.  So when the defendant says to Dardinski, You can

7     do that, but I don't want to know about it, that is willful

8     blindness.  When the defendant says, in one of the

9     conversations, early conversations, As far as I'm concerned

09:53 10   about you, says this to Dardinski, whatever you were into back

11    in those days, you were into.  I don't want to know anything.

12    All I know is that you went to jail.  You need money.

13         When the defendant says, after being told by Dardinski

14    that the money to be laundered is from cocaine, when he says,

15    Well, I don't want to know that because it's illegal, yet

16    continues to meet with and speak with the defendant for two

17    years, that is willful blindness.  That is a ostrich with his

18    head in the sand.

19         Now, the defendant seems to think that this December

09:54 20   2009 conversation is his ace in the hole where you were told 14

21    times, and you would be told again, that the defendant said he

22    wasn't involved.  He says, I don't want to know about that.

23    But what he did was he did nothing more than consciously and

24    deliberately avoid learning of the true facts of Dardinski's

25    money.  In other words, he made himself willfully blind to that

1    fact.  And that is knowledge -- that is evidence of his

2    knowledge.

3         All throughout this case, you've heard several

4    instances of the defendant knowing what he knew or didn't know,

5    talking out of both sides of his mouth.  On the one hand, the

6    defendant wants you to believe that Dardinski is the lowest

7    form of human life.  And on the other hand, he wants you to

8    believe that the defendant, his loyal friend for 12 years, he

9    thought that Ronnie Dardinski's money was legitimate.  Use your

09:55 10   common sense.  Does that make sense to you?  He can not have it

11   both ways.  If he's the lowest form of life, Ronnie Dardinski,

12   then he doesn't have money from legitimate sources.  And if his

13   money is legitimate, then why have to go through this whole

14   thing with this exchange of cash for checks?

15        You heard all of the conversations where Dardinski

16   told the defendant that he told Hansen that the money laundered

17   was drug money.  Again, the defendant is hearing the

18   representation that Dardinski's money was from drugs.  There is

19   no mistaking it.  And, in fact, there comes a time during the

09:55 20   conspiracy that the defendant starts to wonder whether Hansen

21   has gone bad, whether he's cooperating with law enforcement.

22   And he tells Dardinski, I put you with the only guy in the

23   world I thought could help you with a mortgage.  If the

24   defendant thought Ronnie Dardinski's money was legitimate, why

25   is there only one person in the world that could help him get a

1    mortgage or a loan?  Would a 30-year experienced criminal

2    attorney believe that this former client, with a lengthy

3    criminal history, that his money was legitimate, especially

4    after Dardinski tells him it's in Upstate New York; I stashed

5    it all over the place; it's at my father's; it's at my

6    sister's; I'm hiding it all over the place?

7         If Dardinski's money was legitimate, if that's what

8    the defendant believed, why was it all in cash?  If he got it

9    from a legitimate source, why wasn't it in a paycheck?  Why

09:56 10   would it be delivered in a gym bag?  If the defendant thought

11   it was legitimate, why, on April 6th, does the defendant tell

12   Dardinski, Nothing's going to happen because it's you and it's

13   me?  If the money wasn't dirty, there would have been no need

14   for the defendant to help Dardinski launder it.  Just the way

15   one doesn't launder clean clothes, one also doesn't launder

16   clean money.  The defendant knew the money was not from a

17   legitimate source.  This is his client, after all, his former

18   client, and he didn't care one iota where it came from.  As

19   many times as he might have said he was not involved and as

09:57 20   many times as the defendant would like you to believe, he knew

21   the source of the money and conspired with Hansen to launder

22   it.

23         Later you'll hear that the defendant asked Ronnie

24   Dardinski why he would launder Dardinski's money if he wasn't

25   making any money?  Remember?  He said he wasn't benefiting.

1    Why would he take 80,000, give him a check for 80,000, and run

2    it through his account?  He's not making anything.  The judge

3    will tell you that he doesn't need to benefit from this

4    transaction for it to be money laundering.  The defendant says,

5    Ronnie Dardinski doesn't even launder money to do drug deals.

6    He has to launder money to get it so he can pay his probation.

7    He says, I thought he wanted to wash that money to pay his

8    probation.  Well, that's money laundering from the mouth of the

9    defendant.  And this notion that if he didn't benefit from it

09:58 10   that it's not money laundering, that's ludicrous.  The

11    defendant need not have benefited.

12         Why would he do this, members of the jury?  Why would

13    he risk it all?  Be so stupid, they will argue?  We don't have

14    to prove the why, but we have a pretty good idea of what that

15    was.  That's why we presented all of the financial evidence to

16    you.  The defendant could not launder Ronnie Dardinski's money

17    because he didn't have the financial wherewithal to do it.  He

18    didn't have the money in his bank account to launder Ronnie

19    Dardinski's money himself.

09:58 20         The financial evidence showed you that he did not file

21    taxes in 2007 and 2008.  And don't be confused by the tax

22    returns that were showed to Agent Crowley when he came back.

23    There's no evidence that those tax returns were actually filed.

24    And be careful when you're looking at the tax returns of what

25    payments were made and returns were filed.  I submit to you

1   that many of them are after the defendant was indicted in this

2   case.

3        During the period of this investigation, the relevant

4   time period for you to be looking at, the defendant owed over

5   $385,000 to the IRS when he laundered that money.  He spent

6   well over what he brought in over a five-year period of time.

7   He borrowed money by taking a mortgage on his second home to

8   pay living and business expenses.  He bounced 35 checks to the

9   tune of over $120,000.  You saw the balances in his account.

10  He clearly was sinking further and further into a financial

11  hole.  The financial motive here for the defendant, if we had

12  to prove one, which we don't, is that he was desperate to

13  continue doing business with Hansen, whatever the nature of

14  that business was.  And here, with laundering Dardinski's

15  money, he could make a quick buck.

16       Now, in September of 2010, Dardinski asks the

17  defendant to find someone else to launder his money.  And the

18  defendant violates his cardinal rule about talking on the

19  phone, and he says, Okay, we'll find someone else maybe.  I

20  mean, I'll direct you to someone else.  Well, that, by the way,

21  is facilitating and aiding and abetting.  Does that sound like

22  someone who isn't involved in a scheme to launder money,

23  members of the jury?

24       And, by the way, does it sound to you from the

25  conversations you heard in this courtroom that the defendant is

1    afraid of Dardinski?  Because that's what they want you to

2    believe.  You must decide that.  You have to ask yourself

3    whether there's any evidence that the defendant was afraid of

4    Dardinski.  The defendant played the calls from Martha's

5    Vineyard when he was in jail.  When you hear the talk about

6    smashing the defendant's head in, that's a conversation between

7    the defendant and his girlfriend.  That's pillow talk.  Did the

8    defendant ever act on that?  Did he ever go to his house, even

9    though he knew where he lived, when he got out of jail?  No.

10   Did he ever go to his place of business, even though he knew

11   where he got those loans, once he got out of jail?  No.  Were

12   those threats ever communicated to the defendant?  There is no

13   evidence of that.

14        You've listened to more than 38 conversations between

15   the defendant and Dardinski.  Did you hear a hint of

16   intimidation by Dardinski in those calls?  Did it sound at any

17   time like the defendant was afraid of Ronnie Dardinski?  And by

18   the way, this 30-year member of the bar, this experienced

19   criminal attorney, if he were intimidated and scared, don't you

20   think that he knows how to handle that, that he knows people in

21   law enforcement, that he knows how to get himself out of a

22   situation where he's being threatened to engage in criminal

23   activity?

24        And while we're on the prison calls, with respect to

25   the unrecorded calls and Dardinski being able to record and not

1    record and the visibility of the recording device, it seems

2    clear that his girlfriend, Dardinski's girlfriend, knew he had

3    been cooperating when he was in prison, but there's no evidence

4    that she knew that he was cooperating in the investigation of

5    this defendant.

6            Now we're into January of 2011, and here the defendant

7    has come up with a scam he wants to run with his former client,

8    the leg-breaking criminal that he's so afraid of.  He asks

9    Dardinski, You got any cases to send me?  He says "we" in that

10:02 10  conversation, "we," referring to Dardinski, his business

11   associate.  It's his idea.  It's not Dardinski's idea.  And

12   Dardinski seizes on the defendant's idea and tells the

13   defendant that he has some drug-dealing clients he can send

14   him.  And again in that same conversation, Dardinski says --

15   asks the defendant whether the defendant has ever talked to

16   that guy on the bracelet about laundering Dardinski's money.

17   By this time, it's clear that's Dardinski has made the

18   representation it's drug money over and over again.  And the

19   defendant tells him he did.  He doesn't say, No, don't involve

10:03 20  me.  I'm hanging up the phone.  I'm not meeting with you.  I'm

21   done.  He says he did talk to someone about it.

22            By February of 2011, the defendant and his

23   coconspirator have reconciled.  He and Hansen have reconciled

24   because, of course, by then the government has enlisted Hansen

25   to cooperate.  And in the February of 2011 conversation, the

1   defendant tells Dardinski, at the meeting that the defendant

2   had with the Hansen, that he basically talked to Hansen as if

3   he was wired.  So you know that some of what the defendant said

4   in his conversation with Hansen was not true because he was --

5   he said he was talking like he was wired because he thought

6   Hansen was wearing a wire.

7   Also in that conversation on February 11th, Dardinski

8   tells the defendant that he was going to give him a bag of

9   cash.  The defendant doesn't say, Not me.  I'm not involved.

10:04 10   Instead, he says, I can't do it.  He, Hansen, he was the guy.

11   Again, why?  Because the defendant doesn't have the financial

12   wherewithal to do it.  And we know that what it really meant

13   when the defendant said he wasn't involved is that the

14   defendant couldn't paper it.  He had a law firm.  Hansen had a

15   mortgage company.  That's why the defendant couldn't paper it.

16   He couldn't do it in such a way as to not get caught.  That's

17   why he needed other people like Hansen.  Again, Ronnie

18   Dardinski tells the defendant that it was drug money.  The

19   defendant doesn't say, Stop, I can't be involved.  And then we

10:04 20   have a series of conversations about the defendant bringing the

21   defendant clients.

22   As you've noticed, I've just taken you through the

23   transcript binder.  And that's the evidence.  That's the tapes.

24   That's the evidence that cannot lie to you.  The government

25   hasn't asked you to rely on Ronnie Dardinski for anything that

1    was not corroborated by the tapes.  We could have come in here

2    and played tapes for you without calling Dardinski, but we

3    didn't.  We wanted you to hear from Dardinski himself.

4         Would we have preferred that Dardinski was someone

5    without a criminal past?  Absolutely.  But we take our

6    witnesses as we find them.  That is the person that the

7    defendant chose to make his business associate.  These are the

8    types of individuals, like Dardinski, that can infiltrate

9    criminal conspiracies.  It's unlikely that the defendant would

10:05 10   have trusted an undercover agent.  The defendant himself said

11   to Dardinski multiple times on the tapes, I trust you

12   completely.

13        So we did the next best thing, and we tried to record

14   all of the conversations that Dardinski had with the defendant

15   and his coconspirator, Hansen.  And as Agent Tamuleviz told

16   you, that's one way to ensure that what the confidential source

17   is saying is accurate.  So you don't have to rely on Dardinski

18   as the only evidence to prove that the defendant engaged in

19   these crimes.  The defendant's going to tell you you can't

10:06 20   believe a word of what Dardinski says because he's a mob

21   enforcer.  He 's a liar.  He's a cheat.  Just remember, you are

22   the sole judges of credibility.  You listened to Ronnie

23   Dardinski, and you observed his demeanor on the stand.  You

24   have to ask yourselves whether you observed that he was evasive

25   or not evasive.  Was he forthcoming with you?  Did he answer

the questions?  Did he tell you exactly who he is now and what

he once was?

        Dardinski is exactly what he told you.  He's lied in

the past.  He's collected debts in the past.  He's violated his

restraining orders.  He doesn't like the defendant.  He's been

paid by law enforcement.  He's been paid in this case.  He

stands to get more money and on and on.  And you should

scrutinize his testimony.  We told you that in our opening

statement.  And you may reject all of his testimony.  You may

reject part of it.  You may reject none of it, or you may

accept it all.

        But the overwhelming evidence in this case upon which

your verdict can be based does not come from Dardinski's

testimony.  When Mr. Reddington stands up before you and tells

you that the defendant, umpteen times, says that he didn't want

to be involved in laundering Ronnie Dardinski's money and that

Dardinski kept pushing bags of money on him, ask yourselves:

If the defendant didn't want to be involved with money

laundering and if the defendant wasn't representing Dardinski,

because he knows the defendant had no cases pending, then why

all the calls between the two?  Why all the meetings?  What was

this all about?  If it's not a mortgage, which we know it's not

because Dardinski owns no property, there's no mortgage

application, and it's not a loan because there's no paperwork,

and Ronnie Dardinski has done no work for the defendant, then

1    what was this other than money laundering?  Who talks that way

2    to both Ronnie Dardinski and his coconspirator, Hansen?  What

3    lawyer conducts legitimate business this way?  Does a

4    legitimate attorney hold business meetings inside of cars and

5    in parking lots?  Does a legitimate attorney have someone other

6    than a client sign a retainer agreement?  Remember, Dardinski

7    signed that retainer agreement for the undercover.

8         How else do you know that the defendant was willing to

9    launder Dardinski's money, the drug money?  Because all of the

10:08 10   conversations between the two, long after Dardinski has told

11   the defendant again he's got drug money to launder, he's

12   willing to do it again.  He's going to find someone else.  He's

13   spoken to two other people who are going to do it.  He's got

14   someone who maybe can do the whole thing.  Now we've come full

15   circle.

16        How do you know the defendant was involved in this

17   money laundering conspiracy from the beginning?  I'd ask you

18   now to turn -- I'm not going to ask you to turn to the

19   transcript, actually.  I'm going to show you one of the videos

10:09 20   that we've already played, and I want you to watch it for

21   yourself.  With your Honor's permission, I'd ask to play the

22   video.

23             THE COURT:  Yes.

24   (Videotape played.)

