5-

1                   UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA          )
                                       )
4                                      )
     vs.                               )   CR No. 11-10201-NMG
5                                      )
                                       )
6    ROBERT A. GEORGE                  )

7


8

     BEFORE:  THE HONORABLE NATHANIEL M. GORTON
9

10                     DAY SEVEN OF JURY TRIAL

11


12   APPEARANCES:

13        OFFICE OF THE UNITED STATES ATTORNEY(By: Laura Kaplan,
     AUSA, and Zachary Hafer, AUSA), One Courthouse Way, Boston,
14   Massachusetts 02210.  On Behalf of the Government.

15        Robert M. Goldstein, Esq., 20 Park Plaza, Boston,
     Massachusetts 02116.
16        - and -
     Kevin J. Reddington, Esq., 1342 Belmont Street,
17   Suite 203,   Brockton, Massachusetts 02301.  On
     Behalf of the Defendant.
18
               John Joseph Moakley United States Courthouse
19                        Courtroom No. 4
                         One Courthouse Way
20                        Boston, MA 02210
                      Thursday, June 7, 2012
21                         9:53 a.m.

22


23                     Valerie O'Hara, RPR
                      Official Court Reporters
24        John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 3209
25                     Boston, MA 02210
          Mechanical Steno - Transcript by Computer

I N D E X

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

Piedro Nieves

    By Mr. Hafer:    5-3          5-38

    By Mr. Goldstein:        5-16              5-39

Ronald Dardinski

    By Mr. Goldstein:  5-42          5-80

    By Ms. Kaplan:       5-75


CHARGE CONFERENCE        5-94



E X H I B I T S


| No. | Description | In Evd. |
|---|---|---|

21    ....................................... 5-12

120                                5-82

121                                5-82

122                                5-83

5-

PROCEEDINGS

1

2      THE CLERK:  All rise for the jury.

3      (JURORS ENTERED THE COURTROOM.)

4      THE CLERK:  Thank you, you may be seated.

5      THE COURT:  Good morning, jurors.  We are now ready to

6  resume.  Mr. Nieves will be recalled to the witness stand.

7      MR. HAFER:  Yes, your Honor.

8      THE COURT:  Good morning, Mr. Nieves.  You're reminded

9  you remain under oath.  You may be seated.

10:12  10              PEDRO NIEVES, RESUMED

11           DIRECT EXAMINATION, CONTINUED

12  BY MR. HAFER:

13  Q.   When you were testifying yesterday, you testified a little

14  bit about some surveillance observations that you made on

15  September 23d of 2010.  Do you recall that testimony?

16  A.   Yes.

17  Q.   You testified, I believe, that you observed the defendant

18  on that day in a black Lexus?

19  A.   Yes.

10:13  20  Q.   Do you know, for example, the make and model information

21  of that?

22  A.   It's a 2008 Lexus GS350.

23  Q.   When we broke yesterday, Detective, you were testifying

24  about a meeting that you had with the defendant and

25  Mr. Dardinski on February 28th, 2011?

5-

1    A.    Yes.

2    Q.    And that was at the Dedham Hilton Hotel?

3    A.    Yes.

4    Q.    And that meeting was video recorded?

5    A.    Yes.

6          MR. HAFER:  Your Honor, at this time the government

7    would request permission to continue to play the audio and

8    video where we left off.

9          THE COURT:  Yes, you may continue.

10:13 10          MR. HAFER:  I direct the Court and the jurors to C1,

11   tab C1 in their transcript binder.

12          THE COURT:  We're at the beginning of the transcript?

13          MR. HAFER:  Sorry, your Honor, no, we're not.  We are

14   going to start where we left off.  It should be on page 4 below

15   about a third of the way down, the five stars, "No one has a

16   problem."

17          (Video played)

18   Q.    Detective Nieves, I want to ask you a couple of questions

19   about the recording.  Directing your attention to the bottom of

10:27 20   page 3 of the transcript, the defendant says, "Okay.  And how

21   many are there?"  You say, "It's -- it's a couple of runners."

22   What did you mean by that?

23   A.    Drug runners, associates that deliver drugs.

24   Q.    Directing your attention to page 8, about the third of the

25   way down the page, the defendant says to you, "No, no, I mean,

1    do you fax, do you fax or e-mail or you don't like that stuff?"

2    You respond that, "I don't like none of that, no e-mails, none

3    of that stuff."  What were you referring to there?

4    A.   I just didn't want anything to be traced back to me or any

5    of my associates.

6    Q.   That's because you were pretending to be a drug dealer?

7    A.   Yes.

8    Q.   Directing your attention to page 12, please, the very top

9    of the page, the defendant says to you, "But I thought there

10:29  10   were two guys in the can."  You're saying, "No, no," so he

11   says, "That's automatically," you say, "They're taken care of."

12   What did you mean by they're taken care of?

13   A.   They were bailed out and I took care of them.

14   Q.   Directing your attention to page 13, about four or five

15   lines down, the defendant says to you, "I love this place

16   because no one is ever here."  Do you see that?

17   A.   Yes.

18   Q.   What did you understand that to mean?

19   A.   It's a good place where we can discuss my drug businesses

10:29  20   without any other people listening to it.

21   Q.   On page 14, please, Detective Nieves, again, a little less

22   than halfway down the defendant asks, "What address do I use on

23   your mail?  It will just say Worcester, and you give me an

24   address."  You respond, "That's why I don't want to use my

25   address."  What did you mean by "I don't want to use my

5-

1    address"?

2    A.    I just don't want anybody to find out where my drug

3    business was running out of.

4    Q.    About four or five lines further down, the defendant asks

5    if you have an office, you say, "They know where to find me,

6    they know how to find me, most of the guys, and I usually find

7    them.  I don't want them to find me," what are referring to

8    there?

9    A.    My drug associates.

10:30 10    Q.    On page 15, Detective Nieves, about two-thirds of the way

11    down the page, the defendant says, "The thing is have you had

12    all of those guys get in trouble?"  You say, "No, the first two

13    were these guys."  What did you mean by "the first two were

14    these guys"?

15    A.    I was referring to drug runners that got arrested.

16    Q.    On page 17, please, four or five lines down, after the

17    defendant asks if you have brothers, you say a couple lines

18    later, "They're not in the business that much though."  What

19    did you mean "they're not in the business that much"?

10:31 20    A.    My brothers weren't in the business of drug dealing but my

21    cousins were.

22    Q.    After your meeting, Detective Nieves, with the defendant

23    on February 28th of 2011, did there come a time when you met

24    with him again?

25    A.    Yes.

5-

1    Q.    When was that?

2    A.    On March 4th, 2011.

3    Q.    Between February 28th, 2011 and March 4th, 2011, did you

4    have any conversations with the defendant?

5    A.    No.

6    Q.    How did you know to meet him again on March 4th, 2011?

7    A.    It was set up by the confidential informant.

8    Q.    By that you mean Ronald Dardinski?

9    A.    Yes.

10:31  10   Q.    And did you subsequently make a plan to meet with the

11   defendant on March 4th?

12   A.    Yes.

13   Q.    And was there a meeting prior to your going to meet the

14   defendant where the purpose was discussed?

15   A.    Yes.

16   Q.    What happened, just generally what happened?

17   A.    I met with Special Agent Tamuleviz and Special Agent Ward.

18   We met at the prearranged location to discuss me going into the

19   Dedham Hilton Hotel and meet with the defendant.

10:32  20   Q.    And was there anything specifically you were going to do

21   at the meeting on March 4th, 2011?

22   A.    Yes, I was supposed to pay him $25,000 retainer fee and

23   sign an agreement.

24   Q.    When you were meeting with Agent Tamuleviz to get ready

25   for the meeting on March 4th with the defendant, were you given

anything?

A.   I was given a white envelope with $25,000.

Q.   And where did that $25,000 come from?

A.   It's official advanced funds.

Q.   What does that mean, official advanced, government money?

A.   Government money.

Q.   Did you eventually go to a meeting with the defendant on March 4th, 2011?

A.   Yes, I did.

Q.   Where?

A.   Dedham Hilton.

Q.   Do you recall approximately what time you went to the Dedham Hilton on March 4th?

A.   It was about 8:55 in the morning.

Q.   Once you arrived there, did you go somewhere specifically?

A.   Yes, we went to the same location we used on February 28th.

Q.   Was anyone there when you arrived at the inside of the Dedham Hilton?

A.   There was a few people and the defendant and the confidential informant.

Q.   And, again, when you say the confidential informant, are you referring to Ronnie Dardinski?

A.   Yes.

        MR. HAFER:  Your Honor, at this time I would direct

1      the Court and jury's attention to tab 33 in the transcript

2      binders.  This is a call that has already been played.  It's

3      not going to be replayed.

4           THE COURT:  Tab 33?

5           MR. HAFER:  Tab 33, yes, your Honor.  Could I have

6      just one moment, your Honor.  May I have permission to give the

7      witness a copy, your Honor?

8           THE COURT:  Yes.

9      Q.   Looking at that transcript in front of you,

10     Detective Nieves, does this reflect a transcript of the

11     meeting, the one that you just testified to that you had with

12     the defendant and Dardinski on March 4th, 2011 at the

13     Dedham Hilton?

14     A.   Yes.

15     Q.   And just so it's clear, that meeting -- were you present

16     right starting at the beginning of this transcript?

17     A.   No, I wasn't.

18     Q.   Could I direct your attention to approximately page 21.

19     At this point the defendant says to you about halfway down the

20     page, "Detective, if someone gets busted or you're concerned

21     about someone or there's something you need to talk to me

22     about, you don't talk on the phone;" do you see that?

23     A.   Yes.

24     Q.   What did you understand it to mean by that?

25     A.   Do not discuss the drug business over the phone just in

5-

1       case someone was listening.

2       Q.   A little bit further down, about four lines, the defendant

3       says, "I mean, I don't care about that stuff, we are not

4       talking business on the phone," what was your understanding?

5       A.   Same thing, just to not -- you know, don't say anything

6       about my drug business, associates or anything over the phone.

7       Q.   Page 22, please.  About three-quarters of the way down the

8       page, there's an entry, Dardinski says, "I told him you didn't

9       want to sign anything," and you respond, "Yeah."  What is that

10:36  10      referring to?

11      A.   The agreement.

12      Q.   By agreement, you mean what agreement?

13      A.   The retainer agreement that the defendant brought in.

14      Q.   Directing your attention to page 23, please, down towards

15      the bottom of the page, the defendant says, "So I only answer

16      to you.  Now you need to come to me.  Look, listen, I think I'm

17      being followed, look, look, into whether there is an event."

18      What did you understand him to mean by that?

19      A.   If I was being followed by either someone against my drug

10:36  20      trafficking organization or being followed by the police.

21      Q.   On page 24, please, the middle of the page, the defendant

22      says, "And I know from talking to Ronnie what will likely

23      happen, although I don't want to.  By the way, one of the main

24      things here is to protect my incorruptability, okay?  In other

25      words, no one could ever think that I know that someone is

5-

1    going to get bail."  What did you understand to mean there?

2              MR. GOLDSTEIN:  I object to this inquiry, your Honor.

3              THE COURT:  He can testify as to what he understands,

4    understood that to mean at the time.

5    A.   I understand that if I bail any of the guys out, one of

6    the guys will get bailed, one of my drug associates, they were

7    going to leave the country or leave the state, and that was my

8    purpose if anybody was going to get bailed.

9              MR. GOLDSTEIN:  I object and move to strike, your

10:37 10   Honor.

11             THE COURT:  Overruled.

12   Q.   Starting at about the bottom of page 24, Detective Nieves,

13   the defendant says, "If you want to identify for me at some

14   point.  Let me see each other."  And continuing over onto the

15   top of page 25, he says, "Maybe write them down, I would write

16   them down on the back of this."  Do you see where that is in

17   the transcript?

18   A.   Yes.

19   Q.   What, if you know, was he referring to by saying "write

10:38 20   them down on the back of this"?

21   A.   The retainer agreement.

22   Q.   And he starts talking about changing people and other

23   things here.  At that point in the conversation, Detective, did

24   he give you something?

25   A.   He gave me several business cards including one with his

5-

1    personal cell phone on the back of it.

2              MR. HAFER:  Permission to approach, your Honor?

3              THE COURT:  Yes.

4    Q.   Detective, I've placed in front of you, it's marked for

5    identification Exhibit 21.  Do you recognize that or those, I

6    should say?

7    A.   Yes, those are the business cards the defendant gave me

8    including the one with the cell phone on the back of it.

9    Q.   Those are the cards he gave you on March 4th, 2011 at the

10:39 10   meeting?

11   A.   Yes.

12   Q.   And after he gave you those cards and the meeting was

13   over, what did you do with them?

14   A.   I immediately transferred them to Special Agent Joe

15   Tamuleviz.

16   Q.   Do the business cards appear to be in the same or

17   substantially the same condition as when they were given to you

18   by the defendant on March 4th, 2011?

19   A.   Yes.

10:39 20             MR. HAFER:  At this time, your Honor, the government

21   would offer these as Exhibit 21.

22             THE COURT:  They may be marked Exhibit 21.

23             MR. HAFER:  May they be published?

24             THE COURT:  They may be published.

25             (Exhibit No. 21 was admitted into evidence.)

5-

1   Q.   Showing you one of the cards from Exhibit 21, Detective,

2   now in evidence, this is the business card of the defendant

3   that you were given at the meeting on March 4th, 2011?

4   A.   Yes.

5   Q.   Flipping the card over, phone number on the back, what did

6   you say that was?  Do you recognize -- what is that notation on

7   the back?

8   A.   That's the personal cell phone from the defendant.  He

9   wrote it down on the back of this business card for me to keep

10:40  10   that one.

11   Q.   Directing your attention now back to the transcript to

12   about two-thirds of the way down page 25, the defendant says to

13   you, "It wasn't coke, it was marijuana."  What did you

14   understand him to mean by it wasn't coke?

15   A.   Cocaine.

16   Q.   On page 26, again, a little more than halfway down the

17   page, the defendant says, "You know, it's all about weed, it's

18   a lot of weight," and a little further below that, the

19   defendant says, "The telephone book size, you know, kilo will

10:41  20   get you 15.  To get a 10 on grass, you got to load."  Did you

21   have an understanding as to what he meant by "weed" and

22   "grass"?

23   A.   Yeah, marijuana.

24   Q.   And did you have an understanding as to what he meant by

25   "kilo"?

5-

1    A.    It's a kilogram, either cocaine or heroin.

2    Q.    Directing your attention to page 27, about halfway, a

3    little more than halfway down the page, Dardinski says, "You

4    want me to sign it?"  Do you see that?

5    A.    Yes.

6    Q.    The defendant says, "Yeah, I don't care."  Did you have an

7    understanding as to what "it" was?

8    A.    It was the retainer agreement.

9    Q.    The retainer agreement where you, pretending to be a drug

10:42 10    dealer, were hiring the defendant, correct?

11    A.    Yes.

12    Q.    And did Dardinski in fact sign the agreement?

13    A.    Yes, he did.

14    Q.    Did you watch him sign the agreement?

15    A.    Yes.

16    Q.    Did you sign the agreement?

17    A.    No.

18    Q.    At the bottom of page 27, the defendant says, "What are

19    you doing, you've got a summit meeting or something?"  Running

10:42 20    over to page 28, you say, "I'm just trying to make sure

21    everything runs smooth for a month."  What did you mean by

22    "everything runs smooth"?

23    A.    I was expecting a drug delivery here in the Boston area,

24    and I wanted to make sure that everything was in place.

25    Q.    Towards the bottom of page 28 about four lines up from the

5-

1    bottom Dardinski says, "You bring something for him."  Did you

2    have an understanding as to what he meant by that?

3    A.    Yes.

4    Q.    What was it?

5    A.    The $25,000.

6    Q.    And at the time at the bottom of page 28 that Ronnie

7    Dardinski asked you if you brought something for the defendant,

8    did you do anything?

9    A.    Yeah, I reached to my rear left pocket, I pulled out a

10:43 10    white envelope with $25,000, and I handed it over to the

11    defendant.

12    Q.    When you say the defendant, the individual that you handed

13    the $25,000 over to, do you see him in the courtroom?

14    A.    Yes.

15    Q.    Would you point him out, please, for the record and

16    identify an article of clothing he's wearing.

17    A.    Gray suit and glasses.

18         MR. HAFER:   Your Honor, may the record reflect he

19    identified the defendant?

10:43 20         THE COURT:  The record will so reflect.

21    Q.    Detective, the $25,000 that you gave the defendant on

22    March 4th, 2011 in the white envelope, that was the same

23    $25,000 you got at the meeting from Special Agent Tamuleviz?

24    A.    Yes.

25    Q.    It was the government money?

1    A.    Yes.

2    Q.    And right below the entry on page 28 of the transcript

3    where Dardinski says, "You bring something for him, you say not

4    even one less."  Do you see that?

5    A.    Yes.

6    Q.    What did you mean?

7    A.    $25,000 was there, it wasn't short.

8              MR. HAFER:  Could I have one moment, your Honor?

9              THE COURT:  Yes.

10:44 10         MR. HAFER:  Thank you your Honor, nothing further.

11             THE COURT:  Cross-examination, Mr. Goldstein.

12             MR. GOLDSTEIN:  Thank you, your Honor.

13                         CROSS-EXAMINATION

14   BY MR. GOLDSTEIN:

15   Q.    Good morning, Detective Nieves.

16   A.    Good morning.

17   Q.    You went to the hotel and you posed as a potential client,

18   right?

19   A.    I posed as a Dominican drug dealer.

10:45 20   Q.    As a drug dealer, right?

21   A.    Yes.

22   Q.    And Mr. George was there as a lawyer, right?

23   A.    Yes.

24   Q.    And you told him you were a drug dealer, he told you he

25   was a lawyer and he wanted you to sign a representation

5-

1    agreement, right?

2    A.    Yes.

3    Q.    And you know that Mr. George has not been charged with a

4    single crime as a result of him signing you up as a client,

5    right?

6    A.    I didn't know that.

7    Q.    You didn't know that?

8    A.    No.

9    Q.    And you know that he's not charged with a single crime as

10:45 10    a result of accepting the $25,000 as a legal retainer in this

11    case?

12    A.    I have no knowledge of that.

13    Q.    Have you looked at the indictment, sir?

14    A.    I don't recall if I looked at it or not.

15    Q.    Okay.  In any event, Mr. George is there asking you

16    questions about your legal problems, right?

17    A.    Yes.

18    Q.    And the meeting is in a restaurant at a Dedham hotel,

19    right?

10:45 20    A.    Yes.