25             MS. KAPLAN:  You just watched the video.  The

1    defendant doesn't say, No, I can't take that.  I'm not going to

2    be -- have any part in this.  I'm not going to be involved.  He

3    isn't outraged by the offer.  He doesn't say, You laundered

4    drug money?  I can't have anything to do with it.  That's

5    illegal.  I can't take any money from you.  He takes that

6    money.

7            Let's talk about the $25,000 that the undercover agent

8    gave to the defendant on March 4 of 2011.  In the end, what the

9    defendant did with the undercover was also very simple.  He

10:15 10    agreed to pay Dardinski 10 percent for referring him clients.

11    Not a crime, but you've heard that it is against the ethical

12    rules for attorneys to share fees with third parties.  And the

13    defendant believed that that $25,000 in cash that he took from

14    the undercover agent was from drug trafficking.  That's also

15    not a crime.

16            The crime here is what he did after he took that

17    $25,000, which brings us to Counts 4 and 5.  These are the

18    counts for the laundering of the undercover agent's $25,000 in

19    cash, which have been represented to be drug money.  The

10:16 20    defendant conducted a financial transaction.  He deposited the

21    money into his Bank of America account with the intent to avoid

22    a transaction reporting requirement under federal law.  That

23    was the breaking down of the $25,000 into the two deposits

24    under $10,000 on that very same day, within 11 minutes of each

25    other, a half a mile apart, at different branches of the same

1    bank.

2              First, it's clear that the defendant did this to

3    conceal the source of the money from drugs?  How do you know

4    that?  Because he broke it down.  And he split it into amounts

5    under $10,000, first 9,000 and then 8,000.  No, he doesn't go

6    to Citizens Bank, like the defendant showed you on their chart.

7    He doesn't go to Citizens Bank, members of the jury.  And the

8    reason is this:  This check that the defendant wrote to the

9    Commonwealth of Massachusetts to pay his taxes, as you can see,

10:17 10   the date on this check is March 2 of 2011, in the amount of

11   $16,557.57.  Two days before, the defendant gets the $25,000,

12   same account.  That's why he's got to go to the Bank of America

13   and can't go to any other bank, because he needs the money to

14   cover this check.

15             And you know that from the financial analysis that was

16   done, that showed that on March 2 of 2011, there was a balance

17   in that account of $40.42.  The next day, there had been some

18   money put in.  There was a balance of $122.  So prior to the

19   defendant taking that $25,000, there is $122,000 -- $122.82 in

10:18 20   that account that the defendant has already written this check

21   for almost $17,000 to the IRS.  That's why he's got to get that

22   money in the account.  That's why he keeps bugging Dardinski on

23   the phone.  It's got to happen.  We've got to meet.

24             Who does this, members of the jury?  Someone

25   attempting to conceal the source of the funds, as you heard

1    from IRS Agent Talbot, to avoid the reporting requirement, the

2    bank's filing of the CTR.  Because why else break it down?  Why

3    else go to two different branches of the same bank?  Why?  To

4    protect his incorruptibility, which really means his being

5    caught.

6            How do you know that he knew there was a reporting

7    requirement for amounts transacted over $10,000?  First, the

8    defendant is a 30-year member of the bar and has held himself

9    out as being experienced in handling money laundering cases.

10:19 10   Second, because you know from the stipulation that's in

11   evidence that the defendant sat through two money laundering

12   cases in this very courthouse where he represented individuals

13   charged with money laundering.  He heard the judge's

14   instructions on the law about this issue just about two years

15   prior to this investigation and during the time that this

16   investigation was going on.

17           Finally, with respect to Count 7, which is the

18   structuring count, that's for the same breakdown of this money.

19   And there, you don't need the representation that the money

10:19 20   came from drugs.  You just need that the money was broken down

21   into amounts under $10,000.

22           You also heard that the bank did file a CTR.  And

23   you'll hear from the judge that attempting to cause the bank to

24   fail to file is also structuring.  That's exactly what the

25   defendant was charged with here.  It doesn't matter that the

1   bank actually caught the fact that the defendant had structured

2   and they filed the CTR.  What matters is that his intent was to

3   avoid the bank from doing that.

4          Finally, this check for $2,500, members of the jury,

5   this is the check that the defendant wrote to Ronald Dardinski

6   as his fee for having sent him this drug-dealing client.  You

7   heard the numerous conversations between the defendant and

8   Dardinski where the defendant promised Dardinski a cut of the

9   money he would receive from the drug-dealing client, and he was

10:20 10  simply making good on this promise.

11         We know that this $2,500 came from the same bank

12  account, the Bank of America that we've been talking about.

13  You know that that account, on March 3 -- March 3rd, only had

14  $120 in it.  And you know that the defendant was not going to

15  pay Ronnie Dardinski unless the drug-dealing client had come up

16  with the $25,000 retainer.

17         Certainly, there is enough evidence for you to infer

18  that that $2,500 was from that same $25,000.  The defendant

19  writes "office disposal" in the memo section on the check as a

10:21 20  way to conceal the fact that the money came from drugs.  You

21  heard from Dardinski, he did no work for the defendant.  You

22  heard from Agent Tamuleviz that he spoke to Dardinski on a

23  daily basis, and Dardinski did no work for the defendant.  The

24  defendant wrote "office disposal" for no other reason than to

25  conceal the fact that he had laundered drug money.

1        Now, look, you may not like Ronnie Dardinski, and you

2    may not like that the government used him as a witness, and

3    that is entirely understandable.  But you have all taken an

4    oath in this case, which is to decide this case on the

5    evidence.  The issue of the government's use of informants to

6    make cases is not for your consideration.

7        The issue of whether the government improperly induced

8    the defendant to commit these crimes is ludicrous.  This

9    defendant orchestrated this scheme before Dardinski was even

10:22 10    signed up as a cooperating witness with the DEA.  There's no

11    entrapment if there's no government agent.

12        This case is not about Ronnie Dardinski, as much as

13    the defendant tried to make it about him, because almost

14    everything that Dardinski has said was corroborated by the

15    tapes.  This is a tape case, and one thing that Ronnie

16    Dardinski could not control once the tape was rolling is the

17    words that came out of this defendant's mouth.

18        This case is about the defendant, a man who you heard

19    owed almost one half a million dollars to the IRS, had bounced

10:23 20    35 checks in amounts over $120,000, had two mortgages, and was

21    living well above his means.  This case is about the defendant,

22    who was corrupted by no one else but his own greed.

23        I would simply ask you to do your job, which is decide

24    this case on the evidence.  The evidence is the documents, the

25    tapes, and the defendant's own words.  If you do that, it will

1    lead you to the inescapable conclusion that the defendant is

2    guilty of the crimes charged.

3              THE COURT:  All right.  Mr. Reddington, for the

4    defendant.

5              MR. REDDINGTON:  Yes, your Honor.  Thank you.

6              May I do a little housekeeping, your Honor?

7              THE COURT:  Yes, you may, of course.

8              MR. REDDINGTON:  Thank you.  If I use the boards, your

9    Honor, would it be okay if I just kind of hold them a little

10:24 10   bit rather than use this contraption?

11             THE COURT:  Yes, you may.

12             MR. REDDINGTON:  Thank you.

13             Jurors, you know, one of the things that is pretty

14   apparent, when you're summonsed from all over the state to come

15   to the federal court or a state court and sit as a juror on a

16   case, I mean, to be honest about it, many people walk in the

17   courthouse.  They're hoping they don't get picked, get the day

18   off, go back about your life.

19             But one thing that I would suggest to you is amazing

10:25 20   about the system of justice that we have is that jurors --

21   sure, you give up your life for two weeks.  You're not at work.

22   You don't see your friends.  You don't really have much

23   interaction with your family.  You're in a position where you

24   sit in a courtroom.  You can't say anything, which must be

25   frustrating.  You listen.  And that's the whole idea, because

1    you, as a jury -- in the state court, they use language that

2    goes back to Old England, something to the effect of:  You pass

3    between the defendant and his country, the defendant and the

4    government, and he places himself on his country, which country

5    you are.

6          And basically what that means is that, as jurors, you

7    owe allegiance to nothing but your solemn oath that you took.

8    His Honor will instruct you, as he did in the beginning of the

9    case, that, as jurors, I suggest it's one of the most enriching

10:26 10   experiences that you may have in your life.  Incredible

11   interaction with each other, you form one unit.

12         Through the foreperson, you'll speak your verdict.

13   And your verdict is whether or not the government has proven

14   each and every element of these charges to you beyond a

15   reasonable doubt.  It's not a matter of speculation.  It's not

16   a matter of supposition.  It's not a matter of throw stuff

17   around the room and hope that it sticks to the wall.  It's a

18   matter of taking the Indictments -- and by the way, we embrace

19   the evidence, the disk.  We embrace that.  That's why you have

10:26 20   the transcripts.

21         And when you go in the back room there and you're

22   deliberating this case, you go right through those transcripts

23   and you ask yourself:  Is this a man who truly is involved in

24   money laundering and criminal activity?  Or is this a man,

25   quite frankly, and we all know it, who was set up?  By who?  By

1    the Tamuleviz/Dardinski team.  How do you know this?  Well,

2    jurors have the opportunity to look right into the eyes of a

3    witness, and that person is on that witness stand directly

4    across from you so that you're able to look and see, what they

5    say, does it have the ring of truth?  Are they reacting in a

6    particular fashion?  Does it appear as though they're being

7    upfront, honest, communicating to you?

8         Counsel suggests to you that Ronnie Dardinski -- was

9    he forthright?  Ronnie Dardinski, on that witness stand, was

10:27 10   just a meek guy that just wanted to hang out with the kids.

11   He's just going to answer those questions and go yes, no, yes.

12   You don't think that he hasn't been worked over?  Do not get

13   mad.  Do not let Goldstein get under your skin.  Do not let him

14   trip you up.  Just answer the questions yes, no.  You know

15   that.

16        Do you think for one minute that good guy Dardinski

17   just wants to hang with the kids when he's out there carrying a

18   gun and he's in a room, or he's with some poor trembling person

19   who's getting their arm broken because they owe somebody else

10:28 20   money?  And he did it over 50 to 100 times.

21         Not to mention the number of children by the different

22   women.  Of course, the women lie.  He never would assault that

23   woman.  He didn't strangle her and slam her up against the

24   wall.  Counsel asked him:  Did you do that, Ronnie?  I like the

25   "Ronnie."  Did you do that, Ronnie?  No, I didn't.  Fine.

1    We'll believe you, Ronnie.  As Mr. Goldstein brought out on

2    many occasions, Well, we have to take your word for it, don't

3    we?

4          Now, how do you know that this is a setup?  Well, can

5    you imagine the odds?  What are the odds that the same

6    individual, Ronnie Dardinski, in 2004, is working with the same

7    U.S. Attorney's Office in this building and they want to have a

8    consensual wire again so that Ronnie Dardinski can record the

9    conversations that he's having with poor, hapless Bob George,

10:29 10    who thinks he's his friend.  He knows he's his client.  And

11    Dardinski says, Well, he was trying to shake me down for a

12    hundred grand.  Do you believe that?  You truly believe that?

13          You saw, you heard, the cross-examination of Mr.

14    Dardinski.  You heard and have seen the evidence as it relates

15    to why was Bob George there?  What do you think?  Does he just

16    wander into Concord State Prison and says to a guy, Hey, Bro,

17    you're a suspect in two murders, you and another guy that I

18    don't even know, who's your roommate, and I need a hundred

19    grand, okay?  That's a shakedown?  Ludicrous.

10:29 20          He was contacted by Dardinski the inference is, I

21    suggest.  He went up to see Dardinski because Dardinski gives

22    him the name of his roommate.  How else does he know the name

23    of the roommate?  Why does he bring a retainer agreement with

24    him?  Why does he write it up?  Is he trying to do the right

25    thing as far as the Board of Bar Overseers and rules dealing

1    with lawyers signing up clients?  Retainer agreements?  He puts

2    both names on there.  If it was just a simple shakedown by

3    Dardinski for a hundred grand, which is ludicrous.  The guy's

4    in jail.  He's going to give him a hundred grand?  Oh, sure.

5    Let me send you a check.  Why would he put the other guy's name

6    down there?

7         But Dardinski reaches out to the U.S. Attorney's

8    Office.  And then what happens then?  The same U.S. Attorney's

9    Office wants to bug him, wants to set up meetings, wants to set

10:30 10   up wires, and they want to record Bob George back in 2004.

11   Why?  Why?  You have to ask yourself.  Here's a prosecution of

12   -- how many times do we have to hear "30-year criminal defense

13   attorney"?  Or Tamuleviz's reports:  "high-profile, criminal

14   defense attorney," when he writes up his request?  How

15   repulsive.  How repugnant.  This is our government at work.  To

16   take down one man, ruin his life, ruin his life and his family.

17        What do they do?  They submit their request for money.

18   Money.  Talk about grubby.  Money.  And what do they ask for?

19   We've got two goals here, and they refer to it, interestingly

10:31 20   enough.  Doesn't Tamuleviz refer to it as "the scheme"?  You

21   want to talk about a scheme?  I got news for you.  The scheme

22   comes right back there with Tamuleviz.  That's where the scheme

23   comes from.  You want to talk about getting in bed with

24   somebody?  Tamuleviz gets in bed with Dardinski.  You sleep

25   with dogs, you get fleas.

1          Now, you think about this.  Here's Tamuleviz.  He puts

2     in a request for money.  You got Dardinski talking about, Well,

3     it's going to take awhile.  Remember the question from the

4     prosecutor?  Why is it that it went so long before he got the

5     money?  DEA couldn't get the funds.  DEA was trying to track

6     the funds and get the funds.  DEA couldn't find the funds.