21    Q.    There are other people around, right?

22    A.    Yes.

23    Q.    Waitresses coming back and forth, right?

24    A.    Yes.

25    Q.    Other diners inside of the restaurant, right?

5-

1   A.   I believe there was some people there.

2   Q.   Okay.  And Mr. Hafer asked you when Mr. George says, "I

3   love this place because no one is there," you testified it's

4   because it was, what?  I forget your testimony.  What did you

5   say in terms of that question?

6   A.   I don't recall.  What was the question again?

7   Q.   The fact of the matter is he's meeting you in a public

8   restaurant, right?

9   A.   Yes.

10:46  10   Q.   I mean, if he wanted to be isolated with you, he could

11   have met you in his office?

12   A.   I guess, yes.

13   Q.   It would have just been the three of you, right?

14   A.   Yes.

15   Q.   He could have met you in his car at Dunkin' Donuts?

16   A.   Yes.

17   Q.   Right?  Could have met you in the middle of the night in a

18   dark, secluded place, right?

19   A.   Yes.

10:46  20   Q.   Didn't have to meet you in a public restaurant and talk

21   about becoming your lawyer, right?

22   A.   I don't know if, you know, no knowledge if he wanted to do

23   it any other place.

24   Q.   There's a million other places you could have met besides

25   a public restaurant, right?

5-

         1    A.    That's correct.

         2    Q.    And when you went there, you had a certain agenda, right,

         3    your agenda was to make sure Mr. George knew you were a drug

         4    dealer, right?

         5    A.    Yes.

         6    Q.    And you did, right?

         7    A.    Yes.

         8    Q.    And he gave you business cards?

         9    A.    Yes.

10:47   10    Q.    Right?  Whose name is on the business card?

        11    A.    The defendant's.

        12    Q.    Robert George, right?

        13    A.    Yes.

        14    Q.    I'm not trying to hide the fact that he wants to become

        15    your lawyer, right?

        16    A.    Yes.

        17    Q.    That's what lawyers do, they give business cards to

        18    clients, right?

        19    A.    Yes.

10:47   20    Q.    And he put his number on the back of one of the cards,

        21    right?

        22    A.    Yes.

        23    Q.    Could he have been any more open and transparent with you

        24    in terms of what he was there to do in terms of representing

        25    you as a lawyer?

5-

1    A.    I told him my problem, and I guess he replied to, you

2    know, all my questions.

3    Q.    Right.  While your agenda was to let him know that you

4    were a drug dealer, his agenda was to get you to sign an

5    engagement agreement, right?

6    A.    Right.

7    Q.    And he comes back to you, and he wants you to sign a

8    representation agreement, right?

9    A.    Yes.

10:48 10   Q.    And he didn't have to give you a representation agreement

11   and document in writing that he was signing you up as a client,

12   right?

13   A.    Whether he did -- what was the question again?

14   Q.    You didn't ask him to give you an engagement letter,

15   right?

16   A.    No, I didn't.

17   Q.    Right, this is Mr. George wanting to put in writing on a

18   piece of paper that he's your lawyer, right?

19   A.    Yes.

10:48 20   Q.    He didn't have to do that, right?

21   A.    I don't know if he has to or not.

22   Q.    Meaning you didn't make him do that, right?

23   A.    I didn't make him do it.

24   Q.    That was his choice, correct?

25   A.    That was his choice from the first meeting.

5-

1    Q.   His choice, to document the fact that Robert George is

2    becoming Angel Ramos' lawyer, right?

3    A.   Yes.

4    Q.   And the conversation that you just went through, let's go

5    through some of that quickly.  Now, before we go through the

6    transcript, you know that in another part of this conversation

7    Mr. George talked to you about conflicts of interest, and he

8    wanted to avoid any conflicts of interest in his representation

9    of you, right?

10:49 10    A.   Yes.

11    Q.   And he also told you that when he was talking to you about

12    getting things done, he was talking to you about getting them

13    legally done, meaning in a legal, not illegal, but lawful

14    manner, right?

15    A.   Yes.

16    Q.   Now, if I can direct your attention to page 4 of the

17    transcript.

18    A.   Which one?

19    Q.   Excuse me.

10:49 20    A.   Which one?  Which of the two?

21    Q.   February 28th.

22    A.   Thank you.

23    Q.   Here Mr. George is talking to you about his agreement with

24    you, right?  Do you see the underline right here, "because my

25    agreement with you, and I wanted to talk to you about this,

1   Ronnie signs representation agreement."  Do you see that, sir?

2   A.   Yes.

3   Q.   That's him talking to you about the fact that he wants you

4   to sign an engagement agreement, right?

5   A.   Yes.

6   Q.   And then he goes on and says, "Overtly I want an agreement

7   with you."  Do you see that?

8   A.   Yes.

9   Q.   That's Mr. George's agenda during the meeting, right, get

10:50  10   you to sign the engagement agreement and get a legal fee,

11   right?

12   A.   Yes.

13   Q.   Lawyers get paid for representing clients, right?

14   A.   Yes.

15   Q.   And he tells you what the agreement is going to say, says,

16   "I'm going to represent for anything you want, criminal or

17   civil," right?

18   A.   Yes.

19   Q.   So it's not limited to just criminal matters, right?

10:50  20   A.   Yes.

21   Q.   And then he says, "That's all it's going to be, I'll have

22   your name and address," do you see that?

23   A.   Yes.

24   Q.   That's Mr. George's desires, he wants your name and

25   address, right?

5-

```
      1    A.   Yes.
      2    Q.   Now, later on you say, "I don't want to give you my office
      3    address or my address, people can find me," but that's your
      4    agenda as the undercover police officer posing as a drug
      5    dealer, right?
      6    A.   Yes.
      7    Q.   But this is Mr. George's state of mind, and he's telling
      8    you I'll have your name and address and I'll put it right into
      9    my representation agreement, right?
10:51 10    A.   Yes.
     11    Q.   And he then goes on, and you have a discussion, but, well,
     12    if some of your associates get arrested and you refer them to
     13    Mr. George, he wants to tell you what he's going to tell these
     14    associates if he represents them, right?
     15    A.   Yes.
     16    Q.   And he tells you straight up that if any of your
     17    associates ask him what you want him to do, he says, "I'm
     18    telling you now, I'll say to them Angel told you to tell the
     19    truth;" do you see that?
10:51 20    A.   Yes.
     21    Q.   I'm sorry.  Do you see that now?
     22    A.   Yes.
     23    Q.   Meaning he's talking about a potential scenario where you
     24    refer one of your associates to him, right?
     25    A.   Yes.
```

5-

1    Q.    And he's talking about a potential scenario where one of

2    the associates comes up to him and says, Mr. George,

3    Mr. George, what does Angel want me to do here, right?

4    A.    Yes.

5    Q.    And Mr. George's response is what I'm going to tell them

6    is Angel told you to tell the truth, right?

7    A.    Yes.

8    Q.    Okay.  If I can direct your attention to page 7 of the

9    transcript, here Mr. George and yourself are talking about the

10:52  10   details of his representation and how it's going to work in

11   reality, right?

12   A.    What part?  Where in the document?

13   Q.    You can focus on the highlighted parts.

14   A.    All right.

15   Q.    He says, "It will say right in the agreement, it's

16   basically money in the tank every month," do you see that?

17   A.    Yes.

18   Q.    Do you need me to get that closer for you?

19   A.    No, that's fine.

10:52  20   Q.    And it's basically you're going to be paying him a

21   retainer so that Mr. George is available to you, right?

22   A.    Yes.

23   Q.    Okay.  And then he goes on to talk about, "Well, if cases

24   actually materialize and I need to go into court, we'll agree

25   on a price for my representation in the court, and then you'll

5-

1    have to replenish the $25,000 that you're giving me," right?

2    A.    Yes.

3    Q.    And then, again, the next page Mr. George still pushing

4    his agenda he tells you what he's doing is completely

5    legitimate and legal, right?

6    A.    Yes.

7    Q.    And then he says, "Now I'd like to take your address.  Can

8    I have the address that's on your license," right?

9    A.    Yes.

10:53  10   Q.    Mr. George, in the middle of the conversation, still

11   pushing his agenda, which is to get a correct name and address

12   from your license, so he could fill out an engagement agreement

13   that cements and confirms forever that he was your lawyer,

14   right?

15   A.    Yes.

16   Q.    And then he says, "I'll have to see you to show you this

17   agreement that I keep talking to you about," right?

18   A.    Yes.

19   Q.    And then you and Mr. George start talking about what the

10:54  20   legal fee will be, right, and you propose $20,000 and you

21   eventually agree on $25,000, right?

22   A.    Yes.

23   Q.    Mr. George says that, "I'll bank it or do you want me

24   every month?"  And you say, "No, what I'll do is you take the

25   $25,000, and if I need you, I'll call you," in essence, right?

5-

1    A.    Yes.

2    Q.    Page 10 Mr. George is still talking about his

3    representation agreement and the mechanics of how his

4    representation of you is going to evolve, right, talks about,

5    "If you get a case and I charge you 23,000, you're going to

6    have to replace it because we're going to have what's called an

7    evergreen retainer," do you see that term in the middle of page

8    10?

9    A.    Yes.

10:55 10    Q.    And do you understand what that means?  Is that you're

11    giving him $25,000, he's going to put it in a retainer, and if

12    he charges you 23,000 for a case, you have to then replenish

13    the 23,000 so he always has $25,000 as a retainer, right?

14    A.    Yes.

15    Q.    Okay.  Then at the bottom of the page Mr. George tells you

16    something, first he's talking about billing against his time,

17    right?

18    A.    Yes.

19    Q.    And then he says something to you, he says, "Otherwise

10:55 20    it's nonrefundable," do you see that?

21    A.    Yes.

22    Q.    And then he says on the next page, in other words, "You

23    give me 25, and it's right around the corner to the left," he's

24    giving directions to someone there, right, you saw that on the

25    video?

1 A. Yes.

2 Q. He says, "You give me 25 and you don't need me for three

3 months, you don't come looking for me for the 25,000 for three

4 months," do you see that?

5 A. Yes.

6 Q. What he's telling you is this representation agreement

7 that he's going to be drafting for you, in that agreement, and

8 the agreement with you is 25,000 is nonrefundable, right?

9 A. Yes.

10:56 10 Q. Meaning don't come and look for him to give you back a

11 check in three months for $25,000, right?

12 A. Yes.

13 Q. Now, you understand -- let me take you away from that for

14 a second.  This operation was called Operation Highwire, right?

15 A. Yes.

16 Q. And you were involved rather early on at least in terms of

17 conducting surveillance and helping Agent Tamuleviz, right?

18 A. Yes.

19 Q. This was Agent Tamuleviz's case, he was the case agent,

10:56 20 right?

21 A. Yes.

22 Q. Case agents obtain assistance from other agents in helping

23 him pursue his operation, correct?

24 A. Yes.

25 Q. And you were one of the operational agents that assisted

5-

1    him and eventually became an undercover so you're testifying

2    here today, right?

3    A.    Yes.

4    Q.    Now, in the fall of 2010, Agent Tamuleviz sought $100,000

5    from the department, from the DEA to try and give the money

6    directly to Mr. George, you know that, right?

7    A.    Yes.

8    Q.    And the plan in November of 2010 was to get an authority

9    for an additional 100,000 so that they could give it to

10:57 10   Mr. George and try and negate any legal defense he might have

11   to Agent Tamuleviz's investigation, right?

12   A.    Right.   That's what we -- yeah.

13   Q.    Okay.   And you know that after November of 2010 when

14   Agent Tamuleviz got his authority for that $100,000 that he and

15   Mr. Dardinski were trying to arrange a meeting so that

16   Mr. Dardinski could give the 100,000 to Mr. George?

17   A.    I know that, yes.

18   Q.    And you know that Mr. Dardinski set up at least three

19   different meetings where he was going to try and give the

10:58 20   $100,000, and Mr. George didn't even show up at any one of

21   those three meetings?

22   A.    I don't recall how many meetings.

23   Q.    But there were meetings Mr. George didn't show up to,

24   right?

25   A.    There was one that I know of.

5-

1   Q.   And the plan for that particular day that you were a part

2   of was Mr. Dardinski was going to meet Mr. George in a car

3   somewhere, right?

4   A.   I don't know, they were going to meet, yes.

5   Q.   And Dardinski was going to try to give Mr. George $100,000

6   in cash and try to get him to launder that money, right, that

7   was the plan?

8   A.   Yes.

9   Q.   And Mr. George didn't show up, right?

10:58  10   A.   Yes.

11   Q.   Okay.  Now, the objective for your meeting with Mr. George

12   on February 28th and March 4th was for you to get Mr. George to

13   agree to launder your money, right?

14   A.   No, that wasn't my objective.

15   Q.   That wasn't your objective.  Did you know that

16   Agent Tamuleviz told the main headquarters of DEA that the

17   objective was for you to make a representation and try and get

18   Mr. George to launder money?

19          MR. HAFER:  Objection, your Honor.

10:59  20          THE COURT:  Sustained.

21          MR. GOLDSTEIN:  May I approach the witness, your

22   Honor?

23          THE COURT:  Yes.

24   Q.   I just want to show you something, see if it refreshes

25   your recollection.  Do you recognize this as the operational

5-

1    plan that was submitted to Maine DEA?

2    A.   Yes.

3    Q.   Okay.  You can read whatever you'd like, but I'd like to

4    direct your attention to the operational plan below.

5    A.   Yes.

6    Q.   Okay.  Having read that, does that refresh your memory as

7    to whether or not the operational plan was for you to try and

8    get Mr. George to launder your proceeds?

9         MR. HAFER:  Objection, your Honor.  He didn't testify

11:00 10   he didn't remember something, so I'm not sure why we're

11   refreshing recollection.

12        THE COURT:  He can ask him that question.  If it

13   refreshes his memory, he can so state.  Overruled.

14   Q.   Does that refresh your memory in terms if there was an

15   operational plan that you were going to try and get Mr. George

16   to launder your $25,000?

17   A.   Yes.

18   Q.   And that was the operational plan, right?

19   A.   That was according to the operational plan.

11:01 20   Q.   But that's not what you did, right, during the

21   conversations?

22   A.   When?

23   Q.   On February 28th or March 4th, right?

24   A.   If you read at the bottom of the operational plan, it says

25   that I was going to go and pay $25,000 for a retainer fee,

5-

        1    which I did.

        2    Q.   But it also says that you were going to tell him you

        3    needed your money laundered?

        4    A.   Yes.

        5    Q.   Right.  You never asked Mr. George if he was willing to

        6    launder money for you, did you?

        7    A.   No, I never asked him.

        8    Q.   Right.  What Mr. George tells you unequivocally is you

        9    don't come back looking for your money, right?

11:01  10    A.   Yes.

       11    Q.   Meaning Mr. George is not going to be circling your money

       12    through his accounts, right?

       13    A.   I guess, yes.

       14    Q.   Isn't that what that means?

       15    A.   It says nonrefundable.

       16    Q.   Right.  Meaning he's not going to be giving you a check in

       17    three months for the cash you gave him that day?

       18    A.   No.

       19    Q.   And who made the decision to not give Mr. George the

11:02  20    opportunity to tell you, "No, I'm not going to launder your

       21    money," why didn't you ask that during the meeting?

       22    A.   I didn't have a chance to ask him.

       23    Q.   Okay.  Did Agent Tamuleviz ask you to ask Mr. George

       24    during the meeting if he'd be willing to launder the $25,000?

       25    A.   I don't recall that.

1    Q.   But that was the stated reason for Maine DEA, right?

2    A.   According to the operational plan, yes.

3    Q.   Mr. Hafer asked you a serious of questions about the

4    $25,000, but he didn't ask you whether or not that money was

5    serialized?

6    A.   It was.

7    Q.   It was serialized, right?

8    A.   Yes.

9    Q.   Meaning you knew the serialization for every dollar given

11:02 10   to Mr. George on March 4th, right?

11   A.   I didn't even know them personally.  There was a list.

12   Q.   That's true.  But DEA knew, right?

13   A.   It was a list.

14   Q.   There's a list of every dollar, right?

15   A.   Yes.

16   Q.   Not a dollar short, right?

17   A.   Not a dollar short.

18   Q.   Okay.  Now, you are a detective with which police

19   department?

11:03 20   A.   Billerica Police Department.

21   Q.   Billerica Police Department.  But you are tasked to the

22   DEA, right?

23   A.   Yes.

24   Q.   So being tasked with the DEA, you are subject to the

25   Attorney General's guidelines regarding the use of confidential

5-

1    informants, right?

2    A.    Yes.

3    Q.    And you know that according to those guidelines no agent

4    shall even agree to a request from a confidential informant to

5    determine whether the confidential informant is the subject of

6    any investigation.  Are you aware of that?

7    A.    Yes.

8    Q.    And that's a rule that comes down from Maine Department of

9    Justice, right?

11:03 10    A.    Yes.

11    Q.    So you as an agent are never supposed to even agree to a

12    request from an informant like Mr. Dardinski to determine

13    whether Mr. Dardinski is the subject of an investigation,

14    right?

15    A.    Yes.

16    Q.    That would be in contravention of the guidelines issued by

17    the Department of Justice and the Attorney General's Office

18    regarding the use of confidential informants, right?

19    A.    Yes.

11:04 20    Q.    Now, part of your responsibilities in this case was to

21    conduct surveillance, correct?

22    A.    Yes.

23    Q.    And you were present during a meeting between Mr. George

24    and Michael Hansen on August 17th, 2010; is that correct?

25    A.    Yes.

1    Q.   And that was at the Sotheby's Real Estate office in

2    Westwood or Dover; do you remember that?

3    A.   Yes.  I think the date is wrong.

4         MR. GOLDSTEIN:  Your Honor, may I just show him a

5    couple reports?  It might expedite the review.

6         THE COURT:  Yes.

7    Q.   Detective Nieves, just review those.  I'm going to be

8    asking you about the lengths of meetings and things of that

9    nature, so perhaps you could review them to refresh your

11:05  10   memory.  Thank you.  So, on August 17th, 2010, there was a

11   meeting between Mr. George and Michael Hansen at Sotheby's Real

12   Estate office; is that correct?

13   A.   Yes.

14   Q.   And you were there as part of a surveillance team,

15   correct?

16   A.   Yes.

17   Q.   And agents observed Mr. George arrive at 5:55 p.m., right?

18   A.   Yes.

19   Q.   And they saw him leaving at 6:40 p.m., right?

11:05  20   A.   Yes.

21   Q.   That would indicate that there was approximately a

22   45-minute meeting on that particular date, right?

23   A.   Yes.

24   Q.   All right.  Have you seen the video or audio of that

25   particular meeting?

1    A.   I don't recall.

2    Q.   Okay.  Are you aware that Mr. George spoke to

3    Michael Hansen for almost 30 minutes before there was any

4    discussion regarding Mr. Dardinski or the facts of your

5    investigation?