7          So what happens?  We, again, the defense side, we get

8     access to records that show that in addition to the scheme of

9     the United States of America to take down Bob George, prominent

10:32 10    criminal defense attorney, because he's a greedy guy, according

11    to the government's theory, the scheme is to indict Bob George

12    and commence disbarment proceedings against him.  Way to go,

13    Mr. Tamuleviz.  And when do they put in that request, jurors?

14    November of 2009.

15         You put that in context with the initial time frame of

16    Dardinski getting out of jail, the prison on Martha's Vineyard,

17    which is a joke.  And why was he in the prison on Martha's

18    Vineyard?  The little white house next to the Mobile station?

19    Because Monica was in fear.  Now, remember the big pump and the

10:33 20    hype that they had?  Oh, Monica didn't know that he was

21    involved.  Monica didn't know he was a cooperator.  Monica

22    didn't even know, had no contact or knowledge whatsoever with

23    Tamuleviz.  Monica is just the worried girlfriend trying to see

24    her guy who's in the little house on Martha's Vineyard.

25         Well, just like the records that were able to show the

scheme to take down Bob George, have him disbarred and
indicted, we also, thankfully, summoned the jail tapes.  Now,
that tells you a lot.  You think about this.  If we did not
have those jail tapes, what kind of lies do you think would
have been the foundation upon which the government would argue
its case this morning?  But we did have the jail tapes.  What
did they reveal?  Lies.

First of all, Dardinski, I think it's pretty apparent,
agrees that he's a Master of Illusion.  He's better than a
Master of Illusion.  He is the Prince of Darkness.  He is the
Lord of Lies.  He is the absolute Lord of Lies.  This guy
wouldn't know the truth if it fell on him.  He lies faster than
a horse can trot.  You know what?  It doesn't matter.  It
doesn't matter that Dardinski is a liar because, of course, the
government wants to distance themselves from Dardinski as best
they can.

This case stands on something.  You want to talk about
reasonable doubt?  Is there one of you -- and people oftentimes
say to a jury, You don't check your common sense at the door
when you walk through the metal detector.  You bring your life
experience, people you know, jobs you've had, your family.  You
all come together.  You've got all given experiences in life.
You come together with that common sense.

Here's a guy who testifies on direct examination that
he had no problem with Bobby.  Bobby George, oh, I knew him.

1    And, you know, I got out of jail.  Hard time down in the mean

2    streets of the Vineyard.  I'm at the Braintree Mall.  I'm with

3    Monica.  Remember that?  He doesn't mention Monica by name.  He

4    says, I'm with my girlfriend and the kids.  We went to

5    McDonald's, being the good dad that he is.  And then they go

6    upstairs, and he's going to have a cup of coffee.  And lo and

7    behold, there's Bob George, his good buddy, his former lawyer.

8    Bob says, Brother, what's up?  How you doing?  You still got

9    money that I can help launder for you?  Does that make sense?

10:35  10         And then you put it in context.  Put it in context

11   with the fact that we then, Mr. Goldstein, what I would refer

12   to as surgical amputation of his entire heart of his testimony,

13   totally eviscerated him.  And you caught the Lord of Lies on

14   the witness stand and he was flummoxed.  Do you remember his

15   reaction?  And he started -- he got a little shook.  Then he

16   kind of got cool then.  He didn't know we had the tapes,

17   though.  When you listen to those tapes, it was chilling.  Why

18   was it chilling?  Because Monica:  Call Joe T; call Joe T; call

19   Joe T, constantly.  Doesn't know who he is.  Doesn't know that

10:36  20   he's a DEA agent.  But, yet, he's apparently not a used car

21   salesman because obviously the guy's got some fire power.  He

22   can get him transferred from Concord State Prison down to the

23   little house down on the Vineyard.  Why?  Because she was in

24   fear.  Why?  Because he was an agent.  He was cooperating.

25   What does that tell you about credibility?  He's a liar.

1          So then he's on the phone.  He contacts and speaks to

2     Tamuleviz.  What does he say to Tamuleviz?  Hey, I got a

3     problem.  You always got a problem.  Okay.  Well, you know,

4     what I have to do is find out if I'm being investigated, if

5     there's any charges pending.  What are they?  You've got that

6     nice motorcycle with the good paint job that you had.  No, it's

7     another motorcycle that I had.  Well, who is it involving?

8     West Bridgewater, East Bridgewater Police.  Oh, that's no

9     problem.  I can take care of that.  I can take care of that.  I

10:37 10  know guys over there.  What does Tamuleviz says on the witness

11    stand?  Totally denies that until we have the tape.

12          So now you've got the conversations on the tape

13    between Monica and Dardinski where -- you know, not just your

14    basic, which you can understand, When are you coming home?  I

15    miss you.  That type of thing.  Anything about Bobby?  What

16    about the money?  What about the money?  What about the money,

17    money, money, money, money, money, money that he owes me?  And

18    I want that money, and I'm going to stove his head in.  I'm

19    going to stomp his head in.  Is that pillow talk?  Give me a

10:37 20  break.  Does it show hatred?  Does it show anger?  Does it --

21    in addition to laying on five years after he's in Concord State

22    Prison with the same U.S. Attorney's Office that wants to bug

23    him.  Setup?  Okay.

24          So here's a guy who we all know by the evidence has

25    been calling repeatedly, relentlessly, relentlessly calling,

1    calling, calling, calling, calling his office, chasing him,

2    calling his cell phone, calling him.  He doesn't talk to him.

3    You think Bob George wants to talk to Ronnie D?  Do you think

4    for one minute that Bob George doesn't know that Ronnie's

5    looking for him?

6         So now you put that in context with the meeting at the

7    Braintree Mall, which is the foundation, using the term

8    loosely, upon which this case is built.  Is there one of you,

9    with the evidence you have in front of you, that truly believes

10:38 10   that Bob George saw Ronnie Dardinski and said, Hey, Ronnie, how

11   you doing?  And Ronnie buys him a cup of coffee?  Never

12   happened.  Total lie.  Total fabrication.  Total setup.

13        And then what happens is he goes to Tamuleviz.  And

14   isn't this frightening as an American citizen?  He goes to

15   Tamuleviz, who's got all the power and the authority of the

16   Drug Enforcement Administration.  What does Tamuleviz do?

17   Well, this is my man, Ron.  Obviously, they know each other for

18   quite some time, apparently, huh?  Because we have the jail

19   tape.  This is my man, Ron.  I'm going to go commence an

10:39 20   investigation after a couple of weeks.  So he writes up his

21   paperwork, commences an investigation, has a consensual wire,

22   consensual wire of Mr. Dardinski.

23        And this is where -- you know, you've got the

24   transcripts.  You've got the tapes.  You've got the videos.

25   And you can sit there as long as you as a jury feel is

1  appropriate, and you can consider the evidence, the evidence.

2  And you draw your inferences from the evidence.  But a couple

3  of things that are important here, I would suggest to you.

4  First of all, when you consider the tapes, think about the time

5  frame where Dardinski has access to a recorded phone, 90 days.

6  And then he tries to spin it, Well, I didn't call him that

7  often on that phone because he wouldn't pick up.  What are you

8  talking about didn't want to pick up?  Dardinski didn't want to

9  use the recorded phone.  That's why.  Dardinski says, Well,

10:40 10  they made sure they knew exactly what I was doing.

11         And apparently Tamuleviz was really handling him quite

12  well because we know from the evidence and the telephone

13  records the number of times Dardinski called and called.

14  You'll have the exhibit.  You'll have the exhibit to see the

15  number of times that Dardinski called Tamuleviz, the number of

16  times Dardinski called Bob George.  You will be able to

17  determine, through the number of times that these telephone

18  calls were made, for example -- and, again, these are -- you'll

19  have the evidence in the room here.  March 18th -- I apologize,

10:41 20  your Honor.  March 18, 2009, George rejects Dardinski.  This is

21  a conversation the U.S. Attorney was talking about.  This is

22  when Dardinski says, after talking about money to Mr. George

23  inferentially because he's made a bunch of phone calls.  This

24  is Dardinski, if you recall, who says that he has a business.

25  He had what?  90 trucks that he sold.  He had accounts.  One

1    account was a million dollars that he had, his used car

2    business, his repossession business.  He had to hide his money.

3    It was all legitimate money, all legitimate money he was

4    talking about.  And he had to hide it.  Why did he have to hide

5    it?  The U.S. attorney says because he knew it was drug money.

6         Do you remember the conversations, constant

7    conversations, between Dardinski, the records that show he was

8    concerned about what?  Child support.  He owed over a hundred

9    thousand dollars in child support.  He was concerned about

10:42 10   Probation.  I can't show that I've got cash.  If I walk into a

11   courthouse and dump 20 grand down, I'm in big trouble.  He had

12   to use money, hide his money.  Where is the evidence of drugs?

13   There is no evidence of drugs.

14        Does he put him in touch with Hansen?  Sure, he does.

15   He's known Hansen for years.  They grew up together as kids.

16   What happens in the relationship with Bob George and Michael

17   Hansen?  Obviously, it falls apart.  But it is readily apparent

18   that Michael Hansen was a guy that Bob George was able to use

19   to rewrite his mortgages, bring clients through to get a

10:42 20   mortgage.  If somebody wanted to hire him, if they didn't have

21   the money, bring them to the bank.

22        Michael Hansen was not only a good friend of Bob

23   George, but he was a good source of an ability to finance his

24   business, through clients, legitimate, paperwork, documents,

25   have Michael Hansen give these people the money or rewrite his

1       mortgage because, as we all know, greedy Bob George, based upon

2       the government's investigation in this case -- again, scary.

3       The summonses that they submit, the records that they obtained,

4       shows you that Bob George -- and you've got the evidence --

5       married guy, 30 years.  He doesn't cheat on his wife because

6       he's afraid, but, nevertheless.

7              This is a guy that doesn't know he's being recorded.

8       He's making statements about his background, his business, and

9       talking all the time.  There's no discussion of drugs.  Where

10:43 10   is the discussion of drug money?  There is none.  Can you

11      imagine?  If I was going to bug you and sit in a car with you

12      and the goal -- remember, that was the word, the "goal" -- and

13      the scheme and the plan was to launder money, money laundering

14      for what?  Drugs.  Why wouldn't you sit there and say, Okay,

15      look, I've got a hundred thousand dollars in the bag I got from

16      the guy up in Worcester, the drug dealer.  What are you going

17      to do with it?  What can you do with it?  Bobby, I got drug

18      money here, Bobby.  This is the same guy that they're telling

19      you, in the Braintree Mall, goes up and embraces his buddy,

10:44 20   Dardinski.  Can I help launder money for you?  That is such

21      garbage, and you know it based on the jail tapes.

22             You look -- this is when George has the conversation

23      with Dardinski.  And Dardinski says, Yeah, I got some other

24      money.  I sold coke to a guy, and I gotta hide that money, too.

25      So by exclusion, that is proof right there that the first

1    discussion that they're having and the prior discussions --

2    because we don't know what was said in the conversation because

3    he chose to record or not record what he wanted to -- was

4    legitimate funds, legitimate funds.  I've gotta hide that

5    money, too.  Well, The fact is I don't want to know that stuff

6    because it's illegal.  Ah, whatever.  But when you see me, I

7    obviously can't help you with something like that.

8         The government never again mentions drug proceeds in

9    any conversations before April 15 of 2010.  How many times does

10:45 10   a citizen have to say no to the Tamuleviz/Dardinski team?  Here

11   you've got -- let me ask you something.  December 7, 2009, Why

12   am I involved in this?  Tell him to give me a call because I'm

13   not doing anything.  I don't know why he wants me involved.  I

14   am not getting involved.  I'm not.  I'm not involved in this.

15   You're one of my clients, but I don't -- personally, there's

16   nothing but trouble in it for me.  I'm not getting involved.

17        Call him back.  See if he picks up again.  Tell him

18   what I said.  There's no way I would get myself involved in

19   something where I'm not involved.  Okay.  Because I have

10:45 20   nothing to do with this.  But what it does is it implicates me

21   in something I have nothing to do with.  I'm not involved.  I

22   can't do this kind of business.  I don't run this kind of

23   business.  I'm a friggin' lawyer.  Where am I lending money,

24   making money for?  I can't.  I'm not doing that.  Then you guys

25   tied up again on your own?  Okay.  What else is going on?  I

1    don't want to talk about that anymore.  My God, how many times

2    do you have to say, Look, leave me alone?  Leave me out of it.

3    I don't want any part of it.

4         More importantly, the other conversations, how many

5    times does he say -- again, being recorded, not knowing he's

6    being recorded.  Did you really do a deal with that guy?  Did

7    you really?  How many times?  This is to Dardinski.  Once?

8    Twice?  Twice.  What did he get from you?  20,000 each.  40,000

9    bucks?  He took you for 40,000 bucks?  He's asking about it.

10:46 10   He doesn't know about it.

11        Opening statement, Mr. Hafer stood in front of you and

12   said, Jurors, this is a scheme that was hatched and

13   orchestrated by Mr. George, who relentlessly pursued Mr.

14   Dardinski to put him together with Mr. Hansen to launder this

15   money.  Through cross-examination, you could see, Mr. Dardinski

16   was relentless in his pursuit of him.  One of the most poignant

17   questions that was asked by Mr. Goldstein is when he said to

18   Mr. Dardinski, Isn't it fair to say, sir, when we look at these

19   telephone logs and these telephone records and the number of

10:47 20   times you relentlessly called and called and called and called

21   and called, that this human being would not ever have talked to

22   you again if you did not keep calling him?  And he had to

23   agree.

24        So you sit there as jurors, and you look at the

25   transcripts.  This is about the almost laughable argument that,

1   well, Bob George wanted to have Dardinski threaten Hansen

2   because he wanted his cut.  You know, you can always put a spin

3   on words.  But when you're talking about proof beyond a

4   reasonable doubt in a criminal trial, you've got to have

5   evidence.  You can draw an inference, but look at the evidence.

6        Here you've got a situation where the government would

7   have you believe that this is a threat to get money.  If this

8   guy thinks he has some kind of exposure or something happened,

9   it's something that you're an expert at, the Lord of Lies, the

10:48 10  Master of Illusion.  It's something you're an expert at.  If he

11  thinks you're some kind of exposure for him as a result of what

12  he's done with you, only Bob George can solve it for him.  I'm

13  not shaking him down.  I don't want you to threaten him.