6    A.   I wasn't aware.

7    Q.   If I showed you the video, you've not seen it?

8    A.   I don't recall seeing the video.  I mean --

9    Q.   All right.  And on July 29th, that was the meeting at the

10   Dedham Hilton between Mr. George and Michael Hansen, right?

11   A.   Yes.

12   Q.   And agents observed Mr. Hansen and Robert George meeting

13   inside the lounge area, correct?

14   A.   Yes.

15   Q.   And Mr. Hansen arrived at 4:01 p.m., correct?

16   A.   Yes.

17   Q.   And they saw Mr. George and Mr. Hansen leave at 5:10 p.m.,

18   an hour and 10 minutes later, right?

19   A.   Yes.

20   Q.   And have you seen the video of that?

21   A.   I don't recall.

22   Q.   All right.  Are you aware that for the majority of that

23   meeting, Mr. George and Michael Hansen were discussing things

24   other than Mr. Dardinski or any aspect of your investigation?

25   A.   I haven't seen the video so I don't know what was

1    discussed.

2    Q.   Are you aware that both of those meetings the majority of

3    the time was spent talking about Mr. George's mortgages and

4    refinances and other aspects of his personal life?

5    A.   Like I said, I haven't seen the video so I don't know what

6    was discussed.

7    Q.   Okay.  You were present on December 16th, when $100,000

8    was given to Michael Hansen, correct?

9    A.   Yes.

11:07 10    Q.   Given to him by Mr. Dardinski, right?

11    A.   Yes.

12    Q.   Mr. George wasn't there?

13    A.   No.

14    Q.   You were present on April 15th when Michael Hansen gave or

15    Mr. Dardinski gave Michael Hansen the second $100,000, right?

16    A.   If I recall correctly, yes.

17    Q.   Mr. George wasn't there, right?

18    A.   No.

19    Q.   Now, you also know that in June of 2010, Mr. Hansen agreed

11:08 20    to cooperate in your investigation of Mr. George, right?

21    A.   Yes.

22    Q.   And you're aware that pursuant to his agreement, he agreed

23    to cooperate fully with law enforcement agents and government

24    attorneys, right?

25    A.   Yes.

1    Q.   And you know that he also agreed that if requested he

2    should testify at any trial, right?

3    A.   I wasn't aware of that part, but, yes.

4    Q.   All right.  That's standard fare for a cooperation

5    agreement such as that executed by Mr. Hansen, correct?

6    A.   It's not a standard, but, you know.

7    Q.   But that's what he agreed to do, correct?

8    A.   That's what he -- I don't know what he agreed to, so...

9         MR. GOLDSTEIN:  May I approach and see if this

11:09  10   refreshes his memory?

11        THE COURT:  Yes.

12        MR. GOLDSTEIN:  Thank you.

13   Q.   I direct your attention to the first paragraph,

14   Detective Nieves, but you can read whatever part you would

15   like.  Having reviewed that, does that refresh your memory that

16   Michael Hansen agreed that, if requested, he would testify

17   before any grand jury at any hearing and at trial?

18   A.   According to the document, yes.

19   Q.   Okay.  And were you one of the agents that went to

11:09  20   Mr. Hansen's house on the evening of June 8th?

21   A.   No.

22   Q.   Were you present at any of Mr. Hansen's proffer sessions?

23   A.   No.

24        MR. GOLDSTEIN:  One moment, your Honor, please.  One

25   moment, your Honor.

5-

1        THE COURT:  Yes.

2        MR. GOLDSTEIN:  Nothing further, your Honor.

3        THE COURT:  Redirect, Mr. Hafer.

4        MR. HAFER:  Thanks, your Honor, I'll be brief.

5                    REDIRECT EXAMINATION

6   BY MR. HAFER:

7   Q.   Detective, Mr. Goldstein asked you some questions about

8   whether you asked the defendant to launder your money on

9   March 4th, 2011, launder the $25,000 that you gave him.  Do you

11:11 10   recall those questions?

11   A.   Yes.

12   Q.   And you said you didn't ask him to do that, right?

13   A.   No.

14   Q.   Based on your involvement in this investigation, do you

15   know where the defendant went later that day?

16   A.   No.

17   Q.   Mr. Goldstein asked you a lot of questions about the

18   retainer agreement that the defendant talked about at that

19   meeting.  Do you recall those questions?

11:11 20   A.   Yes.

21   Q.   And he asked you specifically a number of times in the

22   transcript where the defendant brought up the retainer

23   agreement and he wanted you to sign the agreement.  Do you

24   recall those questions?

25   A.   Yes.

1    Q.   Did you ever sign a retainer agreement?

2    A.   No.

3    Q.   Directing your attention to page 27 of the March 4th, 2011

4    transcript, about halfway down the page the entry where

5    Dardinski says, "You want me to sign it," you previously

6    testified that it referred to the retainer agreement; is that

7    correct?

8    A.   Yes.

9    Q.   And what does the defendant say when Dardinski says, You

10   want me to sign it?

11   A.   He says he doesn't care if he signs it.

12   Q.   At any point during your meeting with the defendant and

13   Mr. Dardinski on March 4th, did Ronnie Dardinski talk to the

14   defendant about retaining him for legal services?

15   A.   No.

16        MR. HAFER:  Nothing further.

17        MR. GOLDSTEIN:  Very briefly, your Honor, if I may

18   stand here.

19        THE COURT:  Yes.

20                      RECROSS-EXAMINATION

21   BY MR. GOLDSTEIN:

22   Q.   February 28th, Mr. George was very clear he wanted you to

23   sign an engagement agreement, right?

24   A.   Yes.

25   Q.   And March 4th, having days to consider your operational

1    plan, you decided you didn't want to sign it, right?

2    A.    Yes.

3    Q.    But Mr. George wanted you to sign it, right?  He asked you

4    that on February 28th?

5    A.    He asked me to sign it, but I didn't.

6             MR. GOLDSTEIN:  Nothing further, your Honor.

7             THE COURT:  Thank you, Mr. Nieves, you may step down.

8             THE WITNESS:  Thank you.

9             MR. HAFER:  Your Honor, could we see you for a brief

11:13  10   moment at sidebar?

11             THE COURT:  Yes.

12             (THE FOLLOWING OCCURRED AT SIDEBAR:)

13             MS. KAPLAN:  Your Honor, we're prepared to rest at

14   this point, but I just wanted to ask you, I know it's not the

15   practice of many of the judges in the District Court to allow

16   the government to introduce into evidence the transcripts.  I

17   have had it done by some Judges here.  I would just ask that

18   you consider it in this case because there are some 50 calls,

19   there are 50 transcripts.  We've gone in chronological order.

11:15  20   We've been referring to them quite a bit.

21             The concern, when they go back to deliberate, they're

22   going to be lost, and to have them listen to 50 tapes, as much

23   as I'd like that, I understand that may not be your practice, I

24   would just request perhaps you consider it and we move them in

25   at this time, but other than that, we would be prepared to

5-

1    rest.

2          MR. GOLDSTEIN:  Your Honor, I would discuss it with my

3    client.  Is this an issue we can address at a later point?

4          THE COURT:  Yes, we can do that.  Obviously if both

5    sides agree, it's different than if there's a disagreement, so

6    we won't hold it against the government for resting at this

7    stage without having clarified that issue.  That will be

8    reserved until the defendant's had a chance to talk to his

9    client, and we'll make the decision at a later point, and as I

11:15 10   take it, you rest, the defendant will put on a case?

11          MR. GOLDSTEIN:  Mr. Dardinski is our first witness.

12          THE COURT:  Ready?

13          MR. GOLDSTEIN:  Ready.

14          (SIDEBAR CONFERENCE WAS CONCLUDED)

15          MS. KAPLAN:  Your Honor, the government rests.

16          MR. GOLDSTEIN:  Your Honor, I'd like to reserve a

17   motion for the Court's consideration, but we'd also call our

18   first witness.

19          THE COURT:  Yes.

11:15 20          MR. GOLDSTEIN:  Ronald Dardinski the defense would

21   call.

22          Your Honor, I need one moment.  I'm sorry.

23          THE COURT:  Yes.

24          RONALD DARDINSKI, having been duly sworn by the Clerk,

25   testified as follows:

1          DIRECT EXAMINATION

2     BY MR. GOLDSTEIN:

3     Q.   Good morning, Mr. Dardinski.

4     A.   Good morning.

5     Q.   Since you've last appeared, some materials have been

6     admitted into evidence that I'd like to review with you.

7          MR. GOLDSTEIN:  Christine, may I get the toll records?

8          THE CLERK:  I don't have them.

9          MR. GOLDSTEIN:  One second, your Honor, I'm sorry.

11:17 10   Q.   Mr. Dardinski, the first conversation that you recorded in

11    this case was March 18th; is that correct?

12    A.   I believe so, yes.

13    Q.   And the second conversation that you recorded was

14    April 6th, correct?

15    A.   I'm not sure.  I'd have to look at the stuff.

16         MR. GOLDSTEIN:  One moment, if your Honor please.

17    Q.   If you could, just refresh your memory as to the first two

18    recorded conversations, sir.

19    A.   Yes.

11:18 20   Q.   March 18th and April 6th; is that correct?

21    A.   Yes.

22    Q.   And at the time in March you were using a telephone with a

23    number 774-274-9673, correct?

24    A.   I believe so.

25    Q.   And looking at these records, it appears that you had

1    three calls with Mr. George on March 18th, correct?

2    A.    Yes.

3          MR. GOLDSTEIN:  Your Honor, may I hand a witness a

4    chalk that he can write down the days that he called?

5          THE COURT:  Yes.

6    Q.    As we go through, if you could enter the date that you

7    called or Mr. George called you.  The first one would be let's

8    start on March 19th, Mr. Dardinski, okay, that's the day after

9    the first recording?

11:19 10   A.    Okay.

11   Q.    There was an incoming call from Mr. George at 8:01, and it

12   was 38 seconds, correct?

13   A.    That would be on the 18th, not the 19th.

14   Q.    We're going to start on the 19th, do you see that at the

15   middle of the page there?

16   A.    Yes.

17   Q.    So March 19th, 2009 there was an incoming call, do you see

18   the call for the incoming call, just so the jury understands

19   what you're looking at?

11:20 20   A.    Yes.

21   Q.    I've handed you this.

22   A.    Yes.

23   Q.    So there was an incoming call on March 19th, then you

24   called Mr. George on March 20th, correct?

25   A.    Yes.

1    Q.   And that's a minute and three seconds in length, and it

2    was you calling him, correct?

3    A.   Yes.

4    Q.   And that was not recorded, right?

5    A.   I don't know.  I don't believe so, no.

6    Q.   Then you called Mr. George on March 20th again at

7    4:38 p.m.  Do you see that?

8    A.   Yes.

9    Q.   And that was you calling him, outgoing call, right?

11:21 10   A.   Yes.

11   Q.   And it was a minute and six seconds, I believe?

12   A.   I believe I left him message.

13   Q.   Not recorded because we only have two recorded calls?

14   A.   Yes.

15   Q.   Then you called him again on March 20th, 4:47, about nine

16   minutes later outgoing call from you 42 seconds in length,

17   right?

18   A.   Yes.

19   Q.   Then you called him again on March 20th, this time at

11:21 20   5:52, it's an outgoing call, and it was four seconds in

21   duration, correct?

22   A.   Yes, sir.

23   Q.   Then you called him again, March 20th, a minute later,

24   another four-second call, correct?

25   A.   Yes.

5-

1    Q.   Don't worry about filling that in, Mr. Dardinski, we'll do

2    that later, it's going to take too long.   Then you called him

3    again on March 20th, this time at 6:12, five seconds' duration,

4    right?

5    A.   Yes.

6    Q.   These are all outgoing calls, correct?

7    A.   Yes.

8    Q.   So you had the time to call him?

9    A.   Yes.

11:22 10   Q.   But you didn't record it, right?

11   A.   He was on the other line during these calls, that's why it

12   was so short.

13   Q.   But when you picked up the phone to dial him, you didn't

14   know he was going to be on the line, did you?

15   A.   No.

16   Q.   But you chose not to record it?

17   A.   I may not have had a recorder with me, I don't know the

18   circumstances.

19   Q.   This is two days after you recorded?

11:22 20   A.   Yes.

21   Q.   You had the recorder that Agent Tamuleviz had given you?

22   A.   It might not have been with me.

23   Q.   Okay.  So you decided to call him at a time when you

24   didn't have the recorder with you?

25   A.   Yes.  I don't know if I had it with me or if I had

1    somebody with me.

2    Q.   March 20th, you called him again, 6:17, a minute and

3    48-second conversation, right?

4    A.   Yes.

5    Q.   Not recorded, right?

6    A.   Yes.

7    Q.   So we don't know what you told him during this particular

8    conversation, right?

9    A.   No.

11:22 10   Q.   Could have told him that you had legitimate money that you

11   needed converted into a check, right?

12   A.   I didn't tell him that.

13   Q.   But we have to take you for your word, right?

14   A.   Yes.

15   Q.   Then no calls from March 20th to March 24th, then on

16   March 24th you start calling him again, correct?

17   A.   Yes.

18   Q.   He still hasn't returned all of your calls from

19   March 20th, right?

11:23 20   A.   No.

21   Q.   All right.  March 24th, you called him at 4:28, 26 seconds

22   in length, call from you to him not recorded, right?

23   A.   Yes.

24   Q.   March 24th, called him a second time, 4:30, two minutes

25   later, a minute and 16, right?

5-

1      A.   Yes.

2      Q.   Could be you leaving a message, could be a conversation,

3      we don't know, right?

4      A.   No, it would have been either me leaving a message or him

5      not answering the phone, that would be why they're not

6      recorded.

7      Q.   Well, when you called him, Mr. Dardinski, when you picked

8      the phone up and said I'm going to call Mr. George and you

9      started to dial the number, you didn't know whether he was

11:24  10      going to pick up, right?

11      A.   No, but if I had the recorder with me, I would have

12      pressed play when he picked up, not if I was just going to hang

13      up the phone and just leave a message for him.

14      Q.   You recorded leaving messages in other instances, didn't

15      you?

16      A.   I'm not sure.

17      Q.   I have recordings of you leaving messages for Mr. George.

18      A.   Then I probably did at that time, yes.

19      Q.   Okay.  In any event, no recording, right?

11:24  20      A.   Yes.

21      Q.   March 26th, you called him again at 10:12 in the morning,

22      a minute and 8 seconds long, outgoing from you to him, right?

23      A.   Yes.

24      Q.   That could be a conversation, couldn't it?

25      A.   It could be.

1    Q.    Okay.  March 26th, you called him again, 48 seconds

2    length, correct?

3    A.    Correct.

4    Q.    Not recorded, right?

5    A.    Correct.

6    Q.    March 31st, you called him again, 4:28, a minute and 21

7    seconds in length from you to him not recorded, right?

8    A.    Yes.

9    Q.    Could have had a conversation with him that day, right?

11:25  10    A.    It's possible, but I doubt it.

11    Q.    And we have to take your word for it, right?

12    A.    Yes.

13    Q.    Now, April 2d, first time you called him on April 2d, this

14    is four days before the second recording, right?

15    A.    Yes.

16    Q.    Called him at 11:02 a.m., it's a minute and 2 seconds

17    length from you to him, right?

18    A.    Yes.

19    Q.    Not recorded, right?

11:25  20    A.    Yes.

21    Q.    April 2d, 1:20 in the afternoon, 26 seconds in length not

22    recorded, right?

23    A.    Correct.

24    Q.    April 2d, 1:33, 13 minutes later called him again, 41

25    seconds in length, right?

1    A.   Yes.

2    Q.   Not recorded, right?

3    A.   All these calls I would have hung up on that he either

4    didn't answer or I didn't leave a message.

5    Q.   Let's go through them, you called him again on April 2d,

6    2:00, 13 seconds, that's him calling you actually, right?

7    A.   Yes.

8    Q.   So he finally returned your calls, right?

9    A.   Yes.

11:26 10   Q.   Then you called him again four minutes later, 44 seconds,

11    right?

12    A.   Yes.

13    Q.   Clearly you didn't talk to him when he called you in the

14    13 second mark, right?

15    A.   Yes.

16    Q.   And then you called him again 2:26 in the afternoon, a

17    minute and 10 seconds, right?

18    A.   Yes.

19    Q.   Could have talked to him on April 2d, right?

11:26 20   A.   I could have, but it probably was just a message.

21    Q.   Okay.  Then you called him again on April 2d, this time at

22    3:32 in the afternoon this is him calling you actually, right?

23    A.   Yes.

24    Q.   42-second conversation, right?

25    A.   Yes.

1    Q.   And then he called you back, and you had a minute and

2    56-second conversation, right?

3    A.   Yes, he was probably leaving me a message.

4    Q.   Or you could have had a conversation, right?

5    A.   Could have.

6    Q.   Not recorded, right?

7    A.   Correct.

8    Q.   We have to take your word about what happened that day,

9    right?

11:27 10   A.   Yes.

11   Q.   Another call on April 2d at 5:30 from you to him, 50

12   seconds, right?

13   A.   Yes.

14   Q.   Not recorded?

15   A.   Yes.

16   Q.   April 2d, a two-minute and 40-second conversation, you to

17   him, right?

18   A.   Yes.

19   Q.   Not recorded, right?

11:27 20   A.   Yes.

21   Q.   We have to take your word as to what happened that day,

22   right?

23   A.   Yes.

24   Q.   Now, you have your second recorded conversation on

25   April 6th, correct?

1    A.    Yes.

2    Q.    That's the conversation Mr. George tells you, "If it

3    doesn't happen today, I'm all done, Ronnie," do you remember

4    that?

5    A.    Yes.

6    Q.    We went through that?

7    A.    Yes.

8    Q.    April 6th, you call Mr. George, the next day after he

9    tells you he's all done, right, and you have a five minute and

11:28 10    56-second call, right?

11    A.    Yes.

12    Q.    Not recorded, right?

13    A.    Yes.

14    Q.    You placed that call to him, right?

15    A.    Yes.

16    Q.    You made the conscious decision to pick the phone up and

17    not record that conversation, right?

18    A.    Yes, sir.

19    Q.    The next call from you to Mr. George is the next day,

11:28 20    April 8th, a minute and 9 seconds, again not recorded, right?