14  That's not what I'm talking about.  Dardinski:  Do you want me

15  to scare him so he comes back to you for law advice?  Or do you

16  want him -- that's all.  That's all.  That's all.  That's all.

17  In his voice that he's got.  Do not threaten him.  Do not tell

18  him it's about money.  He goes on and on and on.

19        And then you can see when you heard the tape, when he

10:48 20  meets up with Hansen after they're finally brought together,

21  here's the Tamuleviz/Dardinski team that turns around, takes a

22  guy who's been friends with a guy since they were little.  You

23  look at the records.  You can see the telephone calls that

24  don't happen.  You can see the meals that they would have

25  shared.  You can see the beers they would have consumed.  You

1    can see the meetings that they would have had.  They don't

2    happen.

3           For over a year, all which time Dardinski is dealing

4    with Hansen and Hansen is dealing with Dardinski, telephone

5    calls back and forth and back and forth.  Bob George has got

6    nothing whatsoever to do with this.  The government would have

7    you believe he's orchestrating?  Would have you believe that he

8    was involved?  That have you believe that now he wants to shake

9    down this guy for money?

10:49 10           You look at the evidence.  He is a sensitive guy who

11    missed his friend, who truly, truly, truly wanted to reconnect

12    with him.  And the government takes that, the Tamuleviz team,

13    and they twist that, and they use that to get to Bob George.

14    That's what they did.  And what happens?  And how do you know

15    that?  Because all he cares about -- on that video and in the

16    transcripts you'll see, all he cares about is, I'm so glad,

17    buddy, we're back.  It took a heart attack.  It took a stent

18    operation.  I'm so glad we're back.  Okay, okay, bye.

19           You saw that video clip.  If the government didn't

10:50 20    play that video clip, I would have played the video clip for

21    you, where he's hitching up his pants and he's talking.

22    Whatever you want to give me, whatever you want to give me.  He

23    knows that Hansen had done business.  How does he know?

24    Because he was told.  You can see it right there and in the

25    prior conversations.  Did you?  Yeah.  Swear on your kids.

1    Swear on your kids.  Are you kidding me?  How much did you get?

2    40 grand.  Does he say in any one of those tapes, Hey, you owe

3    me 20 grand, brother?  Don't forget.  Does he say, Where is my

4    cut?  Does he call him up?  Does he go to his business?  Does

5    he go to his place?  No, nothing, no contact.  They're not

6    talking.  They were like, as Mr. Goldstein said, two school

7    kids fighting with each other.

8         So what happens when the government braces Mr. Hansen,

9    the government gets Mr. Hansen to wear a body wire and deal

10:50 10   with his long-standing friend and sit down and try to have him

11   have money, try to get the money into his hands.  What else is

12   the money that it's a theme throughout this whole case?  When

13   Dardinski testified -- again, the Lord of Lies.  When he

14   testified, he was asked pointedly, Didn't you have a hundred

15   grand in cash?  That Bob George would not show up for meetings?

16   And why aren't there recordings?  Why aren't there

17   conversations saying, Bobby, Bobby, I got a hundred grand in

18   cash?  I want to give it to you, brother.  Come on.  I got it

19   from the drug dealer.  No.  He doesn't show up for one meeting.

10:51 20        How many times does a citizen have to say no and step

21   back from Dardinski and Tamuleviz?  And, yet, they authorize an

22   additional hundred grand, up to 300,000.  What do they do?

23   They put it in a bag, and he does not show.  As Mr. Goldstein

24   said, How many times do you have to thrust money, virtually

25   thrust money?  If he's the guy in the fictitious meeting in the

1    Braintree Mall that said, Hey, you know, I want to help launder

2    your money, don't you think he would have been there

3    lickety-split right in the parking lot?  Give me the bag.

4    Woo-hoo.  He doesn't show.

5         But, more importantly, Dardinski claims it never

6    happened.  You know it did.  How do you know it did?  Because

7    we have the tape that shows the conversation.  Give me the bag.

8    What bag?  He's really kind of funny, isn't he?  Calice, can we

9    shoot him now?  You know he had the bag.  He's a liar.

10:52 10        As the case goes on, he says to Dardinski, Look, you

11   know, the only thing you can do for me is get me clients.  All

12   you can do is get me clients.  So what does he do?  He sits in

13   a lawful meeting with the guy who portrayed himself pretty

14   effectively.  I think he almost looked like he was undercover

15   on the witness stand.  Sat with him in an open place, basically

16   indicates that he's charging him a fee and he brings a retainer

17   agreement.  Who cares Dardinski signs it?  What does that have

18   to do with anything?  He asked the guy.  You can hear it on the

19   tape.  Legitimately.  Can you sign this?  Give me your name.

10:52 20   I'll give you my name.  What's your address?  I don't want to

21   give you my address.  He goes through the whole thing.

22   Dardinski, will you sign it?  Boy, there's authority, I guess,

23   to have Dardinski sign a fee agreement.  But who cares?  The

24   bottom line is he brought it with him, and he sat with the man,

25   and he took the money.  There's nothing illegal about that.

1    That's what lawyers do.  Whether it's people don't like it,

2    whether they like it, that's perfectly legal.  There's no crime

3    there.

4            And then the deal with the referral fee?  It's a Board

5    of Bar Overseers stuff.  You're not supposed to give referral

6    fees to people that are not lawyers.  Simple as that.  Office

7    disposal?  You know darn right well that he cannot be kicking

8    back a legal fee, a percentage, to Dardinski.  But did he

9    believe that he owed Dardinski a 10 percent referral fee?  You

10:53 10   bet.  He certainly did.  Was he, as the government said, a guy

11   that got the deal done?  Yeah, he did.  He got it done.  He

12   gave the guy a check for 2,500 bucks.

13           When you think about the connection, when you think

14   about evidence and the government proving to you as a jury that

15   that money came from an illegal source on that check for the

16   2,500, or even better, the money that was given from Mr. Hansen

17   and the government contends -- strike that.  I apologize.  The

18   money that was given from the drug dealer, alleged drug dealer,

19   that the government alleges he then structures by depositing in

10:54 20   Bank of America, two branches, you know, when you look at the

21   exhibit that's the overhead photograph, you can see -- excuse

22   me, your Honor.  You can see that this is Needham.  Here's the

23   Bank of America here, Chestnut Street.  You go down here, like

24   going down to pick up a cup of coffee.  On the left is the

25   Needham Bank.  Right next to that is Citizens Bank.  He had

1    accounts in both.  Bank of America again.

2           Now, what's the import of that?  The import of that is

3    this:  If you go to a bank and you open up a savings account,

4    if you want to get the beach towels or whatever the gimmicks

5    are they're giving you, and you open up an account in one bank.

6    Then you go down the street and you want to get another

7    gimmick, another beach towel, you know they're going to say,

8    Oh, you already opened up an account ten minutes ago.  We only

9    give you one.  Don't you think an attorney, 30 years at the

10:55 10   bar, big-time prominent, big shot, criminal defense lawyer,

11   defends people on money laundering, sits there and listen to

12   judges give instructions in trials in this very building --

13   it's on the internet.  You heard the testimony from Mr. Talbot.

14   Remember Mr. Talbot way back?  He's the IRS guy that testified

15   in another trial, that testified you didn't need -- in the

16   other trial, the trial attorney knew about the structuring and

17   it's all, at the end of the day, the aggregation.  That it was

18   on the internet, when you get the forms, it's on the internet.

19          You don't think Bob George doesn't know or didn't know

10:55 20   that if he makes a deposit into the same bank that they're

21   going to aggregate at the end of the day?  Of course, they are.

22   Does this strike you as trying to avoid a reporting

23   requirement?  If he wanted to do that, you take five grand, and

24   you put it in Bank of America.  And then you just go across the

25   street on your way to get a cup of Starbucks, and you walk into

1    the Needham Bank and you put six grand in.

2         And the government's suggestion to you, that, oh, no,

3    it had to go into Bank of America because he had to cover that

4    check, are you kidding me?  You think about this.  You want to

5    do a wire transfer?  Maybe the next day.  Go to the bank,

6    Citizens Bank, the next day.  Say, I want to withdraw five

7    grand that I just put in yesterday.  Okay.  Then you go to Bank

8    of America.  Bingo.  No problem.  That is ludicrous.  It's a

9    charge that the government, targeting Bob George, knows that,

10:56 10   okay, this will work to disbar him; this will work to convict

11   him.  We can get him on structuring if we can't get him on the

12   rest of the foolishness.

13        Now, when you go back into that jury room and you

14   consider the time lines, you consider the relevant dates, you

15   consider the lack of contact, and scrutinize those transcripts,

16   and then see where there is evidence that Bob George was

17   involved in a conspiracy or that Bob George was involved in

18   laundering money.  Did you really get money?  Really?  Swear on

19   your kids.  Tell me how much.  How many times does he say, I

10:57 20   don't have any part of this?  He's like Jon Lovitz, the guy on

21   Saturday Night Live that used to do the devil.  Yeah, that's

22   the ticket.  I had nothing to do with it.  All I want to do is

23   get back with you.  I want my friend back.  Thank you.  Hugs,

24   kisses.  I want my friend back.

25        Greedy Bob George, his lifestyle.  Oh, yeah.  What?

1    Do you have yachts?  Was he running off, going all over the

2    world?  Was he gambling money?  No.  He was paying his kids'

3    tuition and supporting his family and working damn hard to be a

4    respected member of the Bar of Massachusetts.  The United

5    States of America vs. Bob George is a travesty.  Thank you.

6              THE COURT:  Mr. Hafer, rebuttal.

7              MR. HAFER:  Very brief, your Honor.  Thank you.

8              Mr. Reddington just stood in front of you and told you

9    this case was a setup.  A setup?  Really?  You just watched the

10:58 10   video.  Smiling defendant, arms behind his back, laughing.  A

11   setup?  If it's a setup, how does it explain the first phone

12   call in the case on March 18, 2009, when he explains the deal

13   to Dardinski and Dardinski doesn't understand it?  It's not a

14   setup.

15             Mr. Reddington just told you the first meeting at the

16   South Shore Plaza, that's the foundation of the case.  They

17   might want it to be the foundation of the case.  It's not the

18   foundation of the case.  The foundation of the case is the

19   tapes.  And that's, in fact, why Mr. Reddington talked about

10:58 20   other things.  And he showed you this chart.  He showed you

21   this chart from March 18, 2009.  He told you, when he showed

22   you this chart, he said, The government never again mentions

23   drugs after this first meeting.  But guess who did?  He did.

24   That's not on this chart, that next phone call.  And he's

25   already agreed to do the rest.  Where is that?  Not on the

1     chart.  And that's because they want you to look at a lot of

2     things other than the evidence in this case.  They want to talk

3     about retainer agreements from 2004.  They want to talk about

4     DEA fund authorizations.  It's because they don't want to talk

5     about the evidence in this case.

6            Similarly, Mr. Reddington just tried to explain those

7     structuring transactions to you.  And the explanation is beach

8     towels?  Beach towels?  If you're not laundering money and you

9     have $17,000 in cash, you know what you do with it?  You put it

10:59 10     in at the same time.  You don't drive to one bank, deposit

11     $9,000.  And then what?  I guess what happens is you got in the

12     car.  You started driving the half a mile to the other bank,

13     and you bumped into the door and you realized, Oh, shoot, I

14     have the other 8,000 in my other pocket.  At this point I'm a

15     little closer to the second bank.  Let me just go to the second

16     bank and put $8,000 into the very same account 11 minutes

17     later.  It doesn't make any sense.  It makes no sense.

18            Mr. Reddington just told you, ladies and gentlemen,

19     that Special Agent Tamuleviz was in bed with Ronnie Dardinski.

11:00 20     I submit to you, if Special Agent Tamuleviz was in bed with

21     him, he was sleeping with him.  You heard all the calls in this

22     case.  This case isn't about, ladies and gentlemen, the

23     government taking Bob George down.  It's about Bob George

24     taking Bob George down.

25            This is an important case, ladies and gentlemen.  All

1    criminal cases are important.  But while it's important, it is

2    not close.  The evidence is overwhelming that the defendant

3    committed all the crimes he's charged with in the Indictment.

4    Thank you very much.

5           THE COURT:  All right, jurors.  We're going to take a

6    15-minute recess, and then I will give you my charge on the

7    law.

8    (Jury out at 11:00 a.m.)

9           THE COURT:  We'll be in recess then for 15 minutes.

11:01 10          MR. GOLDSTEIN:  Your Honor, at this point I would like

11   to register some objections.  Perhaps at sidebar when you come

12   back will be fine.

13          THE COURT:  You can do it now.

14   (SIDEBAR CONFERENCE AS FOLLOWS:

15          MR. GOLDSTEIN:  First, before I register objections, I

16   would like to ask for an additional instruction when your Honor

17   instructs the jury regarding the transcripts, that it's still

18   the tapes that control.  The reason I ask is that Miss Kaplan

19   was quoting some of the transcripts.  Specifically, she quoted

11:02 20   a part where they talk about a $2,900 fee.  If you actually

21   listen to the tapes, at various places the tapes are different

22   than the transcripts, in my opinion, the government prepared.

23   That's not in material respects but in some respects.

24          In terms of objections, I'd object -- I think the

25   government misstated the evidence on several occasions during

1       its principle closing argument.  Miss Kaplan, for instance,

2       said, All the money Dardinski has is criminal.  And the

3       evidence was clear that Dardinski himself testified that he had

4       lots and lots of legitimately earned money that he did not want

5       to put into the bank.  That testimony was elicited during

6       cross-examination.

7             I'd object to Miss Kaplan's repeated definitions of

8       legal concepts that I don't think were accurate.  She tried to

9       define conspiracy, willful blindness, wire fraud.  I think that

11:03 10  was it in terms of the legal instructions.  I think she

11      misstated those legal instructions.

12            She also, I believe, misstated legal instructions with

13      regard -- regarding the aiding and abetting.