21    A.    Correct.  Again, I was probably bringing a message.

22    Q.    But we have to take your word for it, right?

23    A.    Yes.

24    Q.    Another call on April 8th, this is from Mr. George to you

25    returning your call, and it's a minute and 19 seconds, right?

```
 1    A.   Yes.

 2    Q.   May have had a conversation, may have left a message,

 3    we'll never know, right?

 4    A.   Correct.

 5    Q.   And then he called you back again April 8th, 17 seconds,

 6    probably not a conversation, right?

 7    A.   Probably not.

 8    Q.   Then the next call from you to Mr. George or vice versa

 9    after April 8th is April 27th, a few weeks later.  Do you see

10    that, you placed a call to him on April 27th?

11    A.   Yes.

12    Q.   No calls between April 8th and April 27th, right?

13    A.   I don't know.  I didn't see the whole list.

14    Q.   Okay.

15         MR. GOLDSTEIN:  May I approach, your Honor?

16         THE COURT:  Yes.

17    Q.   See if there's any calls to you from Mr. George or

18    Mr. George to you between April 8th and April 27th.

19    A.   What were the dates again?

20    Q.   April 8th and April 27th.  Do you see anything,

21    Mr. Dardinski?

22    A.   No, not so far.

23    Q.   Okay.  Mr. Dardinski, why don't you put that aside.  It's

24    an exhibit.  The jury can go through it, okay?

25    A.   Okay.
```

1    Q.    You also had another phone that you were using at some

2    point during this investigation, right?

3    A.    Yes.

4    Q.    And that was 774-222-0132; is that correct?

5    A.    Yes.

6          MR. GOLDSTEIN:  May I approach, your Honor?

7          THE COURT:  Yes.

8          MR. GOLDSTEIN:  I want to grab the exhibit back.

9    Q.    And that's the phone that you consented to the government

11:32 10    intercepting and recording every call that went to or from this

11    0132 number, right?

12    A.    Yes.

13    Q.    And that's different than the records we were just going

14    through which ended in 9273, right?

15    A.    Yes.

16    Q.    So for this particular phone, the one that ends in 0132,

17    you signed a form consenting to Agent Tamuleviz to intercept

18    every call to and from this phone, right?

19    A.    Yes.

11:32 20    Q.    And that was in existence some time from the middle of

21    April to the middle of July, right?

22    A.    I don't know the exact dates.

23    Q.    Ninety days or so, right?

24    A.    Okay.

25    Q.    All right.  And you would call Mr. George from that phone,

1    right?

2    A.    I imagine I did.

3         MR. GOLDSTEIN:  Your Honor, with your permission, may

4    I play a phone call, please?

5         THE COURT:  Yes.

6         (Audiotape played)

7    Q.    Do you see a date on this?

8    A.    April 27th, 2010 -- 2009, I'm sorry.

9    Q.    That's you leaving a message from the government issued

11:34 10   phone, right?

11   A.    Yes.

12   Q.    So you placed two calls it looks like to Mr. George, one

13   from the 9273 number, the other from the 0132 number on

14   April 27th, correct?

15   A.    I'm not sure.

16   Q.    Okay.

17   A.    Possibly.

18   Q.    And then you would call Mr. George on occasion from the

19   0132 number, right?

11:34 20   A.    Yes.

21   Q.    You recall that you called him on May 1st, left him a

22   message?

23   A.    It shows here that I called him.  I don't know if I talked

24   to him or left a message.

25   Q.    This is May 1st, correct?

1    A.    Yes.

2            (Audiotape played)

3    Q.    So in that call you identify yourself as his client,

4    right?

5    A.    Yes.

6    Q.    Friend?

7    A.    Yes.

8    Q.    Pain in the ass, right?

9    A.    Yes.

11:36 10    Q.    And that's because you were calling him a lot trying to

11    get ahold of him from late April all the way through till

12    August of 2009, as you testified, right?

13    A.    Yes.

14    Q.    And you also testified that you were getting frustrated

15    because Mr. George would not return your call; do you remember

16    that testimony?

17    A.    Yes.

18    Q.    I'd like to play you a call from July 13th, 2009 that you

19    placed to Mr. George or tried to.

11:36 20            (Audiotape played)

21    Q.    Did you hear that?

22    A.    I don't know what it was that was said.

23    Q.    Let me play that once again.  Do you remember that you

24    were in a room with agents trying to get ahold of Mr. George?

25    A.    I don't remember the date.

1    Q.   But you would on occasion be sitting with agents trying to

2    get ahold of Mr. George, right?

3    A.   Yes.

4    Q.   Do you recall on this instance you told him that you were

5    trying to get in touch with Mr. George and then you said

6    something like, "oh, fuck," do you recall that?

7    A.   No.

8    Q.   Let's listen again, okay.

9         (Audiotape played)

11:37 10   Q.   Did you hear that, sir?

11   A.   Yes.

12   Q.   That's you getting frustrated because Mr. George won't

13   respond to your calls, right?

14   A.   No, that was probably me just trying to dial either the

15   right number or my other phone could have been buzzing, could

16   have been any number of reasons.

17   Q.   All right.  Now --

18        MR. GOLDSTEIN:  One moment, your Honor.

19   Q.   Now, at a certain point you transferred out from the

11:39 20   interception phone, the number we were just going through, and

21   you went to a third telephone number, correct?

22   A.   I believe so.

23   Q.   That was 508-232-8851, right?

24   A.   Yes.

25   Q.   And what I'm showing you here are records from Sprint that

5-

| | |
|---|---|
| 1 | were subpoenaed from your cell phone, and these were calls that |
| 2 | you made to Mr. George.  That's your telephone number, right, |
| 3 | 508-232-8851? |
| 4 | A.   Yes. |
| 5 | Q.   And then it shows that there was a call from this phone |
| 6 | outbound.  Do you see the outbound list? |
| 7 | A.   Yes. |
| 8 | Q.   And it's from your phone, 8851, and if you go over here, |
| 9 | it's to Mr. George's cell phone, 5669, right? |
| 11:40 10 | A.   Yes. |
| 11 | Q.   And if we scroll through here, it looks like you called |
| 12 | him from that nonwire-tapped phone on July 17th, July 20th, |
| 13 | July 21st; do you see that? |
| 14 | A.   Yes. |
| 15 | Q.   And then there's a call on July 21st that's in the box |
| 16 | here, 263 seconds in length; do you see that? |
| 17 | A.   Yes. |
| 18 | Q.   Not recorded, right? |
| 19 | A.   I don't know if that was recorded or not. |
| 11:40 20 | Q.   Check your box, you have recordings from March 18th, |
| 21 | April 6th and April 14th? |
| 22 | A.   Okay, I don't know. |
| 23 | Q.   We don't know, we have to take your word what happened |
| 24 | during that conversation, right? |
| 25 | A.   Yes. |

1   Q.   You call him again July 21st, 31 seconds, right?

2   A.   Yes.

3   Q.   July 22nd, 4 seconds, July 30th, 292 seconds; do you see

4   that?

5   A.   Yes.

6   Q.   And then you don't have another call to Mr. George until

7   August 11th, about 12 days later, right?

8   A.   Yes.

9   Q.   Now, do you recognize this number, 8668?  That's

11:41 10   Michael Hansen's -- is that Michael Hansen's phone number?

11   A.   I believe so, yes.

12   Q.   Your first call to Mr. Hansen's cell phone is August 13th

13   at 11:08 a.m.  Do you see that?

14   A.   No, it would have been December 18th, 2009.

15   Q.   That's a little bit out of order, do you see

16   December comes after August?

17   A.   Okay.

18   Q.   Okay.  So the first call to his cell phone is August 13th

19   at 11:08 a.m., right?

11:42 20   A.   Yes.

21   Q.   Bear with me one second.  Do you recognize this number,

22   262 --

23   A.   It's Mr. George's office.

24   Q.   Okay.  You were calling his office from that phone as

25   well, right?

5-

1    A.    Yes.

2    Q.    Calling Agent Tamuleviz from that cell phone as well,

3    right?

4    A.    Yes.

5    Q.    Just bear with me.

6           MR. GOLDSTEIN:  Can I have one moment, your Honor?

7           THE COURT:  Yes.

8    Q.    We'll come back to that, Mr. Dardinski.  So you called

9    Mr. George a series of times on August 11th, right?

11:43 10   A.    Yes.

11   Q.    Then you called him a series of times on August 13th,

12   right?

13   A.    Yes.

14   Q.    One call was 238 seconds, the other call was 123 seconds,

15   right?

16   A.    Yes.

17   Q.    Not recorded, right?

18   A.    No, I was probably leaving him a message.

19   Q.    We have to take your word for it, right?

11:44 20   A.    Yes.

21   Q.    And then August 14th is the day that you had the

22   conversation with Mr. George that was recorded, and you had a

23   meeting with Mr. Hansen on that day as well, right?  Take a

24   look at the third transcript.

25   A.    What was the date, August 14th?

5-

1    Q.   Yes.

2    A.   Yes.

3    Q.   Okay.  Now, there's no other recorded calls from

4    Mr. George from you until December 7th of 2009, right, after

5    August 14th?

6    A.   Yes.

7    Q.   Count with me how many times you called Mr. George after

8    August 14th, okay.  Let's do it this way.  That's the first

9    call, right?

11:45 10   A.   Yes.

11   Q.   Second?

12   A.   Yes.

13   Q.   Third?  Do you see the little number on the left-hand side

14   says 8R?

15   A.   Yes.

16   Q.   Between August 17th and September 3rd, you called

17   Mr. George 59 times; do you see that?

18   A.   Yes.

19   Q.   Okay.  Now, at the end of the August 14th recorded

11:45 20   conversation, Mr. George tells you I'll call you when Hansen

21   calls me, right?

22   A.   Yes.

23   Q.   Here you are August 17th to September 3rd, you've called

24   him 59 times, right?

25   A.   Yes, but most of the time it was unanswered if you look at

1    the number.

2    Q.   But you didn't know that when you were placing the call,

3    right?

4    A.   Correct.

5    Q.   But when you picked the phone up, you chose not to record

6    it, right?

7    A.   Yes.

8    Q.   And there's certainly calls in there that would indicate

9    there would perhaps be some conversation, right?

11:46 10   A.   This would be all me just dialing and messages.

11   Q.   88 seconds?

12   A.   Yeah, it would have waited for, you know, the time for it

13   to go through.

14   Q.   And we have to take your word for it, right?

15   A.   Yes, anybody with the cell phone knows it takes time, it

16   goes through and they charge you for the minutes.

17   Q.   And you're calling Mr. George and you're calling

18   Mr. George, and he's not getting back to you, right?

19   A.   Yes.

11:46 20   Q.   And then after September 3rd, you don't place a call to

21   Mr. George until December 6th, three months later, right, and

22   Mr. George didn't call you a single time between September 3rd

23   and December 6th, right?

24   A.   Yes.

25   Q.   And you still contend that it was him who was pushing to

```
     1    do some money laundering transaction with you?
     2    A.    Yes.
     3    Q.    Then December 7th Mr. George tells you about 14 times that
     4    he won't be involved, right?
     5    A.    Correct, but he stayed involved.
     6    Q.    I know we have to take your word for it, right?
     7    A.    Yes.
     8    Q.    Do you have any evidence that he stayed involved?
     9    A.    The videos and stuff.
11:47 10    Q.    Do you have any recordings where he says I'd like to be
    11    involved in a dirty laundering transaction?
    12    A.    No, you'd have to go over the tapes that we have.
    13    Q.    Do you have anything new to bring today other than that
    14    which we went through the last time you were here?
    15    A.    No.
    16    Q.    December 7th he tells he doesn't want to be involved 14
    17    times or so, and you continually call him a series of times in
    18    December all the way through to January 11th of 2010.  Do you
    19    see that?
11:47 20    A.    Yes.
    21    Q.    No recordings, right?
    22    A.    No, most of them are one or two seconds long.
    23    Q.    Didn't know that when you picked the phone up, right?
    24    A.    No.
    25    Q.    So we've got to take your word for it that Mr. George
```

1    didn't tell you another 800 times that he wouldn't be involved

2    in your transactions, right?

3    A.    If it was a one-second phone call, that wouldn't have a

4    chance to tell anybody anything.

5    Q.    How about the 97-second called on January 11th?

6    A.    That would have been just a message.

7    Q.    A minute and a half long, just a message?

8    A.    Yeah, every time the phone picked up and the machine and

9    everything else.

11:48 10    Q.    And we have to take your word for it?

11    A.    Yes.

12    Q.    And after January 11st, you don't call Mr. George again

13    until April 26th of 2010, right?

14    A.    Correct.

15    Q.    And you don't know -- do you know Mr. George didn't call

16    you a single time from January 11th to April 26th?

17    A.    I guess not.

18    Q.    Well, these are calls from you to him.  Are you aware that

19    he called you at all during that time period?

11:49 20    A.    Not that aware of, no.

21    Q.    So when you stopped calling Mr. George, he stopped

22    interacting with you, right?

23    A.    Yes.

24    Q.    Now, since you last appeared, we've learned that in the

25    fall of 2010 Agent Tamuleviz secured authority for a third

1    $100,000, and the plan was to try and get you to give it to

2    Mr. George.  Do you recall that?

3    A.   Yes.

4         MS. KAPLAN:  Objection.

5         THE COURT:  Grounds?

6         MS. KAPLAN:  How would he know that?

7         THE COURT:  Sustained.

8    Q.   In the fall of 2010, after November of 2010, up through

9    early February of 2011, you were trying to give a bag of

11:49 10   $100,000 in cash to Mr. George, right?

11   A.   I'm not sure.

12   Q.   Did Agent Tamuleviz ask you, give you physically

13   possession of a bag with $100,000 in cash when Mr. George

14   wasn't showing up to the meetings; do you recall that?

15   A.   No, I don't recall him giving me a bag of money.

16   Q.   You don't recall sitting in a car dialing Mr. George,

17   where are you, this is the third time you didn't show up, I've

18   got something for you; do you recall that message you left him?

19   A.   I don't recall a message, but probably.

11:50 20   Q.   Okay.  And do you recall sitting in the car waiting for

21   Mr. George and him not showing up and you having the $100,000

22   and the agent saying, "give me back the money" and saying "can

23   we shoot him," and you guys joking around about you not wanting

24   to give back the $100,000?

25   A.   Probably.

1    Q.    Probably.  So you make arrangements, trying to make

2    arrangements to physically drop $100,000 in cash on

3    Mr. George's lap in December of 2010 or January or February of

4    2011, right?

5    A.    Yes, and he kept getting tied up in court.

6    Q.    That's what he was telling you, right?

7    A.    Right.

8    Q.    This is almost two full years after you say Mr. George

9    offered to launder you money and you're driving around in a car

11:51 10   trying to dump $100,000 in his lap, right?

11   A.    I wasn't trying to dump it in his lap.

12   Q.    Trying to give it to him?

13   A.    Yes.

14   Q.    And he's not showing up?

15   A.    Yes.

16   Q.    Now, you went over a call with the government from

17   April 27th of 2010.  Do you recall that?

18          MR. GOLDSTEIN:  Can I have a moment, your Honor?

19          THE COURT:  Yes.

11:51 20   Q.    Tab 14?

21   A.    Yes.

22   Q.    Do you recall your testimony, you testified on direct

23   examination that in 2004 when Mr. George tried to swindle you

24   out of $100,000, do you recall that testimony?

25   A.    Yes.

5-

1   Q.   And you testified that he told you that you were a suspect

2   in a murder and gave you a fee agreement with $100,000 for you

3   and Mr. McCann, right?

4   A.   Yes.

5   Q.   That was your testimony that it was Mr. George that told

6   you that you were a suspect, right?

7   A.   Right.

8   Q.   And testified that he came up and in your opinion came and

9   fabricated the whole thing simply trying to swindle, con

11:52  10   Ron Dardinski?

11   A.   Yes.

12   Q.   And Ms. Kaplan went through a recording with you from

13   April 27th, 2010, right?

14   A.   Yes.

15   Q.   And the recording that you went through with Ms. Kaplan

16   began with I believe you don't want to go back to jail.  Let me

17   find that for you.  If you turn to in the book that Ms. Kaplan

18   went through with you and the government transcripts, you can

19   see that it says, "I've got enough money put away," then

11:53  20   there's the ellipticals to indicate that the government cut out

21   a certain portion of that conversation, right?

22   A.   I don't know what page are you looking at.

23   Q.   Page 11, I'm sorry.  Do you see it says, "I've got enough

24   money put away."  And then it says, "Now did you ever cooperate

25   on that stuff?"

1        MS. KAPLAN:  What page is this?

2        MR. GOLDSTEIN:  Page 11.

3    Q.   Does that help you?  Do you see that, Mr. Dardinski?

4    A.   Yes.

5    Q.   And you know because you listened to these recordings, the

6    stars mean that there was a certain portion that was cut out of

7    the government's presentation, right?

8    A.   I believe so.  I'm not sure.

9    Q.   Now, if you look at the transcript I've just put up there,

11:54 10  you see it has got the same language, you see, "I've got enough

11   money put away?"

12   A.   Yes.

13   Q.   Can we play the April 27th clip, please.

14        (Audiotape played)

15        MR. GOLDSTEIN:  Can I have the overhead camera at the

16   same time or no?

17        THE CLERK:  No.

18        (Audiotape played)

19   Q.   Did you hear that, Mr. Dardinski?

11:57 20  A.   Yes.

21        MR. GOLDSTEIN:  Can I have the overhead camera,

22   please.

23   Q.   Mr. George said to you, according to you, Ron Dardinski,

24   they were looking at some waterfront labor racketeering stuff

25   where a murder was involved.  Do you see that?

1    A.    Yes.

2         MR. GOLDSTEIN:  Play the tape.

3         (Audiotape played)

4    Q.   Mr. Dardinski --

5         MR. GOLDSTEIN:  Can I have the overhead camera,

6    please.

7    Q.   Mr. George is talking to you on April 27th, 2010, he does

8    not know that he's being recorded, right?

9    A.    Correct.

11:58 10   Q.   And he's recounting the time when he came up to see you at

11   the Concord prison, right?

12   A.    Yes.

13   Q.   And this was the subject of your direct examination

14   testimony, this is supposedly the 2004 visit where he told you

15   that you were a target in a murder investigation, right?

16   A.    Right.

17   Q.   But here during a conversation he doesn't even know he is

18   being recorded, he says, according to you, Ron Dardinski, they,

19   the U.S. Attorney's Office was looking at you at some

11:58 20   waterfront racketeering stuff where a murder was involved,

21   right?

22   A.    That what he says there, yes.

23   Q.   And you don't say to him, whoa; whoa, whoa, Bob I was

24   pissed at you back then because it was you that told me I was a

25   suspect in a murder, do you?

5-

1    A.    No.

2    Q.    You know you're recording, right?

3    A.    Yes.

4    Q.    You don't interject or dispute or rebut even a single iota

5    of Mr. George's statement that it was you, Ronald Dardinski,

6    who told Mr. George, the lawyer, that the government was

7    looking at you where a murder was involved, right?