14            I also object to the government's playing of the

15      videotape, the portion of the videotape -- two portions, where

16      one is, they talk about the allegations that Mr. George was

17      using cocaine.  And, you know, that's a piece that had been

18      taken out of the transcripts.  I don't think -- I'm not saying

19      they played it intentionally.  They should have been more

11:03 20  careful.  The videotape they played, there's a clip in there

21      where they're talking about the allegations of Mr. George

22      having done cocaine.  I think that was objectionable, your

23      Honor.

24            THE COURT:  I didn't hear that.  Maybe I missed that.

25            MR. GOLDSTEIN:  No, no.  It's clearly in the videotape

1    they played.  There was a discussion regarding allegations that

2    Mr. George was consuming cocaine.

3            I also -- Miss Kaplan engaged in some personal

4    vouching, saying, We know this is not true; we know that is not

5    true.  And those are my objections, your Honor.

6            THE COURT:  You wish to respond, Miss Kaplan?

7            MS. KAPLAN:  I'm sure your Honor will handle

8    appropriately the issue of the tapes that are the evidence and

9    their recollection of the testimony governs.

11:04 10          The video that was played is the video that's in

11   evidence.  I didn't -- that's the video that's in evidence that

12   was played.  I don't think there was anything else

13   objectionable.

14           THE COURT:  Anything else?

15           MR. GOLDSTEIN:  That's it, your Honor.

16           THE COURT:  All right.  Thank you.  We'll be in

17   recess.

18   .  .  .  END OF SIDEBAR CONFERENCE.)

19   (Recess taken at 11:05 a.m.)

11:30 20          THE COURT:  Good morning, jurors, again.  You have now

21   heard the evidence and the closing arguments in this case, and

22   it is now my duty to instruct you on the law that you must

23   follow and apply.  In any jury trial, there are, in effect, two

24   judges.  I'm one of the judges, and you, collectively, are the

25   other.  It's my duty to preside over the trial and to determine

1      what testimony and evidence are relevant under the law for your

2      consideration.  It's also my duty at the end of the trial to

3      instruct you on the law applicable to the case.  You, as

4      jurors, are judges of the facts, but in determining what

5      actually happened in this case, that is, in reaching your

6      decision as to the facts, it is your sworn duty to follow the

7      law as I am about to define it for you.  And when I have

8      finished, you will begin your discussions with one another,

9      which we call jury deliberations.

11:31  10     To help you understand and remember these instructions

11     on the law, I will divide them into three parts:  first,

12     opening, general instructions intended to guide you throughout

13     your deliberations; second, instructions about the Indictment

14     and about the law that determines what the government has to

15     prove in this case; and third, some additional general

16     instructions about the procedures to follow during your

17     deliberations.

18     Now, these instructions are somewhat cumbersome, and I

19     ask you to pay very carefully attention.  I need to read them

11:31  20    to you because I cannot commit to memory all of the law about

21     which I instruct you, but I will submit to you a written copy

22     of this charge when you go to the jury room.  I want to caution

23     you right away, however, not to dwell on any one particular

24     portion of it, if you decide to refer to it at all, because you

25     must consider these instructions as a whole and not just one

1    individual instruction.  So I ask you to do the best you can to

2    say with me.

3         All of my instructions are about the law you must

4    apply.  I do not mean any of my instructions to be understood

5    by you as comment by me on the facts or the evidence in this

6    case.

7         The defendant is presumed to be innocent by law, and

8    this presumption stays with him throughout the trial and your

9    deliberations.  The government has the burden of proving beyond

11:32 10   a reasonable doubt that the defendant is guilty as charged.  It

11   is for you to decide whether, based upon the evidence before

12   you, the government has met its burden with respect to the

13   specific charge against the defendant.  You are the judges of

14   the facts.  And although the law allows a trial judge in this

15   court to comment on the evidence, I deliberately do not do so

16   and instead leave the fact-finding entirely in your hands.  You

17   are the sole and exclusive judges of the facts.

18        Fortunately, you do not need to resolve every dispute

19   of fact raised by the evidence.  In order to know which fact

11:33 20   disputes are important, you need to know what rules of law to

21   apply.  I've explained some of those rules to you during the

22   course of the trial, and I will explain others to you now.  The

23   lawyers were allowed to comment during their arguments on some

24   of these rules of law, but if what they said about the law

25   differs in any way from my instructions, you must be guided

1    only by the instructions on the law as I state them.

2         You must follow all of the rules as I explain them to

3    you.  A single sentence or statement might not refer to an

4    exception or a qualification that I've stated elsewhere in

5    these instructions.  So you must consider all of them together

6    as a unit.

7         And even if you disagree with one or more of the rules

8    of law or don't understand the reasons for them, you are bound

9    to follow them, nevertheless.  This is a fundamental part of

11:33 10   our system of government by law rather than by the individual

11   views of the judge or the jurors who have the responsibility

12   for deciding a case.  If I make any mistake on instructing you

13   on the law, fair and evenhanded application of the law to this

14   and other cases is, nevertheless, assured because any mistake I

15   make on the law can be corrected on appeal.  In contrast, your

16   decision on disputed facts is final.  That is, your findings on

17   material, disputed facts are not subject to appeal.  You are

18   the final and exclusive judges of the facts.

19        Under your oath as jurors, you cannot allow

11:34 20   consideration of the punishment which may be imposed upon the

21   defendant, if convicted, to influence your verdict or to enter

22   into your deliberations in any way.  In addition, you cannot

23   allow considerations of sympathy for the defendant or for the

24   government to influence your verdict or to enter into your

25   deliberations in any way.  It would be improper for you to

1    allow any feelings you might have about the nature of the

2    alleged crime to interfere with your decision-making process.

3         You are not to be swayed by bias, prejudice, sympathy

4    or antagonism.  You're not to consider any personal feelings

5    you may have about the profession, race, religion, natural

6    origin, sex or age of the defendant or of any witness who

7    testified during the trial.  You are not to decide the case

8    based on what you've heard or read outside of this courtroom or

9    according to any guesswork or speculation.  Rather, your

11:35 10   function is to find the facts fairly and impartial solely on

11    the basis of the evidence presented in this courtroom and in

12    accordance with my instructions.  The evidence in the case

13    consists of all the exhibits received into evidence, all facts

14    that may have been admitted or stipulated, and all of the sworn

15    testimony of the witnesses.

16         Statements, questions, and arguments of counsel are

17    not evidence in the case.  The Indictment itself is not

18    evidence.  You may not consider any answer by a witness or any

19    exhibit that I ordered stricken from the record and told you to

11:36 20   disregard, and that includes any testimony related to a

21    specific exhibit, in this case, Exhibit 1C that was stricken.

22         From the facts proved, you may draw reasonable

23    inferences about additional facts.  An inference is a deduction

24    or a conclusion.  An inference is an additional finding that

25    your experience, reason, and common sense lead you to draw from

1    the facts that you find are proven by the evidence.

2         Two more phrases often used in discussions about

3    evidence received at trial are "direct evidence" and

4    "circumstantial evidence."

5         Testimony of a witness showing firsthand observation

6    of a fact by that witness is direct evidence.  For example, the

7    testimony of an eyewitness just about what he or she saw is

8    direct evidence.  If the witness is permitted to go beyond what

9    he or she saw and is permitted to state a conclusion, an

11:37 10   inference or an opinion, that part of the answer is not direct

11    evidence.  Instead, it's a kind of circumstantial evidence.

12         Circumstantial evidence is proof of some facts,

13    including events and circumstances, on the basis of which the

14    jury may infer the existence or nonexistence of additional

15    facts.  For example, let's suppose you've been in this

16    courtroom for a few hours and unable to look outside.  A man

17    comes into the back of the courtroom wearing a wet raincoat and

18    carrying a dripping umbrella.  You may draw the inference from

19    those circumstances that it is raining outside.  That's what we

11:37 20   call circumstantial evidence, as opposed to direct evidence,

21    which would be the testimony of the man in the wet raincoat

22    taking the witness stand and telling you that it's raining

23    outside.

24         Direct and circumstantial evidence have equal standing

25    in the law.  That is, with respect to the weight that -- what

1    weight shall be given to evidence before you, the law makes no

2    distinction between direct and circumstantial evidence.  No

3    greater degree of certainty is required of circumstantial

4    evidence than of direct evidence.  You are to consider all of

5    the evidence in the case and give each item of evidence the

6    weight you believe it deserves.

7         Any inference that you draw from the facts proved must

8    be a reasonable one and not merely conjecture or guesswork.

9    You might decide that you do not have a sufficient basis to

11:38 10    decide what inference to draw.  It is for you, as judges of the

11    facts, to decide whether the evidence before you is or is not

12    sufficient for you to draw an inference.  Ultimately, in

13    drawing inferences, you should use your common sense.

14         If any reference by the Court or by the lawyers to

15    matters of evidence is different from the way you remember the

16    evidence, let your collective memory control.

17         At times during the trial, you heard lawyers object to

18    questions asked by another lawyer and to answers by witnesses.

19    It is a proper function for lawyers to object.  In objecting, a

11:39 20    lawyer is requesting that I make a decision on a question of

21    law.  Do not draw from such objections or from my rulings on

22    them any inferences about facts.  The objections and my rulings

23    related only to the legal questions that I had to determine.

24    They should not influence your thinking about the facts.

25         When I sustained an objection to a question, the

1   witness was not allowed to answer.  Do not attempt to guess

2   what the answer might have been.  And if you heard an answer to

3   a question before my ruling, you are to disregard it.  In your

4   deliberations, you should not consider or talk about any

5   question to which I sustained an objection or any answer or

6   other statement that I excluded or struck or told you not to

7   consider.

8        Also, during the course of the trial, I may have made

9   comments to the lawyers or spoken to a witness concerning the

11:40 10   manner of his or her testifying.  Do not assume from anything

11   that I may have said that I have any opinion concerning any of

12   the issues in this case.  Except for my instructions to you on

13   the law, you should disregard anything that I have said during

14   the trial in arriving at your own findings as to the facts.

15        Now, at the beginning of the trial, I instructed you

16   about taking notes.  I remind you that notes taken by any juror

17   are not evidence in the case and must not take precedence over

18   your independent recollection of the evidence received in the

19   case.  Notes are only an aid to recollection and are not

11:40 20   entitled to any greater weight than actual recollection or the

21   impression of each juror as to what the evidence actually is.

22        You have heard and seen several conversations that

23   were recorded and/or videotaped.  That is proper evidence for

24   you to consider.  While you listened to the audio and watched

25   the video, you were provided transcripts prepared by the

1       government to help you follow along.  The audio and video

2       recordings are in the forms of CDs and DVDs that were marked as

3       exhibits and which you will have in the jury room.  The

4       transcripts have also recently been admitted as exhibits, and

5       you will have them in the jury room as well.  However, based

6       upon the evidence before you, if you believe at any point that

7       the transcripts report something different from what you hear

8       or see on the CDs or the DVDs, you should be guided by what you

9       hear and see on those CDs and DVDs.

11:41 10         Now, a defendant has a constitutional right not to

11      testify and a right not to produce any evidence at all.  No

12      inference of guilt or anything else may be drawn from the fact

13      that a defendant did not testify.  In this case, the defendant

14      has chosen not to exercise his right to testify.  It would be

15      improper and unfair for you to speculate as to the reason or

16      reasons why the defendant has so chosen.  You must not infer

17      anything whatsoever from the defendant's decision not to

18      testify, and I specifically instruct you that during your

19      deliberations you may not discuss this fact in any manner

11:42 20      whatsoever.

21          You are here to decide whether the government has

22      proven beyond a reasonable doubt that the defendant is guilty

23      of the crimes charged in the Indictment.  The defendant is not

24      on trial for any act, conduct or offense not alleged in the

25      Indictment.

1          Now, an important part of your job as jurors will be

2    deciding whether or to what extent you believe what each

3    witness had to say and how important that testimony was.  You

4    are the sole judges of the credibility of the witnesses.  In

5    deciding whether to believe a witness or how much weight to

6    give to that witness' testimony, you may consider anything that

7    reasonably helps you to assess testimony.

8          The following are the kinds of questions that you may

9    want to consider in evaluating a witness' credibility:  Did the

11:43 10   person seem honest?  Did he or she have some reason not to tell

11   the truth?  Did the witness have an interest in the outcome of

12   the case?  Did he or she gain any personal advantage by

13   testifying in this case?  Did the witness seem to have a good

14   memory?  Did the witness' testimony differ from his or her

15   earlier testimony or from the testimony of other witnesses?

16   Was the witness' testimony on cross-examination different from

17   his or her testimony on direct examination?  What was the

18   witness' manner while testifying?  To what extent did the

19   witness have or not have an opportunity to see and know the

11:44 20   fact about he or she was testifying?  How accurate was the

21   witness' recollection?  What was the degree of intelligence

22   shown by the witness?

23          These are some but, of course, not all of the kinds of

24   things that will help you decide how much weight to give to

25   what each witness said.  You may also consider any demonstrated

1    bias, prejudice or hostility of a witness in deciding what

2    weight to give to the testimony of that witness.

3    The mere number of witnesses or exhibits or the length

4    of testimony has no bearing on what weight you should give to

5    evidence or on whether you find that the burden of proof has

6    been met.  Weight does not mean amount of evidence.  Weight

7    means your judgment about the credibility and importance of

8    evidence.  Further, because the government bears the burden of

9    proof in this case, it has presented its case first, and the

11:44 10  defendant presented his case second.  Any witness that may have

11   been called by either side should not be considered a

12   government witness or a defendant's witness but instead should

13   simply be considered a trial witness.  In short, you must not

14   draw any conclusions from the fact that one side or the other

15   was the first party to question any witness.

16   You may consider inconsistencies or differences as you

17   weigh evidence, but you do not have to discredit testimony

18   merely because an inconsistency or a difference exists.  Two or

19   more witnesses may see or hear things differently.  Innocent

11:45 20  misrecollection, like failure of recollection, is a common

21   experience.  In weighing the effect of any inconsistency or

22   difference, consider whether it concerns a matter of importance

23   or an unimportant detail and whether it results from innocent

24   error or intentional falsehood.  On the other hand, you're not

25   required to accept testimony merely because it is

1    uncontradicted.  You may decide, because of a witness' bearing

2    and demeanor or because of inherent improbability or for

3    whatever reason, that witness' testimony is not worthy of

4    belief.  You may accept all of a witness' testimony or reject

5    all of it, or you may accept part and reject another part.