8    A.    Yes, but the government wasn't looking at me.

9    Q.    Well, I understand that.  But your testimony was that it

11:59 10   was Mr. George told you that, and here he's telling you in a

11   conversation he doesn't even know is recorded that it was you

12   who told him that, right?

13   A.    Yes, that was after he had asked me about the U.S.

14   Attorney, if they had ever flipped me.

15   Q.    Right.  But you don't contest at all the proposition that

16   it was you who told Mr. George that you were a subject of a

17   labor racketeering investigation where a murder was involved,

18   do you?

19   A.    Yes, I was just trying to throw off the fact that I was

11:59 20   working.

21   Q.    And do you contest it in the conversation?

22   A.    No.

23   Q.    Do you rebut it in any respect?

24   A.    What do you mean do I rebut it?

25   Q.    Do you claim that he's not telling the truth?

1    A.    Yes.

2    Q.    In the conversation, I know it's a vague one.

3    A.    Not in the conversation.

4    Q.    Contemporaneously when he says it, you don't interject at

5    all, right?

6    A.    No.

7    Q.    You know it's being recorded, right?

8    A.    Yes.

9    Q.    You say something, I forget what it was, right?

12:00 10    A.    Yes.

11    Q.    Now, do you recall that in 2004 after you told the

12    government that Mr. George made up this story about you being

13    involved in a murder that you were trying to back then in 2004

14    set Mr. George up by having your conversations with him

15    secretly monitored by the U.S. Attorney's Office?

16         MS. KAPLAN:  Objection.

17         THE COURT:  Grounds?

18         MS. KAPLAN:  I didn't understand the question.

19         THE COURT:  Sustained on form.

12:00 20    Q.    In 2004, you were calling Mr. George hoping to have a

21    monitored phone call, meaning monitored by the U.S. Attorney's

22    Office or DEA agents, right?

23    A.    No.  They didn't -- they weren't monitoring my calls from

24    the jail that I know of.

25    Q.    Didn't you agree to cooperate against Mr. George in 2004

5-

| | |
|---|---|
| 1 | by having the government listen to your conversations with him? |
| 2 | A.   I don't know if I did or I didn't. |
| 3 | Q.   How can you not know? |
| 4 | A.   I was in jail. |
| 5 | Q.   I know, but you were cooperating, right? |
| 6 | A.   I had made the U.S. Attorney's Office aware of what he had |
| 7 | said that I was being charged with. |
| 8 | Q.   Right.  You told them back then this story that Mr. George |
| 9 | tried to swindle you out of $100,000, right? |
| 12:01 10 | A.   Yes. |
| 11 | Q.   And as a result of that, the government wanted you to have |
| 12 | monitored conversations with Mr. George, right? |
| 13 | A.   Not that I know of. |
| 14 | Q.   You don't remember the U.S. Attorney's Office writing a |
| 15 | letter to the jail in Concord asking for special permission so |
| 16 | that your conversations with Mr. George could be monitored back |
| 17 | in 2004? |
| 18 | A.   I would have no knowledge what the U.S. Attorney's Office |
| 19 | sent to the jail. |
| 12:02 20 | Q.   They wouldn't tell you that they would listen to your |
| 21 | conversations? |
| 22 | A.   No, they would not. |
| 23 | Q.   But you were cooperating at the time? |
| 24 | A.   Yes. |
| 25 | Q.   And, in fact, Mr. George says during this conversation |

5-

1    that the U.S. Attorney's Office told him -- talking about a

2    telephone call I got from the U.S. Attorney's Office, right,

3    and he says, "She said, well, he's cooperating with us on

4    something, right?"  Do you see that right here, sir?

5    A.    Yes.

6    Q.    Meaning in '04, the government tells Mr. George that you

7    are a cooperating person for the government, right?

8            MS. KAPLAN:  Objection.

9            THE COURT:  Grounds?

12:02 10         MS. KAPLAN:  That's what the defendant says.

11           THE COURT:  Sustained.

12   Q.    That's what Mr. George told you during this conversation,

13   right?

14   A.    That's what he says, yes.

15   Q.    Okay.  Now, do you recall that as Mr. George said in this

16   conversation that he wrote you two letters in December of 2004?

17   A.    I don't remember him saying he wrote me two letters.

18           MR. GOLDSTEIN:  Can I have a moment, your Honor?

19           THE COURT:  Yes.

12:03 20         MR. GOLDSTEIN:  May I approach the witness?

21           THE COURT:  Yes.  We're going to take a short recess

22   at this stage, jurors.  We'll be in recess 10 minutes.

23           THE CLERK:  All rise for the jury.

24           (JURORS EXITED THE COURTROOM.)

25           THE COURT:  Please be seated, counsel.  Approximately

1    how much longer?

2          MR. GOLDSTEIN:  Five minutes, your Honor, maybe ten.

3    This is my last line of inquiry.

4          THE COURT:  And the cross, approximately?

5          MS. KAPLAN:  Ten minutes at the most, your Honor.

6          THE COURT:  And will there be other evidence offered?

7          MR. GOLDSTEIN:  I'm going to conference, but I don't

8    think so, your Honor.

9          THE COURT:  We'll be in recess for 10 minutes.

12:05 10        (A recess was taken.)

11         THE CLERK:  All rise for the jury.

12         (JURORS ENTERED THE COURTROOM.)

13         THE CLERK:  Thank you, you may be seated.

14         THE COURT:  Good afternoon, jurors.  We're ready to

15   resume.  Mr. Dardinski, you're reminded that you remain under

16   oath.  You may continue with direct examination, Mr. Goldstein.

17         MR. GOLDSTEIN:  Thank you, your Honor.  May I

18   approach, your Honor?

19         THE COURT:  Yes.

12:22 20   Q.   When we left, I was going to see if it refreshed your

21   memory if you remembered two letters Mr. George sent you while

22   you were in prison in Concord in December of 2004.

23         Mr. Dardinski, having reviewed those, does that

24   refresh your memory that Mr. George wrote you in December 20th,

25   2004 telling you that he was not aware that he felt he

5-

1   represented you in any way?

2   A.   I don't ever remember receiving the letters.

3   Q.   Do you recall him telling you that other than visiting at

4   your request --

5        MS. KAPLAN:  Objection.

6        THE COURT:  You can't read the letter in.  If it

7   refreshes his memory, it does; if it doesn't, it does not.

8   Q.   You don't recall him writing you a letter on December 28th

9   either?

12:24  10   A.   I don't recall receiving -- the only thing I remember

11   receiving from him was the agreement, and then I sent him a

12   letter back firing him.

13   Q.   What about calling Mr. George back in November and

14   December of 2004, do you recall calling him on many, many

15   occasions in November of 2004 and December of 2004?

16   A.   Yes, I remember calling trying to get some money back from

17   him.

18   Q.   And do you remember calling him on November 8th,

19   November 12th, November 15th, November 23d, November 24th,

12:24  20   November 26th of 2004?

21   A.   I remember calling, and I remember his secretary saying he

22   was in court, to keep trying.

23   Q.   Do you remember calling December 12th, December 16th,

24   December 17th of 2004?

25   A.   Like I said, I was calling trying to get in touch with him

5-

1    to get some money back from him.

2    Q.   And you don't have any memory of him writing you letters

3    telling you that you were trying to leverage him somehow and

4    you were up to no good?

5          MS. KAPLAN:  Objection.

6          THE COURT:  Sustained.

7          MR. GOLDSTEIN:  I have no further questions.

8          THE COURT:  Cross-examination, Ms. Kaplan.

9          MS. KAPLAN:  Thank you, your Honor.

12:25 10              CROSS-EXAMINATION

11    BY MS. KAPLAN:

12    Q.   Good afternoon, Mr. Dardinski.

13    A.   Good afternoon.

14    Q.   The calls that Mr. Goldstein was going through with you

15    that were under one minute, you saw many of those calls were

16    seconds?

17    A.   Yes.

18    Q.   Was there any conversation that took place during those

19    calls that were seconds long?

12:25 20              MR. GOLDSTEIN:  Well, I object, Judge.  He can't

21    testify about a whole batch of conversations.

22          THE COURT:  Overruled.

23    Q.   And the device that you used to tape record the

24    conversations, is this something that you were able to turn on

25    and off yourself?

A.    Yes.

Q.    And the way that you would use this device to my understanding is that you would place the call, and if Mr. George picked up the phone, then you would turn on the device?

A.    Yes.

Q.    So that when you would call and you would get the answering machine, you would not turn the device on; is that correct?

A.    Correct.

Q.    And when you did have these longer conversations with the defendant that you were not able to record, did you tell Agent Tamuleviz about the conversations?

A.    Yes, I did.

Q.    And during those phone calls, the unrecorded calls that were of any duration, let's say a minute and over, did you ever tell the defendant, "When I call you back --" if you had a conversation that was unrecorded, did you ever tell him, "I'm going to call you back, and I'm going to talk about my drug money?"

A.    No, I did not.

Q.    Did you ever tell him during these unrecorded calls that you were going to call him back and talk about this money that you had from the repossession scam?

A.    No, I did not.

5-

1    Q.   Did you ever tell him during those unrecorded calls that

2    when you called him back, you were going to talk about

3    laundering the drug money or the money from the wire fraud?

4    A.   No, I did not.

5    Q.   Did you ever tell him during these unrecorded calls that

6    were of any duration that you're going to call and talk to him

7    about these things and he should meet you?

8    A.   No.

9    Q.   Did you tell him during these unrecorded calls,

12:27  10   Mr. Dardinski, that when you called him back, he should talk

11   about scaring the living hell out of Michael Hansen?

12   A.   No, I did not.

13   Q.   And during these unrecorded calls, did you ever tell him

14   that he should talk in the next call about roughing Hansen up?

15   A.   No.

16   Q.   And later during the investigation, you saw a whole series

17   of unrecorded phone calls, the toll records that Mr. Goldstein

18   showed you; do you remember that?

19   A.   Yes.

12:28  20   Q.   So later in the investigation, did you ever tell him

21   during those unrecorded calls that during the meetings that you

22   were going to have with him in person he should say that he'd

23   find someone else to launder your money?

24   A.   No, I did not.

25   Q.   Did you ever tell him during those unrecorded calls that

5-

1    when you met with him in person, he should talk about the fact

2    that he had two other people in mind that he was going to get

3    to launder your drug money?

4    A.   No, I did not.

5    Q.   And did you ever tell him during those unrecorded calls

6    that in the next few conversations and in the meetings that he

7    should tell you that he would give you a check for $2500 and

8    that he was going to write in the memo section that it was for

9    office disposal when he knew that you hadn't done any kind of

12:28 10   work like that?

11   A.   No.

12   Q.   Did you scare him during those unrecorded phone calls into

13   saying the things to you that he said in the recorded calls?

14   A.   No, I did not.

15   Q.   Now, the conversation that Mr. Goldstein just played for

16   you, that was from August 27th of 2009, I believe, do you

17   recall?

18            MR. GOLDSTEIN:  April 27th, your Honor.

19            MS. KAPLAN:  What is it, April?

12:29 20            MR. GOLDSTEIN:  Yes.

21   Q.   Do you recall that conversation?

22   A.   Yes.

23   Q.   Okay.  And do you recall the part of the conversation

24   where the defendant says, "The next day I'm getting a call from

25   the Assistant United States Attorney that said you said, yeah,

5-

1    no, they came up like two or three times, and I was just like,

2    listen, I'm going to do my time.  I've got four years to do.

3    I'll do my time, I'll every day of it."  Was that the truth?

4    A.    As far as me the doing the time, yes.

5    Q.    Was it the truth that you told the government when they

6    came to see you that you were just going to do your time?

7    A.    No, it's not.

8    Q.    Were you playing a role here?

9    A.    Yes.

12:30 10    Q.    Okay.  And did you say what you said because you didn't

11    want the defendant to get angry or to get concerned that you

12    were cooperating so that he wouldn't continue with the

13    investigation?

14    A.    Yes.

15    Q.    And in 2004, by the way, the conversation that you're

16    talking about with the defendant that happened, that happened

17    in 2004, correct?

18    A.    Yes.

19    Q.    Some seven years ago?

12:30 20    A.    Yes.

21    Q.    And in 2004 when you were working with these other

22    agencies, what kind of cases were you working on?

23    A.    Labor racketeering cases.

24    Q.    Did they have anything whatsoever to do with the

25    defendant?

5—

1  A.   No, they did not.

2       MS. KAPLAN:  I have no further questions.

3       THE COURT:  Redirect.

4       MR. GOLDSTEIN:  A couple short questions, your Honor.

5                    REDIRECT EXAMINATION

6  BY MR. GOLDSTEIN:

7  Q.   Can you point to anywhere in any recorded call where

8  Mr. George said for you to "scare the living hell out of

9  Michael Hansen" because that was the question that was asked to

12:31 10 you during cross?

11 A.   No.

12 Q.   And can you point out anywhere where he said "rough him

13 up"?

14 A.   No.

15 Q.   No.  Now, all of those calls you made, all of the

16 unrecorded calls that you just testified to, we have to take

17 your word --

18 A.   Yes.

19 Q.   -- as to what was said and not said, right?

12:31 20 A.   Yes.

21 Q.   And would you believe you?

22       MS. KAPLAN:  Objection.

23       THE COURT:  Sustained.

24 Q.   You testified that it was your decision whether to press

25 the record button or not when you made a phone call, right?

A.   If he answered the phone, I was to press the record button

via the recorder, yes.

Q.   So Agent Tamuleviz left it up to you when to record and

not record a conversation?

A.   I was told to record them if he answered the phone, and

most of these calls, you can see that nobody answered the

phone.  They were four seconds long.

Q.   Well, I can't see because, you know, they're all different

durations.

A.   Well, exactly, but they're all under a minute.

Q.   So it was your choice whether to hit the record button or

not, right?

A.   Yes.

Q.   Agent Tamuleviz left it to you, Ron Dardinski?

A.   Yes.

         MR. GOLDSTEIN:  I have no further questions.

         THE COURT:  Thank you, Mr. Dardinski.  You may step

down.

         MR. GOLDSTEIN:  Your Honor, we have a stipulation that

we've agreed to with the government, if I could read that.

         THE COURT:  Yes.

         MR. GOLDSTEIN:  One moment, your Honor.  "In the

matter of the United States vs. Robert A. George, the parties

hereby stipulate and agree as follows:  The telephone number

617-719-6271 belonged to Special Agent Joseph Tamuleviz during

5-

         1    all times pertinent to this matter, and the telephone number

         2    781-329-9000 belonged to East Coast Mortgage during all times

         3    pertinent to this matter."  And I'll submit the original to the

         4    Court.  I believe it needs an exhibit number as well.

         5              THE COURT:  Which would be 118, I believe.

         6              THE CLERK:  119.

         7              MR. GOLDSTEIN:  120.

         8              THE COURT:  It will be Exhibit 120.

         9              (Exhibit No. 120 was admitted into evidence.)

12:33   10              MR. GOLDSTEIN:  We also by agreement, your Honor, have

        11    an aerial photograph that we'll be admitting into evidence, if

        12    I could just display that to the jury.

        13              THE COURT:  It's been agreed to?

        14              MR. GOLDSTEIN:  It's been agreed to, yes.  And, your

        15    Honor, it's an aerial photograph of Needham Square, and it

        16    shows Highland Avenue, Great Plain Avenue, and it demarks where

        17    the Bank of America from Chestnut Street, where one of the

        18    deposits was made and the Bank of America on Highland Ave., and

        19    it shows the Citizens Bank and the Needham Bank at which

12:34   20    Mr. George had accounts are located in relation to those other

        21    two banks.  That will be the next exhibit.

        22              THE COURT:  It will be admitted as Exhibit 121.

        23              (Exhibit No. 121 was admitted into evidence.)

        24              MR. GOLDSTEIN:  Then for the record, your Honor, and I

        25    don't know if you want to approach sidebar, the defense would

1    offer for the record the Rule 11 transcript in the

2    Michael Hansen matter that's been identified as Exhibit 119,

3    and the defense would also offer the Michael Hansen cooperation

4    agreement dated June 10th of 2010.  That's been marked as

5    Exhibit 120.

6              THE COURT:  Wait.  We just marked the stipulation as

7    120.

8              MR. GOLDSTEIN:  So this would be 121, 122.

9              THE COURT:  The aerial photo is 121, so this will be

10   122.

11             MR. GOLDSTEIN:  The cooperation agreement has been

12   marked 122, your Honor.

13             (Exhibit No. 122 was admitted into evidence.)

14             THE COURT:  We'll talk about that outside the hearing

15   of the jury.

16             MR. GOLDSTEIN:  Very well.  With that, your Honor, the

17   defense rests.

18             THE COURT:  The defense rests.  All right.  That

19   means, jurors, is that the evidence portion of this case is now

20   completed as we anticipated the evidence would be done today.

21   I am going to now excuse you for the rest of the day.  We have

22   lots of work to do between now and when you hear closing

23   arguments and my charge to you at the end of the case about the

24   law.  It is now -- take my prior instructions and multiply them

25   by about two or three, and that is how important it is that you

1    honor my instructions not to talk about this case with anybody

2    else.  That means fellow jurors, members of your family or

3    friends who may, you know, legitimately be very interested in

4    this case and want to talk to you about it.  You are not to do

5    it.  You're to use me as the reason why and say you'd be glad

6    to talk to anybody after this case but you can't right now and

7    you can't do any independent research.

8         You are to decide this case solely on the basis of the

9    evidence that is going to be summarized now by counsel.  They

12:36 10    have a right to now make their closing arguments to you, and

11    then after that you will hear my instructions to you on the law

12    that you are to apply to the facts that you find.  So it is

13    very important that you honor my instructions.

14         We will get to that soon enough, that is, tomorrow

15    morning at 9 a.m. I'm going to ask you to come back and we will

16    then proceed to hear arguments and my charge.  The case will be

17    submitted to you some time late tomorrow morning.  Have a

18    pleasant rest of the day.  I'll see you tomorrow at 9 a.m.

19    Please leave your notebooks in the jury room.

12:37 20              (JURORS EXITED THE COURTROOM.)

21         THE COURT:  Be seated, counsel.  I'm going to move the

22    charge conference to 2:30 rather than at 3.  I do have some

23    matters to announce to you with respect to rulings on matters

24    that are before me.

25         With respect to the defendant's motion to strike

5-

1    Exhibit 1C and related testimony, docket Number 108, the

2    defendant's motion is allowed.  There are several problems

3    associated with that exhibit.  First, it is despite the

4    government's protestations being introduced to prove the truth

5    of the matter asserted, that is, that it is accurate on its

6    face and that Mr. Hansen intended to pay the defendant $80,000

7    on in August of 2009.