6         You've heard evidence that before testifying at this

7    trial, a witness made a statement concerning the same subject

8    matter as his testimony in this trial.  You may consider that

9    earlier statement to help you decide how much of that witness'

11:46 10    testimony to believe.  If you find that the prior statement was

11    not consistent with the witness' testimony at this trial, then

12    you should decide whether that affects the believability of

13    that witness' testimony at the trial.

14         In making this determination, you may consider whether

15    the witness purposely made a false statement or made an

16    innocent mistake, whether the inconsistency concerns an

17    important fact or a small detail, and whether the witness had

18    an explanation for the inconsistency and, if so, whether it

19    appeals to your common sense.

11:47 20         You've heard testimony of law enforcement officers.

21    The fact that a witness may be employed by -- as a law

22    enforcement officer does not mean that his or her testimony is

23    necessarily deserving of more or less consideration or greater

24    or lesser weight than that of an ordinary witness.  It is your

25    decision, after reviewing all of the evidence, whether to

1      accept the testimony of a law enforcement witness and to give

2      to that testimony whatever weight, if any, you find it

3      deserves.

4           You've also heard from an individual having

5      specialized skill or knowledge.  Such witnesses are sometimes

6      referred to as expert witnesses.  You may accept or reject that

7      testimony.  In weighing the testimony, you should consider the

8      factors that generally bear upon the credibility of a witness

9      as well as the expert witness' education and experience, the

11:48 10     soundness of the reasons for the opinion, and all other

11     evidence in the case.  Remember that you alone decide how much

12     of a witness' testimony to believe and how much weight it

13     should be given.

14          You've heard the testimony of Ronald Dardinski, a

15     cooperating witness.  He provided evidence under agreement with

16     the government and received money from the government in

17     exchange for providing information and testimony.  Some people

18     in that position are entirely truthful when testifying.  Still,

19     you should consider such testimony with particular caution

11:48 20     because cooperating witnesses may have reason to make up

21     stories or exaggerate what others did for their own benefit.

22          You've also heard evidence that Mr. Dardinski has been

23     convicted of a number of crimes.  You may consider that

24     evidence, along with other pertinent evidence, in deciding how

25     much weight to give to his testimony.

1          An important issue in every case -- in every criminal

2     case is the identification of the defendant as the perpetrator

3     of the crime charged.  The United States has the burden of

4     proving the identity of the perpetrator beyond a reasonable

5     doubt.  You, the jury, must be satisfied beyond a reasonable

6     doubt of the accuracy of the identification of the defendant

7     before you may find him guilty.  If you are not convinced

8     beyond a reasonable doubt that the defendant was the person who

9     committed the crime charged, you must find the defendant not

11:49 10     guilty.

11          The evidence in this case includes facts to which the

12     government and the defendant have agreed or stipulated.  A

13     stipulation means simply that the government and the defendant

14     accept the truth of a particular proposition or fact.  Since

15     there is no disagreement, there is no need for evidence apart

16     from the stipulation to establish that particular proposition

17     or fact.  You must accept the stipulation as fact, to be given

18     whatever weight you choose.

19          Now, the defendant in a criminal case is presumed to

11:50 20     be innocent.  This presumption is a fundamental part of our

21     legal system and remains with the defendant throughout all

22     stages of the trial and during your deliberations.  It is not

23     overcome unless, from all of the evidence in the case, you are

24     unanimously convinced beyond a reasonable doubt that the

25     defendant is guilty of the specific charge against him.  The

1    fact that the defendant has been charged with a crime is not in

2    any sense evidence against him.  An Indictment is merely a

3    formal way to bring the defendant before the Court and to

4    inform him of the charges.  It's not evidence.

5         There is never any burden on a defendant in a criminal

6    case.  The law does not require the defendant to prove his

7    innocence or to produce any evidence at all.  The burden of

8    proof is on the government throughout the case.  It never

9    shifts to the defendant.  If the government fails to meet its

11:51 10   burden beyond a reasonable doubt with respect to the specific

11   crime charged against the defendant, then you must acquit him.

12   However, if the government meets its burden of proof beyond a

13   reasonable doubt, then you have a similar responsibility to

14   find the defendant guilty.

15        As I've said, the burden is upon the government to

16   prove beyond a reasonable doubt that the defendant is guilty of

17   the charge against him.  This is a strict and heavy burden, but

18   it does not mean that the defendant's guilt must be proved

19   beyond all possible doubt.  It does not require that the

11:51 20   evidence exclude -- it does require that the evidence exclude

21   any reasonable doubt concerning the defendant's guilt.

22        A reasonable doubt may arise not only from the

23   evidence produced but also from a lack of evidence.  Reasonable

24   doubt exists when, after weighing and considering all of the

25   evidence, using reason and common sense, jurors cannot say that

1    they have a settled conviction of the truth of the charge.

2    Of course, a defendant is never convicted on suspicion

3    or conjecture.  If, for example, you view the evidence in the

4    case as reasonably permitting either of two conclusions -- one,

5    that the defendant is guilty as charged, the other that the

6    defendant is not guilty -- you will find the defendant not

7    guilty.

8    It is not sufficient for the government to establish a

9    probability, even if a strong one, that a fact charged is more

11:52 10    likely true than not true.  That is not enough to meet the

11    burden of proof beyond a reasonable doubt.  On the other hand,

12    there are very few things in this world that we know with

13    absolute certainty, and in criminal cases the law does not

14    require proof that overcomes every conceivable doubt.

15    I instruct you that what the government must do to

16    meet its heavy burden is to establish the truth of each part of

17    each offense charged by proof that convinces you and leaves you

18    with no reasonable doubt and thus satisfies you that you can,

19    consistent with your oath as jurors, base your verdict upon it.

11:53 20    If you so find as to the charges against the defendant, you

21    will return a verdict of guilty.  If, on the other hand, you

22    think there is a reasonable doubt about whether the defendant

23    is guilty of the offense, you must give the defendant the

24    benefit of that doubt and find the defendant not guilty.

25    Now, Part II.  I turn to the Indictment and to the

         1    statutes on which it is based.  The Indictment charges the

         2    defendant, Robert A. George, with violating federal criminal

         3    law.  The charge is set forth in seven counts.  Count 1 charges

         4    the defendant conspired to commit certain money laundering

         5    offenses.  Count 2 -- Counts 2 through 6 charge that the

         6    defendant committed five separate substantive money laundering

         7    offenses.  And Count 7 charges that the defendant purposefully

         8    evaded the reporting requirements and attempted to cause a

         9    financial institution to fail to file a required report.

11:54   10         The defendant has pled not guilty to those charges,

        11    and the government, therefore, must prove beyond a reasonable

        12    doubt all of the elements that are a part of each alleged

        13    offense.  You must give separate consideration to each of the

        14    seven separate charges; that is, you must consider each count

        15    separately, weighing the evidence as it bears against the

        16    defendant with respect to that count.

        17         I remind you that an Indictment is not evidence of any

        18    kind against the defendant.  It is simply the formal method

        19    that our Constitution provides for charging someone with the

11:55   20    commission of a crime.  I will send a copy of the Indictment to

        21    the jury room with you to aid you in your deliberations.

        22         You will note that the Indictment charges the offenses

        23    were committed "on or about" a certain date rather than "on" a

        24    certain date.  The proof need not establish with certainty the

        25    exact date of the alleged offenses.  It is sufficient if the

1    evidence in the case establishes beyond a reasonable doubt that

2    the offenses were committed on a date reasonably near the date

3    alleged.

4         The word "knowingly" or any derivative thereof means

5    that the act was done voluntarily and intentionally and not

6    because of mistake or accident.  If the defendant acted in good

7    faith, for example, that is a defense to the charge that he

8    acted in a knowingly criminal manner.  Direct proof of

9    knowledge is almost never available.  The ultimate facts of

11:55 10  knowledge and intent, though subjective, may be established by

11    circumstantial evidence, based upon a person's outward conduct,

12    his words, acts, and all the surrounding circumstances

13    disclosed by the evidence and the rational or logical

14    inferences that may be drawn therefrom.

15         I now will explain the specific charges against the

16    defendant.  In this case, I will submit specific questions to

17    you on a verdict form, but first I will summarize each claim

18    and explain how to apply the law to that claim.

19         At this time, however, my deputy clerk will distribute

11:56 20  copies of the verdict form that you will have in the jury room,

21    and I'll then refer to them during the remainder of these

22    instructions.

23         Now, you'll see that the form is entitled "Verdict

24    Form" at the top, and it has in bold type, "We, the jury,

25    unanimously find as to the defendant, Robert A. George...", and

1  then there's a subparagraph, "...1) On the charge of money

2  laundering conspiracy, Title 18 of the United States Code,

3  Section 1956(h), Count 1," and there's a place for you to check

4  off "not guilty" or "guilty."  I'm going to ask you to put the

5  form down, and we'll talk about that count, and we'll go back

6  and forth to the other counts.

7          Count 1 of the Indictment charges the defendant with

8  conspiring to commit the federal crime of money laundering.

9  Specifically, he is charged with conspiring with Michael Hansen

11:57 10  from on or about February 2009 until on or about June 8, 2010,

11  to commit money laundering.  I instruct you that the defendant

12  cannot be found guilty of conspiring with Ronald Dardinski to

13  commit money laundering.

14          The crime of conspiracy to commit money laundering is

15  independent from the crime of actually committing money

16  laundering and is complete upon the making of an agreement.  It

17  is against federal law to conspire with someone to commit the

18  crime.  For you to find the defendant guilty of conspiracy to

19  commit money laundering, you must be convinced that the

11:58 20  government has proven each of the following two elements beyond

21  a reasonable doubt:  first, that the agreement specified in the

22  Indictment, and not some other agreement or agreements, existed

23  between at least two people to commit money laundering; and

24  second, that the defendant willfully joined in that agreement.

25          First, you must determine whether the government has

1    proven beyond a reasonable doubt the existence of a conspiracy

2    as charged in Count 1 of the Indictment.  A conspiracy is an

3    agreement, spoken or unspoken.  The conspiracy does not have to

4    be a formal agreement or a plan in which everyone involved sat

5    down together and worked out all of the details.  It does not

6    even have to be a successful plan.  But the government must

7    prove beyond a reasonable doubt that those who were involved

8    shared a general understanding about the crime.  Mere

9    similarity of conduct among various people, mere presence at

11:59 10   the scene, the fact of close association among various people,

11   or the discussion of common aims and interests does not

12   necessarily establish proof of the existence of a conspiracy,

13   but you may consider such factors.

14         Second, if you decide that a conspiracy did exist, you

15   must determine whether the defendant willfully joined in it.

16   To act "willfully" means to act voluntarily and intelligently

17   and with the specific intent that the underlying crime be

18   committed, that is to say, with bad purpose either to disobey

19   or disregard the law, not to act by ignorance, accident or

12:00 20   mistake.  The government must prove two kinds of intent beyond

21   a reasonable doubt before Mr. George can be said to have

22   willfully joined the conspiracy:  first, an intent to agree;

23   and second, an intent, whether reasonable or not, that the

24   underlying crime be committed.  Mere presence at the scene of a

25   crime is not alone enough, although you may consider it among

1    other factors.  Intent may be inferred from a person's actions,

2    from what that person says or does, and from the surrounding

3    circumstances.  Mere knowledge or approval of or acquiescence

4    in the object or purpose of a conspiracy without an agreement

5    to cooperate in achieving such object or purpose does not make

6    one a party to a conspiracy.

7         Proof that the defendant willfully joined in the

8    agreement must be based upon evidence of his own words and/or

9    actions.  You need not find that the defendant agreed

12:01 10   specifically to or knew about all of the details of the crime

11   or that he participated in each act of the agreement or played

12   a major role.  But the government must prove beyond a

13   reasonable doubt that the defendant knew the essential features

14   and general aims of the venture.  You may infer that the

15   defendant had knowledge of those features and aims if you find

16   that he deliberately closed his eyes to what would otherwise

17   have been obvious to him, but mere negligence or mistake in

18   failing to learn of them is insufficient.

19         Proof of a financial interest in the outcome of a

12:02 20   scheme is not essential, but if you find that the defendant had

21   such an interest, you may consider it in determining whether or

22   not the defendant was a member of the conspiracy charged in the

23   Indictment.  Even if the defendant was not part of the

24   agreement at the very start, he can be found guilty of

25   conspiracy if the government proves beyond a reasonable doubt

1    that he willfully joined the agreement later.  On the other

2    hand, a person who has no knowledge of the conspiracy but

3    simply happens to act in a way that furthers some object or

4    purpose of the conspiracy does not thereby become a

5    conspirator.

6         The government does not have to prove that the

7    conspiracy succeeded or was achieved.  The fact that the object

8    of the conspiracy was thwarted by law enforcement does not

9    matter.  The crime of conspiracy is complete upon the agreement

12:02 10    to commit the underlying crime.

11         In determining whether the defendant is guilty of

12    conspiracy, you need not find that the conspiracy existed over

13    the entire period charged or that the defendant was a member

14    from beginning to end.  What must be proven beyond a reasonable

15    doubt is that the conspiracy was in existence for some period

16    of time reasonably near the time alleged or for some portion of

17    the period charged and that the defendant was a member of the

18    conspiracy during that period.

19         Count 1 charges that the conspiracy had two objects:

12:03 20    first, to conceal the source of proceeds derived from unlawful

21    activity, specifically narcotics trafficking or wire fraud, in

22    violation of Title 18 of the United States Code, Section

23    1956(a)(1)(B)(I), and, Subsection 2, to commit transactional

24    money laundering, in violation of Title 18 of the United States

25    Code, Section 1957.  To convict the defendant of conspiracy,

1    you must unanimously agree that the defendant conspired to

2    commit at least one of the offenses alleged.  I instruct you

3    that your verdict must be unanimous as to which object of the

4    conspiracy, if any, you find the defendant guilty.  It is not

5    necessary for the government to prove that the defendant

6    conspired to commit both offenses charged as the objects of the

7    conspiracy.