8         Second, even though it is dated in August of 2009,

9    while the alleged conspiracy was ongoing, there is no

12:38 10   independent evidence it was actually written at that time aside

11   from Mr. Hansen's hearsay statements and delivery of the check

12   to Agent Tamuleviz in response to police interrogation.

13        The defendant has a right under the Sixth Amendment to

14   confront Mr. Hansen himself with respect to those statements.

15   If Mr. Hansen were to testify the check in all likelihood would

16   be admissible.  Finally, Agent Tamuleviz has no personal

17   knowledge of the check absent Mr. Hansen's hearsay statements,

18   and, therefore, is not qualified to testify to it under Federal

19   Rule of Evidence 602.

12:39 20        The Court also has a question with respect to the

21   forfeiture that was going to be addressed by defendant's

22   counsel, Mr. Goldstein.

23        MR. GOLDSTEIN:  Our preference would be, your Honor,

24   that you not give it to them with the verdict, but I understand

25   the Court's ruling, so if that's the Court's ruling, then we

1    would ask that it go on the verdict form, but we would prefer

2    and ask that you not tell them out front, I just think it sends

3    a subliminal message to the jury that --

4         THE COURT:  What do you mean that I not tell them up

5    front?

6         MR. GOLDSTEIN:  Meaning that they deliberate on the

7    counts, on the traditional counts, and then if they were to

8    find Mr. George guilty, then we would have to tell them there's

9    more work to be done.

12:40  10         THE COURT:  I'm not going to do that, I'm going to

11   include it on the original verdict form, and I will instruct

12   them, as I do on civil cases, for instance, when we get to the

13   question of damages, we don't get the damages obviously unless

14   there's liability, but I charge on both at the same time.

15        MR. GOLDSTEIN:  I understand the Court's ruling.

16        THE COURT:  And that is pursuant, I take it,

17   Mr. Goldstein, to your request under Federal Rule of Criminal

18   Procedure 32.2(5)(b); is that correct?

19        MR. GOLDSTEIN:  That is exactly the provision, your

12:40  20   Honor.

21        THE COURT:  All right.  Then we have the question of

22   Petroziello.  Is there any motion in that regard?

23        MR. GOLDSTEIN:  There is, Judge.  And I also have a

24   written Rule 29 for your Honor that I can submit, and they

25   dovetail a little bit.  Let me just make it as sort of simple

1   as I can.  The government has offered no evidence that

2   Mr. Hansen agreed with Mr. George to launder criminally-derived

3   funds, just put aside all the evidence regarding Mr. George,

4   the government has offered no evidence that Mr. Hansen ever

5   agreed.  It's got to be a meeting of the minds, so we have

6   these conversations with Mr. George in March and April of 2009.

7         The evidence is uncontradicted that in April of 2009

8   Mr. George stops talking to Mr. Hansen, so they would have had

9   to have a meeting of the minds prior to April of 2009, let's

12:41 10   call it May 1st of 2009.  There's no record evidence that

11   Mr. Hansen ever agreed with Mr. George prior to May 1st to

12   launder criminally-derived funds.

13         For that reason, the government has failed to sustain

14   even by a preponderance that there was a conspiracy in this

15   case.

16         THE COURT:  Ms. Kaplan.

17         MS. KAPLAN:  Your Honor, I think that the evidence is

18   clear from the first four recorded conversations between the

19   defendant and Ronnie Dardinski that there had been

12:42 20   conversations between the defendant and Michael Hansen's

21   co-conspirator, that they in fact, the defendant and

22   Michael Hansen, had ironed out the details.

23         The defendant repeats the details of how the money

24   laundering is going to take place and tells Ronald Dardinski

25   what he's going to do.  That's replete in the first four

1    recorded conversations, and I think from the very first

2    conversation, it's clear that the defendant has already met

3    with Michael Hansen and they have discussed the laundering of

4    Ronald Dardinski's money.

5            MR. GOLDSTEIN:  Can I have one point just to make this

6    as clear as possible?  I would ask Ms. Kaplan to proffer for

7    the Court a single piece of evidence where Mr. George spoke to

8    Mr. Hansen about criminally-derived money.  It's not illegal

9    for Mr. George and Michael Hansen to talk about laundering

12:43 10   legitimate money that Mr. Dardinski didn't want to be publicly

11   exposed.

12           There is not a single piece of record evidence that

13   Mr. George spoke to Mr. Hansen prior to May 1st about

14   criminally-derived money.  The government wants a leap because

15   they had conversations that it's about criminally-derived

16   money.

17           MS. KAPLAN:  Your Honor, I think it's safe to say that

18   you can't launder clean money, you can only launder dirty

19   money.  The defendant exactly knows who Ronald Dardinski is.  I

12:43 20   don't think you're ever in a conspiracy case expected to prove

21   by formal agreement between the two or by direct words.  You

22   can use circumstantial evidence, you can use inferences which

23   is what the government is doing here.  The defendant was aware

24   that this is money that Mr. Dardinski had which was not from

25   legitimate funds, it was from illegitimate funds.

5-

1            THE COURT:  All right.

2            MR. GOLDSTEIN:  I have a Rule 29, your Honor.

3            THE COURT:  You can submit the Rule 29.  I also want

4    you to submit the proposed question you want me to put to the

5    jury with respect to the forfeiture between now and 2:30 so

6    that I have your thoughts in that regard, Mr. Goldstein.

7            MR. GOLDSTEIN:  Yes, your Honor.

8            THE COURT:  All right.  Then I will take the matter of

9    the Petroziello ruling under advisement which I will announce

12:44 10    at the charge conference.  I believe those are the only matters

11    outstanding.

12            MR. GOLDSTEIN:  There are two, I had asked to offer,

13    your Honor, into evidence the Rule 11 hearing for Mr. Hansen

14    and also his cooperation agreement.  I think they're both

15    admissible.  The Rule 11 hearing is a public record admissible

16    under 803.  It is also a statement of a co-conspirator that

17    undermines the credibility of the co-conspirator under 806,

18    your Honor.

19            When the government introduces statements of a

12:44 20    co-conspirator, the defendant is entitled to offer other

21    statements of the co-conspirator that would impeach that

22    co-conspirator's credibility.  The point about the Rule 11

23    hearing, there's no representation during the Rule 11

24    hearing that Mr. Hansen ever agreed to launder criminally-derived funds

25    with Mr. George.  That's consistent with the evidence

1    Mr. Tamuleviz testified to that during Mr. Hansen's proffer

2    sessions, he repeatedly told the government Mr. George never

3    told them it was drug money.  So at the Rule 11 hearing, the

4    government when it elocutes doesn't make a representation that

5    there was an agreement to launder criminally-derived funds.

6         Mr. Vien in representing Mr. Hansen talks about the

7    fact that the government was going to charge him with money

8    laundering if he didn't agree to the 8300 offenses to which he

9    pled guilty, but that's money laundering, not a conspiracy to

10   launder money, and, frankly, I have no doubts Michael Hansen

11   committed money laundering.

12        The tapes are clear, in December of '09 and April of

13   2010, Mr. Dardinski tells him the money is from drugs, but

14   Mr. George isn't present.  Mr. Hansen has been consistent in

15   one thing in his proffers, that is, that that Mr. George never

16   told him it was criminally-derived money.

17        So the Rule 11 hearing is a statement of a party

18   opponent, Ms. Kaplan, when she elocutes, and there are also

19   statements of Mr. Hansen which impeach the evidence the

20   government seeks to admit, meaning that Mr. Hansen was a

21   co-conspirator.

22        In terms of the cooperation agreement, your Honor,

23   it's clearly relevant, and it goes to the missing witness

24   instruction that I've requested.  Michael Hansen is under an

25   agreement with the government to cooperate.  Part of his

5-

1       agreement to cooperate is to testify when requested.  I think

2       the jury is entitled to know that.

3             We asked as late as yesterday or the day before, and I

4       have an e-mail, I asked to interview Mr. Hansen.  I made a

5       formal request of his lawyer in writing.  We don't have the

6       opportunity to interview Mr. Hansen and try to gauge what he

7       would have said if we would have called him.

8             The government can call him in at any moment in time,

9       have him here, question him and present him, and I think the

12:47 10   jury's entitled to know that there's this cooperation

11       agreement.  They heard some evidence regarding it, so for those

12       reasons, I would offer what's been identified as Exhibit 119,

13       the change of plea transcript for Mr. Hansen, and Exhibit 122,

14       a June 10th, 2010 cooperation agreement signed by Mr. Hansen.

15             THE COURT:  Ms. Kaplan.

16             MS. KAPLAN:  Your Honor, with respect to both items,

17       the government would submit that they are not relevant, and

18       there has not been a proper foundation laid.  With respect to

19       the document that Mr. Goldstein refers to as a cooperation

12:47 20   agreement, it's known in our office as a proffer agreement.

21       It's an agreement that Michael Hansen signed when he agreed to

22       come in and to be debriefed.

23             Michael Hansen did not sign a cooperating plea

24       agreement, he signed just an ordinary plea agreement.  It did

25       not obligate him to testify in this matter.  Now,

5-

1    Michael Hansen is amenable to be subpoenaed by the defendant

2    just as he can be subpoenaed by the government, and he was not,

3    and I find it interesting because the only real testimony about

4    what Michael Hansen might have testified about in this case was

5    elicited by the defendant I think through Agent Tamuleviz when

6    he was asked whether isn't it true that Michael Hansen would

7    say that the money did not come from criminally-derived

8    property, so the testimony that they might have gotten was just

9    as favorable to the defendant as to the government, and that's

12:48 10    what the missing witness charge in the First Circuit criminal

11    pattern jury instructions says, that as long as he's available

12    to the defendant as well as the government as long as his

13    evidence would be favorable to either party, then there's no

14    missing witness charge that would be appropriate.

15        Again, this was a proffer agreement, it was not a

16    cooperation agreement that he come to trial and testify at

17    trial.  There's been no foundation laid for that cooperation

18    agreement or the proffer agreement going into evidence.  With

19    respect to the plea agreement, a decision was made that

12:49 20    Mr. Hansen would plead to structuring.  There was no reason for

21    him to elocute at his Rule 11 to have anything to do with the

22    criminally-deprived property, it's not an element of the

23    offense of structuring, and that's why it wasn't brought out.

24        I think that to have that plea agreement in front of

25    this jury would lead them to speculate.  I think it would cause

5-

1   them to consider evidence against Mr. Hansen, the fact that he

2   had pled guilty as evidence against the defendant and that he

3   should only be found guilty of the structuring.  It's not

4   relevant, and there's been no foundation laid for it.

5       MR. GOLDSTEIN:  Your Honor, I need to correct the

6   record, two things:  One is Mr. Hansen didn't plead to

7   structuring, he pled to 8300 offenses; Number 2, we're not

8   offering the plea agreement, we're offering the cooperation

9   agreement.  No. 3 is it is not --

12:50 10       THE COURT:  I thought you were offering the plea, plea

11   colloquy.

12       MR. GOLDSTEIN:  No, no, plea colloquy.  No. 3, this is

13   not a proffer agreement.  All of us who practice in the federal

14   court understand what a proffer agreement is.  This is a

15   cooperation agreement.  Ms. Kaplan just said it didn't require

16   him to testify.  The very first paragraph says, "Your client

17   agrees to cooperate fully with law enforcement agents and

18   government attorneys.  He must provide complete and truthful

19   information to all law enforcement personnel.  If his testimony

12:50 20   is requested, he must testify truthfully and completely before

21   any grand jury at any hearing and trial."

22       This is not a standard proffer agreement, this is a

23   cooperation agreement.  It is far different than the U.S.

24   Attorney's standard proffer agreement, so I just wanted to make

25   sure the record was clear on that.

5-

1          THE COURT:  Ms. Kaplan, do you need to respond?

2          MS. KAPLAN:  No, your Honor.  I think what this

3     agreement -- this is not the standard proffer agreement.  I

4     think that it was a little bit of a cooperation and a proffer

5     agreement, but it's also not a cooperating plea agreement, I

6     think that that's the message that the defendant is trying to

7     get to this jury was that he was obligated to testify at this

8     trial, which he was not.

9          THE COURT:  I take the matter under advisement and

12:51 10    I'll see you all at 2:30.

11          MR. GOLDSTEIN:  Thank you, your Honor.

12          THE CLERK:  All rise.

13          (A recess was taken.)

14                    CHARGE CONFERENCE

15          THE CLERK:  All rise.  Thank you.  You may be seated.

16     Court is now in session.

17          THE COURT:  Good afternoon, counsel.  We have a full

18     agenda of items to discuss.  I hope we can do it with alacrity,

19     but it may take some time.  I'm going to announce some of my

02:45 20    rulings, and then we'll have discussions about other matters

21     that need to be resolved, but first with respect to the

22     proposed exhibits of the defendant's that we discussed just

23     before we broke at noon, that is opposed Exhibits 119 and 122,

24     with respect to those exhibits, they will not be admitted into

25     evidence.  They do not seem to the Court to be relevant to the

5-

1    crimes charged against the defendant and will only confuse the

2    jury, so I'm not going to allow their admission.

3         The defendant's motion under Rule 29 I would just like

4    to hear the government's response to the first argument with

5    respect to Count 6 wherein the defendant suggests that because

6    there was no relationship established between the proceeds

7    given to the defendant by Mr. Nieves and the money actually

8    paid to Dardinski that Count 6 cannot be proven.

9         MR. HAFER:  Yes, your Honor, I'll respond if you don't

02:47 10   mind.  Of course, viewing the evidence in the light most

11   favorable to the government, the evidence is that there were

12   extended conversations between the defendant and Mr. Dardinski

13   about a referral fee.  That referral fee was specifically

14   discussed to be 10 percent of whatever the defendant was paid.

15        The defendant was in fact paid $25,000 and was

16   purported by a law enforcement officer to be drug proceeds.  In

17   light of those conversations, he then makes good on the promise

18   of 10 percent.  It's exactly 10 percent of the money, and,

19   again, this is in the evidence in the light most favorable to

02:47 20   the government.  If he wants to argue somehow that it's a

21   different 2500, I guess he's entitled to that argument.

22        The government's view is when you have conversations

23   discussing the deal and then the deal is consummated on the

24   exact terms of the conversation, and it was specifically, I'm

25   giving you 10 percent of what I do get paid.

1          THE COURT:  So it's your position that it doesn't have

2     to be the remainder of the $17,000 that was deposited, in other

3     words, it doesn't have to come from that $8,000 of green cash?

4          MR. HAFER:  Correct, that's absolutely our position,

5     your Honor.

6          MR. GOLDSTEIN:  That's absolutely an incorrect

7     position of law.  The government has charged in the indictment

8     if you look at Count 6, it has charged that this transaction

9     involved proceeds of property represented to be a specified

02:48  10     amount of criminal activity.  The government must prove that

11     it's the same money, and they can't.  In fact --

12          THE COURT:  It's your position that they have to show

13     that it was actually the remaining $8,000 of cold, hard cash

14     that was not deposited that day by your client?

15          MR. GOLDSTEIN:  Yes, especially because according to

16     the government's own exhibits, your Honor, when the $16,000

17     check to the Department of Revenue was cashed, the account went

18     down to $565.  It later went down even more, so, yes, as a

19     matter of law the government must prove that the money used to

02:49  20     fund that check is the same cash given to Mr. George by

21     Detective Nieves.  They had the money serialized, and they've

22     not offered any evidence, and Mr. Hafer did his best job, but

23     there is no evidence that it was the same money.

24          THE COURT:  I'll give Mr. Hafer one last.

25          MR. HAFER:  I completely disagree, your Honor, it

1    would be almost impossible.  The point is $25,000 is

2    represented to the defendant to be drug proceeds.  There are

3    multiple conversations where the defendant tells Ronnie

4    Dardinski, I'm paying you 10 percent of that money, whatever I

5    get from that guy, I'm paying you 10 percent of that money.  He

6    makes good on that promise, it's 10 percent of the 25,000.

7    Whether there is other activity in the meantime, it is in our

8    view neither here nor there.  It is 10 percent of the money

9    purported to be drug proceeds, and, again, we're viewing the

02:50  10   evidence in the light most favorable.

11            THE COURT:  That's the way I view the law, too, Mr.

12   Goldstein.  I'm going to deny the defendant's motion for

13   judgment of acquittal without prejudice to it being

14   reconsidered after the return of a verdict, but specifically

15   with respect to that Count 6, I see the law the way that it has

16   been described to me by the government.  I may be corrected by

17   a higher authority, but we'll wait and see.

18            With respect to the Petroziello matter and just for

19   the record after having heard all of the evidence, the Court is

02:50  20   satisfied that the out-of-court statements made by

21   Michael Hansen which have been admitted conditionally as

22   exhibits in this case are admissible as evidence pursuant to

23   Federal Rule of Evidence 801(d)(2)(e) in support of the

24   government's charges of conspiracy in Count 1.

25            Under the standards set forth in Petroziello and its

5-

1    progeny, the Court finds by a preponderance of the evidence

2    that the statements were made "during the course and in

3    furtherance of a conspiracy" or joint venture, and that finding

4    is supported by independent evidence, including recorded

5    conversations between the defendant and Ronald Dardinski in

6    March and April, 2009.  Accordingly, the government's motion in

7    limine to admit co-conspirator statements docket Number 100 is

8    now allowed.

9         Turning next to the forfeiture issue, which in the

02:51  10    intervening hour or so the government has filed an in limine

11    motion regarding forfeiture, I take it the defendant has seen a

12    copy of that?

13         MR. GOLDSTEIN:  We have, your Honor.  In light of your

14    earlier issue, we were going to just withdraw the forfeiture

15    issue going to the jurors so as to not create unnecessary

16    issues.

17         THE COURT:  That does help considerably,

18    Mr. Goldstein, because as I see it, the government's point is

19    well taken in that if you press your right under 32.2, we would

02:52  20    have to, if the jury returns a guilty verdict as to any of the

21    counts, basically recharge the jury, send them out again late

22    on Friday afternoon or maybe next week, I don't know which, and

23    it would create some serious logistics problems.

24         MR. GOLDSTEIN:  Before the end of this conference,

25    I'll give you an absolute, but I think that's our inclination.

5-

1          THE COURT:  Otherwise I am reluctantly concluded,

2     having considered the government's memorandum, that I indeed

3     ought not to include it in the first verdict form and would

4     have to then recharge the jury, at least minimally, but

5     recharge the jury and send them out if in the event that there

6     is a guilty verdict on any of the six counts.

7          MR. GOLDSTEIN:  Okay, your Honor, thank you.

8          THE COURT:  All right.  Admission of the transcripts

9     as exhibits, Mr. Goldstein, has the defendant decided on that

02:53  10     one?