8              I will, therefore, explain the elements of money

9    laundering under those specific sections of the United States

12:04 10   Code.  And with respect to the first, that is, Section

11   1956(a)(1)(B)(I), the elements are as follows:  first, the

12   defendant knowingly conducted or attempted to conduct a

13   financial transaction; second, the transaction involved

14   property constituting the proceeds of unlawful activity,

15   specifically, narcotics trafficking or wire fraud; third, the

16   defendant knew that the property involved in the financial

17   transaction was the proceeds of some form of unlawful activity;

18   and fourth, the defendant knew that the transaction was

19   designed, in whole or in part, either to conceal or disguise

12:05 20   the nature, location, source, ownership or control of the

21   proceeds of narcotics trafficking or wire fraud.

22             The term "conducts" includes initiating, concluding or

23   participating in initiating or concluding a transaction.  A

24   "financial transaction" is a transaction which involves a

25   monetary instrument, personal or business check, or the

1    movement of funds by wire or other means and which affects

2    interstate commerce.

3         The term "interstate commerce" means commerce between

4    any combination of states, territories or possessions of the

5    United States.  The transaction must have affected interstate

6    commerce in some way.  It is not necessary for the government

7    to prove that the defendant anticipated an effect on interstate

8    commerce.  It is only necessary that the natural and probable

9    consequences of the defendant's conduct would be to affect

12:06 10   commerce in some way.  Only a minimal effect on commerce is

11   necessary.  If you find beyond a reasonable doubt that the

12   transactions involved checks drawn on banks insured by the

13   Federal Deposit Insurance Corporation, that is itself

14   sufficient to satisfy the affecting interstate commerce

15   requirement.

16        In this case, the government has alleged that the

17   defendant conspired to launder funds derived from the unlawful

18   activity of narcotics trafficking and/or wire fraud.

19   "Narcotics trafficking" involves the felonious manufacture,

12:07 20   importation, receiving, concealing, buying, selling or

21   otherwise dealing in a controlled substance.  "Wire fraud"

22   involves a scheme to defraud or obtain money or property

23   through false pretenses where interstate wire communications

24   such as wire transfers, telephone calls or facsimiles were used

25   in the execution of that scheme.  For purposes of the

1   conspiracy charge, you need not determine whether the funds

2   were, in fact, the proceeds of either of those unlawful

3   activities but only whether the defendant believed them to be.

4           With respect to the second object of the alleged

5   conspiracy, Section 1957, the elements are as follows:  first,

6   that the defendant engaged or attempted to engage in a monetary

7   transaction in or affecting interstate commerce; second, that

8   the monetary transaction involved criminally derived property

9   of a value greater than $10,000; third, that the property was

12:08 10  derived from narcotics trafficking or wire fraud; fourth, that

11  the defendant knew the transaction involved proceeds of a

12  criminal offense; and fifth, that the transaction took place in

13  the United States.

14          Again, for the purposes of the conspiracy charge, you

15  need not determine whether the funds were, in fact, the

16  proceeds of narcotics trafficking or wire fraud but only

17  whether the defendant believed them to be.

18          In sum, in deliberating on the charge of conspiracy to

19  commit money laundering, you must first determine whether the

12:09 20  government has proven beyond a reasonable doubt the existence

21  of a conspiracy as charged in Count 1 of the Indictment.  If

22  you find that the proof fails to establish such a conspiracy,

23  you may not find Mr. George guilty of conspiracy to commit

24  money laundering, and you must return a verdict of not guilty

25  as to the conspiracy charge.  If you decide that such a

1    conspiracy did exist, then you must determine whether the

2    defendant was a member.  If you find that the defendant was a

3    member of the conspiracy to commit money laundering, you must

4    return a verdict of guilty as to the conspiracy charge.

5         Now, I'm going to go back to the form, but we're going

6    to skip down to the second page, for reasons that you'll

7    understand later, and look at Question No. 6.  Question No. 6

8    says, "On the charge of money laundering, Title 18 of the

9    United States Code, Section 1956(a)(3)(B), Count 6, you

12:10 10  find..." "not guilty" or "guilty."  And I'll ask you to put the

11   form down, and we're going to talk about Count 6.

12        Count 6 charges the defendant conducted a financial

13   transaction involving property represented to be the proceeds

14   of specified unlawful activity with the intent to conceal or

15   disguise the nature, location, source, ownership or control of

16   the property.  This count is based upon the $2,500 check Mr.

17   George allegedly gave to Ronald Dardinski.

18        In order to prove the crime of money laundering, in

19   violation of Section 1956(a)(3)(B), the government must

12:10 20  establish beyond a reasonable doubt each of the following three

21   elements:  first, that the defendant conducted or attempted to

22   conduct a financial transaction which affects interstate or

23   foreign commerce in any way or degree; second, that the

24   transaction involved property represented by a law enforcement

25   officer and believed by the defendant to be the proceeds of

1  unlawful activity, specifically narcotics trafficking and/or

2  wire fraud; and third, that the defendant acted with the intent

3  to conceal or disguise the nature, location, source, ownership

4  or control of the property.

5  I've previously instructed you on the meanings of

6  "conducts," "financial transaction," and "affecting interstate

7  commerce," and I will not repeat those instructions here.

8  A "law enforcement officer" includes federal law

9  enforcement officers and any other person acting under the

12:12 10  direction or with the approval of a federal official authorized

11  to investigate or prosecute money laundering.

12  With respect to the second element, the government is

13  not required to prove that the law enforcement officer made an

14  express affirmative statement to the defendant that the

15  property involved was the proceeds of unlawful activity.

16  Instead, the government must prove that the law enforcement

17  officer made the defendant aware of circumstances from which a

18  reasonable person would infer that the property was the

19  proceeds of illegal activity, in this case, narcotics

12:12 20  trafficking or wire fraud, and that the defendant believed that

21  the property was the proceeds of illegal activity.  You should

22  consider all of the evidence in determining whether the

23  government has satisfied that standard.

24  With respect to the third element, one acts with

25  "intent" if he acts deliberately and purposefully, and not by

1    mistake or accident, with the purpose to conceal or disguise

2    the nature, location, source, ownership or control of the

3    property.  To satisfy this element, the government must prove

4    that the defendant knew of the purpose of the particular

5    transaction in issue and that he intended that the transaction

6    conceal or disguise the origin of the property in question as

7    he believed it to be.

8            I'm going to go back to the form, and we'll switch

9    back to Page 1 and look at Questions 2 and 3 together.

12:13 10   Question 2 says:  "On the charge of aiding and abetting money

11   laundering...", and there's a reference to Title 18 of the

12   United States Code, Sections 2, and also Section 1956(a)(3)(B),

13   Count 2.  And there's a place for you to check off "not guilty"

14   or "guilty."  And, again, as to the third paragraph, it says,

15   "On the charge of aiding or abetting money laundering, Title

16   18, United States Code, Sections 2, and 1956(a)(3)(B), Count

17   3...", and, again, a place to check off "not guilty" or

18   "guilty."  Will you put the form down, please, and we'll talk

19   about Counts 2 and 3.

12:14 20           Those counts charge that the defendant aided and

21   abetted financial transactions which involved property

22   represented to be the proceeds of specified unlawful activity,

23   specifically narcotics trafficking and/or wire fraud.  Count 2

24   charges that Mr. George aided and abetted a $100,000

25   transaction between Ronald Dardinski and Michael Hansen on or

1    about September 16, 2009.  Count 3 charges that Mr. George

2    aided and abetted a $100,000 transaction between Ronald

3    Dardinski and Michael Hansen on or about April 15, 2010.

4         To "aid and abet" means intentionally to help someone

5    else commit a crime.  The aiding and abetting statute, Section

6    2(a) of Title 18 of the United States Code, provides, "Whoever

7    commits an offense against the United States or aids or abets

8    or counsels, commands or induces or procures its commission, is

9    punishable as a principal."

12:15 10         To establish aiding and abetting, the government must

11   prove beyond a reasonable doubt:  first, that someone else

12   committed the charged crime; and second, that the defendant,

13   Mr. George, consciously shared the other person's knowledge of

14   the underlying criminal act, intended to help him and

15   intentionally took part in the endeavor seeking to make it

16   succeed.

17        The charged crime that the defendant is alleged to

18   have aided and abetted is money laundering, in violation of

19   Section 1956(a)(3)(B), that is, conducting a financial

12:16 20   transaction involving property represented to be the proceeds

21   of specified unlawful activity with the intent to conceal or

22   disguise the nature, location, source, ownership or control of

23   the property.  I've described the elements of that crime

24   already with respect to Count 6, and you may refer back to

25   those instructions if necessary.

1          To prove that the defendant is guilty of aiding and

2     abetting that crime, the government must establish beyond a

3     reasonable doubt that he consciously shared the other person's

4     knowledge of the underlying criminal act and intended to help

5     that other person.  The alleged aider and abettor need not

6     physically perform the underlying criminal act, be present when

7     it was performed to (sic) be aware of the details of its

8     execution, to be guilty of aiding and abetting.  But a general

9     suspicion that an unlawful act may occur or that something

12:17 10    criminal is happening is not enough.  Mere presence at the

11    scene of a crime and knowledge that a crime is being committed

12    are also not sufficient to establish aiding and abetting.  The

13    aider and abettor must also associate himself with the criminal

14    venture and participate in it by providing assistance,

15    encouragement or help.  He must be more than a mere spectator.

16          Back to the form one more time, or maybe there's two

17    more times.  And we're now at Question No. 4.  And that says,

18    "On the charge of money laundering, Title 18, United States

19    Code, Section 1956(a)(3)(C), Count 4...", a place for you to

12:18 20    check off "guilty" or "not guilty."  And then on the next page,

21    on the top, Paragraph 5 says, "On the charge of money

22    laundering...", same reference to the same statute, Count 5,

23    and, again, a place to check off "not guilty" or "guilty."

24    We'll put it down and talk about Counts 4 and 5 for a minute.

25          Counts 4 and 5 charge that the defendant conducted a

1   financial transaction involving property represented to be the

2   proceeds of specified unlawful activity with the intent to

3   avoid a transaction reporting requirement under state or

4   federal law.  Count 4 is based upon the deposit of $9,000 cash

5   into the defendant's bank account on March 4, 2011.  Count 5 is

6   based upon the deposit of $8,000 of cash into the defendant's

7   bank account on that same date.

8          In order to prove the crime of money laundering, in

9   violation of Section 1956(a)(3)(C), the government must

12:19 10   establish beyond a reasonable doubt each of the following three

11   elements:  first, that the defendant conducted or attempted to

12   conduct a financial transaction which affects interstate or

13   foreign commerce in any way or degree; second, that the

14   transaction involved property represented by a law enforcement

15   officer and believed by the defendant to be the proceeds of

16   unlawful activity, specifically narcotics trafficking and or

17   wire fraud; and third, that the defendant acted with the intent

18   to avoid a transaction reporting requirement under state or

19   federal law.

12:19 20          With respect to the third element, one acts with

21   "intent" if he acts deliberately and purposefully and not by

22   mistake or accident, with the purpose to avoid a transaction

23   reporting requirement under state or federal law.

24          Under federal law, financial institutions must report

25   to the Internal Revenue Service, that is, the IRS, any cash

1       transactions involving more than $10,000.  The bank must submit

2       a Currency Transaction Report, sometimes known as a CTR, to

3       satisfy that, the defendant -- to satisfy that the defendant

4       acted with intent to avoid that transaction reporting

5       requirement, the government must prove that the defendant knew

6       that the purpose of the particular transaction in issue was to

7       avoid the reporting requirement and that he intended that the

8       transaction be conducted in such a way as to avoid that

9       reporting requirement.

12:20 10            Now, finally, back to the form, and we'll read

11      Question No. 7.  "On the charge of structuring transactions to

12      evade reporting requirements, Title 31 of the United States

13      Code, Section 5324(a)(1)...", that's Count 7, and there's a

14      place for you to check off "guilty" or "not guilty."  If you'll

15      put the form down, we'll talk about that final count.

16            Count 7 charges that the defendant structured a

17      financial transaction to avoid reporting requirements.  This

18      count is based upon the two deposits the defendant made into

19      his bank on March 4, 2011.

12:21 20            It is against federal law to structure transactions

21      for the purpose of evading a reporting requirement.  For the

22      defendant to be convicted of this crime, the government must

23      prove the following elements beyond a reasonable doubt:  first,

24      that the defendant structured or attempted to structure a

25      transaction with one or more domestic financial institutions;

1    and second, that the defendant did so with the purpose of

2    evading the reporting requirements of federal law affecting the

3    transactions.

4         Federal law requires that transactions in currency of

5    more than $10,000 be reported by a financial institution to the

6    Internal Revenue Service.  A withdrawal or deposit of cash from

7    a financial institution is a financial transaction.

8         As used in these instructions, the term "financial

9    institution" includes federally insured banks.

12:22 10    The term "structure" refers to the manner in which a

11   transaction was carried out.  Structuring occurs when a person

12   conducts or attempts to conduct one or more currency

13   transactions at one or more financial institutions or different

14   branches of the same financial institution, on one or more

15   days, with the purpose of evading currency transaction

16   reporting requirements in any manner.  Structuring includes

17   breaking down a single sum of currency over $10,000 into

18   smaller sums or conducting a series of cash transactions all at

19   or below $10,000 with the purpose of evading currency

12:23 20   transaction reporting requirements.

21        You may find the defendant guilty of unlawfully

22   structuring a transaction whether or not the financial

23   institution filed or failed to file a true and accurate

24   Currency Transaction Report.

25        Now, I hereby instruct you, as a matter of law, that

1    Mr. George did not engage in any unlawful behavior by simply

2    accepting the undercover agent as a new client or by accepting

3    the $25,000 in cash as a legal fee.  There are no charges in

4    this case that he did anything unlawful or illegal in that

5    regard.

6         Now, the defendant denies each and every charge of the

7    Indictment.  He also asserts, as an affirmative defense to

8    those charges, that he was the victim of entrapment by an agent

9    of the government.  A person is entrapped when he is induced or

12:24 10    persuaded by law enforcement officers or their agents to commit

11    a crime that he was not otherwise ready and willing to commit.