11          MR. GOLDSTEIN:  As long as it includes the transcripts

12     of the jail calls, then we don't object to all of the

13     transcripts going into the jury.

14          THE COURT:  Have we seen the transcripts of the jail

15     calls?

16          MR. GOLDSTEIN:  I've provided them to the government.

17     I didn't show them to the jury during the trial.

18          MS. KAPLAN:  I would just ask to see exactly which

19     transcripts we're talking about because I saw, you know, maybe

02:53  20     50 transcripts the night before they were going in, so maybe we

21     could reach some agreement as to exactly --

22          THE COURT:  Can we narrow in on the calls that were

23     played and not offer 57 that weren't?

24          MR. GOLDSTEIN:  No, of course.  I'm only talking about

25     three or four.

5-

            1          THE COURT:  There were about three or four, weren't

            2      there?

            3          MR. GOLDSTEIN:  There were about 15 of them that we

            4      played.

            5          THE COURT:  Show them to Ms. Kaplan, if there's an

            6      agreement between now and tomorrow morning at nine, we will

            7      admit all of the transcripts including the ones that you can

            8      agree to as to the recorded conversations in the prison.  If

            9      not, if there's not an agreement, then I'll have to make a call

02:54   10      at that time.

           11          MR. GOLDSTEIN:  Okay.

           12          THE COURT:  All right.  We're now going to turn to the

           13      government's proposed jury instructions, and, of course, I will

           14      then follow that by a consideration of the defendant's request

           15      for jury instructions, and I always start this portion of the

           16      charge conference with a caveat that is quite often not

           17      remembered as we get into the heat of it all, and that is when

           18      I say I'm going to give the substance of a proposed charge, I

           19      mean that with emphasis on the word "substance," not

02:55   20      necessarily verbatim.

           21          I know from experience that counsel do offer me

           22      sometimes alternative requests and try to be as thorough as

           23      they possibly can.  I understand the reasons for that, but I'm

           24      going to only charge one time on each of these and usually more

           25      succinctly than I am asked to.

5-

1      So when I do go through this and say I'm going to give

2      the substance of the following instructions, it means that and

3      not necessarily verbatim.  As we start through the government's

4      proposed jury instructions, the first several actually since

5      they weren't numbered, I have to use page numbers up through

6      page 15 were preliminary instructions, so we don't need to be

7      concerned with those.

8      Starting at page 15 in the so-called final

9      instructions, the first several actually about 15 or 20 pages

02:56  10      worth are what I call boilerplate instructions.  They're my

11      standard instructions, and I will give the substance of all of

12      those requests with the exception of those that appear on page

13      21 of the government's request which has to do with the CSI

14      effect.  I don't charge and I'm not going to give that one.

15      Then on page 24, the judicial notice request which, of

16      course, we didn't take judicial notice, as was originally

17      requested, so that's no longer pertinent, and then finally 30,

18      the limiting instructions, which sometimes we have limiting

19      instructions.  We haven't had any in this case, so I'm not

02:57  20      going to give that, but other than that, other than those

21      so-called boilerplate instructions, I will give the substance

22      as requested by the government.

23      MR. GOLDSTEIN:  I'm sorry to interrupt, your Honor,

24      you did grant the motion to strike the Exhibit 1C and related

25      testimony?

1          THE COURT:  Yes.

2          MR. GOLDSTEIN:  I'd ask for some instruction on the

3     jury so I just wanted to bring that to the Court's attention.

4          THE COURT:  That I will do, thank you for reminding

5     me, Mr. Goldstein.  Before closing arguments we will have some

6     housekeeping matters, and it may well be at the time that we're

7     going to say we're going to admit the transcripts as an

8     exhibit, and, by the way, while we're talking about Exhibits 1C

9     such and such described whatever it was has been deleted and is

02:57 10    not to be considered as an exhibit.

11          MR. HAFER:  Your Honor, I'm sorry, again, just while

12    we're on that point, it just dawned on me as I was sitting here

13    that with respect to the tax evidence that was admitted perhaps

14    a limiting instruction is appropriate just to make sure that

15    it's not considered in any way for propensity and that it came

16    in for the purpose that the government offered it for motive

17    purpose and that sort of thing.

18          THE COURT:  Why don't you draft me --

19          MR. HAFER:  I will do that.

02:58 20    THE COURT:  -- less than one paragraph addition, and I

21    would like to have it by five o'clock this afternoon.

22          MR. HAFER:  You will, your Honor.

23          THE COURT:  Any objection to that, Mr. Goldstein?

24          MR. GOLDSTEIN:  Maybe.  I think I want to see the --

25          THE COURT:  Obviously show Mr. Goldstein.

1          MR. HAFER:  Frankly, the point would be to --

2          THE COURT:  It is to the advantage of the defendant

3     but show it to the defendant anyway.

4          MR. GOLDSTEIN:  Your Honor, sometimes highlighting

5     things.

6          THE COURT:  Yes, I understand.  All right.  Then

7     proceeding to the we'll call it for lack of a better term the

8     substantive requests, let's start on page 34.  I will give the

9     substance of the multiple counts request, and, of course, I

02:58 10    note that we only have five separate substantive money

11     laundering counts, not six as mentioned on page 34, but other

12     than that, I give the substance of that request as well as the

13     substance of the request on Count 1, conspiracy page 36,

14     however, at least as to this request, my charge is based on the

15     First Circuit pattern instructions and not the Sand's pattern

16     instruction, which is in most cases much more, much lengthier,

17     mine is about half the length of this, so even though I give

18     the substance, this one is too detailed.

19          The request on page 39, first element, I give the

02:59 20    substance of that.  On 40, I do not give a silent

21     understanding, I just say that the conspiracy is an agreement

22     spoken or unspoken in place of that entire silent understanding

23     request.  I don't give circumstantial evidence of the agreement

24     request, which is on page 41.

25          I instruct on direct and indirect evidence in general,

5-

1    in my general instructions, and the inferences may be drawn, et

2    cetera, from the defendant's conduct, but I don't give a

3    so-called circumstantial evidence instruction.

4         Then on page 42, our charge on willful blindness is

5    limited to the question of whether the defendant knew the

6    essential features and the general aims of the conspiracy.

7    That knowledge is relevant to whether he willfully joined the

8    agreement, so mine is much shorter than the requested willful

9    blindness request on page 42.

03:00 10         I do give the substance of the request on 43, but,

11    again, the middle, that second paragraph is redundant.  I

12    wouldn't give that, object of the conspiracy.

13         Then the request on page 45, I give the substance,

14    ours is much less detailed, and, again, is the First Circuit

15    pattern, not the Sand's pattern.

16         The request on page 49, responsibility for all ongoing

17    actions of co-conspirators, I do not give -- this has to do

18    with committing the underlying offenses of which the defendants

19    are not charged.

03:01 20         I don't give that generally.  If the government wishes

21    to enlighten me, I will hear after I go through these if they

22    wish to get back to this one, I will hear them, but I don't

23    think I'm going to give that.

24         With respect to the one on page 50, I give the rough

25    substance, but we don't repeat the time period, I've used the

1  time period earlier, and I don't say it twice.  Objects of the

2  conspiracy, on the elements now, unlike some of these other

3  requests, I do in fact rely on the Sand's modern federal jury

4  instructions, so I give the substance of this one on page 51

5  and 2.

6      In the definitions, mine are much shorter.  For

7  instance, I don't have the lead-in paragraph, I don't define

8  transaction again.  My other instructions seem to be

9  considerably shorter, but, in essence, I give the rough

03:02 10  substance of this request.  I also include a brief description

11  of narcotics and wire fraud which hasn't been requested but

12  roughly the same as requested.

13      Then the one on page 56, I do give the rough substance

14  of that.  The Court's instruction is based on the Sand's

15  Federal Jury Instruction and includes five elements instead of

16  three.

17      The one on page 57, actually the Court separates its

18  instructions with respect to Count 6 on the one hand and Counts

19  2 and 3 on the other.  With respect to Count 6, which I charge

03:03 20  on first, we give the substance of the government's request

21  toward the end of this request, but with respect to 2 and 3,

22  those instructions are only on aiding and abetting, and the

23  Court bases its instructions on the First Circuit pattern,

24  which are far more succinct than Sand in this case.

25      Then on page 59, I am not going to repeat what I've

1   already said with respect to Count 1, so this is actually

2   repetitive, and I don't give it a second time.  With respect to

3   page 60, I give the rough substance.  My charge in this case is

4   based on Sand's federal jury instructions.  I don't give the

5   last couple of sentences on the bottom of page 60.  The Court

6   just says that to consider all of the evidence consistent with

7   the model instructions.

8        On page 61, I do not give the substance of that.  The

9   Court instructs on this element but bases its instruction on

03:04 10   the Sand's, which is very much reduced from this request.

11        The one on 63, this instruction does not appear to be

12   necessary.  The jury can decide for itself which are relevant

13   factors to consider, and the Court does not believe it's

14   necessary to suggest that to the jury.

15        So aiding and abetting on page 65, the Court's

16   instruction is based on the Sand's modern federal instructions.

17   It bases its aiding and abetting instruction -- I'm sorry, I

18   misspoke.  This one seems to be based on the Sand's modern

19   federal jury instructions, but the Court bases its aiding and

03:05 20   abetting instruction on the First Circuit pattern instructions,

21   which are more concise and which I have used in the past

22   without reversal.

23        On page 67, money laundering, I do give the substance

24   of that, but the Court adds one sentence to explain the

25   transaction upon which each count is based.

1          68, I give the substance of avoiding a transaction

2     reporting requirement based on the Sand's instructions.  I

3     don't give the bottom of page 68 or onto page 69.  I believe

4     that is unnecessary.  It's not in the model instruction.

5          With respect to page 70, willful blindness, no, I

6     don't give that in this regard.  This is with respect to the

7     structuring of the eight and nine thousand dollar deposits.  I

8     don't see how there can be willful blindness involved in this

9     particular count, so I don't give it here.

03:06 10          With respect to Count 7 on page 71, I do give the

11     substance.  My instruction is based on the First Circuit

12     pattern and borrows actually in this case from the

13     Seventh Circuit pattern instruction with respect to definitions

14     of structuring and financial institution.  I also say not only

15     that a withdrawal of cash from a financial institution is a

16     financial transaction but also a deposit of cash in a financial

17     institution is a financial transaction.

18          Going onto the next one is page 74.  I give the rough

19     substance actually of the next two, 74 and 75.  Punishment on

03:07 20     page 76, I don't see that say whole thing, I say the -- let's

21     see, the last sentence is what I say, "under your oath as

22     jurors," et cetera, I don't say the first part of that one.

23     So, maybe rough substance, of at least part of it.

24          Then on page 77, we're getting into the third section

25     of my charge.  I don't actually -- I have my own instructions

with respect to how the jury is to operate during

deliberations, and I would say mine is different than your

request.  Consideration of the evidence on 78, yes, the rough

substance.  On 79, that's an Allen Charge.  I don't give that

charge unless and until the jury returns deadlocked.  We call

that sometimes a dynamite charge, but I don't give it until

it's deemed necessary.

Then, finally, return of the verdict form, I have my

own format that I follow, which is not really this way, so I

don't give that.

Communication with the Court, yes, I give the rough

substance of that.

So that takes care of all of the government's

requests.  Any comments first from the government?

MS. KAPLAN:  Well, your Honor, I would ask you to

reconsider the instruction on page 49, responsibility of all

ongoing actions of co-conspirators.

THE COURT:  Let me catch up to that one.  Hold on.

MS. KAPLAN:  It does seem to me to be relevant here.

There has been argument that the defendant who we say was in

this conspiracy withdrew after the April, '09 conversations,

and our argument would be that, you know, once he's in this

conspiracy with Michael Hansen, anything that Michael Hansen

does until Michael Hansen is no longer in the conspiracy in

June of 2010 this defendant is responsible for as a

1       co-conspirator.

2               THE COURT:  All right.  Any response to that,

3       Mr. Goldstein?

4               MR. GOLDSTEIN:  Well, obviously I prefer the Court not

5       give the Pinkerton instruction.  I think this is what it is.

6               THE COURT:  This is sort of a modified Pinkerton.

7               MR. GOLDSTEIN:  Right.  But if the Court is going to

8       give a Pinkerton instruction, I think the Court necessarily

9       must give a withdrawal instruction, which we've requested.

03:10 10    Ms. Kaplan's submission says that withdrawal is for the

11      conspiracy alone.  I can get the Court a bunch of cases, it's

12      not just conspiracy.  Withdrawal means it has an impact of the

13      Petroziello decision and it impacts Pinkerton, meaning once a

14      defendant withdraws from the conspiracy, he's no longer

15      responsible for the actions of any other co-conspirators.

16              That's black letter law, and so if the jury were to

17      conclude that Mr. George withdrew on April 6 when he said I'm

18      all done or December 7th, when he said 14 times I won't be

19      involved, then by law if the jury finds that he withdrew at

03:10 20    that point, he is no longer part of the conspiracy, therefore,

21      there is no Pinkerton responsibility.

22              To make it clean and simple, I think the Court should

23      stick with its original ruling, but if the Court's confined to

24      the Pinkerton instruction, I think it needs to instruct on

25      withdrawal as well.

1          THE COURT:  All right.  I'll consider that, but we'll

2     get to your withdrawal requests shortly.  Anything else,

3     Ms. Kaplan?

4          MS. KAPLAN:  No, your Honor.

5          THE COURT:  Any other response from the defendant's

6     side?

7          MR. GOLDSTEIN:  There are, Judge, there's a few that I

8     need to address.  One is on page 58, I would --

9          THE COURT:  Let me catch up to you.

03:11 10          MR. GOLDSTEIN:  Okay.

11          THE COURT:  Yes.  The second part of the one that

12     starts on 57?

13          MR. GOLDSTEIN:  I'm sorry, 57 to 58.  This has to do

14     with Count 6.  One, I'd like to preserve my objection.  I think

15     the government does need to prove that the funds that

16     Mr. George used to fund the $2500 check, I do think that the

17     government needs to prove that they were in fact proceeds.

18          I'll give you a hypothetical, your Honor.  If the

19     evidence in this case showed that Mr. George got $10,000 from a

03:11 20     loan at the bank and then put that money into his account to

21     fund the $2500 check, and if that was the state of the

22     evidence, clearly the government couldn't charge him with money

23     laundering because the money he's put in to fund the 2500 has

24     nothing to do with any of his money.

25          The inverse is true, the government needs to prove

1    that the money that was put into the account is the same money

2    that was taken.  The Court has ruled against me, but I do want

3    to preserve it.

4         The other issue is the following, Judge:  The

5    government has slipped into their instructions an alternate

6    prong of the relevant statute, and that is found on page 58

7    where it says, second, "The financial transaction or attempted

8    financial transaction involved property represented by a person

9    at the direction of a federal official to be the proceeds of

03:12 10  specified unlawful activity," and here's the part, "or property

11   used to conduct or facilitate specified unlawful activity."

12        The government, if you look at Count 6 of the charging

13   indictment is not charged, that alternative prong of

14   1956(a)(3)(B).  The indictment only charges that its property

15   represented to be proceeds of a specified unlawful activity.

16   That would be a constructive amendment if the Court were to

17   charge on the alternative prong of that particular statute

18   that's not in the indictment.

19        THE COURT:  All right.  I will further consider that.

03:13 20       MR. GOLDSTEIN:  Secondly, in terms of the proposed

21   instructions regarding Counts 2, 3, 4, 5 and 6 found at pages

22   61 through 63, the government --

23        THE COURT:  Wait a second.

24        MR. GOLDSTEIN:  Yes.

25        THE COURT:  Okay.

5-

1          MR. GOLDSTEIN:  The point is that the government has

2     asked the Court to instruct that if you look at page 63, you've

3     stricken this instruction, I just want to make sure.

4          THE COURT:  Actually why are you arguing it?  I said

5     I'm not going to give this.

6          MR. GOLDSTEIN:  I just want to make sure that the

7     Court knows for this particular prong when you do instruct the

8     jury on (a)(3), it's not mere knowledge that the transaction is

9     designed to conceal, they have to prove that Mr. George's

03:14 10     intent was to conceal.  It's a different mens rea than (a)(1)

11     1956.  Under 1956(a)(1), the government need only prove that

12     the defendant knew that the transaction was designed to

13     conceal, but under (a)(3), the reverse sting provision that

14     Congress enacted, they implemented a higher mens rea, and the

15     government needs to prove that it was actually Mr. George's

16     intent that the transaction conceal the location, source or

17     origin of the funds.

18          And in terms of Counts 4, 5 and 7, your Honor, the

19     government --

03:14 20          THE COURT:  What pages are we on now?

21          MR. GOLDSTEIN:  We are at page 68 I think it begins.

22     The government has asked for an instruction regarding the form

23     8300, and this case, they've not charged 8300.  If you look at

24     the relevant structuring counts, 4, 5 and 7, the government has

25     identified the form that Mr. George intended to evade as the

1    currency transaction report.  It's right in the indictment.

2    Banks don't file form 8300s, so I'm not sure not why the

3    government has.

4         MR. HAFER:  He's right, seeing this now and

5    recognizing it for the first time, he's right, the reporting

6    requirement that we allege was evaded.  It was the bank's -- or

7    intended to evade.  It was the bank's duty to file a CTR.

8    There's no allegation that Mr. George should have filed an

9    8300.  We agree that should come out.

03:15  10         THE COURT:  Where is there a reference to 8300 -- oh,

11   I see.

12         MR. GOLDSTEIN:  It's on 68.

13         THE COURT:  Three-quarters of the way down, form 8300.

14         MR. HAFER:  That paragraph, I think, right, Rob, I

15   think that whole paragraph.

16         MR. GOLDSTEIN:  And on page 72, it's repeated.

17         THE COURT:  72?

18         MR. GOLDSTEIN:  Yes.

19         MR. HAFER:  We agree that shouldn't be in there,

03:15  20   that's just an oversight on our part.

21         THE COURT:  Yes, same paragraph.  All right.  Let me

22   get this down.

23         MR. GOLDSTEIN:  I'm sorry.

24         THE COURT:  Okay.  Next.

25         MR. GOLDSTEIN:  I'd like to for the record object to

1    any willful blindness instruction, your Honor, I need not

2    belabor the issue.  You said you were going to give a modified

3    version at the beginning of the instructions.

4         THE COURT:  Yes, but the second one I'm not going to

5    give.

6         MR. GOLDSTEIN:  No, exactly, no, no, I understand

7    that.  I'm not sure the evidence fits a willful blindness

8    instruction, so I'd like to reserve that objection.

9         THE COURT:  Do you remember which one that was?

03:16 10       MS. KAPLAN:  Page 42, I believe.