12    The law forbids his conviction in such a case.  However, law

13    enforcement agents are permitted to use a variety of methods to

14    afford an opportunity to a defendant to commit an offense,

15    including the use of undercover agents, furnishing of funds for

16    the purpose of controlled substances, the use of informers, and

17    the adoption of false identities.

18         For you to find that the defendant is guilty of crimes

19    with which he is charged, you must be convinced that the

12:25 20    government has proven beyond a reasonable doubt that the

21    defendant was not entrapped.  To show that the defendant was

22    not entrapped, the government must establish beyond a

23    reasonable doubt one of the following two things:  first, that

24    a government agent did not persuade or talk the defendant into

25    committing the crime.  Simply giving someone an opportunity to

1    commit a crime is not the same as persuading him, but excessive

2    pressure or an undue appeal to sympathy can be improper.  Or,

3    second, that the defendant was ready and willing to commit the

4    crime without any persuasion from a government agent.  In that

5    connection, you've heard testimony about actions by the

6    defendant for which he is not on trial.  If you decide to

7    credit such evidence, you may consider it only for the limited

8    purpose of determining whether it tends to show the defendant's

9    willingness to commit the charged crime or crimes without the

12:26 10    persuasion of a government agent.  You must not consider it for

11    any other purpose.

12    And, now, Part III of my instructions, which you will

13    be glad to know is, by far, the shortest.  When you go to the

14    jury room to begin considering the evidence in this case, the

15    forewoman, Miss Felzani, will assure that every juror is

16    present during all of your deliberations and that all the

17    jurors, the forewoman included, will have an equal and full

18    opportunity to participate in deliberations.  All of the

19    exhibits that have been admitted into evidence will be

12:26 20    available for you physically.  There is also a large,

21    touchscreen computer in the jury room upon which you will be

22    able to access all of the exhibits and this charge

23    electronically.  I'm told that operating that machine is very

24    simple.  If you have any difficulty understanding the

25    technology, you can access a short tutorial film by pressing a

1      button in the lower left-hand corner of the screen.

2           Once you are in the jury room, if you need to

3      communicate with me, the forewoman will send a written message

4      to me.  If you do send a written message to me, I will discuss

5      it with the lawyers for both sides before responding to you.

6      So please continue your deliberations to the extent you are

7      able during the time it takes me to respond to any question.

8      Do not stop your deliberations while you wait for a response.

9      And do not tell me how you stand, either numerically or

12:27 10      otherwise, on any issue before you until after you have reached

11      a verdict.

12           On matters touching simply on the arrangements for

13      your meals, schedule and convenience, you are free to

14      communicate with the marshal orally rather than in writing.

15      You are not to communicate with anyone other than me about the

16      case, however, and then only in writing.

17           You may not use any electronic device or media such as

18      a telephone, cell phone, BlackBerry, computer or the internet,

19      et cetera, to communicate with anyone, receive any information

12:28 20      about this case or conduct any research about the case until

21      after I accept your verdict.

22           I have read to you what is called a verdict form.  A

23      verdict form is simply the written notice of the decision that

24      you reach.  You will have the original and copies of this form

25      in the jury room; and when you have reached your verdict, you

1    will have your forewoman fill in, date, and sign the original

2    to state the verdict upon which you agree.  You will then

3    report in writing to the marshal that you have reached a

4    verdict, after which you will be invited to return with your

5    verdict to the courtroom.  Your verdict of not guilty or guilty

6    must represent the individual verdict of each juror as to

7    whether or not each element of the charge against the defendant

8    then under consideration is proved beyond a reasonable doubt.

9    Your verdict must be unanimous.

12:29 10          It is not quite time for you to start deliberating.  I

11   will have a short sidebar conference with counsel.  You may be

12   at ease for a few minutes, and then I'll return with a final

13   instruction to give to you before you retire to deliberate.  I

14   will see counsel at sidebar.

15   (SIDEBAR CONFERENCE AS FOLLOWS:

16          THE COURT:  Government?

17          MS. KAPLAN:  We don't have any objections.

18          THE COURT:  Mr. Goldstein?

19          MR. GOLDSTEIN:  A few, your Honor.  One is, you

12:29 20   instructed the jury that the defendant could have joined the

21   conspiracy at a later point in time, which by itself is

22   obviously not an incorrect statement of the law.  But on the

23   facts of this case, your Honor, I'm concerned that the jury

24   might think that he could have joined the conspiracy between

25   Hansen and Dardinski.  And the Court will recall, Hansen does

1    not meet Dardinski until August, well after Mr. Dardinski is

2    already cooperating with the government.  So on the facts of

3    this case, the only people that can be charged as conspirators

4    are Mr. George and Mr. Hansen.  So I'd ask the Court to make it

5    clear to the jury that the only conspiracy -- you did it once,

6    but I'd like to clarify because of this joining at a later

7    time.  The only conspiracy charge is the conspiracy between Mr.

8    George and Mr. Hansen, and you must find that Mr. George and

9    Mr. Hansen conspired and no other people, no other person.

12:31 10        MS. KAPLAN:  I mean, I think it was an accurate

11   statement of the law.  I think some way that the jury could

12   find the -- I think it's an accurate statement of the law.  I

13   don't think it's necessary to repeat once again.  You already

14   said it, that Dardinski could not be a coconspirator in this

15   matter.

16        THE COURT:  Okay.  Anything else?

17        MR. GOLDSTEIN:  I want to reserve my objections that I

18   made during the charge conference and this morning.

19        In the aiding and abetting, your Honor, you instructed

12:31 20   the jury that mere presence and knowledge is not enough.  Would

21   the Court consider just reminding them that it's "mere

22   presence" or "mere knowledge"?  I don't want the jury to think

23   that they would have -- that it -- he has to be present and/or

24   have knowledge.  If you'd instruct "mere presence" or "mere

25   knowledge."

1          Then on the entrapment --

2          THE COURT:  Before --

3          MS. KAPLAN:  I think that's going to be confusing.  I

4    think the way you stated it was accurate.

5          MR. GOLDSTEIN:  The last one, your Honor, is on the

6    entrapment.  When you're talking about improper inducement, if

7    you could add -- I think your Honor said "excessive pressure."

8    Would you consider adding "dogged persistence," another

9    catchphrase that comes from relevant cases?

12:32 10          THE COURT:  I'm not going to do that.

11          Anything else?

12          MS. KAPLAN:  No, your Honor.

13          THE COURT:  Counsel, you now understand that I

14    separate the two alternates.  I don't let them go home.  They

15    remain in another location in the unlikely event that we need

16    to utilize them.  This is when I do that.

17          MR. GOLDSTEIN:  Thank you.

18    .  .  .  END OF SIDEBAR CONFERENCE.)

19          THE COURT:  All right, jurors.  You have probably

12:33 20    noticed that there are 14 of you, and you may know that only 12

21    deliberate.  The final two jurors seated in the jury are the

22    alternates.  Their job is not done yet.  I'm going to ask them

23    to stay in a separate room in the unlikely event that we may

24    need to utilize their services.  They are Miss Owen in Seat 8

25    and Mr. Bouvier in Seat 5.  My deputy clerk will show you to a

1    separate location.  We do appreciate your willingness to be

2    available if and when your services become necessary.

3         Members of the jury, it is now time for the case to be

4    submitted to you.  You may commence your deliberations.  All of

5    you who are on the jury must be together at all times while you

6    are deliberating.  Whenever you need a recess for any reason,

7    the forewoman, Miss Felzani, may declare a recess.  Do not

8    discuss the case during a recess in your deliberations.  All of

9    your discussion of the case should occur only while you are

12:34 10   together and Miss Felzani has indicated that deliberations may

11   proceed.  This should be your procedure so that everyone on the

12   jury will have an equal opportunity to participate and to hear

13   all of what the other members of the jury have to say.  You may

14   go to the jury room and commence jury deliberations.

15        The binders will be brought in as part of the

16   exhibits, so -- actually, you can take your binders with you.

17   They are now exhibits.

18   (The jury left the room at 12:35 p.m. to commence their

19   deliberations.)

12:34 20

21        THE COURT:  Be seated, counsel.  Even in this

22   electronic age, counsel, you need to assemble all of the

23   exhibits, the written exhibits, because although they have them

24   electronically available, we make the written exhibits also

25   available.  So when Miss Patch returns, I want you to make sure

1    that we have them all in numerical order ready to go into the

2    jury room.

3         Also, you need to give her your cell phone numbers and

4    a way to be in touch with you so that you can be reassembled

5    within ten minutes.  If we get a question, I like to have you

6    available within ten minutes.

7         I believe they will be getting lunch momentarily, so

8    that if you want to get a bite to eat, it would probably be

9    best to do that sooner rather than later, but I want you to

12:36 10   remain available on short notice so that if we have any

11   questions.

12        Anything else that needs to come to my attention

13   outside the hearing of the jury?

14        MR. GOLDSTEIN:  Not from the defense, your Honor.

15        MS. KAPLAN:  No, your Honor.

16        THE COURT:  Then we are in recess until further

17   notice.

18   (Recess taken at 12:37 p.m.)

19        THE CLERK:  Madam Foreperson, has the jury agreed upon

04:33 20   a unanimous verdict?

21        THE FOREPERSON:  Yes.

22        THE CLERK:  Madam Foreperson, will you return your

23   verdict to the Court.

24        THE COURT:  The verdict form is in order and may be

25   recorded.

1         THE CLERK:  Madam Foreperson, members of the jury,

2    hearken to your verdict as the Court has received it.  We, the

3    jury, unanimously find, as to the defendant Robert A. George,

4    on the charge of money laundering conspiracy, in violation of

5    Title 18 of the United States Code, Section 1956(h), Count 1,

6    "guilty."

7         On the charge of aiding and abetting money laundering,

8    in violation of Title 18 of the United States Code, Section 2

9    and 1956(a)(3)(B), Count 2, "guilty."

04:34 10         On the charge of aiding and abetting money laundering,

11    in violation of Title 18 of the United States Code, Section 2

12    and 1956(a)(3)(B), Count 3, "guilty."

13         On the charge of money laundering, in violation of

14    Title 18 of the United States Code, Section 1956(a)(3)(C),

15    Count 4, "guilty."

16         On the charge of money laundering, in violation of

17    Title 18 of the United States Code, Section 1956(a)(3)(C),

18    Count 5, "guilty."

19         On the charge of money laundering, in violation of

04:34 20    Title 18 of the United States Code, Section 1956(a)(3)(B),

21    Count 6, "guilty."

22         On the charge of structuring transactions to evade

23    reporting requirements, in violation of Title 31 of the United

24    States Code, Section 5324(a)(1), Count 7, "guilty."

25         So say you, Madam Foreperson, and so say you all,

1    members of the jury?

2                THE JURY:  Yes.

3                THE COURT:  Do counsel have anything for the Court

4    before the jury is dismissed?

5                MR. GOLDSTEIN:  No, your Honor.

6                MS. KAPLAN:  No, your Honor.

7                THE COURT:  All right.  Then, jurors, I thank you for

8    your attention, concern, and care in performing your civic duty

9    over these past two weeks, and because you have performed it,

04:35 10    justice has been done regardless of the direction of your

11    verdict.

12                I hope you do feel a sense of pride in your service

13    because you have performed one of the most fundamental duties

14    of your citizenship and one that distinguishes your duties from

15    those of citizens of most other countries in the world.

16    Uniquely, in the United States, our citizens have the right to

17    a trial by a jury of their fellow citizens.

18                So you are excused from further jury duty and

19    dismissed with the thanks of this Court, and I hope that all of

04:36 20    you will return to your various walks of life with a better

21    understanding and appreciation of what doing justice in this

22    country is all about.  You are discharged and we are adjourned.

23    (The jury was discharged at 4:36 p.m.)

24                THE COURT:  Be seated, counsel.  The sentencing will

25    be scheduled for Wednesday, September 12, 2012, at 3 p.m.  Any

1    known conflict, Mr. Goldstein?

2           MR. GOLDSTEIN:  I do, your Honor.  I'm beginning a

3    trial September 10th before Judge Stearns.

4           THE COURT:  All right.  We will then defer that for

5    one week, or is that not going to be enough?

6           MR. GOLDSTEIN:  It's probably a two-week trial.

7           THE COURT:  What about the week before?

8           MR. GOLDSTEIN:  I'd rather put it on the week after to

9    be honest.

04:37 10          THE COURT:  You mean two weeks after?

11          MR. GOLDSTEIN:  If you have to do a week after, I'll

12   --

13          THE COURT:  Let's say Wednesday, September 19th, at 3

14   p.m.  Any problem with that?

15          MR. GOLDSTEIN:  That's fine.  I'll work around that.

16          THE COURT:  Mr. Reddington?

17          MR. REDDINGTON:  No, your Honor.

18          THE COURT:  The government?

19          MS. KAPLAN:  That's fine, your Honor.

04:37 20          THE COURT:  It will be Wednesday, September 19, 2012,

21   at 3 p.m.

22          Do counsel have anything else for the Court before we

23   adjourn?

24          MR. GOLDSTEIN:  No, your Honor.  Thank you.

25          MS. KAPLAN:  No, your Honor.

1        THE COURT:  I would just simply say that I think this

2   was a well-tried case.  Both clients, if you will, the

3   government and the defendant, were well-served by counsel who

4   did everything they could to represent the interests of their

5   clients.  As far as this Court is concerned, it was a

6   well-tried case.

7        MR. GOLDSTEIN:  Thank you, your Honor.

8        MS. KAPLAN:  Thank you, your Honor.

9        THE COURT:  We are adjourned.

04:38 10   (Whereupon, at 4:38 p.m. the trial concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4            I certify that the foregoing is a correct transcript

5     of the record of proceedings in the above-entitled matter to

6     the best of my skill and ability.

7

8

9

10

11

12     /s/Cheryl Dahlstrom            02/11/2013

13     Cheryl Dahlstrom, RMR, CRR     Dated

14     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25