11        MR. GOLDSTEIN:  That's correct.

12        THE COURT:  What is it again?

13        MS. KAPLAN:  Page 42.

14        THE COURT:  Okay.

15        MR. GOLDSTEIN:  I leave it to the Court.  I don't

16   think that the evidence fits that.  I'd like to also reserve an

17   issue that we filed pretrial, your Honor, which is that the

18   government should have charged a conspiracy to violate (a)(3),

19   not (a)(1), and this is why we made that motion for this

03:17 20   precise issue.

21        The government in their requested charge on the

22   conspiracy, they've asked your Honor to not charge that the

23   funds in fact be proceeds, but that's what (a)(1) says.  That's

24   why, you know, I've lost the motion already, but there's an

25   incongruity to the government charging (a)(1) as an object of

5-

1       the conspiracy when it's a reverse sting.  I think they should

2       have charged (a)(3), I'd just like to reserve that issue.

3               THE COURT:  Your objection is reserved.

4               MR. GOLDSTEIN:  Thank you.  The final issue that I do

5       want to argue, Judge, is I don't think the government has

6       presented sufficient evidence for a wire fraud to go to the

7       jury as one of the specified unlawful activities.  I think I

8       addressed this issue in my Rule 29 pleading, but the government

9       has not proven that Mr. Dardinski's state larceny offenses

03:18 10  would have qualified as a federal offense.

11              The facsimiles to and from American Service Lenders

12      bore no relationship to Mr. Dardinski simply lying to people

13      coming in and out of his office.  I think it's going to confuse

14      the jury.  There was no real evidence that the government

15      alleges that they charged it, but there was no evidence that

16      the funds came from a federal wire fraud.

17              THE COURT:  How about that, Ms. Kaplan?

18              MS. KAPLAN:  Your Honor, I think, again, in viewing

19      the evidence in light most favorable to the government, the

03:18 20  evidence from Ronnie Dardinski was exactly that he had a

21      franchise with a company in Odessa, Texas and that the way they

22      did their business was through the use of the phones or through

23      the use of faxes.

24              What he testified to was that this company, American

25      Lenders, would send him these repossession notices notifying

1    him which cars he needed to repossess.  He would then repossess

2    those cars and put them on his lot or he would tell the victims

3    of the crime that he had the cars from that business.

4         THE COURT:  So you're saying the repossession was an

5    element, a necessary element to the crimes of larceny?

6         MS. KAPLAN:  Certainly, yes, it was certainly

7    incidental to it, and I think when Mr. Goldstein argued this

8    before, he alleged that there was a much higher standard that

9    had to be met between the use of the wires than actually exists

03:19 10   under the law.

11        MR. GOLDSTEIN:  The use of the wires has to be a

12   component of the fraud, and there's no evidence of that,

13   meaning Mr. Dardinski faxing back and forth to Texas bore no

14   relationship to --

15        THE COURT:  Well, the argument, as I understand it, is

16   he wouldn't have had access to the cars "to sell" if he hadn't

17   been in the franchise business in Odessa, Texas.

18        MR. GOLDSTEIN:  Mr. Dardinski's testimony was these

19   people never even saw the cars, people would come in and ask

03:20 20   him if they could get a car, and he'd tell them yes and then

21   he'd take their money.

22        THE COURT:  All right.  I'll think about it again.

23   Now we're going to turn to the defendant's requests, actually

24   there were two.  They submitted a supplemental just last night,

25   I believe it was, so we'll go through the two of them and then

1     hear counsel in that regard.

2          First with respect to docket Number 80, the one that

3     was filed earlier this month or last month, the indictment is

4     not evidence, request Number 1, I give the substance of that.

5     Caution as to cooperating witness, I give some of that, more in

6     line with the government's proposed instruction, and the

7     First Circuit pattern, for instance, I don't say the last, I

8     guess it's the last sentence on the top of page 2 that "you

9     must determine whether the testimony of such a witness," so on

03:21 10     and so forth, but I say words to that effect but in a different

11     way.

12          Number 3, law enforcement officers as witnesses, yes,

13     I do give a cautionary instruction but not the middle

14     paragraph, which seems to me goes beyond the standard charge

15     that I give, so I would say I give the rough substance of that.

16     Number and nature of witnesses, some of this language has been

17     added to my general instruction on the number of witnesses, so

18     I do give the rough substance of that one and also the

19     conspiracy instruction.  It goes on for what, three pages.  I

03:22 20     give a good chunk of it toward the bottom of page 3.  It does

21     seem to me to get redundant.

22          We're talking about in order to find Mr. George guilty

23     of a conspiracy, you must find that he conspired with

24     Michael Hansen only.  As I understand the evidence, at least

25     until March 18th, if one believes the testimony of

Mr. Dardinski, there could be a conspiracy between Dardinski

and the defendant.  Only after March 18th does he become an

agent of the government; isn't that right?

MR. GOLDSTEIN:  Well, the government notified us when

it filed its original discovery letter that the only uncharged

-- or the only co-conspirator was Michael Hansen.  They've

never identified Ronald Dardinski as an ulterior.

THE COURT:  Ms. Kaplan.

MS. KAPLAN:  I think you're right, your Honor, but

Mr. Goldstein is probably right as well.

THE COURT:  All right.  I will charge accordingly,

but, in any event, I give the rough substances of this again

depending on the First Circuit pattern instruction and not the

Sand's instruction, which I think this is based upon, although

it does cite the First Circuit pattern instruction.

On page 4, for instance, I don't say twice merely

introducing two people who eventually commit a crime.  You've

said that twice in the same paragraph.  I don't say that.  And

there doesn't seem to be any evidence of multiple conspiracies.

I charge that the relevant conspiracy is between the defendant

and Mr. Hansen, but I don't charge multiple conspiracies, so I

give maybe the rough substance of that long conspiracy but not

in the same sort of detail.

And then turning to the defendant's supplemental

requests, I do give the rough substance of the request Number 1

5-

1    in the supplement, that is the constitutional right,

2    defendant's constitutional right not to testify.  I do caution

3    about cooperating witnesses.  I say he received financial

4    benefit, I don't say and perhaps other benefits, but I do

5    certainly use an instruction about a cooperating witness.

6         Now, the withdrawal.  I find that the withdrawal

7    charge is not applicable to aiding and abetting charges, and,

8    furthermore, the defendant has not even made a request for an

9    instruction on withdrawal with respect to the conspiracy

03:25 10    charge.  It does not seem to me to be appropriate to ask me to

11    give a withdrawal charge as to aiding and abetting when there

12    isn't a request of a withdrawal from the conspiracy.

13         MR. GOLDSTEIN:  Well then I would make the request,

14    Judge, that you charge for withdrawal as to conspiracy.  The

15    aiding and abetting is only if there's a Pinkerton instruction

16    given, but I would make that request as well, I'm sorry I

17    didn't in writing.

18         THE COURT:  Well, you don't have to be sorry, I just

19    didn't see it.

03:26 20         Does the government have a response to that?

21         MR. HAFER:  Judge, we think as to whether a withdrawal

22    instruction with respect to the underlying conspiracy is

23    appropriate?

24         THE COURT:  Yes.

25         MR. HAFER:  That's certainly what the defendant has

1    argued.  We obviously argue opposite.  I think just sort of

2    winging it that we don't think -- can I get back to you on this

3    before five o'clock?  How about that, your Honor?  I'm

4    stammering up here.

5            THE COURT:  Okay.

6            MR. HAFER:  All right.

7            THE COURT:  You can but it should be succinct.

8            MR. HAFER:  It will.

9            THE COURT:  Okay.  Then going onto the duress request,

03:26  10   I don't believe a duress instruction is warranted.  I'd agree

11   with the government's opposition to that that the evidence does

12   not support any such instruction.  I know where you're coming

13   from, Mr. Goldstein.  There were the comments made during the

14   course of the conversations with his wife from prison, but I

15   didn't hear anything that would put that beyond so-called

16   braggadocio conversations with somebody who was not a part of

17   this whole situation, so I am not going to give a duress

18   instruction.

19           With respect to entrapment, that's a much closer

03:27  20   question.  I am inclined to give the standard modern jury

21   instructions on entrapment and let the jury decide whether they

22   feel that Mr. George was entrapped here.  I don't feel strongly

23   about it but I am inclined to do that.  I'll hear counsel at

24   the end when I finish this if they want to comment on that, and

25   then, finally, Number 6, I do give the substances of no crime

1    by accepting a client or retainer, that's correct.

2         I am not going to give a missing witness instruction.

3    I agree with the government's opposition that it is not

4    warranted.  The defendant was also entitled to call Mr. Hansen.

5    I'm not going to consider some sort of an instruction against

6    the defendant because he failed to do that, but I don't believe

7    it's warranted on the other side either.

8         Then I'm not sure what was intended by request

9    Number 8, whether the inference would be that the defendant

03:29 10   thinks that the government is going to argue somehow that they

11   weren't required to record all of the calls that were made and

12   somehow they're going to imply that Mr. George could have

13   recorded the calls if he wanted to.  They're not going to do

14   that.  I would strongly suggest and therefore I'm not going to

15   give that request Number 8.

16        MR. GOLDSTEIN:  Your Honor, that had nothing to do

17   with the government, it was just a matter of perhaps the jury

18   might speculate on their own.

19        THE COURT:  All right.  Any comments with respect to

03:29 20   my rulings on the defendant's requests?  And the defendant's

21   should go first on this one.

22        MR. GOLDSTEIN:  Of course, I can't read my notes.

23   We'd like to reserve on the duress.  I do think there was

24   sufficient evidence.  I do feel strongly though about the

25   entrapment issue, your Honor.  I think there's plenty of record

5-

1    evidence that supports the defendant's burden of production on

2    that issue, your Honor.  I would ask your Honor to provide that

3    instruction.

4         The missing witness instruction, Judge, the government

5    is in a unique position with regard to Mr. Hansen.  I have an

6    e-mail, I don't know if your Honor wants to see it, where

7    Mr. Hansen's counsel has declined our request for an interview,

8    and where Mr. Hansen is under a cooperation agreement with the

9    government and is available to them and is required by that

03:30 10   agreement to testify, I do think one is warranted, and I think

11   that's it, your Honor.

12        THE COURT:  All right.  Mr. Hafer.

13        MR. HAFER:  Your Honor, we agreed with the ruling on

14   the missing witness.  I just want to speak very briefly to the

15   entrapment issue.  We don't think that the factual basis for

16   entrapment is there.  I'll actually come to that second.  I

17   want to just back up and say if the Court does give it, it's,

18   and you said, your Honor said it would be the pattern

19   instruction.

03:30 20        I think the very important think that's not included

21   in the proposed charge, it has to start with defendant asserts

22   that he has been entrapped, and that's how the pattern

23   instruction starts, and it is an affirmative defense, and if

24   the Court finds that the basis is there for the instruction, it

25   has to be that the defendant has asserted as part of the charge

1    that he has been entrapped, not just some general language

2    about entrapment.

3         Backing up and explaining why we don't think it's even

4    warranted, although obviously I'd abide by whatever ruling the

5    Court makes, the First Circuit issued an opinion, your Honor,

6    in March of 2010, DePierre. The case's cite is 599 F.3d 25,

7    and in that opinion, the Court said the following:  In

8    practical terms, the defense of entrapment is difficult for the

9    defendant because the threshold must be met to show wrongful

03:31 10   inducement.

11        And that's a word that for some reason is not included

12   in the pattern charge, and we don't think based on the evidence

13   that came in at trial that we certainly stipulate that there's

14   inducement, but it's that word "wrongful" that we submit is

15   very critical, and we don't think there is a factual basis, and

16   based on DePierre, that's our position on entrapment, but

17   certainly if the government is going to give it, we believe

18   firmly that it has to be started off that defendant asserts

19   that he's been entrapped.

03:32 20        THE COURT:  All right.  Thank you.

21        MR. GOLDSTEIN:  Do you want to say anything?

22        THE COURT:  Yes.

23        MR. GOLDSTEIN:  Two points.  First, we start with the

24   language, the inducement has to be an improper inducement.

25   That's black letter law, and the evidence in this case is that

5-

1    Mr. Dardinski was threatening to violently beat Mr. George in

2    jail.  Your Honor said it was perhaps idle discussion, but the

3    evidence is as soon as he got out of jail, he began calling

4    Mr. George and calling him and calling him.  That was

5    Mr. Dardinski's testimony.  Mr. Dardinski also testified that

6    he had no doubt that if he stopped calling Mr. George,

7    Mr. George would have never called him back.

8         The evidence that we introduced in terms of the

9    telephone records, we'll go through it during closing

03:33  10    arguments, is that Mr. Dardinski was like a predator calling

11    Mr. George on the phone.  In the recordings with Mr. Hansen, he

12    said Bob George is scared to death of me, he said that when I

13    want to get him to call, I simply tell him I'm going to call

14    Jackie Salemme and hang up the phone.

15         There is an abundance of record evidence regarding

16    entrapment, improper inducement, "dogged persistence" is the

17    language that some courts used, "threats" is the language other

18    courts use, "undue appeal to sympathy" is other language that's

19    used.  It's a burden of production.  Mr. Hafer can call it high

03:33  20    burden, but it's a burden of production.  The burden of

21    persuasion rests with the government, and I would object to the

22    language Mr. Hafer requests in terms of the inception of the

23    charge where he wants the Court to send to the jury a message

24    that Mr. George concedes that he's committed a crime and he's

25    defending it on the terms of entrapment, but a defendant can

1    have multiple defenses, and one defense can be I am not guilty,

2    and the other defense can be, well, if you decide that the

3    evidence is there, you need to decide entrapment.  I don't

4    think the Court should be sending a message to the jury that

5    it's the defendant.  It's as a matter of law.  It's an

6    instruction as a matter of law.

7              THE COURT:  All right.  Thank you.  I believe that

8    then concludes the treatment of all of the requested proposed

9    instructions.  We have a few other matters to deal with.

03:34 10             The verdict form will, of course, depend.  I actually

11    have copies of the verdict form that Ms. Patch can pass out.

12    These, of course, do not have anything mentioning forfeiture,

13    and if we're going to have resolution on that, Mr. Goldstein?

14             MR. GOLDSTEIN:  Without -- Judge, can we have until

15    perhaps 4:30 to give you an answer?

16             THE COURT:  Yes, you may.

17             MR. GOLDSTEIN:  Thank you.  If there's anything on

18    that verdict form now which does not include reference to

19    forfeiture, you can bring it up before we get to the conclusion

03:35 20    here.  The last item on my agenda, at least, is logistics on

21    the closings.  How long do you believe that you need for

22    closings, Ms. Kaplan?

23             MS. KAPLAN:  I would think at least an hour, your

24    Honor.

25             MR. REDDINGTON:  I would ask for the same, your Honor.

1          THE COURT:  One hour is acceptable.  I take it the

2     government will reserve some time for rebuttable?

3          MS. KAPLAN:  We'd ask for 10 minutes, your Honor.

4          THE COURT:  That's going to be part of the hour.

5          MS. KAPLAN:  I see.

6          THE COURT:  50 minutes first and 10 minutes last.

7          MS. KAPLAN:  Well, then I'll ask for an hour and 10

8     minutes.

9          THE COURT:  No, it's going to be an hour.  You can

03:36 10   have some rebuttal, but it's going to come out of your first

11    part, and I want to know before we start what portion you're

12    going to use.

13         MS. KAPLAN:  Five minutes for rebuttal, your Honor.

14         THE COURT:  It will be you giving the closing and

15    Mr. Hafer the rebuttal?

16         MS. KAPLAN:  That's correct.

17         THE COURT:  And on the defendant's side?

18         MR. REDDINGTON:  I'm arguing the closing, your Honor.

19         THE COURT:  All right.  It will be an hour but no

03:36 20   more.

21         MR. REDDINGTON:  Yes.  There will be a lot of clearing

22    of the throat, Judge, if I go over an hour.

23         THE COURT:  I do want to remind Mr. Reddington that I

24    didn't chastise you at all for wandering, but I don't want you

25    to wander during the closing.  You can use this podium, you can

5-

1    stand in the well, you can stand anywhere you'd like, but I

2    don't want you wandering around.

3         MR. REDDINGTON:  I did catch that in my brain when I

4    did it, that's why I said that I apologize when I walked up

5    there.

6         THE COURT:  No apologies necessary because I didn't

7    think it got to the point where I needed to do that, but

8    obviously if you have to use a chalk or get an exhibit, that's

9    an exception, you can get the exhibit, but I just don't want

03:37 10    the wandering back and forth.

11         In fact, I don't want you approaching the jury box

12    closer than 10 feet.  That's my limit, okay, and so what we'll

13    do is we'll start with Ms. Kaplan, she will have up to 55

14    minutes.  We'll go to Mr. Reddington, he'll have up to one

15    hour, and then Mr. Hafer will have five minutes.  Okay?

16         MR. HAFER:  Yes, your Honor.

17         THE COURT:  We need to then conclude with what we're

18    going to do tomorrow before we have closings.  One item that we

19    know about is informing the jury that Exhibit 1C is no longer

03:38 20    in the case.  A second item, which I presume is going to be

21    resolved in the next hour, will be that the transcripts will

22    either be exhibits or they won't be, but we'll announce that to

23    the jury, and I'm not sure if there's anything else.

24         MR. GOLDSTEIN:  We have the forfeiture issue, your

25    Honor.

1          THE COURT:  I'm sorry.

2          MR. GOLDSTEIN:  The forfeiture issue.

3          THE COURT:  The forfeiture issue will be resolved

4     later this afternoon.

5          MR. HAFER:  And this afternoon on the tax return

6     issue, I'll get something quick.

7          THE COURT:  Yes.

8          MR. GOLDSTEIN:  Your Honor, just one last thing, we're

9     not asking for an advisory opinion in any way, but I assume

03:38 10     because it will have a fairly large impact on certainly how

11     Ms. Kaplan closes, to the extent that the Court is leaning one

12     way or another on entrapment or when it has reached a decision,

13     if there's any way the parties could be made aware of that.

14          THE COURT:  I will let you know before you argue

15     whether I will give an entrapment instruction.  As I say, if I

16     give it, it will be along the lines of the modern jury pattern

17     instruction.  Anything else, counsel?

18          MR. GOLDSTEIN:  No, your Honor.

19          THE COURT:  Thank you, we're adjourned.

03:39 20          THE CLERK:  All rise.

21          (Whereupon, the hearing was adjourned at 3:40 p.m.)

22

23

24

25

1                        C E R T I F I C A T E

2

3

4          I certify that the foregoing is a correct transcript

5     of the record of proceedings in the above-entitled matter to

6     the best of my skill and ability.

7

8

9

10

11

12     /s/ Valerie A. O'Hara

13     Valerie A. O'Hara, RPR          Dated March 2, 2013

14     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25